IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAM O'HARA,[1]<br><br>               Plaintiff,<br><br>    v.<br><br>DEVON BECK,<br>c/o Ohio National Guard<br>2825 West Dublin Granville Rd.,<br>Columbus, Ohio 43235-2789<br><br>JM CAMPBELL, BADGE NO. 2639<br>c/o D.C. Office of the Attorney General<br>400 6th Street NW<br>Washington, D.C. 20001<br><br>TIFFANY BROWN, BADGE NO. 4172<br>c/o D.C. Office of the Attorney General<br>400 6th Street NW<br>Washington, D.C. 20001<br><br>EDWARD REYES-BENIGNO, BADGE NO. 4864<br>c/o D.C. Office of the Attorney General<br>400 6th Street NW<br>Washington, D.C. 20001<br><br>ALFONSO LOPEZ MARTINEZ, BADGE NO. 4704<br>c/o D.C. Office of the Attorney General<br>400 6th Street NW<br>Washington, D.C. 20001<br><br>DISTRICT OF COLUMBIA,<br>c/o D.C. Office of the Attorney General<br>400 6th Street NW<br>Washington, D.C. 20001,<br><br>               Defendants. | Case No. 25-cv- _____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**
(42 U.S.C. § 1983 for First & Fourth Amendment violations; false arrest / imprisonment; battery)

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiff's residential address is being filed under seal with the Court in a separate Notice of Filing.

1

1. In the Star Wars franchise, The Imperial March is the music that plays when Darth Vader or other dark forces enter a scene or succeed in their dastardly plans. It is also the soundtrack of Sam O'Hara's protest against the National Guard deployment in D.C.

2. Those troops arrived in the District in August 2025, after President Trump decided to flood D.C. neighborhoods with National Guard members from around the country. A few weeks passed, and yet the troops remained. Given the roughly 200-year-old tradition of civilian law enforcement in the United States, Mr. O'Hara was deeply concerned about the normalization of troops patrolling D.C. neighborhoods. And so, he began protesting the Guard members' presence by walking several feet behind them when he saw them in the community. Using his phone and sometimes a small speaker, he played The Imperial March as he walked, keeping the music at a volume that was audible but not blaring. Mr. O'Hara recorded the encounters and posted the videos on his TikTok account, where millions of people have viewed them.

3. Ohio National Guard member Sgt. Devon Beck was not amused by this satire. On September 11, 2025, Mr. O'Hara saw Sgt. Beck, along with several other Guard members, walking in uniform in the Logan Circle neighborhood, near the intersection of 14th and R Streets NW. Mr. O'Hara calmly walked behind the Guard members, began playing The Imperial March aloud on his phone, and started recording. In less than two minutes, Sgt. Beck turned around and threatened to call D.C. police officers to "handle" Mr. O'Hara if he persisted. Mr. O'Hara continued recording and playing the music. Sgt. Beck contacted the Metropolitan Police Department (MPD). Defendant MPD Officers Brown, Campbell, Reyes-Benigno, and Lopez Martinez came to the scene and, in essence, did what Sgt. Beck had threatened, putting Mr. O'Hara in handcuffs and preventing him from continuing his peaceful protest.

4. The law might have tolerated government conduct of this sort a long time ago in a galaxy far, far away. But in the here and now, the First Amendment bars government officials from shutting down peaceful protests, and the Fourth Amendment (along with the District's prohibition on false arrest) bars groundless seizures.

5. Both Sgt. Beck and the District's officers violated these constitutional mandates. And the MPD officers compounded these violations by needlessly prolonging the length of Mr. O'Hara's seizure and using excessive force by placing handcuffs tightly around his wrists and failing to loosen them after he complained. Each Defendant is therefore liable for constitutional violations under 42 U.S.C. § 1983, and the District's officers, as well as the District itself, are liable under D.C.'s prohibition on false arrest, false imprisonment, and battery.

6. Mr. O'Hara brings this suit to ensure accountability, secure compensation for his injuries, and vindicate core constitutional guarantees.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the case raises federal questions. The Court also has jurisdiction over the matter under 28 U.S.C. § 1343 because the case seeks to redress the deprivation of rights under the First and Fourth Amendments to the U.S. Constitution via 42 U.S.C. § 1983.

8. Plaintiff's claims under the law of the District of Columbia arise from the same events as the constitutional claims and are therefore within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this Court because the events that give rise to this action occurred in the District of Columbia.

