UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAM O'HARA<br><br>           Plaintiff,<br><br>      v.<br><br>DEVON BECK, *et al.*,<br><br>           Defendants. | Civil Action No. 25-3753 (TJK) |

**MOTION TO DISMISS AND**
**<u>MEMORANDUM IN SUPPORT THEREOF</u>**

**TABLE OF CONTENTS**

Table of Contents...............................................................................................................i

Table of Authorities ........................................................................................................ii

Introduction..................................................................................................................... 1

Background ...................................................................................................................... 3

Legal Standards............................................................................................................... 5

          A.       Rule 12(b)(5) ................................................................................... 5

          B.       Rule 12(b)(6) ................................................................................... 6

Argument ........................................................................................................................ 8

    I.       Plaintiff Does Not Plausibly Plead Action Under Color of State or District Law, and Any Federal-Officer Theory Would Fail Under *Bivens*.................................. 8

          A.       Beck Was Serving in a Federally Authorized Title 32 Support Mission, Not Exercising District Police Power. ........................................................ 8

          B.       Whether National Guard members are acting in a federal capacity turns on the function being performed and the source of the challenged authority.10

          C.       Sergeant Beck Was Not Acting Under Color of State Law...................... 13

          D.       Beck's Alleged Coordination with MPD Does Not Transform His Conduct into District Action. .................................................................................. 15

          E.       Plaintiff Does Not Have a Cognizable *Bivens* Claim Against Beck for Alleged Constitutional Violations Under Color of Federal Law. ............. 16

          F.       Any *Bivens* Theory Also Suffers from a Separate Service Defect........... 21

    II.      Beck is Entitled to Qualified Immunity on Plaintiff's Claims.............................. 21

          A.       Plaintiff Does Not Plausibly Allege That Beck Personally Caused Plaintiff's Detention or the Termination of His Protest........................... 23

          B.       Beck Is Entitled to Qualified Immunity on All Federal Claims Because Plaintiff Has Not Plausibly Alleged that He Violated Any Clearly Established Law. ...................................................................................... 32

Conclusion ................................................................................................................... 36

**TABLE OF AUTHORITIES**

**Cases**

*Abhe & Svoboda, Inc. v. Chao*,
  508 F.3d 1052 (D.C. Cir. 2007) ................................................................................ 7, 8

*Amobi v. D.C. Department of Corrections*,
  755 F.3d 980 (D.C. Cir. 2014) .................................................................................. 29

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ............................................................................................ 22-23

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ................................................................................... 22, 32, 35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................... 6, 7, 23, 24, 25, 30

*Askew v. Bloemker*,
  548 F.2d 673 (7th Cir. 1976) ............................................................................. 14, 15

*Atherton v. D.C. Off. of the Mayor*,
  567 F.3d 672 (D.C. Cir. 2009) .............................................................................. 23, 24

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015) ............................................................................... 7, 8

*Barham v. Ramsey*,
  434 F.3d 565 (D.C. Cir. 2006) ..................................................................................... 33

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 6, 7

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
  403 U.S. 388 (1971) .............................................................................................. 2, 19

*Black Lives Matter D.C. v. Trump*,
  544 F. Supp. 3d 15 (D.D.C. 2021) .............................................................................. 18

*Buchanan v. Barr*,
  71 F.4th 1003 (D.C. Cir. 2023) ................................................................................... 18

*Butera v. District of Columbia*,
  235 F.3d 637 (D.C. Cir. 2001) .................................................................................... 22

*Carlson v. Green*,
  446 U.S. 14 (1980) ..................................................................................................... 17

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
  407 F.3d 1220 (D.C. Cir. 2005) .................................................................................... 3

*Davis v. Passman*,
442 U.S. 228 (1979) ...................................................................................................... 16

*Dep't of the Navy v. Egan*,
484 U.S. 518 (1988) ...................................................................................................... 19

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) ................................................................................ 25, 27, 28, 32, 34

*Doe v. Rumsfeld*,
683 F.3d 390 (D.C. Cir. 2012) ...................................................................................... 20

*Dukore v. District of Columbia*,
799 F.3d 1137 (D.C. Cir. 2015) .................................................................................... 22

*Egbert v. Boule*,
596 U.S. 482 (2022) ................................................................................................ 17, 18

*Enders v. District of Columbia*,
4 A.3d 457 (D.C. 2010) ........................................................................................... 25, 28

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) ...................................................................................................... 33

*Schultz v. Wellman*,
717 F.2d 301 (6th Cir. 1983) ........................................................................................ 11

*Hanson v. Wyatt*,
552 F.3d 1148 (10th Cir. 2008) ............................................................................... 10, 11

*Hartman v. Moore*,
547 U.S. 250 (2006) ................................................................................................. 23, 28

*Hernández v. Mesa*,
589 U.S. 93 (2020) ...................................................................................... 16, 17, 19, 20

*Holley v. United States*,
No. 24-1536 (LLA), 2025 U.S. Dist. LEXIS 11350 (D.D.C. Jan. 22, 2025) ......................... 12

*Hurd v. District of Columbia*,
864 F.3d 671 (D.C. Cir. 2017) ........................................................................................ 3

*Jackson v. District of Columbia*,
327 F. Supp. 3d 52 (D.D.C. 2018) ............................................................................. 31, 32

*Johnson v. Government of the District of Columbia*,
734 F.3d 1194, 1199–1201 (D.C. Cir. 2013) ................................................................... 12

*Johnson v. Orr*,
780 F.2d 386 (3d Cir. 1986) .......................................................................................... 11

*Jones v. District of Columbia*,
    No. 21-836 (RC), 2021 U.S. Dist. LEXIS 216137 (D.D.C. Nov. 9, 2021) ...................... 31, 32

*Jones v. Secret Serv.*,
    143 F.4th 489 (D.C. Cir. 2025) ................................................................................. 18, 19

*K.O. v. Sessions*,
    41 F.4th 664 (D.C. Cir. 2022) ........................................................................................ 19

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) .......................................................................................... 7

*Leach v. District of Columbia*,
    No. 19-947 (APM), 2022 U.S. Dist. LEXIS 60568 .................................................... 31

*Liff v. Off. of Inspector Gen. for the U.S. Dep't of Labor*,
    881 F.3d 912 (D.C. Cir. 2018) ................................................................................. 18, 21

*Lindke v. Freed*,
    601 U.S. 187 (2024) ....................................................................................................... 13

*Loumiet v. United States*,
    948 F.3d 376 (D.C. Cir. 2020) ................................................................................ 18, 19

*Malley v. Briggs*,
    475 U.S. 335 (1986) ....................................................................................................... 23

*Mann v. Castiel*,
    681 F.3d 368 (D.C. Cir. 2012) ........................................................................... 5-6, 6, 21

*Meshal v. Higgenbotham*,
    804 F.3d 417 (D.C. Cir. 2015) ....................................................................................... 20

*Moore v. Hartman*,
    644 F.3d 415 (D.C. Cir. 2011) ....................................................................................... 28

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ........................................................................................... 23, 28, 34

*Oberwetter v. Hilliard*,
    639 F.3d 545 (D.C. Cir. 2011) ....................................................................................... 33

*Ord v. District of Columbia*,
    587 F.3d 1136 (D.C. Cir. 2009) ..................................................................................... 29

*Palmieri v. United States*,
    896 F.3d 579 (D.C. Cir. 2018) ....................................................................................... 22

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ....................................................................................................... 22

*Perpich v. Department of Defense*,
　496 U.S. 334 (1990) ................................................................................... 10, 20, 21

*Reichle v. Howards*,
　566 U.S. 658 (2012) .......................................................................................... 33, 34

*Saucier v. Katz*,
　533 U.S. 194 (2001) .................................................................................................. 22

*Settles v. U.S. Parole Comm'n*,
　429 F.3d 1098 (D.C. Cir. 2005) .......................................................................... 8, 16

*Thai v. County of Los Angeles*,
　127 F.4th 1254 (9th Cir. 2025) ................................................................... 12-13, 14

*Wesby v. District of Columbia*,
　765 F.3d 13 (D.C. Cir. 2014) ................................................................................. 29

*Williams v. United States*,
　396 F.3d 412 (D.C. Cir. 2005) ................................................................... 8, 9, 12-16

*Wood v. Moss*,
　572 U.S. 744 (2014) ................................................................................................ 32

*Zahrey v. Coffey*,
　221 F.3d 342 (2d Cir. 2000) ................................................................................... 30

*Ziglar v. Abbasi*,
　582 U.S. 120 (2017) ................................................................................. 16, 17, 19-21

**Statutes**

32 U.S.C. § 502 ............................................................... 2, 3, 10, 11, 15, 20, 21, 32
42 U.S.C. § 1983 ................................................... 2, 8, 10, 13, 15, 16, 21, 23, 24
D.C. Code § 22-1321 ................................................................................. 25, 26, 27

**Other**

Chairman of the Joint Chiefs of Staff Manual 3130.06D, *Global Force Management Allocation Policies and Procedures* (June 20, 2024) ................................................................. 12

Joint Pub. 3-28, *Defense Support of Civil Authorities* .................................................. 11

U.S. Const. art. I, § 8, cl ................................................................................. 20

**INTRODUCTION**

This lawsuit arises from an encounter between Plaintiff and Sergeant Devon Beck in Logan Circle on September 11, 2025. Sergeant Beck was ordered to Washington, DC, as part of an out-of-state National Guard contingent assigned to Joint Task Force–District of Columbia, a mission organized to support federal law-enforcement operations in the Nation's Capital. Before participating in that mission, Guard personnel were sworn as Special Deputies by the United States Marshals Service. They were armed, given a limited law-enforcement-support role, and deployed to provide presence patrols to deter crime. Importantly, Guard personnel were not authorized to effect arrests or perform routine law enforcement functions, but were instead directed to report incidents to civilian police and federal law-enforcement partners.