## PARTIES

10. Sam O'Hara is a 35-year-old District resident who recorded and protested the deployment of National Guard members to D.C. on several occasions, including on September 11, 2025, when he was detained for this activity.

11. Defendant Sgt. Beck is a member of the Ohio National Guard who, at all relevant times, was acting in the scope of his duties as a member of the Ohio Guard under the authority and control of the Ohio Governor with responsibilities that included coordinating with D.C. officials to enforce D.C. law. Defendant Beck therefore acted under color of Ohio and/or District law at all relevant times. He is sued in his individual capacity.

12. Defendant Campbell is an MPD officer who, at all relevant times, was acting in the scope of his duties as a member of the District's police force under the authority and control of the Mayor of the District of Columbia with responsibilities that included enforcing D.C. law. Defendant Campbell therefore acted under color of District law. He is sued in his individual capacity.

13. Defendant Brown is an MPD officer who, at all relevant times, was acting in the scope of her duties as a member of the District's police force under the authority and control of the Mayor of the District of Columbia with responsibilities that included enforcing D.C. law. Defendant Brown therefore acted under color of District law. She is sued in her individual capacity.

14. Defendant Lopez Martinez is an MPD officer who, at all relevant times, was acting within the scope of his duties as a member of the District's police force under the authority and control of the Mayor of the District of Columbia with responsibilities that included enforcing D.C. law. Defendant Lopez Martinez therefore acted under color of District law. He is sued in his individual capacity.

15. Defendant Reyes-Benigno is an MPD officer who, at all relevant times, was acting within the scope of his duties as a member of the District's police force under the authority and control of the Mayor of the District of Columbia with responsibilities that included enforcing D.C. law. Defendant Reyes-Benigno therefore acted under color of District law. He is sued in his individual capacity.

16. Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C., and operates and governs MPD pursuant to the laws of the District of Columbia. In this case, the District of Columbia acted through its subdivisions, agents, employees, and servants, including MPD and its officials and agents, who were at all times acting within the scope of their employment.

## FACTS

### I. The Ohio National Guard Deploys to the District of Columbia.

17. On August 11, 2025, President Donald Trump issued a memorandum ordering the Secretary of Defense to address a purported "siege [of] violent crime" in the District by deploying the D.C. National Guard.[2] The President also instructed the Secretary of Defense to contact State Governors for additional support from State National Guards.[3]

18. The D.C. National Guard responded by creating the Joint Task Force District of Columbia (JTF-DC) which, per the Secretary of Defense, was directed to "to perform law enforcement support activities" in the District.[4]

---

[2] *Presidential Memoranda: Restoring Law and Order in the District of Columbia*, White House (Aug. 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/.
[3] Id.
[4] *Joint Task Force (JTF-DC) Operational Overview*, District of Columbia National Guard (last visited Oct. 23, 2025), https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-

19. Because the focus of JTF-DC was supporting District law enforcement, its operations served to enforce District law.

20. Defense Department officials asked at least eight State Governors to send Guard members to join JTF-DC, and seven States obliged.

21. One was Ohio. On August 16, 2025, Ohio Governor Mike DeWine agreed to a request from the Secretary of the Army to send 150 Military Police from the Ohio National Guard to participate in JTF-DC.[5]

22. The Ohio Guard members are operating in D.C. under authority of 32 U.S.C. § 502(f), a point made clear by a statement from the D.C. National Guard describing the operational status of all JTF-DC members.[6]

23. Guard members acting under § 502(f) operate under the command of the State Governor.

24. In articulating the scope of the Ohio Guard's mission, Gov. DeWine stated that "Ohio National Guard members will carry out presence patrols and serve as added security."[7] Gov. DeWine further directed that, "[i]f in doing a patrol or if in standing guard of a federal building, an arrest has to be made, our guard will be in direct contact with the D.C. police department who will make arrests . . . . Our people won't make the arrests."[8]

---

DC/#:~:text=JTF%2DDC%20Mission,order%20declaring%20a%20crime%20emergency (hereinafter "JTF-DC Operational Overview")

[5] *See Governor DeWine Issues Statement on Ohio National Guard*, Press Release, Off. of the Governor of Ohio, (Aug. 16, 2025), https://governor.ohio.gov/media/news-and-media/governor-dewine-issues-statement-on-ohio-national-guard (hereinafter "DeWine Press Release"); *see also* JTF-DC Operational Overview (listing the Ohio National Guard as a member of JTF-DC).