Beck's presence in Logan Circle on September 11, 2025, was not personal or political. He was there because that was his assigned duty. Plaintiff's own account makes clear that he, by contrast, intentionally sought out Beck and his fellow Guardsmen. This was not an accidental encounter or a one-time disagreement on a public sidewalk. In the preceding weeks, Plaintiff had followed Guard patrols on several prior occasions while playing the "Imperial March" from *Star Wars* and filming them, and September 11, 2025, was simply his fourth installment of the same routine. On that day, according to the Complaint, Plaintiff again trailed armed Guard members at close range, recording them while broadcasting distracting music as they moved through their patrol area. Beck could reasonably perceive that conduct as interfering with the patrol's movement and situational awareness, because an armed patrol must attend to nearby persons, maintain the ability to hear, and move without a civilian trailing it at close range. Moreover, Beck and his fellow Guardsmen could have reasonably felt harassed by Plaintiff and concerned that he was following them and ignoring their requests to stop.

Eventually, Sergeant Beck turned and warned that if Plaintiff kept following them, Beck would contact the Metropolitan Police Department. When Plaintiff persisted, Beck then did exactly what the mission contemplated—he stepped aside and called the local police to investigate. Although Plaintiff tries to transform Beck's restrained effort to handle a disruptive and deliberately provocative encounter into a personal constitutional tort, by Plaintiff's own telling, none of the events that followed are attributable to Beck. Beck did not arrest him, did not handcuff him, did not search him, and did not make the subsequent decisions that Plaintiff attributes to others.

At bottom, the complaint seeks to hold Beck liable for simply requesting police assistance while performing a federal support mission as an on-duty Guardsman. Beck was engaged in the limited federal mission assigned to him by the Secretary of Defense and coordination by the District of Columbia National Guard, and his actions were consistent with his mission role. When followed, distracted, and harassed by Plaintiff, Beck did the very thing the mission contemplated: he called local law enforcement to conduct their own investigation and to address the matter as they saw fit. From there, local law enforcement made independent decisions that did not involve, and are in no way attributable to, Sergeant Beck.

Plaintiff's claims against Sergeant Beck are subject to dismissal for several reasons. First, Sergeant Beck was acting under color of federal law and therefore cannot be liable under 42 U.S.C. § 1983. Second, any constitutional claim brought under *Bivens v. Six Unknown Named Agents of the Federal Bureau of* Narcotics, 403 U.S. 388 (1971), for conduct taken under color of federal law would not be cognizable. And third, Beck is entitled to qualified immunity because Plaintiff has not plausibly alleged that he personally violated any constitutional right, let alone violated clearly established law.

## BACKGROUND

This case arises from a September 11, 2025 encounter between Plaintiff Sam O'Hara, an Ohio National Guard patrol that included Sergeant Devon Beck, and responding officers of the Metropolitan Police Department ("MPD"). Compl. (ECF No. 1) ¶¶ 3, 39–47. The encounter occurred against the backdrop of Operation Make D.C. Safe and Beautiful, a National Guard mission established after the President directed the Secretary of Defense to address violent crime in the District of Columbia and to seek additional National Guard support from other States. Compl. (ECF No. 1) ¶¶ 17–21. The District of Columbia National Guard created the Joint Task Force District of Columbia ("JTF-DC") for that mission. Compl. (ECF No. 1) ¶ 18. Colonel Lawrence M. Doane, the JTF-DC Commander, later described the mission as providing support to law-enforcement agencies, including the United States Marshals Service, the United States Park Police, and MPD, as part of Operation Make D.C. Safe and Beautiful. Doane Decl. (Ex. A) ¶ 4. [1]

---

[1]     Plaintiff expressly incorporated Colonel Doane's declaration by reference. Paragraph 26 sets out a substantive block quotation from the declaration, and footnote 9 identifies the precise source filing, so the Court may consider that declaration on Rule 12(b)(6) without converting the motion into one for summary judgment. Compl. (ECF No. 1) ¶ 26 & n.9. On a motion to dismiss, the Court may consider "any documents either attached to or incorporated in the complaint," as well as documents "referred to in the complaint and integral to [the plaintiff's] claim." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). And because the Doane Declaration is also a filed declaration in a separate federal action, the Court may independently take judicial notice of it as a public court record. *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005). Colonel Doane's declaration consists of a base declaration and two attachments. Attachment 1 is a memorandum, signed by the Secretary of Defense, providing employment guidance to National Guard Service Members. Attachment 2 is Department of Defense Joint Publication 3-28. For ease of reference, Colonel Doane's Declaration will be separately reproduced as Exhibit A, the Secretary of Defense's Memorandum will be reproduced as Exhibit B, and Joint Publication 3-28 will be reproduced as Exhibit C.

Ohio was one of the States that agreed to send Guardsmen to Washington. Compl. (ECF No. 1) ¶¶ 20–21. Plaintiff alleges that Governor DeWine agreed to send 150 Ohio National Guard military police to participate in JTF-DC. Compl. (ECF No. 1) ¶ 21. The District of Columbia National Guard ("DCNG") memorandum of understanding governing supporting-state forces likewise states that the operation was executed in support of "Federal Law Enforcement," that participating forces would perform duties under 32 U.S.C. § 502(f), and that supporting-state units would remain under the command and control of their home jurisdictions while receiving operational direction for mission accomplishment from DCNG. Mem. of Understanding (Ex. D) §§ 2, 3.2–3.3. The same memorandum further states that National Guard members participating in the mission under Title 32 were performing missions in support of, or to the benefit of, the Federal Government. *Id.* § 3.6.

The mission documents also defined the operational limits on Beck's role. The Secretary of Defense's August 20, 2025 employment guidance authorized District of Columbia National Guard members to support federal law enforcement in a duty status pursuant to 32 U.S.C. § 502(f) and separately authorized the activation of out-of-district National Guard members, including personnel from Ohio, to provide support to the Department of Justice. Sec'y Def. Employment Guidance Mem. (Ex. B) at 1. That same guidance provided that supporting out-of-district personnel would remain under the administrative command and control of their State Governors, while the Secretary of the Army, through DCNG leadership, would coordinate their employment by assigning tasks consistent with the guidance of the supported law-enforcement agency. *Id.* at 2. The guidance also stated that, absent written authorization from the Secretary of Defense, Guardsmen activated under 32 U.S.C. § 502(f) were "not authorized" to effect arrests or engage in similar direct law-enforcement activity. *Id.*

Doane's declaration is to the same effect: he states that JTF-DC personnel acted as a presence to deter crime, report crime to law enforcement, and assist law enforcement in other support missions when requested, and that all JTF-DC members were sworn in as Special Deputies by the United States Marshals Service but were not authorized to conduct searches, seizures, arrests, or similar functions. Doane Decl. (Ex. A) ¶¶ 6–7. Doane further states that the decision whether to arrest an individual, and any investigation of the underlying incident, were solely the responsibility of the supported law-enforcement agency. *Id.* ¶ 7.

The command-and-control and response procedures reflected the same support role. Plaintiff himself alleges that Ohio National Guard members in the District were operating under 32 U.S.C. § 502(f), and that Ohio Governor DeWine publicly stated that Ohio Guardsmen would conduct "presence patrols" and serve as "added security," but that if an arrest had to be made, the D.C. police would make it. Compl. (ECF No. 1) ¶¶ 22–25. Doane likewise states that, from a tactical standpoint, JTF-DC personnel were instructed to call 9-1-1 whenever they witnessed a crime, a person in distress, or another emergency requiring a police response, after which the MPD would respond and coordinate through the JTF-DC operations center. Doane Decl. (Ex. A) ¶ 14.

Plaintiff alleges that he opposed the National Guard deployment and chose to express that opposition by following Guardsmen in public while playing "The Imperial March" from *Star Wars* and recording the encounters on his phone for TikTok. Compl. (ECF No. 1) ¶¶ 1–3, 30–37. According to the Complaint, Plaintiff did this three times between August 29 and September 10, 2025, each time walking behind Guard members for several minutes while playing the music at a volume loud enough for people in the vicinity to hear. Compl. (ECF No. 1) ¶¶ 32–35. By Plaintiff's own telling, the September 11 encounter was his fourth such protest. Compl. (ECF No. 1) ¶ 38.

On September 11, 2025, Plaintiff alleges that, while coming home from work, he saw four armed Ohio National Guard members near the intersection of 14th and R Streets NW in the Logan Circle neighborhood. Compl. (ECF No. 1) ¶¶ 39–40. Plaintiff alleges that the Guardsmen were in military fatigues bearing Ohio National Guard insignia and were walking on patrol. Compl. (ECF No. 1) ¶ 39. Plaintiff then began walking behind them while playing "The Imperial March" on his phone and recording. Compl. (ECF No. 1) ¶ 40. Plaintiff alleges that Beck turned around and said: "Hey man, if you're going to keep following us, we can contact Metro PD and they can come handle you if that's what you want to do. Is that what you want to do?" Compl. (ECF No. 1) ¶ 41. Plaintiff alleges that he did not respond and continued recording and playing the music. Compl. (ECF No. 1) ¶ 42. Beck then allegedly replied, "That's what you want to do? Okay," stepped aside, and called MPD. Compl. (ECF No. 1) ¶¶ 43–44.