[6] *National Guard Authorized To Carry Weapons in Support of Law Enforcement*, D.C. Nat'l Guard (Aug. 23, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4284293/national-guard-authorized-to-carry-weapons-in-support-of-law-enforcement/.

[7] DeWine Press Release

[8] Jessie Balmert, *Ohio Gov. Mike DeWine Calls Sending National Guard to D.C. "The Right Thing To Do,"* COLUMBUS DISPATCH (Aug. 18, 2025),

25. Gov. DeWine has retained control over the Ohio Guard members operating in the District.

26. As explained by the JTF-DC Commander, the relationship between the federal and state governments in the JTF-DC operation is as follows:

> As JTF-DC Commander, I have direct command and control over DCNG personnel. I exercise coordinating and tasking authority over the out of district [sic] forces participating in this mission. All out-of-district forces are participating in this mission with the consent of their state Governors and remain under the administrative command and control of their sending state [sic] Adjutants General and ultimately their State Governors. All tasks assigned to out-of-district forces are within parameters set by their State Governors. For example, I cannot assign Ohio National Guard Forces crowd control tasks, and no out of district [sic] forces can be assigned beautification missions. All out of district [sic] forces are assigned tasks by JTF-DC and only participate in law enforcement support tasks. Out of district [sic] forces may be withdrawn, or their operations further limited by their State Governors at any time. DCNG has no disciplinary or administrative authority over these forces. Any out of state [sic] force can refuse any task assigned to them should their Governor or Adjutant General object to the assignment.[9]

27. By late August, over 2,000 members of State and D.C. National Guards were actively patrolling the District as part of JTF-DC.[10]

## II.     Sam O'Hara Protests the Guard's Presence in D.C.

28. The State and D.C. National Guard deployment proved controversial.

29. To many District residents, the deployment constituted an attack on D.C.'s autonomy and a dangerous departure from the Nation's tradition of barring troops from policing civilians. District and national media outlets covered the deployment extensively. The District's Attorney General sued to end it.

---

https://www.dispatch.com/story/news/politics/2025/08/18/dewine-explains-why-he-sent-ohio-national-guard-to-washington-d-c-trump/85707511007/

[9] Decl. of Col. Lawrence M. Doane, ECF 34-1 ¶ 9, *District of Columbia v. Trump*, No. 25-cv-03005 (D.D.C. Sept. 16, 2025).

[10] Haley Britzky, *Experts Estimate National Guard Deployment in DC Is Costing Roughly $1 Million a Day*, CNN (Aug. 28, 2025), https://www.cnn.com/2025/08/28/politics/cost-national-guard-deployment-washington-dc

30. Sam O'Hara sought to join this discourse. He believes that armed military police should not monitor District residents as they walk through their neighborhoods. To do nothing in the face of the ongoing deployment, Mr. O'Hara feels, would normalize a threat to liberty.

31. Mr. O'Hara decided to encourage the public to view the deployment as a waste of tax dollars, a needless display of force, and a surreal danger.

32. Three times between August 29 and September 10, 2025, Mr. O'Hara saw Guard members patrolling D.C.'s streets and protested them in essential the same way: He walked behind them and used his phone (and on one instance a small speaker) to play the Imperial March and record the interaction.

33. On each occasion, Mr. O'Hara did not speak with the Guard members he trailed. He played the March at a volume loud enough for people in the vicinity to hear but not at a blaring level.

34. On each of the three occasions, Mr. O'Hara did not touch Guard members or interfere in their operations. Mr. O'Hara initiated his protests only when he saw Guard members engaged in operations consisting entirely of walking on patrol, as opposed to incidents where Guard members were actively involved in supporting law enforcement. And, on each occasion, Mr. O'Hara walked behind the Guard members for only a few minutes.

35. Mr. O'Hara posted recordings of the incidents on his TikTok page, where millions of people have viewed them.

36. Commentors have responded on TikTok by expressing amusement, sharing Mr. O'Hara's videos with others, and stating their views about the Guard's presence in the District.

37. For their part, most Guard members ignored Mr. O'Hara, and a few smiled or laughed.

### III.   Mr. O'Hara's September 11 Protest of the Guard's Deployment

38. Mr. O'Hara's fourth protest took place on September 11, 2025.

39. Coming home from work that day, he saw four Guard members near the intersection of 14th and R Streets NW. They were armed and wore military fatigues that had the insignia of the Ohio National Guard—a pendant with an "O" adjacent to a star— embroidered on the upper left arm of their uniforms.