Plaintiff then alleges that several MPD vehicles arrived within a few minutes, that officers exited their vehicles, and that MPD detained him and prevented him from continuing to follow the Guard. Compl. (ECF No. 1) ¶¶ 45, 65. Plaintiff then alleges that Beck's statements before the call, together with MPD's actions afterward, "indicate" that Beck instructed MPD to detain Plaintiff and stop his protest. Compl. (ECF No. 1) ¶ 46. At the same time, however, the Complaint does not allege what Beck actually said during the call to MPD, does not allege that Beck made any false report, and does not allege that Beck instructed MPD to handcuff Plaintiff, prolong the detention, or restrict recording. Compl. (ECF No. 1) ¶¶ 41–46.

The Complaint instead alleges that, once MPD arrived, Officer Campbell "immediately" approached Plaintiff and accused him of "harassing" or "assaulting" the Guard members. Compl. (ECF No. 1) ¶ 47. Plaintiff alleges that he denied assault, asserted that he was engaged in peaceful protest, and maintained that he had been standing several feet away while recording and playing

- 4 -

music. Compl. (ECF No. 1) ¶¶ 47–51. Plaintiff further alleges that when the Guard members began to walk away, Campbell stood in Plaintiff's path and ordered him to "stand there." Compl. (ECF No. 1) ¶ 52. Plaintiff alleges that MPD Officers Brown, Reyes-Benigno, and Lopez Martinez then approached, accused him of harassing the Guard, and, without conducting any investigation, told him he was being detained. Compl. (ECF No. 1) ¶¶ 53–54. MPD Officer Reyes-Benigno allegedly placed Plaintiff in handcuffs, and Plaintiff alleges that the officers later told him he was being stopped for "harassing the National Guard," even while also telling him he was not under arrest. Compl. (ECF No. 1) ¶¶ 54–56. Beck was not involved in any of these actions, nor did he have any authority or control over the MPD officers.

Plaintiff alleges that the handcuffs were tight, that he complained about them, and that none of the officers loosened them. Compl. (ECF No. 1) ¶¶ 57–59. He further alleges that, after he was handcuffed, several MPD officers crossed the street and spoke with Beck and the three other Guardsmen. Compl. (ECF No. 1) ¶ 60. Plaintiff alleges that Beck was in a position to see the detention and hear Plaintiff's complaints but did not take action to encourage MPD to end the seizure. Compl. (ECF No. 1) ¶ 61. Plaintiff alleges that he remained handcuffed for approximately fifteen to twenty minutes, was released without charges, and later claimed anxiety, wrist marks, and aggravation of a preexisting shoulder condition. Compl. (ECF No. 1) ¶¶ 62–67.

<b>LEGAL STANDARDS</b>

**A.    <u>Rule 12(b)(5)</u>**

A motion under Rule 12(b)(5) challenges the sufficiency of service of process. Fed. R. Civ. P. 12(b)(5). Effective service is a prerequisite to the Court's exercise of personal jurisdiction, and "federal courts lack the power to assert personal jurisdiction over a defendant unless the procedural requirements of effective service of process are satisfied." *Mann v. Castiel*, 681 F.3d 368, 372

(D.C. Cir. 2012). Once service is challenged, the plaintiff bears the burden of demonstrating that service complied with Rule 4. *Mann*, 681 F.3d at 372.

When an individual defendant is sued in his individual capacity, service has to satisfy Rule 4(e) unless some additional provision of Rule 4 also applies. Fed. R. Civ. P. 4(e). Rule 4(e) permits service on an individual by following the law of the state where the district court sits or where service is made, by personal delivery, by leaving the summons and complaint at the defendant's dwelling or usual place of abode with a suitable resident, or by delivering the papers to an agent authorized by appointment or by law to receive service. Fed. R. Civ. P. 4(e).

However, if the individual defendant is properly treated as a United States officer or employee sued individually for conduct alleged to have occurred in connection with duties performed on the United States' behalf, Rule 4(i)(3) would require service not only on the individual defendant himself but also on the United States. Fed. R. Civ. P. 4(i)(3). Rule 4(m) separately provides that service ordinarily must be completed within ninety days after the complaint is filed, requires an extension upon a showing of good cause, and otherwise leaves the Court discretion either to dismiss without prejudice or to allow additional time for service. Fed. R. Civ. P. 4(m).

**B.     Rule 12(b)(6)**

A motion under Rule 12(b)(6) tests the legal sufficiency of the complaint, not whether the plaintiff will ultimately prevail on the facts. Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). To survive dismissal, the complaint must contain sufficient factual matter to state a claim that is plausible on its face. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. The Court accepts well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor, but it does not accept legal conclusions, formulaic recitations of elements, or conclusory characterizations masquerading

as facts. *Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. Thus, the Court's task is to determine whether the factual content actually alleged, stripped of labels and legal conclusions, plausibly establishes entitlement to relief under the governing law. *Iqbal*, 556 U.S. at 679.

In performing that analysis, the Court is not rigidly confined to the four corners of the complaint in the narrowest sense. A pleading includes not only the body of the complaint, but also any written instrument attached to it as an exhibit. Fed. R. Civ. P. 10(c). The D.C. Circuit has therefore held that, on a Rule 12(b)(6) motion, the Court may consider the complaint, documents attached to or incorporated in the complaint, and matters of which the Court may take judicial notice without converting the motion into one for summary judgment. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). The incorporation-by-reference doctrine likewise permits consideration of a document not physically attached to the complaint when the complaint refers to that document and the document is integral to the plaintiff's claim. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). That rule prevents a pleader from evading dismissal by selectively quoting from, paraphrasing, or characterizing a document on which the claim necessarily depends while withholding the document itself or omitting its full context. *Banneker Ventures*, 798 F.3d at 1133; *Kaempe*, 367 F.3d at 965.

Judicial notice supplies a separate and additional basis for considering certain materials at the Rule 12(b)(6) stage. Under Federal Rule of Evidence 201, the Court may take judicial notice of an adjudicative fact that is not subject to reasonable dispute because it is either generally known within the court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Judicial notice may be taken at any stage of the proceeding. Fed. R. Evid. 201(d). Consistent with that rule, courts in this

- 7 -

Circuit may consider appropriate public records on a motion to dismiss, including records of other judicial proceedings and official government materials, at least for their existence, contents, and legal significance, without converting the motion into one for summary judgment. *Abhe & Svoboda*, 508 F.3d at 1059; *Banneker Ventures*, 798 F.3d at 1133.

## ARGUMENT

**I.  Plaintiff Does Not Plausibly Plead Action Under Color of State or District Law, and Any Federal-Officer Theory Would Fail Under *Bivens*.**

Counts I through III are pled against Defendant Beck exclusively under 42 U.S.C. § 1983. Compl. (ECF No. 1) at 1, 13–15. That choice is fatal. Section 1983 reaches only deprivations committed "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia," not conduct undertaken under color of federal law. 42 U.S.C. § 1983; *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005); *Williams v. United States*, 396 F.3d 412, 414–16 (D.C. Cir. 2005). The D.C. Circuit has explained that the "traditional definition of acting under color of state law" requires that the defendant have "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Williams*, 396 F.3d at 414 (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). Here, the complaint's own allegations, together with the mission documents it expressly cites and incorporates, show that Beck was not exercising power conferred by District law, and they do not plausibly identify any Ohio-law source for the specific authority plaintiff claims Beck misused.

### A.  Beck Was Serving in a Federally Authorized Title 32 Support Mission, Not Exercising District Police Power.

The complaint affirmatively alleges that Beck was "a member of the Ohio National Guard" who, "at all relevant times, was acting in the scope of his duties as a member of the Ohio Guard under the authority and control of the Ohio Governor." Compl. (ECF No. 1) ¶ 11. While this is

refuted by the Doane Declaration and other incorporated materials that show that Beck was under federal operational authority, it is notable that—even in Plaintiff's own formulation—the complaint does not describe Beck as wielding District police authority. To the contrary, Plaintiff cites at length statements from Ohio Governor DeWine directed that if an arrest became necessary, "the D.C. police department . . . will make arrests" and "[o]ur people won't make the arrests." Compl. (ECF No. 1) ¶¶ 22–24. Plaintiff alleges that Beck acted "[a]dhering to Gov. DeWine's directive that MPD, and not Guard members, make arrests" when he "stepped aside briefly and called MPD." Compl. (ECF No. 1) ¶ 44. But Plaintiff never explains how this indicates that Beck engaged in an unlawful exercise of Ohio legal authority in the District of Columbia solely by virtue of calling the MPD.