40. Mr. O'Hara began walking behind the Guard members while playing The Imperial March on his phone and recording. He did not speak to the Guard members. He did not touch them or interfere with their activities—which consisted entirely of walking across public streets and down public sidewalks. He played the music loudly but not at a blaring level.

41. Less than two minutes after the protest began, Sgt. Beck turned around and said, "Hey man, if you're going to keep following us, we can contact Metro PD and they can come handle you if that's what you want to do. Is that what you want to do?"

42. Mr. O'Hara did not say anything in response to this statement but continued playing the music and recording.

43. Sgt. Beck then asserted: "That's what you want to do? Okay."

44. Adhering to Gov. DeWine's directive that MPD, and not Guard members, make arrests, Sgt. Beck stepped aside briefly and called MPD.

45. When several MPD cars arrived within minutes of Sgt. Beck's call, the MPD officers exited and proceeded to do, in essence, what Sgt. Beck had threatened: they detained Mr. O'Hara and prevented him from continuing to record or protest the Guard.

46. Sgt. Beck's statements to Mr. O'Hara before the call, and MPD's actions on the scene after it, indicate that Sgt. Beck instructed the MPD officers to detain Mr. O'Hara and to prevent him from continuing to walk behind the Guard members and record and protest them.

47. Specifically, when MPD arrived on the scene, Defendant Officer Campbell immediately walked up to Mr. O'Hara, without conducting any investigation. He said to Mr. O'Hara accusatorily, "[i]f you're harassing them"—at which point Mr. O'Hara interrupted to ask for Defendant Campbell's badge number. After providing that information, Defendant Campbell said, "if you are assaulting them," which again prompted Mr. O'Hara to interrupt, this time to say that he was not assaulting the Guard members but rather peacefully protesting.

48. Mr. O'Hara was correct. He was not harassing or assaulting the Guard members. He was, in fact, standing several feet away, recording them and playing the March. Nor had Mr. O'Hara assaulted or harassed the Guard members at any point during his interaction with them.

49. Officer Campbell also accused Mr. O'Hara of standing in front of the entrance to a store when, in fact, Mr. O'Hara was standing to the side of the entrance and not blocking anyone's passage.

50. In response to Mr. O'Hara's statements that he was engaged in protest, Officer Campbell said, "That's not a protest. You better define protest. This isn't a protest. You are not protesting."

51. In fact, Mr. O'Hara was protesting. He was, as noted, standing on the sidewalk playing the music several feet from the Guard members and recording during the entirety of this interaction with Defendant Campbell.

52. Meanwhile, the Guard members, who had remained several feet from Mr. O'Hara during this interchange, began to walk across the street. Mr. O'Hara started to walk after them so he could continue his protest, but Officer Campbell stood in his path and ordered Mr. O'Hara to "stand there." Mr. O'Hara complied.

53. Defendant Officers Brown, Reyes-Benigno, and Lopez Martinez then approached Mr. O'Hara. They, too, accused him of harassing the Guard members and Mr. O'Hara, again, expressly

10

denied the allegation. He stated that he had been on the sidewalk, playing music on his phone and recording as part of a peaceful protest.

54. Without conducting any investigation, Officers Brown, Reyes-Benigno, and Lopez Martinez told Mr. O'Hara that he was being detained, and Officer Reyes-Benigno placed handcuffs around his wrists.

55. Mr. O'Hara did not physically resist the officers or engage in any violent or physically aggressive conduct.

56. Mr. O'Hara did, however, criticize the decision to detain him and repeatedly ask why he was being arrested, whether he could go, and if he could speak with a supervisor. Officers Brown, Reyes-Benigno, and Lopez Martinez said that he was not under arrest, and Officer Reyes-Benigno stated that he was stopped for "harassing the National Guard."

57. Mr. O'Hara complained about the tightness of the handcuffs.

58. Officer Reyes-Benigno had placed the handcuffs quite tightly around Mr. O'Hara's wrists—tightly enough to leave marks after they were removed. Officer Reyes-Benigno also jerked Mr. O'Hara's arms while he was handcuffing him, which was particularly painful because Mr. O'Hara's left shoulder labrum is sensitive after undergoing two surgeries since 2023.

59. Neither Officer Reyes-Benigno nor Officers Brown, Lopez Martinez, or Campbell—all of whom were standing near Mr. O'Hara—did anything to loosen the handcuffs in response to Mr. O'Hara's complaints.

60. After Mr. O'Hara was cuffed, several other MPD officers crossed the street and spoke with Sgt. Beck and the three other Guard members.