Plaintiff is mistaken. Governor DeWine was describing the Secretary of Defense's imposed limitations on National Guard personnel deployed to the district, but did not issue those directives himself. Rather, the documents Plaintiff chose to incorporate into his pleading make the federal character of the mission clear. The Secretary of Defense's August 20, 2025 memorandum authorized the activation of out-of-district Guard members from Ohio and other States "to provide support to the Department of Justice." Sec'y Def. Employment Guidance Mem. (Ex. B) at 1. The same memorandum directed the Chief of the National Guard Bureau to work with Governors so that their Guard members would be ordered to duty under § 502(f) "to assist the Department of Defense in providing support requested by a Federal law enforcement agency." *Id.* at 2. And the same memorandum provided that, although supporting out-of-district Guard personnel would "remain under the administrative command and control of their State Governor," the Secretary of the Army, through DCNG leadership, would "assign[] tasks" for the supporting Guard personnel,

- 9 -

while Guard members activated under § 502(f) were "not authorized" "[t]o effect arrests or engage in other similar direct law enforcement activity." *Id.*

Colonel Doane's declaration says the same thing in more operational terms. He states that JTF-DC's mission was "to provide support" to federal law enforcement agencies, including the United States Marshals Service, the United States Park Police, and MPD, and that the JTF-DC operated pursuant to the August 20 Secretary of Defense memorandum. Doane Decl. (Ex. A) ¶ 4. He states that Guard members on the mission were "not authorized" "[t]o effect arrests or engage in other similar direct law enforcement activity," and that Guard forces in the District acted "as a presence to deter crime, report any crime they witness to law enforcement, and assist law enforcement in other support missions when requested." *Id.* ¶¶ 4, 6.

Critically, all Joint Task Force-DC members were sworn in as Special Deputies by the United States Marshals Service, and that the special deputation authorized them to carry service weapons, but expressly provided they were "not authorized to conduct searches, seizures, arrests, or other similar functions," with any arrest decision being "solely the responsibility of the supported law enforcement agency." *Id.* ¶ 7.

**B.    Whether National Guard members are acting in a federal capacity turns on the function being performed and the source of the challenged authority.**

The Supreme Court has long recognized that the National Guard occupies a distinctive dual-status role. In *Perpich v. Department of Defense*, 496 U.S. 334, 345–49 (1990), the Court explained that Guard members hold dual enlistments, and lower courts have summarized *Perpich* to mean that Guard members wear different legal "hats" depending on the authority under which they are acting. *Hanson v. Wyatt*, 552 F.3d 1148, 1153 (10th Cir. 2008). The Tenth Circuit accordingly opened its discussion with the observation that "[t]he National Guard is a state/federal hybrid." *Hanson*, 552 F.3d at 1153. The same Court noted that "members of the National Guard

- 10 -

hold dual enlistments in both a state militia . . . and a federal force," and that "[i]n the latter capacity they bec[o]me a part of the Enlisted Reserve Corps of the Army[.]" *Hanson*, 552 F.3d at 1151 (quoting *Perpich*, 496 U.S. at 345).

Thus, Guard personnel may act under color of state law when they are exercising quintessentially state-militia authority, such as state Guard personnel decisions made by an Adjutant General and approved by a Governor. *Schultz v. Wellman*, 717 F.2d 301, 304–05 (6th Cir. 1983); *Johnson v. Orr*, 780 F.2d 386, 390–92 (3d Cir. 1986). But one cannot simply point to a Guard member's state affiliation. *Hanson*, 552 F.3d at 1151. Here, the challenged conduct was not an Ohio Guard personnel action, not an exercise of Ohio militia disciplinary authority, and not the enforcement of any identified Ohio statute. Compl. (ECF No. 1) ¶¶ 11, 17–26, 41–46. It was operational conduct undertaken during a Section 502(f) mission "in support of" federal law enforcement, under a Secretary of Defense utilization memorandum, under a United States Marshals Service special deputation, and subject to federal restrictions that forbade arrest authority and instead required Guard members to summon local police when a police response was needed. Sec'y Def. Employment Guidance Mem. (Ex. B) at 1–3; Doane Decl. (Ex. A) ¶¶ 4, 7, 14; Mem. of Understanding (Ex. D) at 1–3.

Indeed, Department of Defense Joint Publication 3-28, *Defense Support of Civil Authorities*, describes Title 32 missions in exactly those terms: as activities conducted "in a federal duty status, subject to state control, while accomplishing federal missions and purposes." Joint Pub. 3-28 (Ex. C) at E-3. That description closes the gap Plaintiff tries to exploit. The fact that out-of-district personnel remained under the "administrative command and control" of their Governors does not itself establish that their challenged conduct was under color of state law, because Title 32 deliberately combines state command relationships with federally authorized missions.

- 11 -

Current joint guidance instead defines administrative control as the "[d]irection or exercise of authority over subordinate or other organizations with respect to administration and support, including organization of Military Departments or Service forces, control of resources and equipment, personnel management, unit logistics, individual and unit training, readiness, [mobilize], [demobilize], discipline, and other matters not included in the operational missions of the subordinate or other organizations." Chairman of the Joint Chiefs of Staff Manual 3130.06D, *Global Force Management Allocation Policies and Procedures* GL-8 to -9 (June 20, 2024), https://www.jcs.mil/Portals/36/Documents/Library/Manuals/CJCSM%203130.06D.pdf.

By contrast, joint guidance defines operational control as "the authority to perform those functions of command over subordinate forces involving organizing and employing commands and forces, assigning tasks, designating objectives, and giving authoritative direction necessary to accomplish the mission," and further explains that operational control "does not, in and of itself, include authoritative direction for logistics or matters of administration, discipline, internal organization, or unit training." *Id.* at GL-17 to -18.

That doctrinal distinction aligns closely with the federal-state-authority cases. In *Williams*, 396 F.3d at 414–15, the D.C. Circuit asked whether the defendant exercised authority "possessed by virtue of state law" and held that a federal officer did not act under color of District law where "[o]nly the federal government gave him the power" to make the challenged arrest. In *Johnson v. Government of the District of Columbia*, 734 F.3d 1194, 1199–1201 (D.C. Cir. 2013), the D.C. Circuit likewise focused on source of authority and supervision, holding that Superior Court Deputy Marshals are "at all times . . . federal official[s] acting under color of federal law," notwithstanding their role in the District's local courts. *See also Holley v. United States*, Civ. A. No. 24-1536 (LLA), 2025 U.S. Dist. LEXIS 11350, at *12–14 (D.D.C. Jan. 22, 2025). And *Thai*

- 12 -

*v. County of Los Angeles*, 127 F.4th 1254, 1259–63 (9th Cir. 2025) makes the same inquiry explicit, looking to "the source of authority under which the challenged conduct took place," whether "day-to-day operations are supervised by the Federal or state government," and whether the officers were under the "immediate control of a federal supervisor." Plainly, the case law's fair-attribution inquiry maps far more naturally onto the military's doctrinal category of operational control—who organizes, tasks, directs, and supervises the mission—than onto administrative control, which concerns pay, discipline, logistics, training, and other background Service responsibilities.

### C.      Sergeant Beck Was Not Acting Under Color of State Law.

Section 1983 applies "only when 'the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority.'" *Lindke v. Freed*, 601 U.S. 187, 198 (2024) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)). Officer Beck is not subject to suit under Section 1983 because he was acting under color of federal, not state, law at the time of his encounter with Plaintiff. The D.C. Circuit's decision in *Williams* is the natural starting point. There, a plaintiff tried to sue a federal Government Printing Office police officer under § 1983 after the officer arrested him for disorderly conduct under the D.C. Code. *Williams*, 396 F.3d at 412–14. The plaintiff argued that the arrest was under color of District law because, but for the existence of the District's disorderly-conduct statute, the officer could not have made the arrest. *Williams*, 396 F.3d at 414. The D.C. Circuit rejected that theory. *Williams*, 396 F.3d at 414–16. The court held that the officer did not act under color of District law because he was "a federal official, not a D.C. official," because "[o]nly the federal government gave him the power to make arrests for violations of D.C. law," and because the District "had no authority over him[.]" *Williams*, 396 F.3d at 415. The court added that D.C. officials neither "provided significant encouragement" nor otherwise participated in the arrest in a way that would convert it into District

action. *Williams*, 396 F.3d at 415 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)).

The same reasoning applies here with even greater force. In *Williams*, the federal officer himself made the arrest for a District of Columbia offense. *Williams*, 396 F.3d at 412–13. Here, by contrast, Plaintiff acknowledges that Beck did not have arrest authority, that Beck was directed to not make arrests, and that Beck complied with that directive by calling MPD when concerned with Plaintiff's behavior. Compl. (ECF No. 1) ¶¶ 24, 44. If a federal officer who actually arrested for a District of Columbia-law offense was still not acting under color of District law in *Williams*, then a Title 32 Guardsman who allegedly did no more than call MPD under a federally defined support mission is not plausibly alleged to have acted under color of District law here.

The Ninth Circuit recently applied the same source-of-authority analysis in *Thai.* The court there held that locally employed investigators assigned full time to a joint federal-state disability-fraud task force acted under color of federal, not state, law because "the federal government was the source of authority under which the task force was implemented" and because "the officers' day-to-day work was supervised by a federal officer[.]" *Thai*, 127 F.4th at 1256, 1260–62.

The Seventh Circuit's older but still instructive decision in *Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir. 1976), makes the same point in language especially apt here. There, officers retained official links to the St. Louis Police Department while serving full time in a federal drug-enforcement office, but the court held that official Justice Department credentials, immediate federal supervision, federal funding, and federal compensation coverage "cast an indelibly federal hue upon the activities of these agents, even though they maintained official links with the SLPD." *Id.* The court added that "the totality of the circumstances" showed the agents were "acting pursuant to federal authority and not under color of any state law," and that "the mere presence of

- 14 -

state agents in a support status does not turn a federal law enforcement endeavor into state action sufficient to support a § 1983 claim." *Askew*, 548 F.2d at 677–78.