61. Sgt. Beck was in position to see Mr. O'Hara's detention and hear his complaints; however, Sgt. Beck did not take any action to encourage MPD to end the seizure.

62. Mr. O'Hara remained handcuffed for 15-20 minutes. Defendant Brown indicated that, because Mr. O'Hara had asked for a supervisor, the officers would not release him until one arrived.

63. The officers provided no other basis for continuing to detain Mr. O'Hara. They had none. The need for a supervisor, moreover, arose only from Mr. O'Hara's request for one, which he made as part of his efforts to complain about his detention and secure his release.

64. Mr. O'Hara responded to Defendant Brown by reemphasizing that he wanted to leave immediately and did not wish to speak with a supervisor if doing so would extend the seizure. The officers then released Mr. O'Hara without charges.

65. By handcuffing and detaining Mr. O'Hara, Officers Campbell, Brown, Reyes-Benigno, and Lopez Martinez prevented him from recording or protesting Sgt. Beck and the other Guard members.

66. Because of this incident, Mr. O'Hara has experienced significant anxiety around law enforcement and feels less safe in his neighborhood.

67. The overly tight handcuffs left marks on Mr. O'Hara's wrists and caused pain through the next morning. Officer Reyes-Benigno's jerking of his shoulders, and the position of his arms during the detention, irritated his left shoulder labrum, which, as noted previously, had undergone surgery twice since 2023.

68. None of this would have occurred if Sgt. Beck had not responded to Mr. O'Hara's protest by calling MPD so that its officers could, as he warned Mr. O'Hara, "handle you."

69. On October 22, 2025, Mr. O'Hara, through his attorney, used the District Office of Risk Management's online portal to inform the District, pursuant to D.C. Code § 12-309, of the date, time, cause, and circumstances of his injuries arising from the September 11 seizure.

## CLAIMS

### Claim 1: First Amendment / 42 U.S.C. § 1983 – suppression of speech
### (Defs. Beck, Campbell, Brown, Reyes-Benigno, and Lopez Martinez)

70. The First Amendment protects individuals' right to record government officials in public places as well as their right to protest those officials' conduct.

71. Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez violated Mr. O'Hara's First Amendment rights by preventing him from recording and peaceably protesting the Guard members. Sgt. Beck caused this violation of Mr. O'Hara's First Amendment rights by calling the officers and instructing them to detain Mr. O'Hara and to terminate his ability to continue recording the Guard members and peacefully protesting them.

72. Defendants Beck, Campbell, Brown, Reyes-Benigno, and Lopez Martinez terminated Mr. O'Hara's protest in the absence of a "clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963). Indeed, Defendants lacked any legitimate interest whatsoever in terminating Mr. O'Hara's protest activity, and their actions were not narrowly tailored in any way.

73. Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez are joint and severally liable for this violation of Mr. O'Hara's rights.

74. Defendants Beck, Campbell, Brown, Reyes-Benigno, and Lopez Martinez acted with reckless or callous indifference to Mr. O'Hara's federally protected rights and therefore are liable for punitive damages.

### Claim 2: First Amendment / 42 U.S.C. § 1983 - retaliation
### (Defs. Beck, Campbell, Brown, Reyes-Benigno, and Lopez Martinez)

75. The First Amendment bars government officials from retaliating against individuals based on their exercise of protected First Amendment activity.

76. Mr. O'Hara engaged in protected activity when he recorded and protested the National Guard on September 11, 2025. Officers Campbell, Brown, Reyes-Benigno, and Lopez Martinez retaliated against Mr. O'Hara by detaining him solely for that protected activity, without any basis to believe that it constituted a crime. Sgt. Beck also retaliated against Mr. O'Hara solely due to his protected activity when, in response to that activity, he called MPD to the scene to detain Mr. O'Hara even though he lacked any basis to believe that Mr. O'Hara was engaged in crime.

77. Mr. O'Hara's retaliatory seizure would deter a person of ordinary firmness from speaking again.

78. Mr. O'Hara's exercise of his First Amendment rights was the motivating factor for the retaliatory action taken by Sgt. Beck and Officers Campbell, Brown, Reyes-Benigno, and Lopez Martinez.

79. Sgt. Beck and Officers Campbell, Brown, Reyes-Benigno, and Lopez Martinez are jointly and severally liable for the injuries Mr. O'Hara suffered from his detention.

80. Defendants Beck, Campbell, Brown, Reyes-Benigno, and Lopez Martinez acted with reckless or callous indifference to Mr. O'Hara's federally protected rights and therefore are liable for punitive damages.