Those decisions map neatly onto Beck's alleged conduct. Beck was serving in a federally authorized § 502(f) mission, under a Secretary of Defense utilization memorandum, in support of DOJ and other supported law-enforcement agencies, under a United States Marshals Service special deputation, subject to federal restrictions on arrest authority, while receiving tasking through the DCNG-led JTF-DC structure and coordinating with MPD through the federally prescribed 9-1-1-and-operations-center protocol. Sec'y Def. Employment Guidance Mem. (Ex. B) at 1–3; Doane Decl. (Ex. A) ¶¶ 4, 7, 9, 11–14; Mem. of Understanding (Ex. D) at 1–3. If those circumstances are not enough to make Beck a federal officer for all purposes, they are certainly enough to show that Plaintiff has not plausibly pleaded that Beck was exercising power conferred by District law, and they likewise defeat the complaint's wholly conclusory assertion that Beck acted under color of "Ohio and/or District law." Compl. (ECF No. 1) ¶ 11.

### D.   Beck's Alleged Coordination with MPD Does Not Transform His Conduct into District Action.

Plaintiff's fallback theory appears to be that Beck somehow became a District actor because he called MPD and allegedly "instructed" officers to detain Plaintiff. Compl. (ECF No. 1) ¶¶ 45–46, 71, 84. That still does not plausibly plead action under color of District law. The relevant question is not whether MPD later acted, but whether Beck himself was exercising District-conferred authority. *Williams*, 396 F.3d at 414–16.

The Complaint does not plausibly allege that he was. It alleges only that Beck warned Plaintiff he would call MPD, called MPD, and that MPD then detained Plaintiff after arriving on scene. Compl. (ECF No. 1) ¶¶ 41–46. That is coordination with local police, not a plausible allegation that District law clothed Beck with District authority. In *Williams*, the D.C. Circuit held

- 15 -

that a federal officer did not act under color of District law even though he arrested the plaintiff for a District offense and turned him over to local police, because the officer's authority came from federal law, not the District. 396 F.3d at 414–16. And *Settles* states the same rule directly: Section 1983 does not apply to federal officials acting under color of federal law. 429 F.3d at 1106–07.

Nor does the complaint plausibly allege that Beck actually directed MPD to do anything. Plaintiff does not allege what Beck said during the call, does not allege that Beck had authority to command MPD officers, and pleads only that Beck's earlier statements and MPD's later conduct "indicate" he instructed them to detain Plaintiff. Compl. (ECF No. 1) ¶ 46. That is speculation, not a well-pleaded factual allegation. At most, the complaint alleges that Beck summoned local officers, who then exercised their own separate authority on arrival. That does not transform Beck's conduct into action under color of District law.

E.      **Plaintiff Does Not Have a Cognizable *Bivens* Claim Against Beck for Alleged Constitutional Violations Under Color of Federal Law.**

Once the Section 1983 theory falls away, Plaintiff cannot salvage Counts I through III by relabeling them as implied damages claims against a federal actor. Unlike 42 U.S.C. § 1983, which provides for damages suits against state officers for constitutional violations, Congress never "create[d] an analogous statute for federal officials." *Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017). When the Supreme Court decided *Bivens* in 1971, it "broke new ground by holding that a person claiming to be the victim of an unlawful arrest and search could bring a Fourth Amendment claim for damages against the responsible agents even though no federal statute authorized such a claim." *Hernández v. Mesa*, 589 U.S. 93, 100 (2020). Since *Bivens*, the Court fashioned an implied damages remedy under the Constitution just twice—first, for a Fifth Amendment sex discrimination claim against a congressman, *see Davis v. Passman*, 442 U.S. 228 (1979), and second, for an Eighth Amendment deliberate indifference claim by the estate of a federal prisoner

- 16 -

who died after prison officials failed to provide "competent medical attention for some eight hours" when the prisoner was suffering from a life-threatening asthma attack, *see Carlson v. Green*, 446 U.S. 14, 16 n.1 (1980). "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the [Supreme] Court has approved of an implied damages remedy under the Constitution itself." *Abbasi*, 582 U.S. at 132.

After 1980, the Court "changed course," *Hernández*, 589 U.S. at 99, and has "consistently refused to extend *Bivens* to any new context or new category of defendants." *Abbasi*, 582 U.S. at 135 (quoting *Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 68 (2001)). The Supreme Court has made clear that "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity." *Abbasi*, 582 U.S. at 135 (quoting *Iqbal*, 556 U.S. at 675). That is because the Court has "come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'" *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (quoting *Hernandez*, 589 U.S. at 741). In its recent *Bivens* decisions, the Court has "made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Id.* at 486; *id.* at 491 ("At bottom, creating a cause of action is a legislative endeavor.").

Courts follow a two-step analysis to determine whether a plaintiff has stated a cognizable *Bivens* claim. *Egbert*, 596 U.S. at 492. First, a court must ask whether the case "presents 'a new *Bivens* context'—*i.e.*, is it 'meaningfully different from the three cases in which the Court has implied a damages action." *Id.* (quoting *Abbasi*, 582 U.S. at 139). The Court has also emphasized that "even a modest extension is still an extension." *Abbasi*, 582 U.S. at 147. "Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of

- 17 -

allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Abbasi*, 582 U.S. at 136). The Supreme Court has recently noted that, while its cases "describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.*

The availability of a *Bivens* cause of action is a threshold question that should be decided at the outset. *Liff v. Off. of Inspector Gen. for the U.S. Dep't of Labor*, 881 F.3d 912, 916–17 (D.C. Cir. 2018).

Counts I and II would fail immediately under that framework because they are First Amendment claims. Compl. (ECF No. 1) at 13–14. The Supreme Court has now squarely held that "there is no *Bivens* action for First Amendment retaliation." *Egbert*, 596 U.S. at 499. That holding forecloses plaintiff's First Amendment suppression and retaliation counts against Beck if Beck is treated as a federal actor rather than a state actor. *Egbert*, 596 U.S. at 498; Compl. (ECF No. 1) ¶¶ 70–80. *See also Loumiet v. United States*, 948 F.3d 376, 382, 389 (D.C. Cir. 2020) (holding a First Amendment retaliatory-enforcement claim presented a new Bivens context and that the "First Amendment creates no implied damages action"); *Buchanan v. Barr*, 71 F.4th 1003, 1008–10 (D.C. Cir. 2023) (reiterating that "[t]he Supreme Court has never recognized the availability of Bivens claims for First Amendment violations"); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 30–31 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023) (holding the plaintiffs' First Amendment claim arose in a new Bivens context because the Supreme Court had "never extended Bivens to a claim brought under the First Amendment"); *Jones v. Secret Serv.*, 143 F.4th 489, 495 (D.C. Cir. 2025) (declining to recognize *Bivens* in the First Amendment context)

Count III fares no better. Plaintiff's Fourth Amendment claim against Beck is meaningfully different from *Bivens* in a number of ways. Although *Bivens* itself involved a Fourth Amendment claim, the Supreme Court has made clear that a case can still present a new context even when it invokes the same constitutional provision, because there can be "a world of difference" between one Fourth Amendment setting and another. *Hernandez*, 589 U.S. at 103; *Abbasi*, 582 U.S. at 139–40. This case is far removed from the original *Bivens* context of rank-and-file federal narcotics agents conducting a warrantless search and arrest in a private home. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389–90 (1971). By contrast, this case alleges—at most—a request for law enforcement assistance on a public street.

Moreover, this case involves a new category of defendants. Beck was not a federal law enforcement officer investigating drug crimes but rather a Guard member serving on an armed domestic support mission under Title 32, operating under a federal statute, a Secretary of Defense mission memorandum, special deputation by the United States Marshals Service, and a command-and-control structure that involved the Secretary of Defense, the Secretary of the Army, DCNG leadership, and supporting governors, and is alleged to have called MPD when faced with an individual repeatedly following National Guard personnel. Compl. (ECF No. 1) ¶¶ 11, 17–26, 39–46. The D.C. Circuit has held that "a 'new context' is present whenever the plaintiff seeks damages from a 'new category of defendants.'" *Loumiet*, 948 F.3d at 382 (quoting *Abbasi*, 582 U.S. at 135); *see also K.O. v. Sessions*, 41 F.4th 664 (D.C. Cir. 2022); *see also Jones*, 143 F.4th at 494.

Implying a *Bivens* claim here would also "risk . . . disruptive intrusion by the Judiciary into the functioning of other branches," *Abbasi*, 582 U.S. at 140. No prior *Bivens* case implicated members of the military, and "courts traditionally have been reluctant to intrude upon the authority of the Executive in military . . . affairs." *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988). In

- 19 -

sum, this case presents a new *Bivens* context by any measure. *Abbasi*, 582 U.S. at 139–40; *Hernandez*, 589 U.S. at 102–04.

Special factors independently foreclose any such extension. The D.C. Circuit has stated in unambiguous terms that "[t]he Supreme Court has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence." *Doe v. Rumsfeld*, 683 F.3d 390, 396 (D.C. Cir. 2012). The court explained that the Constitution's allocation of authority over the military to the political branches "counsels hesitation" before courts create damages remedies in that field. *Doe*, 683 F.3d at 396 (quoting *Chappell v. Wallace*, 462 U.S. 296, 301–02 (1983)). The D.C. Circuit has also stressed that "even if the choice is between *Bivens* or nothing, if special factors counsel hesitation, the answer may be nothing," because the central question is "who should decide whether such a remedy should be provided." *Meshal v. Higgenbotham*, 804 F.3d 417, 425–26 (D.C. Cir. 2015) (quoting *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985)).