### Claim 3: Fourth Amendment / 42 U.S.C. § 1983 – unreasonable seizure, unreasonably prolonged seizure, excessive force
### (Defs. Beck, Campbell, Brown, Reyes-Benigno, and Lopez Martinez)

81. The Fourth Amendment proscribes arrests initiated without probable cause and stops effected without reasonable suspicion.

82. The Fourth Amendment also requires seizures to be executed in a reasonable manner.

83. The individual defendants violated the Fourth Amendment's mandates in three independent ways.

84. First, Defendant Beck caused, and Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez effected, a seizure without probable cause or even reasonable suspicion. Mr. O'Hara's conduct—recording and protesting Guard members—violated no District law and no reasonable officer could have concluded otherwise.

85. Second, Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez conducted the seizure in an unreasonable manner by placing unnecessarily tight handcuffs on Mr. O'Hara's wrists and refusing to loosen them after he complained.

86. Finally, Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez also conducted the seizure in an unreasonable manner by extending it longer than reasonably necessary for any legitimate law enforcement purpose.

87. Defendants Beck, Campbell, Brown, Reyes-Benigno, and Lopez Martinez are jointly and severally liable for the violation of Mr. O'Hara's rights.

88. Defendants Beck, Campbell, Brown, Reyes-Benigno, and Lopez Martinez acted with reckless or callous indifference to Mr. O'Hara's federally protected rights and therefore are liable for punitive damages.

### Claim 4: D.C. Common Law False Arrest / False Imprisonment
(Defs. Campbell, Brown, Reyes-Benigno, Lopez Martinez, and District of Columbia)

89. District common law proscribes false arrest and false imprisonment, defined as an unlawful detention.

90. Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez violated this obligation by detaining Mr. O'Hara without any reasonable suspicion or probable cause and by extending the length of the detention after the officers' justification for doing so elapsed.

91. Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez acted with an evil motive or actual malice and therefore are liable for punitive damages.

15

92. Defendant District of Columbia is vicariously liable for the common law false arrest / false imprisonment committed by its employees, Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez, all of whom were acting in their capacities as District employees at all relevant times.

93. The District and Officers Campbell, Brown, Reyes-Benigno, and Lopez Martinez are jointly and severally liable for the violation of Mr. O'Hara's rights.

### Claim 5: D.C. Common Law Battery
### (Defs. Campbell, Brown, Reyes-Benigno, Lopez Martinez, and District of Columbia)

94. District common law proscribes battery, defined as an intentional act causing harmful or offensive bodily contact.

95. Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez committed a battery by handcuffing Mr. O'Hara tightly, which caused him pain, and then refusing to loosen the handcuffs when Mr. O'Hara complained.

96. Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez acted with an evil motive or actual malice and therefore are liable for punitive damages.

97. Defendant District of Columbia is vicariously liable for the common law battery committed by its employees, Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez, all of whom were acting in their capacities as District employees at all relevant times.

98. The District and Officers Campbell, Brown, Reyes-Benigno, and Lopez Martinez are jointly and severally liable for the violation of Mr. O'Hara's rights.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

(a) RULE that the actions taken by Defendants Beck, Campbell, Brown, Reyes-Benigno, and Lopez Martinez violated Plaintiff's rights under the First and Fourth Amendments to the United States Constitution;

(b) RULE that the actions taken by Defendants Campbell, Brown, Reyes-Benigno, and Lopez Martinez, and the District of Columbia constituted false arrest / false imprisonment and battery under D.C. law;

(c) ENTER JUDGMENT awarding Plaintiff compensatory damages against all Defendants in an amount appropriate to the evidence adduced at trial;

(d) ENTER JUDGMENT awarding Plaintiff punitive damages against all individual Defendants in an amount appropriate to the evidence adduced at trial;

(e) ENTER JUDGMENT awarding Plaintiff his costs and reasonable attorneys' fees in this action as provided in 42 U.S.C. § 1988(b); and

(f) GRANT Plaintiff such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury.

Dated: October 23, 2025

Respectfully submitted,

*/s/ Michael Perloff*
Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street NW, Ste. 722
Washington, D.C. 20045
Tel: (202) 457-0800
mperloff@acludc.org
*Counsel for Plaintiff Sam O'Hara\**

---

\* Counsel wish to acknowledge recent law school graduate Bianca Corgan for her assistance in legal research and paralegal Ameerah Adetoro for her investigative work and assistance in the preparation of this Complaint.