Those concerns are at their zenith here. Plaintiff seeks a judicially created damages remedy against an individual National Guard member for conduct allegedly undertaken during a congressionally authorized domestic deployment under 32 U.S.C. § 502(f). 32 U.S.C. § 502(f); Compl. (ECF No. 1) ¶¶ 17–26. Creating a personal-capacity damages remedy in that setting would require the Court to fashion liability rules for military support missions, Guard command relationships, the interaction between Titles 10 and 32, and the Executive Branch's chosen mechanisms for domestic law-enforcement support. U.S. Const. art. I, § 8, cls. 12–16; *Perpich*, 496 U.S. at 345–49; *Doe*, 683 F.3d at 396–98. Those are classic separation-of-powers reasons to leave the question to Congress.

- 20 -

Congress's silence is especially telling because Congress has legislated extensively about National Guard status, domestic duty under § 502(f), and the relationship between federal mission requirements and gubernatorial control, yet it has not created a damages action of the sort Plaintiff asks this Court to invent. 32 U.S.C. § 502(f); *Perpich*, 496 U.S. at 345–49; *Abbasi*, 582 U.S. at 148–49; *Liff*, 881 F.3d at 916–23. Under the Supreme Court's current doctrine, that is the end of the matter.

For all of those reasons, Counts I through III should be dismissed as against Beck. Compl. (ECF No. 1) at 13–15.

### F.    Any Bivens Theory Also Suffers from a Separate Service Defect.

Any attempt to recast Counts I through III as a *Bivens* claim would fail for an additional threshold reason: Plaintiff never served the United States as Rule 4(i)(3) requires for an individual-capacity suit against a federal officer for acts allegedly taken in connection with duties performed on the United States' behalf. Fed. R. Civ. P. 4(i)(1), (3); *Mann*, 681 F.3d at 372. The docket reflects service on Beck on December 20, 2025, but it reflects no service on either the United States Attorney for the District of Columbia or the Attorney General of the United States. Docket, ECF No. 9. Because effective service is a prerequisite to personal jurisdiction, and because "federal courts lack the power to assert personal jurisdiction over a defendant unless the procedural requirements of effective service of process are satisfied," any federal-officer claim against Beck is subject to dismissal under Rule 12(b)(5). Fed. R. Civ. P. 12(b)(5).

## II.    Beck is Entitled to Qualified Immunity on Plaintiff's Claims

Even assuming Plaintiff had a cognizable claim under either Section 1983 or *Bivens*, he would nevertheless be entitled to qualified immunity because the complaint fails to plausibly allege that Beck personally engaged in wrongful conduct or that he violated clearly established law.

- 21 -

The Supreme Court established a two-part inquiry for analyzing a qualified immunity defense. *See, e.g.,* P*earson v. Callahan,* 555 U.S. 223, 232 (2009). In the context of a motion to dismiss, the plaintiff must plausibly plead "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

To show that a right is clearly established under the second prong of the qualified immunity analysis, the plaintiff must point to case law in a similar context that clearly establishes the right in question. *See Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. at 236. The Supreme Court has therefore warned courts not to define clearly established law "at a high level of generality," because the relevant question is whether existing precedent placed the constitutional question "beyond debate." *al-Kidd*, 563 U.S. at 741–42. This Circuit looks to decisions of "the Supreme Court, the District of Columbia Circuit, and, to the extent that there is a consensus, other circuits [that] have spoken clearly on the lawfulness of the conduct at issue." *Butera v. District of Columbia*, 235 F.3d 637, 652 (D.C. Cir. 2001). It is the plaintiff's burden "to show that the particular right in question—narrowly described to fit the factual pattern confronting the officers—" was clearly established. *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (citation omitted); *see also Palmieri v. United States*, 896 F.3d 579, 586 (D.C. Cir. 2018) (plaintiff must "overcome" the assertion of qualified immunity by demonstrating that the right "was clearly established at the time of" the alleged violation). In other words, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640

- 22 -

(1987). The qualified immunity defense thus raises a high bar: government officials are protected unless they are "plainly incompetent or . . . knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### A.      Plaintiff Does Not Plausibly Allege That Beck Personally Caused Plaintiff's Detention or the Termination of His Protest.

Counts I and II do not state a plausible claim against Beck because they do not plead facts showing that Beck himself caused the alleged First Amendment or Fourth Amendment injury. Compl. (ECF No. 1) ¶¶ 41–46, 60–61, 68, 70–79. The pleading alleges, at most, that Beck warned Plaintiff that he would call MPD, then called MPD, after which MPD officers arrived and made their own detention decisions. Compl. (ECF No. 1) ¶¶ 41–45. That is not enough to state a personal-capacity claim, which requires plausible, nonconclusory allegations that the defendant's own conduct caused the deprivation. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); *Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 677 (D.C. Cir. 2009).

At bottom, Plaintiff's theory against Beck is that Beck disliked Plaintiff's protest, called MPD, and MPD then detained Plaintiff. Compl. (ECF No. 1) ¶¶ 41–46, 68, 71, 76. But a Section 1983 claim against Beck requires plausible facts showing more than temporal sequence and suspicion. It requires facts showing that Beck's own conduct caused the alleged suppression of speech or the alleged unlawful seizure. *Iqbal*, 556 U.S. at 677–78; *Nieves v. Bartlett*, 587 U.S. 391 (2019); *Hartman v. Moore*, 547 U.S. 250, 259–63 (2006). The Complaint does not plead that. And the incorporated source documents make Beck's conduct at least equally, and more plausibly, consistent with the limited support role assigned to him: observe, report, and call MPD for assistance, while leaving arrest decisions to MPD. Doane Decl. (Ex. A) ¶¶ 4, 6–7, 14; Compl. (ECF No. 1) ¶¶ 22–26, 41–45. When the pleaded facts and the incorporated documents are taken together, the claim against Beck rests not on factual allegations of personal participation, but on

- 23 -

speculation that because Beck called MPD, he must have orchestrated everything MPD later did. Rule 8 does not permit that leap. Counts I and II should therefore be dismissed as to Beck.

1.    Section 1983 requires factual allegations that Beck's own conduct—not merely MPD's later conduct—caused the alleged constitutional injury.

The starting point is the basic rule the Supreme Court reiterated in *Iqbal*: "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. That principle applies with full force here. A plaintiff cannot state a claim against Beck merely by alleging that MPD later detained Plaintiff and then attaching the legal conclusion that Beck must therefore have "instructed" MPD to do so. Compl. (ECF No. 1) ¶ 46. The D.C. Circuit likewise requires personal involvement by the particular defendant; where the allegations "did not support any personal involvement" by the defendant in the challenged decision, dismissal is proper. *Atherton*, 567 F.3d at 677.

The Complaint's operative factual allegations about Beck are exceptionally thin. The Complaint alleges that Beck said: "if you're going to keep following us, we can contact Metro PD and they can come handle you if that's what you want to do," that Plaintiff continued recording and playing music, and that Beck then "stepped aside briefly and called MPD." Compl. (ECF No. 1) ¶¶ 41–45. The Complaint does not allege that Beck handcuffed Plaintiff (or touched Plaintiff in any way), ordered Plaintiff to stand still, instructed any officer to seize Plaintiff in words the Complaint identifies, made false factual statements to MPD, signed any affidavit, filed any complaint, or otherwise exercised command over the responding officers. Compl. (ECF No. 1) ¶¶ 41–65. Instead, the pleading jumps from the fact of Beck's call to the conclusion that Beck "instructed the MPD officers to detain Mr. O'Hara and to prevent him from continuing to walk behind the Guard members and record and protest them." Compl. (ECF No. 1) ¶ 46. That is

precisely the kind of "naked assertion[] devoid of further factual enhancement" that does not suffice under *Iqbal* and *Twombly*. *Iqbal*, 556 U.S. at 678 (quotation omitted).

> 2. The Complaint's own incorporated materials supply an obvious, lawful explanation for Beck's conduct—he summoned MPD because that was the role assigned to him by the mission

The Complaint itself supplies an obvious and lawful explanation for Beck's conduct: he summoned MPD because he reasonably believed Plaintiff's conduct suggested that a crime—or, at minimum, an escalating public-order violation—was unfolding, and the mission assigned Guard personnel to contact MPD rather than make arrests themselves. Compl. (ECF No. 1) ¶¶ 24, 44; *District of Columbia v. Wesby*, 583 U.S. 48, 57–61 (2018); *Enders v. District of Columbia*, 4 A.3d 457, 470–71 (D.C. 2010). Plaintiff alleges that he had been following National Guard patrols for days, recording them while playing *The Imperial March* from his phone and, at least on one occasion, a speaker, and that on September 11 he again followed Beck and three other armed Guardsmen on public sidewalks and streets while playing the music "loudly." Compl. (ECF No. 1) ¶¶ 2–3, 32–34, 39–44. Plaintiff further alleges that Beck warned him that MPD would be called if he continued, yet Plaintiff persisted in trailing the patrol at close range until Beck contacted MPD. Compl. (ECF No. 1) ¶¶ 42–44, 48, 51–53. On those allegations, Beck did not need certainty that Plaintiff had completed a chargeable offense or that every element of a particular statute had already been satisfied; he needed only a reasonable basis to conclude that Plaintiff's conduct had moved beyond mere criticism and into potentially unlawful interference that warranted police intervention. *Wesby*, 583 U.S. at 57–61; *Enders*, 4 A.3d at 470–71.

The clearest District of Columbia offense suggested by the Complaint is disorderly conduct by "unnecessarily crowding" or interfering with a person in a public place under circumstances whereby a breach of the peace may be occasioned. D.C. Code § 22-1321(g). Plaintiff's own allegations describe far more than distant observation or passive dissent: he intentionally followed

an armed patrol from only several feet away, continued after warning, and used loud music and recording to maintain a close, disruptive presence as the patrol moved through public space. Compl. (ECF No. 1) ¶¶ 40–43, 48, 51–53. Beck could reasonably perceive that conduct as active interference with patrol movement, spacing, and situational awareness, especially because armed patrol duties require attention to nearby persons, the ability to hear, and the ability to move without a civilian shadowing the patrol at close range. Compl. (ECF No. 1) ¶¶ 24, 39–44; D.C. Code § 22-1321(g). And because subsection (g) reaches interference by unnecessary crowding, Beck was not required to wait for physical contact, an overt threat, or some more dramatic escalation before concluding that MPD should be called. D.C. Code § 22-1321(g).

The Complaint also plausibly supports Beck's view that Plaintiff's conduct implicated D.C. Code § 22-1321(a)(1), which prohibits intentionally or recklessly acting in a manner that causes another person reasonably to fear that a person or immediately possessed property is likely to be harmed or taken. D.C. Code § 22-1321(a)(1). Plaintiff alleges that Beck and the other Guardsmen were armed, that Plaintiff silently followed them from only a few feet away while loudly playing mocking music, that he ignored Beck's warning, and that he then attempted to keep following as the patrol crossed the street. Compl. (ECF No. 1) ¶¶ 39–44, 48, 52–53. From Beck's on-the-ground perspective, that combination of close trailing, persistence, auditory distraction, and refusal to disengage could reasonably appear threatening or at least recklessly provocative, particularly in the context of an armed patrol engaged in law-enforcement-support duties. Compl. (ECF No. 1) ¶¶ 18–26, 39–44; D.C. Code § 22-1321(a)(1). Beck therefore had a lawful basis to conclude that waiting for further escalation would be imprudent and that summoning MPD was the appropriate response. Compl. (ECF No. 1) ¶ 44.

Finally, the governing Fourth Amendment standard does not require certainty or proof beyond dispute. It asks whether the facts created a "probability or substantial chance of criminal activity," not whether criminality had already been conclusively established. *Wesby*, 583 U.S. at 57–58. Here, the complaint alleges that Plaintiff was closely trailing an armed patrol, loudly playing music, continuing after warning, and attempting to keep following as the patrol moved through public streets and sidewalks. Compl. (ECF No. 1) ¶¶ 39–44, 48, 51–53. While Plaintiff may have found this amusing, a reasonable person in Beck's situation may have recognized the potential risk posed by an unknown person following in close proximity, causing a distraction, disrupting situational awareness, and interfering with his team's ability to perform the observational task they had been assigned.

On those facts, Beck could reasonably perceive that the situation was developing into disorderly conduct or another public-order offense, including "unnecessarily crowding" or interfering with a person in public under circumstances where a breach of the peace might be occasioned, or conduct creating a reasonable fear of imminent harm. D.C. Code § 22-1321(a)(1), (g). It's not even clear Beck needed probable cause when he took no action to seize Plaintiff himself but instead simply called MPD for assistance and to investigate the situation.

In short, the complaint itself offers a straightforward lawful explanation for Beck's conduct. Beck did not detain Plaintiff himself, did not purport to adjudicate Plaintiff's guilt on the sidewalk, and did not take action outside the role the mission assigned him. Compl. (ECF No. 1) ¶¶ 24, 44. Instead, confronted with Plaintiff's repeated close-following of an armed patrol while loudly playing music and refusing to disengage after warning, Beck did exactly what the complaint says Guard personnel were expected to do: he called MPD because he reasonably believed Plaintiff's conduct suggested an ongoing or imminent violation of D.C. public-order law and

- 27 -

warranted police assessment. Compl. (ECF No. 1) ¶¶ 24, 42–44, 48, 51–53. That obvious, non-retaliatory, and lawful explanation defeats any effort to portray Beck's call to MPD as inherently suspect on the face of the complaint. *Wesby*, 583 U.S. at 57–61; *Enders*, 4 A.3d at 470–71.

> 3.    Plaintiff does not plausibly bridge the causal gap between Beck's alleged motive and MPD's later detention decision.

Plaintiff's own pleading self-consciously builds a causal gap between Beck's alleged motives and MPD's detention decision. That gap is fatal to both Count I and Count II.

In retaliation cases, the Supreme Court has emphasized that causation is not satisfied by alleging bad motive plus downstream injury. As the Court put it in *Nieves v. Bartlett*, 587 U.S. 391, 399–404 (2019), plaintiff must establish a "causal connection" between the defendant's "retaliatory animus" and the plaintiff's injury, and "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury." *Id.* (quoting *Hartman*, 547 U.S. at 259). The Court further explained that where a separate decisionmaker stands between the defendant's alleged animus and the plaintiff's injury, causation becomes "more complex," because the plaintiff must bridge the gap between one actor's motive and another actor's injurious decision. *Hartman*, 547 U.S. at 261–63; *Nieves*, 587 U.S. 391. The D.C. Circuit has said the same thing in this very line of cases, explaining that the no-probable-cause requirement in retaliatory-inducement cases is justified by "the need to prove a chain of causation from animus to injury," and that the plaintiff must show that the non-deciding official "induced" the ultimate decisionmaker to act. *Moore v. Hartman*, 644 F.3d 415 (D.C. Cir. 2011).

That causation defect is exactly what appears here. MPD—not Beck—made the challenged detention decision. Compl. (ECF No. 1) ¶¶ 45, 52–59. The Complaint contains no nonconclusory facts showing that Beck misled MPD, fabricated facts for MPD, pressured MPD, issued commands to MPD, or otherwise displaced MPD's own judgment. Compl. (ECF No. 1) ¶¶ 41–61. The only

factual allegations are that Beck said he could "contact Metro PD," called MPD, and that MPD later detained Plaintiff. Compl. (ECF No. 1) ¶¶ 41–45. The intervening decision of the MPD officers therefore breaks the inferential chain unless Plaintiff pleads facts showing that Beck overcame or manipulated that independent judgment. Plaintiff does not do so. That omission is especially glaring because the incorporated Doane declaration says the arrest decision and investigation were "solely the responsibility of the supported law enforcement agency." Doane Decl. (Ex. A) ¶ 7. In other words, the Complaint's factual theory runs directly against the mission document it incorporates.

The contrast with cases where causation was adequately alleged underscores the deficiency. In *Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009), the D.C. Circuit described a complaint alleging that an MPD officer "caused a warrant to issue" "on the basis of a false affidavit and without probable cause." In *Wesby v. District of Columbia*, 765 F.3d 13 (D.C. Cir. 2014), the D.C. Circuit described a supervising sergeant who was "directing the arrests." In *Amobi v. D.C. Department of Corrections*, 755 F.3d 980 (D.C. Cir. 2014), the D.C. Circuit explained that malicious-prosecution-type liability may exist where a defendant's actions "cause the plaintiff to be unreasonably seized without probable cause," and it recognized that, under District of Columbia law, "[i]nstigation is sufficient, when institution [of a proceeding] actually follows from it." Those cases involve factual allegations or record evidence that the defendant supplied the operative falsehoods, directly initiated the challenged process, or affirmatively directed the seizure. Here, by contrast, the Complaint alleges only that Beck called the police and then infers, without supporting facts, that he must have directed MPD's response. Compl. (ECF No. 1) ¶ 46. That is not analogous to a false-affidavit case, an arrest-direction case, or an instigation-by-fabrication case.

- 29 -

The Second Circuit has explained that an "intervening exercise of independent judgment breaks chain of causation 'in the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment.'" *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000). In sum, reporting conduct to law enforcement does not itself make the reporter liable for a later seizure unless facts plausibly show that the reporter controlled, manipulated, or jointly executed the seizure. Plaintiff pleads no such facts here.

4.      Plaintiff's conclusory allegations that Beck caused MPD to detain Plaintiff are not plausibly pleaded.

The Complaint alleges that Beck's statements before the call, "and MPD's actions on the scene after it, indicate that Sgt. Beck instructed the MPD officers to detain Mr. O'Hara and to prevent him from continuing to walk behind the Guard members and record and protest them." Compl. (ECF No. 1) ¶ 46. That allegation is wholly inferential. It does not describe any actual instruction, any actual conversation, any factual content of what Beck purportedly told MPD, or any basis for concluding that MPD acted because Beck told them to arrest Plaintiff rather than because MPD made its own, right or wrong, on-scene judgment after arriving. Compl. (ECF No. 1) ¶¶ 45–54. Counts I and II merely repeat the same conclusion in formulaic form, alleging that Beck "caused" the First Amendment violation and "retaliated" by calling MPD "to detain Mr. O'Hara." Compl. (ECF No. 1) ¶¶ 71, 76. Under *Iqbal*, courts do not accept such legal conclusions as true merely because they are framed as factual allegations. *Iqbal*, 556 U.S. at 678. Nor does Rule 8 permit a plaintiff to plead around an obvious lawful explanation supplied by the very documents on which the Complaint depends. Here, the obvious explanation is that Beck did exactly what his mission instructions contemplated: he summoned MPD, and MPD then exercised its own authority. Doane Decl. (Ex. A) ¶¶ 6–7, 14.

5.    Beck's alleged failure to intervene after the handcuffing does not salvage Counts I or II.

The Complaint also alleges that, after MPD handcuffed Plaintiff, "[s]everal other MPD officers crossed the street and spoke with Sgt. Beck," that Beck could see the detention and hear Plaintiff's complaints, and that Beck "did not take any action to encourage MPD to end the seizure." Compl. (ECF No. 1) ¶¶ 60–61. That allegation does not rescue the claims against Beck for at least three reasons.

First, Counts I and II are pleaded as causation claims—i.e., that Beck caused the detention by summoning MPD and instructing them to detain Plaintiff—not as a distinct failure-to-intervene claim. Compl. (ECF No. 1) ¶¶ 70–79. Second, even if the Court were to construe the pleading to imply a bystander-liability theory, that doctrine does not fit Beck as pleaded. Cases in this District frame failure-to-intervene as a law-enforcement-officer theory—one officer's obligation to step forward when a fellow officer is violating a plaintiff's rights and the bystander officer has a realistic opportunity to stop it. *Jones v. District of Columbia*, No. 21-836 (RC), 2021 U.S. Dist. LEXIS 216137, at *13–14 (D.D.C. Nov. 9, 2021) (quoting *Moore v. District of Columbia*, 79 F. Supp. 3d 121, 135 (D.D.C. 2015)); *see also Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 67 (D.D.C. 2018); *Leach v. District of Columbia*, No. 19-947 (APM), 2022 U.S. Dist. LEXIS 60568, *29–34 (D.D.C. Mar. 30, 2022). Beck, by contrast, is not a law-enforcement officer, let alone an MPD officer with authority over MPD's on-scene detention decisions, so the complaint does not plausibly state a bystander-liability claim against him even on its own terms. *Leach*, 2022 U.S. Dist. LEXIS 60568, *29–34.

Moreover, even if Beck were treated as a law-enforcement officer, courts reject bystander-liability theories where the allegations do not show that the defendant had a "reasonable opportunity to prevent the harm" or knew enough to understand that a constitutional violation was

- 31 -

underway. *Jones*, 2021 U.S. Dist. LEXIS 216137, at 13–14. And where officers arrive after the challenged force or handcuffing has already occurred, courts have held that they had no reasonable opportunity to know "why it had been employed" or to prevent its use. *See Jackson*, 327 F. Supp. at 67. The Complaint's allegation that Beck was nearby after the handcuffing, and did not urge MPD to release Plaintiff, falls well short of plausibly alleging knowing participation in or deliberate indifference to a constitutional violation by officers over whom Beck had no pleaded command authority. Compl. (ECF No. 1) ¶¶ 60–64.

**B.    Beck Is Entitled to Qualified Immunity on All Federal Claims Because Plaintiff Has Not Plausibly Alleged that He Violated Any Clearly Established Law.**

That specificity requirement is dispositive here. The Complaint alleges only that Beck warned Plaintiff that if he kept following the patrol, Beck could call MPD, that Beck then called MPD when Plaintiff's conduct continued, and that Beck later failed to urge MPD to release Plaintiff after MPD handcuffed him. Compl. (ECF No. 1) ¶¶ 41–46, 61, 68. Plaintiff's own causation allegation instead says only that Beck's statements and MPD's later conduct "indicate" that Beck instructed MPD to detain O'Hara and end the protest. Compl. (ECF No. 1) ¶ 46.

The complaint's own description of the mission makes Beck's position still more particularized. Plaintiff alleges that Beck was an Ohio Guardsman operating under 32 U.S.C. § 502(f), under the Ohio Governor's authority and control, and on a mission in which Ohio personnel were conducting "presence patrols" and would not themselves make arrests. Compl. (ECF No. 1) ¶¶ 11, 22–26. Measured at that level of specificity, plaintiff cannot defeat immunity by invoking only abstract propositions that peaceful protest and recording are protected by the First Amendment. *Al-Kidd*, 563 U.S. at 742; *Wesby*, 583 U.S. at 63–64. The Supreme Court rejected precisely that mode of analysis in *Wood v. Moss*, 572 U.S. 744, 748–49, 759–64 (2014), where it held that Secret Service agents accused of disadvantaging protesters were entitled to

immunity because "[n]o decision of this Court so much as hinted that their on-the-spot action was unlawful," and because "[n]o decision of which we are aware . . . would alert Secret Service agents engaged in crowd control" that the First Amendment required the accommodation plaintiffs demanded. Here too, Beck confronted an on-the-spot encounter during an armed law-enforcement-support patrol, and the complaint itself places him in a regime where he was expected to summon MPD rather than make an arrest himself. Compl. (ECF No. 1) ¶¶ 24–26, 41–46; Doane Decl. (Ex. A) ¶¶ 7, 14.

Plaintiff's retaliatory-speech theory is even less capable of overcoming immunity. In *Reichle v. Howards*, 566 U.S. 658, 664–65 (2012), the Court held that the "clearly established" standard was not satisfied because the Court had "never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." More recently, the Court reiterated that, as a general rule, a retaliatory-arrest plaintiff "must plead and prove the absence of probable cause for the arrest." *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (quoting *Nieves*, 587 U.S. at 402). Those cases involved officers directly tied to the arrest decision. Plaintiff identifies no Supreme Court, D.C. Circuit, or D.D.C. authority holding that, by September 2025, a non-arresting National Guard sergeant on a Title 32 support mission was on clear notice that summoning local police under a no-arrest mission protocol violated the First Amendment.

The D.C. Circuit's own protest-arrest cases only reinforce how context-bound the inquiry is. In *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006), the court denied qualified immunity in a mass-arrest case because police swept up an entire park full of demonstrators and bystanders without particularized probable cause, and the court emphasized that no officer could believe probable cause existed to arrest every person present. In *Oberwetter v. Hilliard*, 639 F.3d 545, 548–49, 555–56 (D.C. Cir. 2011), by contrast, the court upheld an arrest arising from expressive

conduct after the plaintiff twice refused an officer's orders in a sensitive government setting. Those decisions underscore the point relevant here: D.C. Circuit protest-and-arrest doctrine turns on concrete operational facts, the officer's actual role, and the specific legal authority under which he acted. Nothing in those cases put Beck on notice that his alleged conduct here—warning Plaintiff, calling MPD, and then deferring to MPD's decisionmaking—was unconstitutional.

The Fourth Amendment claim fares no better. The Supreme Court has made clear that clearly established law must prohibit the officer's conduct in the "particular circumstances before him," and that this inquiry requires a high "degree of specificity." *Wesby*, 583 U.S. at 63–64. Beck's alleged conduct was not effectuating a seizure; it was warning Plaintiff, calling MPD, and then standing by while MPD made and carried out its own detention decision. Compl. (ECF No. 1) ¶¶ 41–46, 61, 68, 84. The incorporated mission materials confirmed that arrest decisions belonged to the supported law-enforcement agency, not to Beck. Doane Decl. (Ex. A) ¶ 7. No precedent clearly established that an out-of-state Guardsman on a Title 32 support mission, lacking arrest authority and acting pursuant to a protocol directing him to call 9-1-1, could be held personally liable for a seizure later carried out by MPD officers exercising their own arrest authority.

That conclusion is reinforced by the causation concerns the Supreme Court has repeatedly identified when someone other than the defendant makes the ultimate arrest or charging decision. *Nieves*, 587 U.S. at 399–401; *Reichle*, 566 U.S. at 667–69. Here, plaintiff's own pleading concedes that MPD officers arrived, made the detention decision, handcuffed him, kept him detained while he requested a supervisor, and then released him when they chose to do so. Compl. (ECF No. 1) ¶¶ 45, 47–64. Beck's alleged liability thus depends on stacking several inferences: that his warning meant he intended an arrest, that MPD acted on Beck's unconstitutional instruction rather than its

own judgment, and that clearly established law forbade Beck from requesting MPD intervention in the first place. Qualified immunity does not permit a damages action to proceed on so attenuated and so poorly established a theory.

At minimum, a reasonable Guardsman in Beck's shoes could believe that requesting MPD intervention was lawful. Beck was on a mission Plaintiff himself describes as a Governor-controlled Title 32 deployment, he was not authorized to make arrests, the mission documents directed JTF-DC personnel to call 9-1-1 when a police response was needed, and the complaint alleges only that Beck did exactly that. Compl. (ECF No. 1) ¶¶ 11, 22–26, 41–46; Doane Decl. (Ex. A) ¶¶ 4, 7, 14. Qualified immunity exists precisely for officials who make "reasonable but mistaken judgments about open legal questions," and the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743. Because the law did not place Beck's alleged conduct beyond debate, Claims I, II, and III should be dismissed as against Beck.

\* \* \*

- 35 -

## CONCLUSION

For these reasons, Defendant Sergeant Devon Beck respectfully requests that the Court grant his motion to dismiss and dismiss all claims against him.

Dated: April 14, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:      /s/  *Brian C. Tracy*
BRIAN C. TRACY, NE Bar # 25379
Special Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-7113
brian.tracy@usdoj.gov

*Attorneys for the United States of America*

- 36 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAM O'HARA

        Plaintiff,

   v.

DEVON BECK, *et al.*,

        Defendants.

Civil Action No. 25-3753 (TJK)

## [PROPOSED] ORDER

UPON CONSIDERATION of Defendant Devon Beck's Motion to Dismiss, any opposition thereto, any reply, and the entire record, it is hereby

ORDERED that Defendant Devon Beck's Motion to Dismiss is GRANTED; and it is further

ORDERED that all claims against Defendant Devon Beck are DISMISSED.

SO ORDERED:

_____
Date

_____
TIMOTHY J. KELLY
United States District Judge