**Joint Publication 3-28**




# Defense Support of Civil Authorities



## 23 September 2024






# PREFACE

## 1.  Scope

This publication provides fundamental principles and guidance to plan, conduct, and assess defense support of civil authorities.

## 2.  Purpose

This publication has been prepared under the direction of the Chairman of the Joint Chiefs of Staff (CJCS).  It sets forth joint doctrine to govern the activities and performance of the Armed Forces of the United States in joint operations, and it provides considerations for military interaction with governmental and nongovernmental agencies, multinational forces, and other interorganizational partners.  It provides military guidance for the exercise of authority by combatant commanders and other joint force commanders (JFCs) and prescribes joint doctrine for operations and training.  It provides military guidance for use by the Armed Forces in preparing and executing their plans and orders.  It is not the intent of this publication to restrict the authority of the JFC from organizing the force and executing the mission in a manner the JFC deems most appropriate to ensure unity of effort in the accomplishment of objectives.

## 3.  Application

a.  Joint doctrine established in this publication applies to the Joint Staff, combatant commands, subordinate unified commands, joint task forces, subordinate components of these commands, the Services, the National Guard Bureau, and combat support agencies.

b.  This doctrine constitutes official advice concerning the enclosed subject matter; however, the judgment of the commander is paramount in all situations.

c.  If conflicts arise between the contents of this publication and the contents of Service publications, this publication takes precedence unless the CJCS, normally in coordination with the other members of the Joint Chiefs of Staff, has provided more current and specific guidance, or the Secretary of Defense has directed otherwise.  Commanders of forces operating as part of a multinational (alliance or coalition) military command should follow multinational doctrine and procedures ratified by the United States unless they conflict with this guidance.  For doctrine and procedures not ratified by the United States, commanders should evaluate and follow the multinational command's doctrine and procedures, where applicable and consistent with United States law, regulations, and doctrine.

For the Chairman of the Joint Chiefs of Staff:

DAGVIN R.M. ANDERSON
Lieutenant General, U.S. Air Force
Director for Joint Force Development

Intentionally Blank

SUMMARY OF CHANGES<br/>
REVISION OF JOINT PUBLICATION 3-28<br/>
DATED 29 OCTOBER 2018

- **Updates content related to the Posse Comitatus Act throughout the publication.**

- **Increases content related to coronavirus disease 2019 lessons learned, including Department of Defense (DoD) support to pandemic influenza and infectious disease response.**

- **Adds content to discuss electromagnetic spectrum operations, changes to response to natural disasters, and updates to specific DoD medical support during natural disasters.**

- **Retitles Chapter II to "Supporting Domestic Emergencies."**

- **Removes redundant content discussed in Joint Publication 3-27, *Homeland Defense,* to increase focus on defense support of civil authorities (DSCA).**

- **Describes United States Space Command and United States Space Force DSCA-related responsibilities.**

- **Adds Chapter VI, "Defense Support of Civil Authorities in the Future Operational Environment."**

Intentionally Blank

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ....................................................................................... ix

CHAPTER I
    OVERVIEW

- Introduction.......................................................................................I-1
- Defense Support of Civil Authorities .................................................I-2
- Homeland Security, Homeland Defense, and Defense Support of
  Civil Authorities.................................................................................I-5
- Foundational Elements of Interagency Response ................................I-7
- All Hazards Scope of Defense Support of Civil Authorities ...............I-12
- Legal and Policy Considerations .......................................................I-12

CHAPTER II
    SUPPORTING DOMESTIC EMERGENCIES

- State, Local, Territorial, and Tribal Government Roles ......................II-1
- Federal Role......................................................................................II-4
- Department of Defense Immediate Response and Emergency Authority .................II-5
- Emergency Support Functions...........................................................II-7
- Catastrophic Incident Support...........................................................II-7
- Interorganizational Coordination .......................................................II-8
- Unity of Effort..................................................................................II-11
- Department of Defense and Emergencies in the Homeland ................II-12
- Command and Control in United States Northern Command and United
  States Indo-Pacific Command Areas of Responsibility.......................II-13
- Planning Considerations for Defense Support of Civil Authorities.........................II-16
- Phases of Defense Support of Civil Authorities .................................II-18
- Assessing Defense Support of Civil Authorities .................................II-18
- Multinational Forces Integration........................................................II-21

CHAPTER III
    SUPPORTING CIVILIAN LAW ENFORCEMENT AGENCIES

- General............................................................................................ III-1
- The Posse Comitatus Act.................................................................. III-1
- Direct Assistance to Civilian Law Enforcement Agencies................... III-2
- Other Permissible Types of Military Support to Law Enforcement Agencies ........ III-4
- Law Enforcement Considerations...................................................... III-8

CHAPTER IV
    OTHER DOMESTIC ACTIVITIES AND SPECIAL EVENTS

- General............................................................................................IV-1

- National Special Security Events ..................................................................... IV-1
- Community Support Activities ........................................................................ IV-1
- Sensitive Support Operations .......................................................................... IV-1
- Military Training Exchanges .......................................................................... IV-2
- Specialized Support ........................................................................................ IV-2
- Support Provided to the United States Secret Service ................................... IV-3
- Civil Air Patrol/Air Force Auxiliary Support ............................................... IV-3
- Incident Awareness and Assessment .............................................................. IV-3
- Civilian Critical Infrastructure Protection .................................................... IV-4
- Postal Services ............................................................................................... IV-4
- Explosive Ordnance Disposal Considerations ............................................... IV-5
- Urban Search and Rescue Program ................................................................ IV-6
- Defense Support to Cybersecurity Incident Response ................................... IV-6
- Human Space Flight Support .......................................................................... IV-8
- Other Defense Support of Civil Authorities Missions .................................. IV-8

## CHAPTER V
### SUPPORTING AND SUSTAINING ACTIVITIES

- General ............................................................................................................. V-1
- Personnel Services ........................................................................................... V-1
- Intelligence Support ........................................................................................ V-3
- Meteorological Support .................................................................................... V-6
- Logistics ........................................................................................................... V-6
- Information Activities and Public Affairs ...................................................... V-10
- Health Services ............................................................................................... V-11
- Mortuary Affairs ............................................................................................ V-15
- Cyberspace Support ........................................................................................ V-16
- Space Operations Support .............................................................................. V-16
- Electromagnetic Spectrum Operations .......................................................... V-17
- Other Support and Sustainment Considerations ............................................ V-17

## CHAPTER VI
### DEFENSE SUPPORT OF CIVIL AUTHORITIES IN THE FUTURE OPERATIONAL ENVIRONMENT

- Fundamental Changes ...................................................................................... VI-1
- Natural and Man-Made Disasters ................................................................... VI-1
- Domestic Crises ............................................................................................... VI-1
- Joint Force Commander Responses ................................................................. VI-1

## APPENDIX

A   National Incident Management System Overview ................................... A-1
B   National Response Framework's Emergency Support Functions .............. B-1
C   Standing Rules for the Use of Force for United States Armed Forces ....... C-1
D   Department of Defense Dual-Status Commander .................................... D-1

E        Key Legal and Policy Documents .............................................................. E-1
F        Reimbursement for Defense Support of Civil Authorities .......................... F-1
G        Department of Defense Installations Supporting Defense
         Support of Civil Authorities ...................................................................... G-1
H        Defense Support of Civil Authorities Planning Format (Notional) .......... H-1
J        Example Phasing of Defense Support of Civil Authorities ........................ J-1
K        References ................................................................................................ K-1
L        Administrative Instructions ...................................................................... L-1

## GLOSSARY

Part I    Shortened Word Forms (Abbreviations, Acronyms, and Initialisms) ..... GL-1
Part II   Terms and Definitions ............................................................................ GL-5

## FIGURE

I-1       Relationships Between Homeland Defense, Defense Support of Civil
          Authorities, and Homeland Security Missions ........................................... I-6
I-2       Layers of Related Capabilities ................................................................. I-8
II-1      Map of the Ten Federal Emergency Management Agency Regions ....... II-14
II-2      Example Defense Support of Civil Authorities Objective to Standard
          Assignment (Combatant Command) ........................................................ II-20
II-3      Example Defense Support of Civil Authorities Objective with Effect,
          Measure, and Standards ......................................................................... II-21
B-1       Emergency Support Functions ................................................................. B-1
D-1       Dual-Status Commander Command and Control Relationship ............... D-2

Intentionally Blank

EXECUTIVE SUMMARY

## 1. Overview

Joint Publication 3-28, *Defense Support of Civil Authorities,* describes how the Department of Defense (DoD) fulfills its role as a support mechanism to state, local, tribal, and territorial (SLTT) governments when requested during times of crisis.  Crises may develop because of natural or man-made disasters, civil disturbances, and other emergency situations.  There are significant legal restrictions on traditional military operations that assist local authorities within the United States (US).  A formal request for assistance (RFA) usually precedes military assistance operations.  Defense support of civil authorities (DSCA) only occurs in the US homeland.  The President, Secretary of Defense (SecDef), and affected state governors implement DSCA to save and protect lives, alleviate human suffering, and mitigate damage to property. DoD also supports civil governments during national special security events, search and rescue operations, and explosive ordnance disposal.

## 2. Key Defense Support of Civil Authorities Planning Considerations

a.  DSCA is distinct from homeland defense (HD) and homeland security (HS).  DoD is responsible for providing HD, it contributes to HS, and it provides DSCA in support of another federal department or agency.  The Federal Emergency Management Agency is the lead federal agency (LFA) for coordinating DSCA during natural or man-made disasters.  The President assigns LFAs during civil disturbances or other emergency situations.

b.  DSCA is highly coordinated; DoD supports and does not supplant civil authorities.  Federal and SLTT authorities handle incidents at the lowest jurisdictional level possible.

c.  DoD generally provides DSCA when it does not conflict with its primary mission of defending the United States against military threats.

d.  Civil authorities request DSCA through a formal RFA and in most cases, commit to reimbursing DoD for its support.  DoD does not withhold support if requesting authorities do not initially commit to reimbursement.

e.  The Posse Comitatus Act (PCA) restricts DoD forces conducting DSCA under Title 10, United States Code (USC), from participation in law enforcement functions unless specifically authorized by law, the President, or act of Congress.

f.  There are three ways to use National Guard (NG) forces for incident response:

(1)  SecDef, in coordination with affected governors, employs forces under Title 32, USC.

(2)  The President employs NG forces for federal service under Title 10, USC.

(3)  Governors may employ NG forces in a state active duty (SAD) status.

g.  DSCA does not include NG forces responding to an incident in a SAD status.  The PCA does not restrict NG forces in SAD or Title 32, USC, status.  NG forces in SAD status may conduct specified law enforcement functions.

## 3.  Support to Civil Authorities without Secretary of Defense Approval

a.  Immediate response authority.  Enables responsible DoD officials to immediately respond to requests from civil authorities when time does not permit SecDef or presidential approval.  PCA restrictions apply.  Title 42, USC, states that a DoD response may not exceed 10 days without a presidential emergency or disaster declaration.

b. Emergency authority.  Distinct from immediate response authority.  Emergency authority exists to enable federal military commanders to respond to large-scale unexpected civil disturbances when prior presidential authorization is impossible.  PCA restrictions do not apply to emergency authority activities and actions taken under the Insurrection Act.

c.  Pre-existing mutual and automatic aid agreements with civil authorities enable installation commanders to provide DSCA.

## 4.  Important Defense Support of Civil Authorities-Related Doctrinal Constructs

a.  DSCA plans incorporate command and control options that promote unity of effort.  DoD may provide liaison officers to the lead federal agency and its components.  Joint force commanders (JFCs) employing military forces within the United States ensure their staffs and liaisons understand statutory and operational relationships among all involved agencies.  JFCs enhance unity of effort and support to civil authorities by using standardized terminology with non-DoD organizations and synchronizing communications to promulgate a common narrative to affected populations.

b. The President and affected governor assign a specially trained, dual-status commander (DSC) to optimize unity of effort when federal and NG forces are simultaneously employed during a response.  The DSC is a single commander who exercises command over federal and state forces via separate federal and state chains of command.  Not all situations require DSCs; the President, SecDef, or state governor may adjust command and control relationships to meet the needs of a given situation.

c.  JFCs provide clear and specific guidance on the rules for the use of force to avoid associated legal and political pitfalls while supporting civil authorities.  Commanders at all levels involved with DSCA understand use of force constructs before DSCA operations commence and clearly communicate the rules for use of force to their units.

d.  Due to the inherent flexibility of their assigned forces, commanders and units that are likely to be employed for DSCA missions prepare themselves with continuous training and assessment programs.

# CHAPTER I
## OVERVIEW

> *"The American people have trusted the Armed Forces of the United States to protect them and our Constitution for almost 250 years.  As we have done throughout our history, the US military will obey lawful orders from civilian leadership, support civil authorities to protect lives and property, ensure public safety in accordance with the law, and remain fully committed to protecting and defending the Constitution of the United States against all enemies, foreign and domestic."*
>
> **The Joint Chiefs of Staff's Message to the Joint Force**
> **Washington, DC**
> **January 12, 2021**

## 1. Introduction

a. The primary purpose of the Department of Defense (DoD) is to defend the United States (US) against military threats.  Additionally, the Armed Forces of the United States have a historic and enduring role in supporting civil authorities during times of crisis and emergency.  Defense support of civil authorities (DSCA) in the United States presents unique challenges based on both US history and the many United States Government (USG) departments and agencies; state, local, territorial, and tribal (SLTT) governments; private organizations; and nongovernmental organizations (NGOs) involved in crisis planning and response.  These interconnected organizations establish robust support systems utilizing legislation, agreements, and policies to safeguard lives, property, and institutions.  When these organizations are stressed beyond their capability and resources by extraordinary events, DSCA serves as a means to save and protect lives and to mitigate unnecessary human suffering and damage to property and institutions.  The joint force plans, conducts, and assesses DSCA activities in conjunction with SLTT governments and federal agencies.  DSCA requests are closely evaluated and considered against DoD primary taskings.  The Federal Emergency Management Agency (FEMA) is the lead agency responsible for coordinating and providing direction for DSCA during natural or man-made disasters.

b. In the event of a catastrophic disaster, it is imperative that DSCA is coordinated with lead federal agencies (LFAs) to ensure response capabilities are available and shortfalls or overlaps in capability or capacity are identified.  Integrated planning between DoD, FEMA, SLTT governments, and the National Guard (NG) enables FEMA and DoD to plan more effectively.  Interagency planning has added more analytical rigor over the past decade, making plans more operationally effective and executable for DSCA.

c. Consistent with the law, the Secretary of Defense (SecDef) may use available Active Component and Reserve Component (RC) personnel in a Title 10, United States Code (USC), status to conduct DSCA.  SecDef may also, with the consent of the state's governor, use NG forces in a Title 32, USC, status to conduct DSCA.  Pursuant to respective state laws, governors may also call up and employ their forces as state militia in a state active duty (SAD) status.  Activities performed by the NG in SAD status are not DSCA.

> **Department of Defense Directive 3025.18,** *Defense Support of Civil Authorities (DSCA),* **specifies defense support of civil authorities is executed "within the United States, including the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any territory or possession of the United States or any political subdivision thereof." Additionally, the National Cyber Incident Response Plan; Presidential Policy Directive-41,** *United States Cyber Incident Coordination Policy;* **and Department of Defense Instruction 8530.03,** *Cyber Incident Response,* **include cyberspace.**
>
> **Various Sources**

d. The United States Coast Guard (USCG) performs national defense, maritime safety, security, and stewardship roles and missions. USCG forces normally integrate into the *National Response Framework* (NRF) as a component of the Department of Homeland Security (DHS) and remain under the operational and administrative control of the USCG to execute its statutory missions. The USCG, when performing statutory roles and missions, may be supported by DoD conducting DSCA.

*For additional information, see Department of Defense Directive (DoDD) 3025.18,* Defense Support of Civil Authorities (DSCA); *Army Techniques Publication (ATP) 3-28.1/Marine Corps Reference Publication (MCRP) 3-30.6/Navy Tactics, Techniques, and Procedures (NTTP) 3-57.2/Air Force Tactics, Techniques, and Procedures (AFTTP) 3-2.67/Coast Guard Tactics, Techniques, and Procedures (CGTTP) 3-57.1,* Multi-Service Tactics, Techniques, and Procedures for Defense Support of Civil Authorities (DSCA); *Department of Defense Instruction (DoDI) 3025.22,* The Use of the National Guard for Defense Support of Civil Authorities; *and Coast Guard Publication 3-28,* Incident Management and Crisis Response. *See also Department of Defense Manual (DoDM) 3025.01,* Defense Support of Civil Authorities, *Volumes 1-3, for more information.*

**2. Defense Support of Civil Authorities**

a. DSCA is provided by DoD, to include NG forces (when SecDef, in coordination with the governors of the affected states, elects and requests to use and fund those forces in Title 32, USC, status), in response to a request for assistance (RFA) from civil authorities for domestic emergencies, cybersecurity incident response, law enforcement support, and other domestic activities or from qualifying entities for special events. DSCA includes support to predict, assess, prepare for, prevent, protect from, respond to, and recover from domestic incidents. DSCA is provided in response to requests from civil authorities and upon approval from appropriate authorities. DoD supports and does not supplant civil authorities.

b. DoD support may include capabilities and resources from applicable combatant commands (CCMDs) and the Services, including Active Component and RC forces. Unless otherwise directed by higher authority, military commanders prioritize resources to DoD requirements first and then to address civilian authority requests. Military forces

coordinate, integrate, and synchronize their support with other government and nongovernment agencies and organizations.

c. The NG provides a unique capability to respond as either a state or federal military force. In a SAD status, the NG serves and executes state missions in support of their governor. Governors may provide NG forces in a SAD status to support other state response efforts through interstate mutual aid and assistance arrangements, such as the Emergency Management Assistance Compact (EMAC). The NG supports DoD missions in both Title 10 and Title 32, USC, duty status. The National Guard Bureau (NGB) facilitates domestic operations coordination, planning, and support between affected states and supporting states through the National Guard Coordination Center and pre-incident complex catastrophe planning. The NGB provides domestic operations training, education, and exercise coordination for state NG personnel. Commanders should be aware that NG support provided in a SAD or Title 32 or Title 10, USC, status differs in its associated command and control (C2) of assigned forces, as well as the funding and reimbursement processes. DoD carefully manages its use of the NG for federal missions so as not to remove critical capabilities from governors during incident responses or special events in their state or other jurisdictions. DoD, through the NGB, manages the use of the NG to minimize risk to both federal and state missions.

d. DoDI 8530.03, *Cyber Incident Response,* applies to all DoD components. It also applies to NG personnel when under federal C2 and, when SecDef authorizes, with the concurrence of the governors of the affected states, the use of NG personnel in Title 32, USC, status to fulfill an RFA for DSCA.

*For additional information on interorganizational issues, see Joint Publication (JP) 3-08,* Interorganizational Cooperation. *For more information on NG domestic operations, see ATP 3-28.1/MCRP 3-30.6/NTTP 3-57.2/AFTTP 3-2.67/CGTTP 3-57.1,* Multi-Service Tactics, Techniques, and Procedures for Defense Support of Civil Authorities (DSCA).

e. DSCA capabilities are generally derived from DoD warfighting capabilities and may be used to respond to an RFA from civil authorities for domestic emergencies, law enforcement support, or other domestic activities or from qualifying entities for special events. In the case of the NG, Congress authorizes National Guard and Reserve Equipment Account funds to purchase commercial off-the-shelf capabilities that also perform as DSCA-related necessary equipment for response to domestic emergencies.

f. Domestic chemical, biological, radiological, or nuclear (CBRN) incident response is a type of support provided within the DSCA mission conducted by DoD forces to save lives, protect property and the environment, and meet basic human needs. Chairman of the Joint Chiefs of Staff Instruction (CJCSI) 3125.01, *Defense Response to Chemical, Biological, Radiological, and Nuclear (CBRN) Incidents in the Homeland,* establishes DoD roles and responsibilities for domestic CBRN response activities. Domestic CBRN response requires unity of effort among SLTT, federal, and DoD organizations. DoD established a chemical, biological, radiological, and nuclear response enterprise (CRE) for domestic CBRN response, to include active duty forces and NG forces serving under Title 10, USC, or Title 32, USC, duty status. As a DSCA activity, domestic CBRN response

focuses on providing DoD support directly to the civil authorities leading the CBRN response at the incident. State and local governments are closest to those affected by incidents and have a lead role in response and recovery. DoD tailors its support to the scope and magnitude of the incident. Specifically, DoD employs CRE forces with a focus on specific response requirements beyond the resources of state and federal civil authorities. A joint task force (JTF) typically leads DoD forces supporting domestic CBRN response, providing C2 of forces trained and equipped for this mission, as well as contingency-sourced conventional forces. Using a phased approach, the joint force commander (JFC) leads DoD forces through all phases of domestic CBRN response.

*For further information, see JP 3-41,* Chemical, Biological, Radiological, and Nuclear Response*, which fully addresses domestic CBRN response.*

**KEY TERMS**

**Defense support of civil authorities (DSCA). Department of Defense (DoD) support provided in response to requests for assistance from civil authorities. Civil authorities may seek assistance for domestic emergencies, law enforcement activities, and homeland security missions. DSCA activities may support the security, safety, health, and welfare of the American people against the threats and consequences of man-made and natural disasters; terrorism; violent extremist organizations; cybersecurity incidents; public health emergencies (including epidemics and pandemics); chemical, biological, radiological, or nuclear incidents; and the direct physical effects of a nation-state attack.**

**Emergency authority. A federal military commander's authority in extraordinary emergency circumstances, where prior authorization by the President is impossible and duly constituted local authorities are unable to control the situation, to engage temporarily in activities that are necessary to quell large-scale, unexpected civil disturbances because (1) such activities are necessary to prevent significant loss of life or wanton destruction of property and are necessary to restore governmental function and public order or (2) duly constituted federal, state, or local authorities are unable or decline to provide adequate protection for federal property or federal governmental functions.**

**Immediate response authority. A federal military commander, DoD component head, or responsible DoD civilian official's authority temporarily to employ resources under their control, subject to any supplemental direction provided by higher headquarters, and provide those resources to save lives, prevent human suffering, or mitigate great property damage in response to a request for assistance from a civil authority, under imminently serious conditions when time does not permit approval from a higher authority within the United States. Immediate response authority does not permit actions that would**

**subject civilians to the use of military power that is regulatory, prescriptive, proscriptive, or compulsory.**

**State immediate response authority.  State officials have the authority to direct a state immediate response using National Guard (NG) personnel under state command and control (including personnel in a Title 32, United States Code [USC] status) in accordance with state law, but NG personnel are not placed in or extended in Title 32, USC, status to conduct state immediate response activities.**

**Adopted from Department of Defense Directive 3025.18, *Defense Support of Civil Authorities (DSCA),* and the *Homeland Defense Policy Guidance***

## 3.  Homeland Security, Homeland Defense, and Defense Support of Civil Authorities

Homeland security (HS) and homeland defense (HD) are distinct operations.  DSCA refers to DoD operations and activities to support other departments and agencies in conducting HS and other missions.

a.  HS is a concerted effort requiring all levels of government, private-sector partners, organizations, and even individuals—collectively referred to as the Homeland Security Enterprise—to prevent, protect, mitigate, respond to, and recover from all threats and hazards.  At the federal level, HS missions, authorities, and responsibilities involve various departments and agencies and include protecting critical infrastructure, recovering from loss of essential services, enforcing immigration laws, securing transportation, and responding to public health emergencies and other activities that threaten the United States, its economy, the rule of law, and government operations.  DHS leads the nation's HS efforts; however, not all HS missions are led by DHS.  HS is an integral element of a broader US national security and domestic policy.

(1)  HS describes the intersection of evolving threats and hazards with traditional governmental and civic responsibilities for civil defense, emergency response, law enforcement, customs, border security, and immigration (see Figure I-1).  DoD provides support to HS missions primarily through DSCA.

(2)  The following compulsory primary missions are provided per Title 6, USC, Section 111:

(a)  "Prevent terrorist attacks within the United States;"

(b)  "Reduce the vulnerability of the United States to terrorism;"

(c)  "Minimize the damage, and assist in the recovery, from terrorist attacks that do occur within the United States;"

(d)  "Carry out all functions of entities transferred to the Department [DHS], including by acting as a focal point regarding natural and manmade crises and emergency planning;"

Chapter I



**Figure I-1. Relationships Between Homeland Defense, Defense Support of Civil Authorities, and Homeland Security Missions**

(e) "Ensure the functions of the agencies and subdivisions within the Department [DHS] that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit act of Congress;"

(f) "Ensure the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland;"

(g) "Ensure the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland; and

(h) "Monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict drug trafficking."

(3) In this distributed system, individual agencies retain functional autonomy while DHS provides overarching guidance.

(4) Three key concepts form the foundation for a comprehensive approach to HS:

(a) Security: protect the United States and its people, vital interests, and way of life;

(b) Resilience: foster individual, community, and system robustness, adaptability, and capacity for rapid recovery; and

(c) Customs and exchange: expedite and enforce lawful trade, travel, and immigration.

b. HD is the military protection of US sovereignty and territory against external threats and aggression or, as directed by the President, other threats. Defending the homeland is DoD's responsibility and top priority.

*For additional information on HD, see JP 3-27,* Joint Homeland Defense*, and DoDD 3160.01,* Homeland Defense Activities Conducted by the National Guard.

c. DoD plays a vital role in all three missions involving the homeland—HD, HS, and DSCA. The key difference among the three missions is that DoD is responsible for HD, DoD contributes to HS, and DoD conducts DSCA in support of another federal department or agency executing their responsibilities. DoD works with DHS and other USG departments and agencies when accomplishing these missions.

d. HS, DSCA, and HD operations and events may occur simultaneously and require extensive coordination, integration, and synchronization. Additionally, attribution of incidents in the homeland to external threats is often difficult.

## 4. Foundational Elements of Interagency Response

a. SLTT officials are responsible for preparing for and coordinating assistance for their populace for domestic emergencies and disasters. Governors have the authority to call up their NG forces in SAD status. The President or SecDef may request that governors select NG forces for call up under Title 32, USC, to conduct DSCA. Pursuant to Title 42, USC, Chapter 68, Section 5121, Robert T. Stafford Disaster Relief and Emergency

Chapter I

Assistance Act (commonly referred to as the Stafford Act), NG forces are, in most situations, employed under the governor's C2 prior to requesting federal assistance; however, a governor may request federal assistance in parallel.

b. The USG maintains a wide array of capabilities and resources that can be made available upon request of the governor of a state or local civil authorities for immediate response or under mutual aid agreements. When an incident occurs that exceeds or is anticipated to exceed SLTT resources, the USG may provide resources and capabilities to support the response (see Figure I-2). The USG and SLTT governments also maintain working relationships with the private sector and NGOs and integrate them as necessary when responding to domestic incidents.

(1) Interstate mutual aid and assistance is provided through prearranged agreements such as the EMAC. The EMAC is an interstate compact, accepted by all states, to allow interstate mutual aid agreement that enables states to share resources and certifications during times of disaster. EMACs work in synergy with the federal disaster response system by providing timely resources to states requesting assistance from other member states.

(2) Memoranda of agreement (MOAs), memoranda of understanding (MOUs), or EMACs can be used either in lieu of federal assistance or in conjunction with federal assistance, thus providing a seamless flow of needed goods and services to an impacted



**Figure I-2. Layers of Related Capabilities**

state.  These mutual aid agreements further provide another avenue for maximizing limited resources within member states' inventories.

(3)  For incidents involving primary federal jurisdiction or authorities (e.g., on a military base or a federal facility or lands), USG departments or agencies may be the first responders and first line of defense, coordinating activities with SLTT partners.

c.  Pursuant to the Homeland Security Act of 2002 and Homeland Security Presidential Directive (HSPD)-5, *Management of Domestic Incidents,* the Secretary of Homeland Security is the principal federal official for domestic incident management (unless it occurs solely on a DoD installation).  Domestic incident management refers to how incidents are managed across five mission areas in accordance with (IAW) Presidential Policy Directive (PPD)-8, *National Preparedness*—prevention, protection, mitigation, response, and recovery.  An incident is an occurrence, caused by either human action or a natural phenomenon, that requires action by the principal federal official for domestic incident management.  Use of the National Incident Management System (NIMS) is a requirement in all five mission areas of domestic incidents.

d.  DoD provides support to federal authorities when an RFA is received from the LFA, validated, and approved by SecDef or a designated delegee.  DoD's involvement in support of civil authorities may be affected by such factors as the availability of DoD capabilities and resources.  When there are competing demands for DoD resources, DoD prioritizes fighting and winning the nation's wars and defending the homeland above DSCA, unless otherwise directed by the President.  Another factor could be competing use of allocated bandwidth (both civilian and military) and limited interoperability between communications systems.  Interfaces that could be activated pursuant to SecDef authorization include military web portals accessible by nonmilitary domain servers; unclassified defense collaborative tool suites or similar commercial collaboration tools; voice switching, control, and applications; video teleconferencing; land mobile radios, satellite communication, and high-frequency radios; cell phones; links to subject matter experts; and commercial Internet.

*For additional information on communications, see JP 6-0,* Joint Communications.

e.  **PPD-8,** *National Preparedness,* describes the nation's approach to prepare for the threats and hazards that pose the greatest risk to the security of the United States.  It describes national roles and responsibilities related to threats and risks, including natural disasters, pandemics, chemical spills and other man-made hazards, and terrorist and cyberspace attacks.  It also identifies the 32 core capabilities and a framework for communities to prevent, protect against, mitigate, respond to, and recover from these disaster and crisis events.

f.  The national preparedness system includes planning frameworks for all five mission areas.  The national planning frameworks outline the strategy and doctrine for building, sustaining, and delivering core capabilities and set whole community roles and responsibilities.

g. ***Federal Interagency Operational Plans.*** *Federal Interagency Operational Plans,* one for each mission area, serve as a concept of operations (CONOPS), focusing on how the federal government executes the delivery and support of the core capabilities within each of the five mission areas. *Federal Interagency Operational Plans* describe the CONOPS to integrate and synchronize existing federal capabilities to support SLTT and federal plans and are supported by federal, department-level operational plans, where appropriate. In addition to the NRF, the *Response Federal Interagency Operational Plan* serves as a federal-level CONOPS, which focuses on how the USG executes the delivery and support of the core capabilities for response to a domestic incident. The operational plans are supported by several incident annexes. The annexes address unique CONOPs, roles, responsibilities, and critical tasks or resources for unique threats or hazards requiring additional information not addressed by the *Federal Interagency Operational Plan.*

h. **NRF.** The NRF provides a comprehensive approach to domestic incident management utilizing the NIMS. DHS is the executive agent for NRF coordination, management, and maintenance. The NRF is coordinated and managed by FEMA, an operational component of DHS. The NRF is an essential component of the National Preparedness System and is not a plan but a framework that sets the doctrine for how the nation builds, sustains, and delivers the response core capabilities and objectives the United States accomplishes across all five mission areas to be secure and resilient. The NRF is a guide that outlines how the nation responds to all types of disasters and emergencies. It is aligned with concepts identified in the NIMS to synchronize key roles and responsibilities across the United States. The NRF provides common doctrine and purpose to foster unity of effort for emergency operations planning and response activities.

(1) The NRF is built upon scalable, flexible, and adaptable coordinating structures to align key roles and responsibilities across the nation, linking all levels of government, NGOs, and the private sector. The NRF is not based on a one-size-fits-all organizational construct but instead acknowledges the concept of a tiered response, which emphasizes that responses to incidents should be handled at the lowest jurisdictional level capable of handling the mission. It captures specific authorities and best practices for managing incidents that range from the serious but purely local to large-scale terrorist attacks or catastrophic natural disasters. The term response, as used in the NRF, includes the capabilities necessary to save lives, protect property and the environment, and meet basic human needs. Response also includes the execution of emergency plans and actions to support short-term recovery. The NRF is always in effect, and elements can be implemented as needed on a flexible, scalable basis to improve response.

(2) Actions range in scope from ongoing situational reporting and analysis through the DHS National Operations Center to the implementation of NRF incident annexes and other supplemental federal contingency plans and full implementation of all relevant NRF coordination mechanisms outlined in the base plan.

(3) DoD has a large role in supporting the NRF. The NRF applies to all incidents requiring a coordinated federal response as part of an appropriate combination of federal, SLTT, private-sector, and nongovernmental entity efforts. DSCA may occur in response

to, or in anticipation of, a presidential declaration of a major disaster or an emergency, in coordination with the primary agency.

(4) DSCA operations are consistent with the NRF in that they supplement the efforts and resources of other USG departments and agencies in support of SLTT governments and voluntary organizations. When executing DSCA, the US military is in support of the LFA coordinating the federal response. US federal and NG forces may also conduct support at the SLTT levels. It aims to produce a scaled response with appropriate coordination. Under the NRF, local and state governments should request federal assistance only when their resources are overwhelmed. At that point, DoD may provide support in response to an RFA, typically as part of a broader federal response.

i. **NIMS**

(1) The NIMS provides a common, nationwide approach to enable the whole community to work together to manage all threats and hazards. The NIMS applies to all incidents, regardless of cause, size, location, or complexity. It includes a core set of concepts, principles, terminology, and technologies covering the incident command system (ICS); multiagency coordination systems; unified command; training; identification and management of resources (including systems for classifying types of resources); qualifications and certification; and the collection, tracking, and reporting of incident information and incident resources. The components of the NIMS include resource management, command and coordination, and communications and information management support response.

(2) The ICS, multiagency coordination systems, and public information systems are the fundamental elements of the NIMS that direct incident operations; acquire, coordinate, and deliver resources to incident sites; and share information about the incident with the public.

(3) When both local and state resources and capabilities are overwhelmed, governors may request interstate and federal assistance; however, the NIMS is designed to allow local jurisdictional authorities to retain command, control, and authority over the response. Adhering to the NIMS allows all agencies to better utilize limited resources.

j. The NRF and NIMS are designed to improve the nation's incident management capabilities and overall efficiency. During incidents requiring significant federal support, the NRF and NIMS integrate the capabilities and resources of various governmental jurisdictions, incident management and emergency response disciplines, NGOs, and the private sector into a cohesive, coordinated, and seamless national response. A basic premise of both the NIMS and NRF is that incidents are generally handled at the lowest jurisdictional level possible. In most incidents, local resources and local mutual aid provides the first line of emergency response and incident management.

*A detailed discussion of the NRF and NIMS is contained in Appendix A, "National Incident Management System Overview."*

k. **Emergency Support Functions (ESFs).** ESFs provide the structure to coordinate federal interagency support for a federal response to an incident. ESFs are not based on the capabilities of a single USG department or agency; rather, they are resources and capabilities grouped together to provide federal support to states and federal-to-federal support, both for declared disasters and emergencies under Title 42, USC, Chapter 68, Section 5121, the Stafford Act, where the President has declared a federal disaster or emergency and for non-Stafford Act incidents (non-Stafford Act events are defined as events that have recovery requirements exceeding the capability of individuals and the local community but do not exceed the capabilities of the state). Appendix B, "National Response Framework's Emergency Support Functions," describes the roles and responsibilities of federal departments and agencies as ESF primary agencies.

l. **Community Lifelines.** Lifelines reframe incident information and understanding and communicate incident impacts using plain language to promote unity of effort across the whole community and prioritize efforts to stabilize the lifelines during incident response. A lifeline enables the continuous operation of critical government and business functions and is essential to human health and safety or economic security. ESFs deliver core capabilities to stabilize community lifelines for an effective response.

m. DoD support to civil authorities should be informed by human security principles and analysis in all phases of DSCA operations.

## 5. All Hazards Scope of Defense Support of Civil Authorities

The homeland is confronted by a full spectrum of threats and hazards. Some can be difficult to categorize as either a traditional military threat requiring only a DoD response or a purely law enforcement threat requiring a nonmilitary response from DHS, the Department of Justice (DOJ), or other civilian agency. The characterization and prioritization of a particular threat may ultimately rest with the President. Other threats (e.g., civil disorder) may be characterized by individual governors.

## 6. Legal and Policy Considerations

a. **Legal Considerations.** The legal authorities governing the employment of US military forces in DSCA operations include federal and state laws and several directives, making a comprehensive legal review of DSCA plans essential.

(1) Commanders should allow for the application of military capabilities and resources within the constraints of the law. Accordingly, commanders should seek advice regarding DSCA plans, policies, and operations from their legal advisors to ensure compliance with legal requirements. This may require prior education and training of assigned legal personnel in operational functions and processes.

(2) The authority of DoD to apply military capabilities and resources to assist civil authorities is limited by law, requiring a civil authority to request assistance in most circumstances.

(3)  The commander's ability to access RC members, capabilities, and resources depends on the availability of applicable activation authorities.

(4)  NG employment to support civil authorities is most often in SAD status at the direction of the governor and under the command of the adjutant general (TAG).  In addition to activation IAW Title 10, USC, authorities, NG members may be activated in Title 32, USC, duty status to carry out DoD DSCA activities at the request of the President or SecDef and with the consent of the governor.  When carrying out DoD DSCA activities, NG members operate under state C2.  When employed in a SAD or Title 32, USC, status, NG members are not subject to the Posse Comitatus Act (PCA).

(5)  When the Armed Forces of the United States and the NG are employed simultaneously in support of civil authorities in the United States, appointment of a commissioned officer as a dual-status commander (DSC), serving on active duty and duty in the NG of a state, as commander of federal forces by federal authorities and as commander of state NG forces by state authorities is the usual and customary C2 arrangement.  However, this requirement does not preclude or limit, in any way, the authorities of the President, SecDef, or governor of any state to direct, control, and prescribe C2 arrangements for forces under their command.  For further information on this C2 arrangement, see Appendix D, "Department of Defense Dual-Status Commander."

(6)  Commanders and emergency response planners should consider the likelihood and effects of interstate, multi-jurisdictional domestic incidents (e.g., wildland fire, hurricane).  Responses to such incidents require significant coordination with multiple authorities having jurisdiction and may be further complicated by crossing over government fiscal years.  Advanced contingency planning in cooperation with proximate civil authorities having jurisdiction helps mitigate these concerns.

b.  **Policy Considerations.**    Military commanders, executing validated missions, should use DoD resources judiciously while conducting DSCA operations by adhering to the validation criteria of cost, appropriateness, risk, readiness, legality, and lethality as discussed in DoDD 3025.18, *Defense Support of Civil Authorities (DSCA).*    Some supporting principles include:

(1)  DoD resources may be provided when response requirements are beyond the capabilities of local, state, and federal civil authorities and when requested by an LFA and approved by SecDef.  An exception to this is in the case of immediate response authority.  When requested by a civil authority, under imminently serious conditions and when time does not permit approval from higher authority, federal military commanders, heads of DoD components, and responsible DoD civilian officials may temporarily employ the resources under their control to respond to save lives, prevent human suffering, or mitigate great property damage within the United States.  Another exception, installation commanders may provide DSCA to local jurisdictions under mutual and automatic aid agreements (i.e., reciprocal fire protection agreements), when requested.  Support provided pursuant to a mutual and automatic aid agreement is not reimbursed with funding but, instead, is reimbursed in-kind by reciprocal support.  Refer to DoDD 3025.18, for a full explanation of the requirements and constraints of immediate response authority.  The

commander exercising immediate response authority notifies the National Joint Operations and Intelligence Center of the details of the response through the DoD organization's higher headquarters and chain of command.

(2) DoD components do not perform any function of civil government unless authorized. Additionally, DoD resources may also respond to search and rescue (SAR) cases on an "ask not task" basis with a federal mission number from the Air Force Rescue Coordination Center, the Alaska Rescue Coordination Center, or any USCG joint rescue coordination center.

c. **DoD Intelligence Component Support to Civil Authorities and Law Enforcement Agencies (LEAs) and Intelligence Oversight.** Commanders and staffs should carefully consider the legal and policy limits imposed on intelligence activities in support of LEAs and on intelligence activities involving US citizens and entities by intelligence oversight regulations, policies, and executive orders (EOs). This oversight includes incident awareness and assessment (IAA) activities and products. No intelligence activities should take place while conducting DSCA unless authorized by appropriate authorities IAW EO 12333, *United States Intelligence Activities;* DoDD 5240.01, *Defense Intelligence Activities;* DoDM 5240.01, *Procedures Governing the Conduct of DoD Intelligence Activities;* DoDI 3025.21, *Defense Support of Civilian Law Enforcement Agencies;* DoD 5240.1-R, *Procedures Governing the Activities of DoD Intelligence Components that Affect United States Persons;* and, as applicable, Chief, National Guard Bureau (CNGB) Instruction 2000.01, *The Conduct and Oversight of National Guard Intelligence Activities.*

*For more information, see Appendix E, "Key Legal and Policy Documents."*

## CHAPTER II
## SUPPORTING DOMESTIC EMERGENCIES

### 1. State, Local, Territorial, and Tribal Government Roles

a. Response begins at the local level with public officials and responders at the county, city, municipality, or town affected by the incident. Local leaders and emergency responders prepare their communities to manage incidents locally. The NRF response guidance describes coordinating resources within jurisdictions, among adjacent jurisdictions, and with the private sector and NGOs such as the American Red Cross.

(1) **Chief Elected or Appointed Official.** A mayor, city manager, or county manager, as a jurisdiction's chief executive officer, ensures the public safety and welfare of the people of that jurisdiction. Specifically, this official, who likely does not normally focus on emergency management and response, provides strategic guidance and resources to constituents during preparedness, response, and recovery efforts.

(2) **Emergency Manager.** The local emergency manager oversees daily emergency management programs and activities. The emergency manager establishes or directs functions of an emergency operations center (EOC). The EOC is the physical location where multiagency coordination occurs. The emergency manager staffs the EOC to support the incident command and arranges needed resources. The emergency manager coordinates all components of the local emergency management program, including assessing the availability and readiness of local resources most likely required during an incident and identifying and correcting any shortfalls.

(3) **Incident Commander.** The incident commander is the person responsible for all aspects of an emergency response, including quickly developing incident objectives and managing all incident operations and application of resources, as well as responsibility for all persons involved. The incident commander sets priorities and defines the organization of the incident response teams and the overall incident action plan. The role of incident commander may be assumed by senior or higher-qualified officers upon their arrival or as the situation dictates. Even if subordinate positions are not assigned, the incident commander position is always designated or assumed. The incident commander may, at their own discretion, assign individuals, who may be from the same agency or from assisting agencies, to subordinate or specific positions for the duration of the emergency. Military forces always remain under the control of the military chain of command and are subject to redirection or recall at any time. Military forces do not operate under the command of the incident commander or under the unified command structure, but they do coordinate with response partners and work toward unity of effort while maintaining their internal chain of command.

b. A primary responsibility of state government is to supplement and facilitate local efforts before, during, and after domestic emergencies. The state provides direct and routine assistance to its local jurisdictions through emergency management program development and by routinely coordinating these efforts with federal officials. Under the Stafford Act, states are also responsible for requesting federal emergency assistance for

communities within their jurisdiction.  In response to an incident, the state helps coordinate and integrate resources and applies them to local needs.

(1) **Governor.**  Public safety and welfare of a state's citizens are fundamental responsibilities of every governor.  For the purposes of the NRF, any reference to a governor refers to the chief executive of states, territories, and insular areas.  The governor:

(a)  Coordinates state resources and provides the strategic guidance needed to prevent, mitigate, prepare for, respond to, and recover from incidents of all types.

(b)  IAW state law, may make, amend, or suspend certain orders or regulations associated with response.

(c)  Communicates to the public and helps people, businesses, and organizations cope with the consequences of any type of incident.

(d)  Commands the state military forces (NG personnel not in Title 10, USC, status and state defense forces).

(e)  Coordinates assistance from other states through interstate mutual aid and assistance compacts, such as MOAs, MOUs, or via an EMAC.

(f)  Requests federal assistance, including, if appropriate, a Stafford Act presidential declaration of an emergency or major disaster, when it becomes clear that state capabilities are insufficient or are exceeded.

(g)  Coordinates with affected tribal governments within the state and initiates requests for a Stafford Act presidential declaration of an emergency or major disaster on behalf of an affected tribe when appropriate.

(h)  Consent for the DSC and the successor, if named, to serve in both state and federal duty statuses; establishes jurisdiction in which the DSC is permitted to perform duties in a state status, as well as the duration for which the DSC is established.

*For additional information on the DSC, see Appendix D, "Department of Defense Dual-Status Commander."*

(2) **State HS Advisor.**  The state HS advisor serves as counsel to the governor on HS issues and may serve as a liaison between the governor's office, the state HS structure, DHS, and other organizations both inside and outside of the state.  Depending on the state, TAG and the state HS advisor may be the same individual.  The director of a state's emergency management agency often chairs a committee composed of representatives of relevant state agencies, including public safety, the NG, emergency management, medical and public health, and others charged with developing emergency management and response services and support.

(3) **Director, State Emergency Management Agency.**  All states, US territories, and commonwealths have laws mandating establishment of a state emergency

management agency and emergency plans coordinated by that state. The director of the state emergency management agency coordinates the state response in any incident, prepares the state to deal with large-scale emergencies, and coordinates the statewide response to any such incident. This includes support to local governments as requested and coordinating assistance with other states and the USG. The state emergency management agency may dispatch personnel to the scene to assist in the response and recovery effort. If a jurisdiction requires resources beyond those available within the state, local agencies may request federal assistance through the state.

(4) State TAGs advise their governors on military affairs and are the senior military officials in their respective state or territory. They provide C2 of state NG forces (Title 32, USC, or SAD status). State department and agency heads and their staffs develop, plan, and train to internal policies and procedures to meet response and recovery needs safely. They should also participate in interagency training and exercises to develop and maintain the necessary capabilities. They are vital to the state's overall emergency management and HS programs, as they bring expertise and serve as core members of the state EOC.

(5) A National Guard joint force headquarters-state (NG JFHQs-State) provides C2 of all NG forces in the state and can act as a joint headquarters for national-level response efforts during operations. These NG forces may be in a SAD status; a Title 32, USC, status; or a combination of both. The NG JFHQ-State is staffed with emergency preparedness liaison officers (EPLOs) from the Service active components.

(6) During some DSCA events, the state may create a joint task force-state for a specific mission. The joint task force-state reports directly to an NG JFHQ-State or is under the operational control of a predesignated DSC and staff. An NG JFHQ-State relays information to the NGB for situational awareness.

*For additional information on a joint task force-state and NG JFHQ-State, see JP 3-33,* Joint Force Headquarters, *and DoDD 5105.83,* National Guard Joint Force Headquarters-State (NG JFHQ-State).

c. **Tribal Governments.** Tribal governments coordinate resources to address actual or potential incidents. When the tribe requires additional capability or capacity to mitigate the incident's effects, tribal leaders may seek assistance from states or the USG.

(1) The chief executives of tribal nations can elect to work with the state or to deal directly with the USG for disaster assistance.

(2) The tribal leader is responsible for the public safety and welfare of the people of that tribe. As authorized by tribal government, the tribal leader:

(a) Coordinates tribal resources needed to prevent, protect against, respond to, and recover from incidents of all types. This also includes preparedness and mitigation activities.

(b) May have powers to amend or suspend certain tribal laws or ordinances associated with response.

(c) Communicates with the tribal community and helps people, businesses, and organizations cope with the consequences of any type of incident.

(d) Negotiates mutual aid and assistance agreements with other tribes or jurisdictions.

(e) Requests federal assistance under the Stafford Act when it becomes clear that the tribe's capabilities are insufficient.

*See JP 3-08,* Interorganizational Cooperation*, for additional information on insular governments related to the United States.*

d. **Insular Area Governments.**   Insular areas covered under DSCA include the Commonwealth of Puerto Rico, American Samoa, Guam, the US Virgin Islands, and the Commonwealth of the Northern Mariana Islands.   USG support under DSCA is coordinated through the existing insular government structure, regardless of the type and robustness of the government.  For more information on insular areas, see Title 48, USC.

## 2. Federal Role

a. The USG maintains a wide range of capabilities and resources that may be required to deal with domestic incidents to save lives and protect property and preserve the environment while ensuring the protection of privacy, civil rights, and civil liberties.  The primary federal role is as a resource provider.  Particularly in disaster and crisis response, FEMA serves as the LFA to provide suitable and sufficient resources for the state and local communities to respond to events that are beyond their ability to handle alone.

b. The USG becomes involved with a response when federal interests are involved; if SLTT resources are overwhelmed; when federal assistance is requested; or as authorized or required by statute, regulation, or policy.  Accordingly, in some instances, the USG may play a supporting role to state and local civil authorities by providing federal assistance to the affected parties.  For example, the USG provides assistance to SLTT authorities when the President declares a major disaster or emergency under the Stafford Act.  In other instances, the USG may play a leading role in the response where the USG has primary jurisdiction or when incidents occur on federal property (e.g., national parks, military bases).

c. Regardless of the type of incident, the President leads the USG effort to quickly and efficiently apply necessary resources in response to large-scale and catastrophic incidents.   Different USG departments or agencies lead coordination of the USG's response, depending on the type and magnitude of the incident, and are also supported by other agencies that bring their relevant capabilities to bear in responding to the incident. For example, FEMA leads and coordinates federal response and assistance when the President declares a major disaster or emergency under the Stafford Act.  Similarly, the

Department of Health and Human Services (HHS) leads all federal public health and medical response to public health emergencies and incidents covered by the NRF.

d. The response to a catastrophic incident, and any cascading effects, requires a coordinated effort involving SLTT and federal governments, NGOs, and private-sector partners. All response partners, organized in support of an ESF, utilize the NIMS to facilitate usage of a common terminology, including the establishment of plain language (clear text) communications standards, accessible and actionable effective communication for whole community access, integrated communications, unified command structure, and comprehensive resource management to ensure effective coordination between all stakeholders.

## 3. Department of Defense Immediate Response and Emergency Authority

a. **Immediate Response.** As authorized by the Stafford Act, and prescribed by DoDD 3025.18, *Defense Support of Civil Authorities (DSCA),* federal military commanders, heads of DoD components, and responsible DoD civilian officials have immediate response authority. In response to an RFA from a civil authority, under imminently serious conditions and if time does not permit approval from higher authority, DoD officials may provide an immediate response by temporarily employing the resources under their control, subject to any supplemental direction provided by higher headquarters, to save lives, prevent human suffering, or mitigate great property damage within the United States. Immediate response authority is not an exception to the PCA, nor does it permit actions that would subject civilians to the use of military power that is regulatory, prescriptive, proscriptive, or compulsory.

(1) A DoD official directing immediate response authority immediately notifies, through the chain of command, the National Joint Operations and Intelligence Center. The National Joint Operations and Intelligence Center informs United States Northern Command (USNORTHCOM) or United States Indo-Pacific Command (USINDOPACOM), the Office of the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs (OASD[HD&HA]), and the appropriate DoD components.

(2) Immediate response ends when DoD assistance is no longer necessary (e.g., when there are sufficient resources and capabilities available from state, local, and other federal agencies to respond adequately), when a DoD authority directs an end to the response, or when the President formally declares a major disaster or emergency. The DoD official directing a response under immediate response authority makes an assessment, no later than 72 hours after receipt of request for DoD assistance, as to whether there remains a need for the continued DoD support. Under Title 42, USC, DoD response may not exceed 10 days without a presidential declaration of a major disaster or emergency.

(3) Support provided under immediate response authority should be provided on an incremental, cost-reimbursable basis, where appropriate or legally required, but decisions to use DoD resources are not delayed or denied based on the inability or unwillingness of the requester to make a commitment to reimburse DoD. DoD officials

who authorize the expenditure of funds without first having satisfied all of the conditions necessary to properly exercise immediate response authority risk violating Title 31, USC, Section 1341, the Antideficiency Act.  See Appendix F, "Reimbursement for Defense Support of Civil Authorities," for additional guidance on reimbursement for DSCA.

(4)  State officials have the authority to direct state-level or local-level immediate response authority using NG personnel serving in SAD or Title 32, USC, status if this is IAW the laws of that state.  NG members are not placed in or extended in Title 32, USC, status to conduct state immediate response activities.  NG members already in a Title 32, USC, status may either be transitioned to SAD orders or temporarily remain on Title 32, USC, orders.  Commanders may need to assign alternate forces to complete DoD DSCA missions assigned to NG members in a Title 32, USC, status who are re-missioned to conduct state immediate response activities.

(5)  The distance from the incident to the DoD office or installation is not a limiting factor for the provision of support under immediate response authority.  However, DoD officials should use the distance and travel time to provide support as factors in determining DoD's ability to support the request for immediate response.

(6)  The scale of the event should also be a deciding factor for whether to provide support to incidents several miles or hundreds of miles away from the installation under immediate response authority.  In some cases of a catastrophic incident, the demands for life-saving and life-sustaining capabilities may exceed both the state and USG's ability to mobilize sufficient resources to meet the demand.  In these circumstances, installations and facilities not directly affected should be prepared to provide immediate response support if they are able to save lives, prevent human suffering, or prevent great property damage.

*For more information on immediate response authority, see DoDD 3025.18,* Defense Support of Civil Authorities (DSCA).

b. **Emergency Authority.**  Emergency authority is a federal military commander's authority to engage temporarily in activities that are necessary to quell large-scale, unexpected civil disturbances in extraordinary emergency circumstances when prior authorization by the President is impossible, duly constituted local authorities are unable to control the situation, such activities are necessary to prevent significant loss of life or wanton destruction of property, are necessary to restore governmental function and public order, or when duly constituted federal and SLTT authorities are unable or decline to provide adequate protection for federal property or federal governmental functions.  Responsible DoD officials and commanders use all available means to seek presidential authorization through the chain of command while applying their emergency authority.  Emergency authority should not be confused with immediate response authority.  Federal forces acting under immediate response authority are still bound by the PCA and may not participate directly in law enforcement, whereas emergency authority and actions taken under the Insurrection Act are exceptions to the PCA.

*For more information on emergency authority, see DoDI 3025.21,* Defense Support of Civil Law Enforcement Agencies, *and DoDD 3025.18,* Defense Support of Civil Authorities (DSCA).

## 4. Emergency Support Functions

a. The USG and many state governments organize their response resources and capabilities under the ESF construct. ESFs have proven to be an effective way to organize and manage resources to deliver core capabilities. The federal ESFs are the primary, but not exclusive, federal coordinating structures to build, sustain, and deliver the response core capabilities. The federal ESFs bring together the capabilities of USG departments and agencies as well as other national-level assets. ESFs are not based on the capabilities of a single department or agency, and the functions for which they are responsible cannot be accomplished by any single department or agency. Instead, federal ESFs are groups of organizations that work together to deliver core capabilities and support an effective response.

b. Many state and local jurisdictions have adopted and tailored the ESF construct. State and local jurisdictions establish ESFs based on their specific risks and requirements, and there is no mandatory or direct linkage to the federal ESFs. However, many are similar to the ESF construct outlined in the NRF. ESFs align categories of resources and provide strategic objectives for their use. ESFs utilize standardized resource management concepts such as typing, inventorying, and tracking to facilitate the dispatch, deployment, and recovery of resources before, during, and after an incident. ESF coordinators and primary agencies are identified on the basis of authorities and resources. Support agencies are assigned based on the availability of resources in a given functional area. ESFs provide the greatest possible access to USG department and agency resources regardless of which organization has those resources.

*For a more detailed description of each of the 15 ESFs, see Appendix B, "National Response Framework's Emergency Support Functions," and DHS's* National Response Framework.

## 5. Catastrophic Incident Support

a. The NRF states a catastrophic incident is "any natural or man-made incident, including terrorism, that results in extraordinary levels of mass casualties, damage, or disruption severely affecting the population, infrastructure, environment, economy, national morale, or government functions." A catastrophic incident is the same as a catastrophic event in DoD terminology. A catastrophic event could result in significant nationwide impacts over a prolonged period of time. It almost immediately exceeds resources normally available to SLTT and private-sector authorities in the affected area and significantly interrupts governmental operations and emergency services to such an extent that national security could be threatened. These factors drive the urgency for coordinated national planning to allow for accelerated federal or national assistance.

b. The catastrophic event becomes complex (i.e., a complex catastrophe) when it severely affects the population, environment, economy, public health, national morale, response efforts, or government functions resulting from cascading failures of multiple, interdependent, critical life-sustaining infrastructures, in which disruption of one infrastructure component (such as the electric power grid) disrupts other infrastructure components (such as transportation and communications). Cascading infrastructure failures could magnify requirements for DSCA in the immediately affected zone and outside affected areas in the region and complicate the operational environment in which DoD would be asked to provide assistance.

c. When a situation is beyond the capability of an affected state or territory, the governor may request federal assistance from the President. The President also has the authority to proactively direct the USG to provide supplemental assistance to SLTT governments to alleviate the suffering and damage resulting from disasters or emergencies.

d. In the event of a catastrophic incident, SecDef, using the Chairman of the Joint Chiefs of Staff (CJCS) *Emergency Action Plan* process, convenes a consultative assessment process attended by SecDef; the CJCS; relevant combatant commanders (CCDRs); the CNGB; and other senior DoD leadership. SecDef determines whether DoD should treat an incident as a complex catastrophe based upon its magnitude. SecDef approves and orders the level of support to the response, including forces and exceptions to policy, as necessary. SecDef notifies the President of potential changes to worldwide risk and readiness issues if DoD provides the level of support required.

*See DoDM 3025.01, Volume 2,* Defense Support of Civil Authorities: DoD Incident Response, *for information on the SecDef decision matrix and a listing of potential DoD support requirements by ESF.*

## 6. Interorganizational Coordination

The Secretary of Homeland Security coordinates required federal response activities consistent with HSPD-5, *Management of Domestic Incidents.* Other USG departments and agencies carry out their response authorities and responsibilities within this overarching construct. Nothing in the NRF alters or impedes the ability of federal or SLTT departments and agencies to carry out their specific authorities or perform their responsibilities under all applicable laws, EOs, and directives. Additionally, nothing in the NRF is intended to impact or impede the ability of any USG department or agency to take an issue of concern directly to the President or any member of the President's staff.

a. **Planning Considerations for Interorganizational Coordination.** DoD works closely with other USG departments and agencies, in particular DHS and its subordinate organizations, when planning for DSCA. DSCA plans are compatible with the NRF, NIMS, and DoD issuances. DSCA planning should consider C2 options that emphasize unity of effort. DoD organizations and agencies provide numerous liaison officers (LNOs) to DHS and DHS components. DoD LNOs may represent organizations and specialties such as the Office of the Secretary of Defense (OSD), CCMDs, combat support agencies, intelligence organizations, or engineers.

(1) As the supported CCDRs, Commander, United States Northern Command (CDRUSNORTHCOM), and Commander, United States Indo-Pacific Command (CDRUSINDOPACOM), are DoD's principal planning agents for DSCA and provide joint planning and execution directives for peacetime assistance rendered by DoD within their assigned areas of responsibility (AORs). In addition to participating in interagency steering groups and councils, DoD has responsibilities under the NRF.

(2) DoD coordinates with interagency partners and through the CNGB with states/territories on all matters pertaining to the NG to ensure DoD planning supports the needs of those requiring DSCA. Coordination aligns with the NRF, NIMS, and interagency coordination guidelines provided in CJCSI 3110.01, *(U) Joint Strategic Campaign Plan (JSCP).*

(3) The domestic operating environment for DSCA presents unique challenges to the JFC. It is imperative that commanders and staffs at all levels understand the relationships, both statutory and operational, among all USG departments and agencies involved in the operation. Moreover, it is equally important to understand DoD's role in supporting other USG departments and agencies. **DoD elements provide assistance to the primary agency upon request by the appropriate civil authority and upon approval by the President, SecDef, or a SecDef-delegated official (e.g., the supported CCDR).** There are also specific USNORTHCOM and USINDOPACOM domestic plans (e.g., DSCA, civil disturbance operations) where the responsibilities of various USG entities are described in detail. The LFA for civil disturbances is normally DOJ.

b. **Elements for Interagency Coordination.** The CCMD interagency coordination process complements and supports strategic interagency coordination processes and may involve application of such key elements as joint interagency coordination groups (JIACGs) in campaign plans, operation plans, and concept plans (CONPLANs). Annex V (Interorganizational-Interagency Coordination) is found in Chairman of the Joint Chiefs of Staff Manual (CJCSM) 3130.03, *Planning and Execution Formats and Guidance,* and provides a single-source reference to request interagency activities and to lay the groundwork for interagency coordination. All are designed to enhance information sharing, enable effective joint and interagency planning, and maximize coordinated operations.

(1) **JIACG.** The JIACG is an interagency staff group that establishes regular, timely, and collaborative working relationships between civilian and military operational planners. The JIACG provides the CCDR with the capability to collaborate at the operational level with other USG departments and agencies. It is composed of USG civilian and military experts assigned to the CCDR and tailored to meet the requirements of that supported CCDR. It is the CCDR's primary interagency forum to share information; analyze ongoing activities; and anticipate future interagency actions, implications, or consequences.

(2) **Agency Representatives and Command Representatives.** Subject matter experts and LNOs from key partner agencies and commands facilitate effective two-way communication, coordination, and cooperation. A formally established liaison and

representative link between the CCMD and the partner agency is beneficial to both organizations. Specific focus should be on agency or command LNOs whose organizations play a key part in successful and seamless execution of DSCA operations. Regardless of mission, having key partner agency and command representatives is essential for the CCDR conducting operations in a US territory. Equally important, CCMDs may locate a command representative or LNO at key partner agencies commensurate with their operational requirements. On-the-ground agency representatives and command LNOs are typically located where they may be supportive of command activities and beneficial to their parent agency or command. However, they should also have an ongoing interface with the CCMD JIACG. This maximizes their participation in support of the interagency process and benefits their particular agency or command.

(3) **Joint Field Office (JFO).** The JFO is a temporary, federal, multiagency coordination center established locally to facilitate field-level domestic incident management activities related to prevention, preparedness, response, and recovery when activated by the Secretary of Homeland Security. The JFO provides a central location for coordination of federal, SLTT, nongovernmental, and private-sector organizations with primary responsibility for activities associated with threat response and incident support. When multiple JFOs are established to support an incident, one of the JFOs may be identified (typically in the most heavily affected area) to serve as the primary JFO and

> **CONSTANT IMPROVEMENT FOR DEFENSE SUPPORT OF CIVIL AUTHORITIES**
>
> The lessons learned on improving interagency coordination and command and control options from previous defense support of civil authorities (DSCA) operations, such as Hurricane Katrina, paid tremendous dividends during Hurricane Sandy in 2013. As Hurricane Sandy made landfall, the Secretary of Defense and the governors of two of the affected states, New Jersey and New York, established dual-status commanders (DSCs) for response. Partnerships among the Federal Emergency Management Agency, Department of Defense (DoD) (e.g., United States Northern Command, the National Guard Bureau), and the individual states resulted in a swift and coordinated response, including pre-positioned Title 10, United States Code, resources in the region, along with the quick response of National Guard, state, and local resources. United States Transportation Command and interagency partners executed strategic and ground movements of DoD assets and thousands of short tons of equipment, including private/commercial power utility company trucks and personnel. The DSCs provided critical leadership to achieve greater unity of effort between federal and state military forces in responding to the devastating effects of this hurricane. The federal government learned the importance of anticipation during Hurricane Sandy. 2017 brought even greater challenges, as DoD responded to an unusually high number of disasters. These included a trio of category 4 and 5 hurricanes (Harvey, Irma, and Maria) and wildland fires, as well as an earthquake in Mexico. The disasters of 2017 resulted in a thorough after action review process to ensure DoD

> **capabilities are used most efficiently in complex disasters, such as enabling common pictures across all levels of government for requesting, tasking, and understanding the execution of DoD capabilities throughout the disaster response. DoD improved planning, training, and exercising with key partners and anticipation of key capability needs critical to mission success. A common thread throughout DSCA operations is the importance of partnerships and professional relationships that enable enhanced unity of effort for the accomplishment of DSCA missions.**
>
> **Various Sources**

provide strategic leadership and coordination for the overall incident management effort, as designated by the Secretary of Homeland Security. The JFO organizational structure is built upon the NIMS but does not impede, supersede, or affect the ICS structure.

*For further reference, see JP 3-08,* Interorganizational Cooperation, *and the NRF.*

## 7. Unity of Effort

Unity of effort refers to coordination and cooperation toward common objectives, even if the participants are not necessarily part of the same command or organization.

a. **Responsibilities.** Incidents are managed at the lowest level possible. Federal support is provided in response to requests from state or local officials through the state coordinating officer to the federal coordinating officer. The federal coordinating officer coordinates for DoD support through the defense coordinating officer (DCO) in the JFO. DoD may provide support to the LFA, which has the lead in managing the federal response to a domestic incident. DHS is responsible for domestic incident management and the framework for federal interaction with SLTT governments, the private sector, and NGOs in the context of incident preparedness, response, and recovery activities. DoD support to this response is initiated through a formal RFA or mission assignment process or provided as directed by the President or SecDef. Situating a senior NG representative or even the DSC alongside the senior defense official increases the integrity and efficiency of this process, providing timely visibility of all state NG assets.

b. **Domestic Incident Management.** HSPD-5, *Management of Domestic Incidents,* states, "to prevent, prepare for, respond to, and recover from terrorist attacks, major disasters, and other emergencies, the United States Government shall establish a single, comprehensive approach to domestic incident management." The objective of the USG is to ensure all levels of government across the nation have the capability to work efficiently and effectively together, using a national approach to domestic incident management. To this end, the USG treats crisis management and CBRN response as a single, integrated function rather than as two separate functions. DoD categorizes such support domestically as DSCA. DoD also uses the term crisis management and other terminology that may be specific to the actual type of operation.

c. Non-DoD participants, including local civil authorities and first responders, are frequently not familiar with US military terms, definitions, and doctrine. When working with non-DoD participants/partners, especially in an emergency situation, clear, effective, and mutually understandable communication is essential. DoD elements should strive to use standardized terms and concepts published in the NRF and NIMS. The NIMS defines incident management as how events are managed across all HS activities, including prevent, protect against, mitigate, respond to, and recover from terrorist attacks, major disasters, and other emergencies. This is consistent with the DoD view that incident management is a comprehensive national approach to these emergencies. The NRF further defines emergency management as a subset of incident management, the coordination and integration of all activities necessary to build, sustain, and improve the capability to prepare for, protect against, respond to, recover from, or mitigate against threatened or actual natural disasters, acts of terrorism, or other man-made disasters.

## 8. Department of Defense and Emergencies in the Homeland

a. DSCA is initiated by a request for DoD assistance from civil authorities or is authorized by the President or SecDef.

b. IAW the National Defense Authorization Act of 2012, Public Law 112-81, Section 515(c), 125 Stat. 1395 (2011), when the federal government and NG simultaneously provide support to civil authorities in the United States, appointment of a DSC should be the usual and customary C2 arrangement.

c. Requests for DSCA should be written and include a commitment to reimburse DoD IAW the Stafford Act; Title 31, USC, Section 1535 (also known as the Economy Act of 1932); or other authorities, except requests for support for immediate response and mutual or automatic aid, IAW DoDD 3025.18, *Defense Support of Civil Authorities (DSCA)*. Unless approval authority is otherwise delegated by SecDef, all DSCA requests are submitted to the office of the DoD Executive Secretary.

d. DoD informs civil authorities that verbal requests for DoD assistance during emergency circumstances are to be followed by a formal written RFA, which includes intent to reimburse DoD, at the earliest opportunity. Support may be provided on a nonreimbursable basis only if required by law or if both authorized by law and approved by the appropriate DoD official.

e. Civil authority requests for DoD assistance are evaluated for:

(1) Legality (compliance with laws).

(2) Lethality (potential use of lethal force by or against DoD forces).

(3) Risk (safety of DoD forces).

(4) Cost (including the source of funding and the effect on the DoD budget).

(5)  Appropriateness (whether providing the requested support is in the interest and within the capability of DoD).

(6)  Readiness (impact on DoD's ability to perform its primary mission).

f.  DSCA plans should be compatible with the NRF, NIMS, and DoD issuances and should consider C2 options to support unity of effort.

g.  With limited exceptions (e.g., local requests for immediate and emergency response), initial RFAs are directed to the DoD Executive Secretary.  SecDef-approved RFAs are assigned to the appropriate CCDR.  The supported CCDR determines the appropriate level of C2 for each response and usually directs a senior military officer to deploy to the incident site.  The DCO serves as DoD's single point of contact in the JFO.  DSCA requests originated in the JFO are coordinated and processed through the DCO, with the exception of requests for United States Army Corps of Engineers (USACE) support or, in some circumstances, DoD forces in support of the Federal Bureau of Investigation (FBI) or the United States Secret Service (USSS).

## 9.  Command and Control in United States Northern Command and United States Indo-Pacific Command Areas of Responsibility

a.  **Supported CCDR.**  For DSCA operations, SecDef designates a supported CCDR.  Ordinarily, this is CDRUSNORTHCOM for the continental United States, Alaska, Puerto Rico, and the US Virgin Islands and CDRUSINDOPACOM for Hawaii, Guam, American Samoa, and the Northern Mariana Islands.  The CJCS may publish, if required, a SecDef-approved execute order (EXORD) to further delineate support relationships, available forces, objective, purpose, and SecDef-approved scope of actions.  The supported CCDR may elect to employ a JTF, lead functional component command, or other C2 structure IAW JP 3-0, *Joint Campaigns and Operations.*

b.  **JTF.**  If a JTF is designated, consistent with operational requirements, a C2 element, appropriate liaison, or interagency planning cell may be co-located at the JFO to allow for coordination and unity of effort.  A JTF interagency planning cell provides timely coordination with the DCO staffs to help determine the best use of JTF resources in fulfilling RFAs and developing mission assignments.  The interagency planning cell also provides operations assessment input to the JTF headquarters.  The co-location of the JFC's C2 element does not replace the requirement for a DCO as a part of the JFO coordination staff.  A JFC may be required to provide communications support to civil authorities in the affected area.

(1)  The Title 10, USC, response force could be formed from either a standing JTF or one configured for specific missions to provide emergency assistance across all lines of support.  The Title 10, USC, JFC coordinates with the NG JFHQ-State through a dual-status command relationship, if a DSC is established, through the NGB or directly, as appropriate, to achieve unity of effort between federal and state response forces.

(2)  Designation of a DSC or JFC is not contingent on a request from the primary or coordinating federal agency.

Chapter II

_____

(3)  All types of DoD support may be required as outlined in mission assignments. Because of this, close coordination between the JFC and the DCO is essential.

c.  **DCO.**  The DCO is the DoD single point of contact at the JFO.  RFAs are validated through the DCO and forwarded to designated DoD entities for approval and sourcing.

(1)  United States Army, North, DCOs are permanently aligned to each of the 10 FEMA regions (see Figure II-1).  During an event requiring DoD response, DCOs from inactivated regions may be activated to support multiple disaster declarations in regions requiring support.  USINDOPACOM DCO (based in Hawaii and Guam) work closely with United States Army, North, Region 9 DCO.

(2)  C2 of DCOs is directed by the supported CCDR.

(3)  The DCO is supported by the defense coordinating element, an administrative and support staff.

(4)  Depending on severity of the event and the type of DoD response required, the defense coordinating element may also be augmented by specialty staff augmentees, additional personnel from the Services, and additional LNOs in the form of EPLOs.



**Figure II-1.  Map of the Ten Federal Emergency Management Agency Regions**

_____

*For more information on the DCO, refer to DoDI 3025.23,* Domestic Defense Liaison with Civil Authorities.

d. **EPLOs.** EPLO positions are authorized in each FEMA region and state from the Title 10, USC, reserve forces. The EPLOs are aligned with the 10 defense coordinating elements and their associated FEMA regions (see Figure II-1). EPLOs provide DoD liaison with NG JFHQ-State and FEMA regional organizations and agencies; facilitate planning, coordination, and training for DSCA and national security emergency preparedness; advise federal agencies and organizations on DoD capabilities and resources; advocate mutual support required by DoD; and, on order, augment DoD response for DSCA. The EPLO program is established by DoDI 3025.16, *Defense Emergency Preparedness Liaison Officer (EPLO) Programs.*

(1) EPLOs are senior RC officers administered by, and reporting to, program managers within their respective Services responsible for organizing, training, and equipping personnel for a DSCA response.

(2) EPLOs are trained in emergency management and DSCA operations. EPLOs advise civil authorities on military resources and capabilities and facilitate coordination between civil authorities and DoD during state or federal exercises or DSCA operations.

(3) EPLOs are activated and employed by their Services at the request of the supported CCDR to support the DCO or as coordinated with the CCDR to facilitate Military Department response. EPLOs, provided in support to the DCO, normally operate under the tactical control of the DCO. When in support of the Military Departments, EPLOs operate under the operational control of the appropriate military commander.

(4) Regional EPLOs normally support the DCO but can be located pre-event at the regional response coordination center and then moved forward to the JFO with the DCO.

(5) State EPLOs are aligned with the appropriate DCO but are oriented toward supporting the state emergency response team and the NG JFHQ-State.

*For more information on the EPLO, refer to DoDI 3025.16,* Defense Emergency Preparedness Liaison Officer (EPLO) Programs.

e. **Joint Regional Medical Plans and Operations Officer (JRMPO).** JRMPOs support the DCO, defense coordinating element, and, if required, the JFC in coordinating DoD public health and medical capabilities in support of approved LFA RFAs and requirements (e.g., ESFs #8 and #11) and also support preparedness activities. They advise the joint force surgeons on the synchronization and integration of DoD medical capabilities with federal and SLTT medical and public health capabilities. During incidents, JRMPOs are the primary DoD public health and medical advisor to the DCO.

*For more information on DCOs, EPLOs, and JRMPOs, refer to DoDI 3025.23,* Domestic Defense Liaison with Civil Authorities.

f. **NG Regional Medical Plans Officer.**  The regional medical plans officer works directly for the NGB, Office of the Surgeon General.  The NGB regional medical plans officers provide direct medical planning to support DCOs and to the National Guard CBRN Response Enterprise.  They serve as liaisons with ESFs #8 and #11 authorities within the states and territories.  They also advise state surgeons general and J-3 domestic operations officers at NG JFHQ-State as well as state emergency managers on the synchronization and integration of NG medical capabilities with federal and SLTT medical and public health capabilities.

*For more information on NG regional medical plans officers, see JP 4-02,* Joint Health Services.

## 10.  Planning Considerations for Defense Support of Civil Authorities

Cultural traits are an intangible factor that affect DSCA operations.  Cultural considerations should be incorporated early and consider such traits as sex, race, ethnicity, local observances, and local perceptions of the population being served during DSCA operations.  To expedite planning and operational response during crisis situations, the CJCS publishes the DSCA EXORD and domestic CBRN response EXORD to allow prompt force deployment in support of domestic incidents.  DoD planners work hand-in-hand with NG and civilian planners to develop tailored regional civil-military plans for DSCA.  These plans inform SLTT and national planning efforts.

*For further information, see CJCS DSCA EXORD; CJCS CBRN Response EXORD; USNORTHCOM CONPLAN 3500,* Defense Support of Civil Authorities (DSCA); *USNORTHCOM CONPLAN 3502,* Civil Disturbance Operations; *USINDOPACOM CONPLAN 5001,* Defense Support of Civil Authorities (DSCA); *JP 3-41,* Chemical, Biological, Radiological, and Nuclear Response; *CNGB Instruction 3204.00,* National Guard Emergency Management Program; *and CNGB Instruction 5200.01,* National Guard Bureau All-Hazards Support Plan.

*General planning guidance for DSCA is provided in CJCSM 3130.03,* Planning and Execution Formats and Guidance, *and more specific planning guidance is provided in CJCSM 3130.03-1,* Defense Support of Civil Authorities Supplement to CJCSM 3130.03, Planning and Execution Formats and Guidance.

a. **Environmental Considerations.**  Environmental considerations are an integral part of the mission planning and operational decision-making process.  All joint operations within the United States and territories should be conducted in compliance with applicable federal, state, territory, and local environmental regulatory guidance.  Adverse environmental impacts should be avoided or mitigated when practicable based on mission requirements and response to emergency situations.

*For additional information on environmental considerations in DSCA operations, see JP 3-34,* Joint Engineer Operations.

b. **Mission Assurance.**  Mission assurance is a process to protect or ensure the continued function and resilience of capabilities and assets, including personnel,

equipment, facilities, networks, information and information systems, infrastructure, and supply chains, and is critical to the performance of DoD mission-essential functions in any operational environment or condition. Mission assurance leverages existing protection and resilience programs, such as antiterrorism, force health protection (FHP), physical security, continuity of operations, critical infrastructure protection, operational energy, and cybersecurity, and provides input to existing DoD planning, budget, requirements, and acquisition processes. DoD may need to coordinate with key partners to prioritize restoration of non-DoD-owned critical infrastructure to enable critical DoD missions, including DSCA.

*For further information, see JP 3-34,* Joint Engineer Operations; *JP 4-0,* Joint Logistics; *and DoDD 4180.01,* DoD Energy Policy.

c. **Force Protection (FP).** FP efforts in support of DSCA operations are central to achieving DoD mission assurance. FP includes preventive measures taken to mitigate hostile actions against DoD personnel (including DoD family members), resources, facilities, and critical information in an all-hazards environment. By conserving the force's operating capabilities so they can be applied at the decisive time and place, FP allows for the effective employment of the joint force in DSCA operations. USNORTHCOM and USINDOPACOM have antiterrorism and FP responsibilities for DoD forces operating within their respective AORs.

*For further information, see USNORTHCOM Instruction 10-222,* Force Protection Mission and Antiterrorism Program; *USNORTHCOM CONPLAN 3500,* Defense Support of Civil Authorities (DSCA); *and USINDOPACOM Instruction 0536.2,* USINDOPACOM Antiterrorism (AT) Program.

d. **Operations.** DSCA operations are considered alongside other concurrent DoD missions. The duration and scope of DoD involvement are determined by the severity and magnitude of the event and the approved RFA.

e. **Communication Synchronization.** The military plays an important supporting role in communication synchronization, primarily through information capabilities such as public affairs (PA), psychological operations forces (employed as civil authority information support [CAIS]), and civil affairs. These information capabilities follow established processes to coordinate and synchronize narratives, themes, messages, images, operations, and actions to ensure their integrity and consistency to the lowest tactical level across all relevant communication activities. Successful DSCA depends on creating an operational advantage in a highly complex and dynamic information environment. To meet this challenge, DoD communicates the rationale for its actions to a wide range of audiences. If planners fail to provide a narrative that provides an observer with context for sense-making, observers use their own narratives to explain the military events around them, which may or may not advance the DSCA's overall intent. Developing an effective narrative helps audiences from the individual military member to international audiences understand the reasons behind DoD activities. Communication synchronization considerations should be included in all joint operational planning for military operations from routine, recurring military activities in peacetime through major operations.

*For additional information, see JP 3-0,* Joint Campaigns and Operations; *JP 5-0,* Joint Planning; *JP 3-53,* Joint Military Information Support Operations; *JP 3-04,* Information in Joint Operations; *JP 3-57,* Civil-Military Operations; *and JP 3-61,* Joint Public Affairs.

f. **Facility Requirements.** DoD forces rely on DoD facilities for support to the maximum extent possible. Short-term leasing may be a necessary option depending on location and duration. No occupation of private land or facilities is authorized without specific legal authority. Real property support may be obtained from the General Services Administration, USACE, Naval Facilities Engineering Systems Command, Air Force Installation and Mission Support Center, or other USG departments and agencies.

*For information on base support installation (BSI)/joint reception, staging, onward movement, and integration (JRSOI), refer to Appendix G, "Department of Defense Installations Supporting Defense Support of Civil Authorities," and JP 3-35,* Joint Deployment and Redeployment Operations. *For additional information on acquiring or occupying non-DoD real property, refer to DoDI 4165.71,* Real Property Acquisition.

## 11. Phases of Defense Support of Civil Authorities

Phasing is a way to organize and conduct a complex joint operation in manageable parts. The phases are unique for each operation as a tool to integrate and synchronize related activities. A phase can be characterized by the focus that is placed on it. During planning, the JFC establishes conditions, objectives, or events for transitioning from one phase to another. Phases are distinct in time, terrain, or purpose but are planned in mutual support and should represent a natural progression and subdivision of the campaign or operation. Each phase should have starting conditions and ending conditions. The ending conditions of one phase are the starting conditions for the next phase. DSCA operations are generally executed in the following phases: phase 1 pre-incident, (1a) normal operations, (1b/1c) elevated/credible threat (for a notice event); phase 2 response, (2a) immediate response, (2b) deployment of resources and personnel, (2c) sustained response; and phase 3 recovery and transition. These phases align with FEMA's CONOPS and deviate from the notional phasing construct.

*For an example phasing construct in support of FEMA for disaster response, see Appendix J, "Example Phasing of Defense Support of Civil Authorities."*

*For additional information, see JP 5-0,* Joint Planning.

## 12. Assessing Defense Support of Civil Authorities

a. **Introduction.** Assessment is a continuous process that measures the overall effectiveness of employing joint force capabilities during military operations and the expected effectiveness of plans against contingencies as the operational environment changes. The purpose of assessment is to integrate relevant, reliable feedback into planning and execution, thus supporting the commander's decision making regarding the adjustment of operations during execution. JFCs are the central driver for assessments as the ultimate stakeholders in the success of their command's activities. However, for DSCA operations, the LFA and SLTT civil authorities are major stakeholders in the assessment process. As

such, the JFC should work with the LFA and other civil authorities early in the DSCA response to establish transition criteria and the metrics used for assessment. The JFC should continually monitor the support rendered and assess the progress toward meeting RFAs from civil authorities. These assessments should be shared with civil authorities to establish and maintain a shared understanding of progress and the assessment of transition criteria.

b. **Immediate Response.** Under immediate response authority, local commanders assess the situation and determine when the conditions are such that immediate response is no longer appropriate:

(1) The criteria to provide immediate response are no longer met (e.g., saving lives, protecting property, mitigating suffering under imminently serious conditions),

(2) The necessity giving rise to the response is no longer present (e.g., when there are sufficient resources available from federal and SLTT departments and agencies to respond adequately and those agencies or departments have initiated response activities), or

(3) The initiating DoD official or a higher authority directs an end to the immediate response.

c. **DSCA Response.** Given the operational environment (i.e., homeland) and the fact that DoD is in support of an LFA, assessing DSCA differs in some ways from other operations. DSCA operations are typically initiated based on an LFA assessment of the situation and subsequent RFAs and continues until a decision is made to transition all operations back to civil authorities. The JFC's staff still determines if it is making progress and meeting the commander's intent and objectives. The assessment of DSCA as it progresses through the phases of a response is about ensuring DoD meets the requirements requested in any RFA from civil authorities. Success can be measured in a wide variety of ways. Assessment in DSCA events can be highly subjective due to the ever-changing situation. Furthermore, every incident or declared civil emergency event is unique, and the assessment should be tailored to the specific situation.

(1) **Development of Assessment Metrics.** The JFC's staff develops metrics in coordination with the LFA and other stakeholders to determine whether operations are properly linked to the larger hierarchy of the LFA's objectives. Metrics can also either be objective (using sensors or personnel to directly observe the situation) or subjective (using indirect means to ascertain results). Both qualitative and quantitative metrics should be used to avoid unsound or distorted results. Metrics can either be inductive (directly observing the operational environment and building situational awareness cumulatively) or deductive (extrapolated from what was previously known of the adversary and operational environment). Success is measured by indications that the effects created are influencing the situation in desired ways. Given the dynamic environment in which DSCA operations occur, a metric used one week may not be valid the subsequent week.

(2) **Assessment Tools.**  There are numerous assessment models a JFC may utilize, depending on the complexity of the DSCA response.  The following example is provided to illustrate the relationship between high-level objectives and the performance of tasks at the incident level.

(a) **Objective-Based Assessment.**  The objective-based assessment framework assigns measures to the objective.  It serves as an analytical foundation for assessing developed measures for each effect where we consider "Are we doing the right things?"  The effects are then rolled up to provide an assessment of how well the response force is achieving its objectives.

1. The foundation of the objective-based assessment framework is the development of the measures.  The key consideration is that the measures are to determine the impact of what DoD is doing with its resources under the conditions that exist.

2. The assessment of each measure is informed by knowledge of the tasks performed; the tools required (organization, training, and equipment); and the authorities, resources, and environment involved in creating the effect.  The results of the assessment translate into recommendations toward sustaining objectives that are successfully achieved and improving on objectives that have challenges.  The assessment focuses on the high-level objectives by showing the current assessment, as well as the projected assessment for a given time period.  The periodicity of assessment should maximize information sharing and decision making for the LFA and JFC.

3. Once objectives have been established, effects and measures can be assigned to each objective.  See Figures II-2 and II-3.  There may be one or multiple desired effects for each objective.

---

**Example Defense Support of Civil Authorities Objective to Standard Assignment (Combatant Command)**

Objective:  Stabilize the Incident.

Effect:         Initial, rapid response supports stabilization of the incident.

Measure:     What is the contribution of pre-positioning of key enablers to the stabilization of the event?

Standards:   Significantly contributed to stabilization.

Moderately contributed to stabilization.

Contributed little to stabilization.

Detracted from stabilization.

**Figure II-2.  Example Defense Support of Civil Authorities Objective to Standard Assignment (Combatant Command)**

---

---

**Example Defense Support of Civil Authorities Objective with Effect, Measure, and Standards**

Objective:  Rescue Trapped Survivors

Effect:  Lives are saved during search and extract operations.

Citizens are rescued from search sites.

Measure:  Demand for Department of Defense support decreases due to successful completion of mission assignments.

Standards:  Begin urban search and rescue operations at designated location(s) on time.

Affected areas searched to locate victims (include total number of located victims during the current reporting period).

Injured victims medically triaged and treated.

**Figure II-3.  Example Defense Support of Civil Authorities Objective with Effect, Measure, and Standards**

(b) **Sources of Assessment Information.**  Once objectives are matched to effects, measures, and standards, the question becomes, "How do we gather the information to inform decision making?"  There are numerous sources the staff can use, including input from the LFA (normally via the DCO located at the JFO), briefings/meetings in support of the LFA's operational tempo (battle rhythm), open sources, and web-based collaboration tools.

*For additional information on assessment, see JP 5-0,* Joint Planning, *and ATP 5-0.3/MCRP 5-10.1/NTTP 5-01.3/AFTTP 3-2.87,* Multi-Service Tactics, Techniques, and Procedures for Operation Assessment.

## 13.  Multinational Forces Integration

a.  If a foreign government indicates interest in supporting a US domestic response with their own defense forces, its request to support is passed through the Department of State (DOS) to FEMA for review.  If FEMA approves the request, DoD establishes processes and procedures to integrate these foreign forces as a component of the military total force into the response.  Initial discussions and coordination between potential non-US participants should address basic questions at the national strategic level.  These senior-level discussions could involve international organizations such as the United Nations or the North Atlantic Treaty Organization, existing multinational forces, or individual nations. The result of these discussions should determine:

(1)  The capability and capacity (i.e., scale, scope, and duration) of the response.

(2)  The command structure of the response force.

(3)  The essential strategic guidance for the response force, including objectives.

b.  Much of the information and guidance provided for unified action and joint operations remains applicable to multinational operations.  However, commanders and staffs consider differences in partners' laws, doctrine, organization, weapons, equipment, terminology, culture, demographics and norms, politics, religion, language, and caveats on authorized military action throughout the entire operation.  JFCs develop plans to align US forces, actions, and resources in support of the multinational plan, and in preparation for integrating multinational assistance in support of the United States, in coordination with DOS.

c.  When directed, designated JFCs participate directly with the armed forces of other nations in preparing bilateral plans.  JFCs assess the potential constraints, security risks, and any additional vulnerabilities resulting from bilateral planning and how these plans affect the ability of the United States to reach its objective.  Bilateral planning involves the preparation of combined, mutually developed and approved plans governing the employment of the forces of two nations for a common contingency.  Bilateral planning may be accomplished within the framework of a treaty or alliance; in the absence of such arrangements, international law still applies, including customary international law. Bilateral planning is also accomplished IAW specific guidance provided by the President, SecDef, or CJCS and captured in a bilateral strategic guidance statement signed by the leadership of both countries.  An example of such a bilateral plan is the civil assistance plan signed between CDRUSNORTHCOM and Commander, Canadian Joint Operations Command.

*For more information, see JP 5-0,* Joint Planning*; JP 3-16,* Multinational Operations; *and the* Canada-US Civil Assistance Plan.

## CHAPTER III
## SUPPORTING CIVILIAN LAW ENFORCEMENT AGENCIES

> *"DoD [Department of Defense] shall be prepared to support civilian LEAs [law enforcement agencies] consistent with the needs of military preparedness of the United States, while recognizing and conforming to the legal limitations on direct DoD involvement in civilian law enforcement activities."*
>
> **Department of Defense Instruction 3025.21,** *Defense Support of Civilian Law Enforcement Agencies*

### 1. General

a. When requested, federal forces may provide support to federal, state, territory, tribal, insular area, and local law enforcement organizations reacting to civil disturbances, conducting border security and counterdrug (CD) missions, preparing for antiterrorism operations, and participating in other related law enforcement activities. The requested support is provided consistent with the limits Congress placed on military support to law enforcement through the PCA and other laws.

b. NG forces in Title 10, USC, status have the same restrictions with respect to performing law enforcement functions. State NG forces in SAD status may support LEAs within their respective states and within the limits prescribed by state law. State NG forces from another state in SAD status, operating under the EMAC or a MOA between the states, may only support civilian law enforcement as specified in a memorandum approved by both governors. SecDef may authorize NG forces to provide DoD support to federal LEAs in a Title 32, USC, status. The use of NG forces is closely monitored to assess readiness impacts to their primary federal mission.

### 2. The Posse Comitatus Act

a. The primary restriction on DoD participation in civilian law enforcement activities is the PCA.

b. IAW DoD policy, unless specifically authorized by law, DoD personnel in a Title 10, USC, status do not become involved in direct civilian law enforcement activities, except in cases, and under circumstances, expressly authorized by the President or act of Congress. Per Title 18, USC, Section 1385, "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both."

c. These restrictions also apply to reserve members of the United States Army (USA), United States Navy (USN), United States Marine Corps (USMC), and United States Air Force (USAF) who are on active duty, active duty for training, or inactive duty training in a Title 10, USC, duty status.

d.  The PCA does not apply to DoD personnel operating under provisions of Title 10, USC, Chapter 13, Insurrection.

e.  The PCA does not apply to NG forces operating in a SAD or Title 32, USC, status. However, when the NG is operating under a Title 10, USC, status (federal status), they are subject to the PCA.

f.  The PCA does not restrict the USCG, even when operating under the USN, due to the USCG having express law enforcement authority under Title 14, USC.

g.  Since commanders' initial uncertainty regarding the nature and extent of PCA restrictions may cause delays in what would be appropriate employment of federal forces, it is imperative that commanders likely to be assigned DSCA missions gain familiarity with such provisions.

## 3.  Direct Assistance to Civilian Law Enforcement Agencies

a.  **Permissible Direct Assistance**

(1)  **Military Purpose.**  There are several forms of direct assistance to civilian law enforcement by military personnel that are permitted under the Military Purpose Doctrine.  The Military Purpose Doctrine provides that law enforcement actions that are performed primarily for a military purpose, even when incidentally assisting civil authorities, does not violate the PCA.  The Military Purpose Doctrine requires a legitimate, independent military purpose for participating in law enforcement activities against civilians.  The support provided to civilian law enforcement is incidental.  DoD cooperation with civilian law enforcement officials includes:

(a)  Investigations and other actions related to the enforcement of the *Uniform Code of Military Justice.*

(b)  Investigations and other actions related to the commander's inherent authority to maintain law and order on a military installation or facility.

(c)  Protection of classified defense information or equipment or controlled unclassified information (e.g., trade secrets and other proprietary information), the unauthorized disclosure of which is prohibited by law.

(d)  Protection of DoD personnel and their dependents, DoD equipment, and official guests of DoD.

(e)  Other actions that are undertaken primarily for a military or foreign affairs purpose.

(f)  Investigations and other actions that are likely to result in administrative proceedings by DoD, regardless of whether there is a related civil or criminal proceeding. (See DoDI 5525.07, *Implementation of the Memorandum of Understanding (MOU) Between the Departments of Justice (DOJ) and Defense Relating to the Investigation and*

*Prosecution of Certain Crimes,* and Memorandum of Agreement Between the Attorney General and the Secretary of Defense, *Agreement Governing the Conduct of Defense Department Counterintelligence Activities in Conjunction with the Federal Bureau of Investigation,* with respect to matters in which DoD and DOJ have an interest.)

(2) **Emergency Authority.** Emergency authority should not be confused with immediate response authority. Federal forces acting under immediate response authority are still bound by the PCA and may not participate directly in law enforcement. Emergency authority and actions taken under the Insurrection Act are expressed exceptions to the PCA. These exceptions allow federal forces to perform actual law enforcement functions. It is DoD policy that federal military commanders do not take charge of any function of civil government unless absolutely necessary under conditions of extreme emergency. Any commander who is directed, or undertakes, to control such functions strictly limits military actions to the emergency needs and facilitates the reestablishment of civil responsibility at the earliest time possible.

(3) **Title 10, USC, Chapter 13, Insurrection**

(a) This law authorizes the President to employ the NG in federal service and the Armed Forces of the United States within the United States, when requested by a state legislature or a governor if the state legislature cannot be convened. The President is also authorized to employ the NG in federal service and the Armed Forces of the United States to suppress an insurrection; suppress a rebellion against the authority of the United States, which makes it impracticable to enforce the laws of the United States by the ordinary course of judicial proceedings; and suppress, in any state, any insurrection, domestic violence, unlawful combination, or conspiracy, if the President considers it:

<u>1</u>. Hinders execution of state and US law protecting constitutional rights and the state is unable, fails, or refuses to protect those rights, thereby denying equal protection of the law secured by the Constitution or

<u>2</u>. Opposes or obstructs execution of US law.

(b) The President executes this authority by issuing a proclamation ordering the insurgents to disperse and retire peaceably to their homes within a limited time. **Any Title 10, USC, forces employed in civil disturbance operations remain under federal military authority at all times.**

(c) Forces deployed to assist federal and local authorities during times of civil disturbance follow the rules for the use of force (RUF) found in CJCSI 3121.01, *(U) Standing Rules of Engagement/Standing Rules for the Use of Force for US Forces.*

b. **Prohibited Direct Assistance.** Direct assistance and participation by military personnel in the execution and enforcement of the law is the heart of the prohibition of the PCA. Prohibited direct assistance by military personnel includes, among other activities:

(1) Interdiction of a vehicle, vessel, or aircraft.

(2)  A search or seizure.

(3)  An arrest, apprehension, stop and frisk, interview and questioning of potential witnesses, or similar activity.

(4)  Use of military personnel for surveillance or pursuit of individuals or as undercover agents, informants, investigators, or interrogators.

(5)  Using force or physical violence, brandishing a weapon, discharging or using a weapon, or threatening to discharge or use a weapon.  Exceptions include self-defense; defense of other DoD persons in the vicinity; or defense of non-DoD persons, including civilian law enforcement personnel, in the vicinity when directly related to an assigned activity or mission.

## 4.  Other Permissible Types of Military Support to Law Enforcement Agencies

a.  **Training**

(1)  Military Departments and DoD agencies may provide training that is not large-scale or elaborate and does not permit a direct or regular involvement of military personnel in activities that are traditionally civilian law enforcement operations.

(2)  Training assistance is limited to situations where the use of non-DoD personnel would be impractical because of time or cost and where it would not otherwise compromise military preparedness of the United States.

(3)  Training assistance cannot involve military personnel in a direct role in a law enforcement operation unless otherwise authorized by law, and this assistance is rendered at locations where law enforcement confrontations are unlikely.

b.  **Expert Advice.**  SecDef has directed that Military Departments and DoD agencies may provide expert advice as long as military personnel are not directly involved in activities that are fundamentally civilian law enforcement operations.

c.  **Equipment.**  LEA requests for loans of equipment, maintenance, facilities, or personnel are made and approved IAW DoD policy (or applicable Service policy) and instructions for requesting DSCA and require SecDef approval.

d.  **Use of DoD Personnel to Operate or Maintain Equipment.**  DoD personnel made available under Title 10, USC, Section 274(b), may operate equipment for the following purposes:

(1)  Detection, monitoring, and communication of the movement of air and sea traffic.

(2)  Detection, monitoring, and communication of the movement of surface traffic outside of the geographic boundary of the United States and within the United States, not to exceed 25 miles of the boundary if the initial detection occurred outside of the boundary.

(3)  Aerial reconnaissance.

(4)  Interception of vessels or aircraft detected outside the land area of the United States for the purposes of communicating with such vessels and aircraft and directing such vessels and aircraft to a location designated by appropriate civilian officials.

(5)  Operation of equipment to facilitate communications in connection with law enforcement programs specified in Title 10, USC, Section 274(b).

(6)  DoD personnel may also be made available to operate equipment for the following additional purposes subject to joint approval by SecDef and the Attorney General (and the Secretary of State in the case of a law enforcement operation outside of the land area of the United States).

(a)  Transportation of civilian law enforcement personnel along with any other civilian or military personnel who are supporting or conducting a joint operation with civilian law enforcement personnel.

(b)  Operation of a base of operations for civilian law enforcement and support personnel.

(c)  Transportation of suspected terrorists from foreign countries to the United States for trial (so long as the requesting federal LEA provides all security for such transportation and maintains custody of the suspect through the duration of the transportation).

e.  **Other Permissible Assistance.**  In addition to those items listed above, Title 10, USC, Section 271, allows for the transfer of information acquired in the normal course of military operations to civilian LEAs.  Additionally, it is DoD policy that the Secretaries of the Military Departments or the directors of the DoD agencies may approve other actions that do not subject civilians to the regulatory, prescriptive, proscriptive, or compulsory use of military power.

(1)  **Border Security and Immigration Enforcement Assistance.**  DoD provides assistance to other federal agencies in border security and in the event of a mass migration emergency.  CCDRs can expect to be designated as the supported commander within DoD when assisting DHS during mass migration operations. CDRUSNORTHCOM should expect to be designated as the supported commander for limited assistance to DHS collection relocation processing centers on DoD installations in the continental United States.  Commander, United States Southern Command, can be expected to be designated as the supported commander for temporary mass migration operations at Guantanamo Bay, Cuba.

(2)  **Counterterrorism Operations.**  The Attorney General, acting through the FBI and in cooperation with the heads of other federal departments, agencies, and military criminal investigative organizations, coordinates domestic intelligence collection and the activities of the law enforcement community to prevent, protect against, mitigate, respond

to, and recover from terrorist attacks and to identify the perpetrators and bring them to justice in the event of a terrorist incident.

(a)  If there is a credible threat, DoD may also be requested to support LEAs with the pre-positioning of forces.  NG reaction forces can also be requested to support counterterrorism operations.  In the case of an imminent threat to life or severe property damage, DoD forces may take direct action until responsible authorities (e.g., DOJ, DHS) can respond.

(b)  Under this type of support, specific RUF are established and approved. In the absence of preexisting RUF, requests for RUF for DSCA missions are sent through the supported CCDR and the OASD(HD&HA) for development and to SecDef for approval.  Mission-specific RUF may be required depending on the situation.

(c)  Military responses to a credible threat and acts of terrorism may require incident management operations (including response to the incident itself and law enforcement activities), which often overlap.

(d)  The FBI manages counterterrorism operations through the Strategic Information and Operations Center and joint operations centers (JOCs).  The Strategic Information and Operations Center is the FBI's worldwide operations hub and supports connectivity with other federal operations centers, such as the DHS national operations center, the DoD National Military Command Center, and National Counterterrorism Center, to rapidly gain and disseminate situational awareness and deploy resources as appropriate.  This includes C2 of joint interagency investigative and domestic intelligence efforts led by the FBI on-scene commander (OSC) through its JOCs.  The Strategic Information and Operations Center and FBI JOCs enable effective coordination and liaison with partner agencies, strategic communications, and coordination and information sharing with other leaders, as appropriate and IAW classification and legal requirements, to manage the threat.

(e)  An FBI JOC is a multijurisdictional, interagency investigative and intelligence operations center led by the FBI OSC and supported by a multiagency command group.  The FBI JOC is the place from which the FBI leads and coordinates law enforcement investigations, intelligence activities, and counterterrorism in response to terrorist threats or incidents.  The FBI OSC establishes the JOC within a regional AOR; the OSC is the designated senior FBI representative responsible for leading and coordinating all law enforcement and investigative operations to prevent or resolve terrorist threats or incidents and for preserving evidence for subsequent criminal prosecution. Additionally, the FBI OSC has primary responsibility for establishing, directing, and overseeing crime scenes, their security, and evidence management, including fatalities management, through all phases of the response, managed through an FBI JOC.  For national special security events (NSSEs), the JOC remains in watch mode and is supported by an intelligence operations center.  The intelligence operations center leads and coordinates the law enforcement intelligence activities and analysis to deter, detect, and prevent threats related to the security of an NSSE.  The JOC is staffed by federal

departments, state and local LEAs, private industry, and other entities as may be appropriate.

*For more information on responses to domestic terrorism incidents, see the* National Prevention Framework *and the* Terrorism Incident Law Enforcement and Investigation Annex.

(3) **CD and Counter Transnational Organized Crime Support Operations.** CD operations in support of LEAs may be conducted under the following authorities:

(a) **Title 10, USC, Section 124.** This authority specifies that DoD serves as the single lead agency for detection and monitoring of aerial and maritime transit of illegal drugs into the United States in support of the CD activities of federal, state, local, and foreign LEAs. This DoD support does not require a request from LEAs.

(b) **Title 10, USC, Section 284.** DoD may provide certain forms of support on a nonreimbursable basis, upon proper request, to the CD or countering transnational organized crime activities of any other department or agency of the federal government or to any SLTT or foreign LEA. Although many of the forms of authorized support parallel those authorized under section 274, there are several distinctions. Refer to the implementing guidance in DoDI 3000.14, *DoD Counterdrug and Counter-Transnational Organized Crime Policy.*

(c) **Title 10, USC, Section 271.** DoD may provide information to an LEA that is relevant to a violation of federal or state law that is collected during the normal course of training or operations, and the information needs of the LEA should be taken into account in the planning and execution of such DoD training or operations. To the extent consistent with national security, DoD promptly provides intelligence information relevant to drug interdiction or other civilian law enforcement matters to the appropriate civilian LEA officials.

(d) **Title 10, USC, Section 279.** Requires the assignment of Coast Guard law enforcement personnel to every appropriate surface naval vessel at sea within a drug interdiction area.

(e) **Title 32, USC, Section 112.** Authorizes the NG CD programs. SecDef may provide funds to the governor of a state to execute an approved state drug interdiction and CD activities plan using NG forces under the C2 of the respective governor in a Title 32, USC, duty status.

*Refer to JP 3-07.4,* Counterdrug Operations; *Title 10, USC, Section 124; and Title 32, USC, Section 112, for additional information.*

(4) **Explosive Ordnance Disposal (EOD).** DoD EOD forces should maintain relationships with local, state, and other federal bomb disposal or LEA assets within their geographic locations. These relationships may include conferences and training exercises to increase the interoperability and integration with local EOD agencies, improve the response capabilities to civilian authorities when requested, and enhance the consolidated

response capabilities. DoD EOD personnel may also conduct explosive hazards (e.g., improvised explosive devices and unexploded explosive ordnance) awareness and education programs that promote public safety and inform the public of the hazards associated with military munitions and explosive items.

(5) **Title 18, USC.** Under Title 18, USC, Section 831, the Attorney General may request that SecDef provide emergency assistance if civilian law enforcement is inadequate to address certain types of threats involving the release of nuclear materials, such as potential use of a nuclear or radiological weapon. SecDef may provide such assistance IAW Title 10, USC, Chapter 15, providing personnel under the authority of DoD.

## 5. Law Enforcement Considerations

a. Domestic law enforcement support requires expert legal advice to military leaders at every level. The command staff judge advocate should review plans and orders carefully. To avoid delays, proper preplanning is critical to mission support. Plans and orders should identify measures that require legal consultation, command approval, or both. Supporting commanders should plan for provision of additional liaison personnel and communications to the supported LEA. Commanders should educate their personnel on their chain of command and which LEA they are supporting. Federal military forces and NG forces may operate in proximity, although they remain under separate chains of command. On the ground, however, commanders from both forces should co-locate so they can closely coordinate operations.

b. Just as with military operations, civilian law enforcement operations rely on information to ensure success of the mission. Civilian LEAs comply with strict legal limits on information, specifically who provides the information, what information is collected, how the information is collected, and how the information can be used. Military forces providing intelligence support to civilian LEAs comply with intelligence oversight procedures and policy, as well as civilian LEA constraints. Military personnel performing law enforcement functions also comply with DoDD 5200.27, *Acquisition of Information Concerning Persons and Organizations Not Affiliated with the Department of Defense.* Commanders ensure laws, military regulatory authorities, and DoD policies are not violated. Employment of intelligence systems domestically remains a sensitive legal area, particularly when used in support of civilian LEAs.

c. Joint patrols involving NG and local law enforcement officers have proven to be highly effective and efficient in the aftermath of disasters and disturbances. Generally, NG members conduct security patrols in SAD or Title 32, USC, status.

d. Joint forces supporting law enforcement often have severe restrictions and specific RUF. These rules have been approved by SecDef and are found in CJCSI 3121.01, *(U) Standing Rules of Engagement/Standing Rules for the Use of Force for US Forces.*

e. NG commanders in a Title 32, USC, or SAD status should also brief their personnel on applicable state RUF and be issued an appropriate RUF card prior to deploying from home station for a DSCA mission. There may also be a difference between the standing

rules for the use of force (SRUF) and the RUF for each state's NG forces. Depending on the state, the state RUF may be more or less restrictive than the SRUF. NG forces serving in a Title 32, USC, duty status follow state laws.

(1) Commanders should evaluate and plan for the use of nonlethal weapons in domestic operations. Additionally, commanders should plan for and conduct rehearsals of RUF to prepare their personnel for operations that may employ nonlethal weapons.

(2) Each Service has developed nonlethal weapons to address force application and FP requirements. Given the nature of the DSCA operation, nonlethal weapons—and their ability to provide precise and relatively reversible effects—are particularly relevant. Nonlethal weapons span a range of technologies (e.g., acoustic and optical devices to provide enhanced warnings, riot control agents and blunt impact munitions to deny access or move individuals, mechanical systems to deny access to vehicles, or electromagnetic systems to degrade/stop/disable personnel or materiel).

(3) Military personnel should be qualified and current in their training in the use of nonlethal weapons. The command staff judge advocate should also review all pertinent orders and instructions for their use. Use of nonlethal weapons, including use of riot control agents, like the use of all weapons, requires approval from higher headquarters or authorization from appropriate authorities (state or federal). Care should be taken to ensure that orders and instructions for the use of nonlethal weapons are not more restrictive than those for lethal weapons or their utility in mitigating civilian casualties and collateral damage are compromised.

(4) Intermediate force capabilities (e.g., nonlethal weapons, especially nonlethal directed energy weapons) are below lethal active means intended to temporarily impair, disrupt, delay, or neutralize targets during military operations across the competition continuum.

f. The use of just-in-time training is important to ensure Service members are qualified and current in their training for law enforcement support missions. JRSOI is typically the appropriate time to conduct just-in-time training to ensure all Service members supporting law enforcement have a baseline level of training. The level of training and proficiency is determined by the commander and weighed against the need for a timely response.

Chapter III

Intentionally Blank

# CHAPTER IV
## OTHER DOMESTIC ACTIVITIES AND SPECIAL EVENTS

## 1. General

There is a range of activities beyond response to a natural or man-made disaster or support to law enforcement that also leverage DoD resources.

## 2. National Special Security Events

NSSE is a designation given to certain special events that, by virtue of their political, economic, social, or religious significance, may be the target of terrorism or other criminal activity.  The Secretary of Homeland Security is responsible for designating special events as NSSEs.

a.  When a special event is designated as an NSSE, the USSS, as part of DHS, assumes the role of primary agency for the design and implementation of the security plan.  Events in this category are normally large events, generally with sufficient time for planning (except state funerals).  Multiple federal and state agencies, including NG forces, may be involved and have operational areas.  Planning for possible transition to disaster support is inherent in these operations.

b. Special events that are likely to be designated as NSSEs include presidential inaugurations, State of the Union addresses, Group of Seven summit meetings, World Trade Organization meetings, United Nations General Assembly meetings, Democratic and Republican Party national conventions, and state funerals.  Special events requiring DoD support include the following examples (note that any of these special events could also be designated as an NSSE): World's Fair, Super Bowl, Olympic Games, World Series, and NASCAR [National Association for Stock Car Auto Racing] events.

## 3. Community Support Activities

Per DoDI 5410.19, Volume 1, *Community Outreach Activities: Policy Overview and Evaluation Procedures,* all requests for military support at outreach activities must be submitted using Department of Defense Form 2535, *Request for Military Aerial Support,* or Department of Defense Form 2536, *Request for Armed Forces Participation in Public Events (Non-Aviation),* as appropriate.  Forms should be submitted per guidance provided in their instructions for processing.

## 4. Sensitive Support Operations

Sensitive support to special activities is provided under DoDD S-5210.36, *(U) Provision of DoD Sensitive Support to DoD Components and Other Departments and Agencies of the US Government.*

## 5. Military Training Exchanges

Military training exchanges can be provided as innovative readiness training under DoDI 1100.24, *Innovative Readiness Training (IRT): Support and Services for Eligible Organizations and Activities Outside DoD.* Military training support can also be provided to local first responders by military mobile training teams or installation personnel or through preparation and conduct of exercises. Civil authorities can request local installation commanders provide combat service support (e.g., medical, transportation, supply, maintenance) or combat support (e.g., engineering or security). Installations can provide support when it meets the requirements of innovative readiness training/support as incidental to military training (Title 10, USC, Section 2012). The NG is part of the DoD exercise program as directed by DoDD 5105.83, *National Guard Joint Force Headquarters-State (NG JFHQ-State).*

## 6. Specialized Support

a. **Military Laboratory Support.** Testing and evaluation in DoD facilities can be provided to civil authorities by agreement and is categorized as DSCA.

b. Military working dog support can be provided per DoDD 5200.31E, *DoD Military Working Dog (MWD) Program.*

c. DoD created the CRE to support civil authorities during CBRN response operations. The DoD CRE enables resiliency in the homeland as a means to ensure integrated deterrence by raising a potential attacker's direct and indirect costs and reducing their expected benefits from aggressive action against the homeland. The CRE includes state, territorial, and federal response forces.

(1) Federal forces include a defense CBRN response force; The Chemical-Biological Incident Response Force; Joint Task Force-Civil Support; and two C2 CBRN response elements.

(2) State and territorial forces include 57 weapons of mass destruction-civil support teams, 17 CBRN enhanced response force packages, and 10 homeland response forces.

*For further information on the DoD CRE, see JP 3-41,* Chemical, Biological, Radiological, and Nuclear Response.

*For more information on NG CBRN response, see CNGB Instruction 3510.01,* National Guard Chemical, Biological, Radiological, and Nuclear Response Management, *and CNGB Manual 3510.01,* National Guard Homeland Response Force and Chemical, Biological, Radiological, Nuclear, and High-Yield Explosives Enhanced Response Force Package Procedures.

d. **CBRN and Weapons of Mass Destruction Technical Analysis.** The Defense Threat Reduction Agency serves as the focal point for DoD's National Countering Weapons of Mass Destruction Technical Reachback Enterprise, a national countering

weapons of mass destruction support element that provides time-sensitive access to a broad range of CBRN and high-yield explosives subject matter experts in a collaborative environment capable of supporting a DSCA effort with CBRN implications.

*For additional details on Defense Threat Reduction Agency capabilities, see DoDD 5105.62,* Defense Threat Reduction Agency (DTRA).

### 7. Support Provided to the United States Secret Service

Title 18, USC, Section 112, "Protection of foreign officials, official guests, and internationally protected persons," authorizes the Attorney General to request the assistance of the Armed Forces of the United States to perform this function. For further information, see DoDD 3025.13, *Employment of DoD Capabilities in Support of the US Secret Service (USSS), Department of Homeland Security (DHS),* and DoDI 3025.19, *Procedures for Sharing Information with and Providing Support to the US Secret Service (USSS), Department of Homeland Security (DHS).*

### 8. Civil Air Patrol/Air Force Auxiliary Support

The Civil Air Patrol flies more than 85 percent of all federal inland SAR missions directed by the Air Force Rescue Coordination Center. Outside the continental United States, the Civil Air Patrol supports the joint rescue coordination centers in Alaska, Hawaii, and Puerto Rico. The Civil Air Patrol provides air and ground transportation and an extensive communications network. Volunteer members fly disaster-relief officials to remote locations and provide manpower and leadership to local, state, and national disaster relief organizations. Requests for support are submitted to and approved by First Air Force (the continental United States, Puerto Rico, and the US Virgin Islands), Eleventh Air Force (Alaska), and Headquarters Pacific Air Forces (Hawaii) commanders for the assigned missions of damage assessment (e.g., observation, photography, hyperspectral imaging), evacuation, monitoring, and light airlift in their AORs.

### 9. Incident Awareness and Assessment

IAA may be requested to support first responders and decision makers in the following eight mission areas: situational awareness, damage assessment, evacuation monitoring, SAR, CBRN assessment, hydrographic survey, dynamic ground coordination, and cybersecurity incident response. SecDef approval of the DSCA EXORD may authorize traditional intelligence capabilities to conduct DSCA missions for non-intelligence purposes. Use of Title 10, USC, IAA assets designated to provide IAA for other than the eight IAA missions requires SecDef approval on a case-by-case basis. Questions on whether DoD intelligence capabilities may be utilized in a DSCA operation should be referred to the command judge advocate if the authorities, permissible operational parameters, or limitations are unclear. While the use of intelligence assets by the NG requires SecDef approval, the use of non-intelligence assets in a Title 32, USC, or SAD status for IAA requires approval of the governor. NG complies with procedures and restrictions established in the CNGB Manual 2000.01, *National Guard Intelligence Activities.*

## 10. Civilian Critical Infrastructure Protection

a. Critical infrastructure can be described as those systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters. In addition to critical infrastructure, key assets include symbols or historical attractions, such as prominent national, state, or local monuments and icons. In some cases, these include quasi-public symbols that are identified strongly with the United States as a nation and fall completely under the jurisdiction of state and local officials or even private foundations. Key assets also include individual or localized facilities that deserve special protection because of their destructive potential or their value to the local community. DoD's portion of the critical infrastructure includes the defense industrial base (DIB). The DIB sector is the worldwide industrial complex that enables research and development, as well as design, production, delivery, and maintenance, of military weapons systems, subsystems, and components or parts, to meet US military requirements. The *DIB Sector-Specific Plan,* developed in collaboration with industry and government security partners, provides sector-level critical infrastructure and key resources protection guidance. The DIB partnership consists of the DoD components and more than 100,000 DIB companies and their subcontractors, who perform under contract to DoD, and companies providing incidental materials and services to DoD, as well as government-owned/contractor-operated and government-owned/government-operated facilities. DIB companies include domestic and foreign entities, with production assets located in many countries. Contrary to common belief, the DIB sector does not include commercial infrastructure, such as communications, transportation, power, and other utilities. These commercial infrastructure assets are addressed by other sector-specific agencies.

b. The NG supports the DHS Cybersecurity and Infrastructure Security Agency (CISA) and USCG with critical infrastructure vulnerability and port vulnerability assessments to improve critical infrastructure and port resiliency.

*See DoDD 3020.40,* Mission Assurance (MA), *and DoDI 3020.45,* Mission Assurance Construct, *for additional information on roles and responsibilities for DoD components to assure DoD's critical assets and infrastructures are identified and managed.*

## 11. Postal Services

During postal work stoppages or natural disasters that disrupt mail service on a national, regional, or local basis, DoD may be required to provide assistance pursuant to Title 39, USC, Section 411. This assistance may take the form of materials, supplies, equipment, services, and personnel sufficient to permit the United States Postal Service to safeguard, process, and deliver the mail in areas in which normal mail service has been impaired. Legal authority for the employment of military resources to reestablish and maintain essential postal service is found in Title 39, USC, Section 411. DoD provides postal augmentation under an interdepartmental transfer of services. The declaration of a national emergency is a sufficient condition for the selective mobilization of RC forces to support the United States Postal Service.

## 12. Explosive Ordnance Disposal Considerations

a. DoD EOD personnel may provide immediate response for EOD support of civilian authorities, when requested, IAW DoDD 3025.18, *Defense Support of Civil Authorities (DSCA),* and the military munitions rule, 40 Code of Federal Regulations part 260.

b. Explosives or munitions emergency response may include actions to assist civil authorities, when requested, in the mitigation, rendering safe, and disposal of suspected or detected unexploded explosive ordnance, damaged or deteriorated explosives or munitions, improvised explosive devices, other potentially explosive material or devices, or other potentially harmful military chemical munitions or devices that create an actual or potential imminent threat to human health and safety or to the environment, including property.

(1) The following require an immediate EOD response: military munitions, discarded military munitions, and unexploded explosive ordnance in the unauthorized possession or realm of public officials or lands, including items that were illegally removed from military installations; military munitions that land off range, munitions located on property formerly leased or owned by DoD (including manufacturing areas, pads, pits, basins, ponds, streams, burial sites, and other locations incident to such operations); transportation accidents involving military munitions; and public possession of unauthorized military munitions potentially presenting an imminent and substantial endangerment to the safety and health of the population and the environment. Military munitions found in these conditions should be considered extremely hazardous and should not be disturbed or moved until technically qualified EOD personnel assess and determine the hazard. DoD officials, including local military commanders, provide EOD support for military munitions, discarded military munitions, and unexploded explosive ordnance that have DoD origins, or appear to have DoD origins, including foreign ordnance.

*See DoDI 3025.21,* Defense Support of Civil Law Enforcement Agencies, *for additional information.*

(2) Rendering safe and disposing of explosive hazards reported or discovered outside of DoD installations are primarily the responsibility of civil authorities. However, due to the potential lethality and danger to public safety, DoD EOD personnel may provide assistance upon request IAW DoDD 3025.18, *Defense Support of Civil Authorities (DSCA).*

(3) When responding to RFAs from civilian authorities under immediate response authorities, the closest, capable EOD unit, regardless of Service, provides support.

(4) Requests from civil authorities for non-immediate DoD EOD support are subject to approval by SecDef. Examples of non-immediate DoD EOD support include post-blast analysis, use of DoD material and equipment, and support of preplanned events.

(5) DoD EOD forces providing support under immediate response authorities comply with applicable local, state, and federal laws and regulations, including environmental laws and regulations.

(6)  The Bureau of Alcohol, Tobacco, Firearms, and Explosives is advised of the recovery and disposition of military munitions, as well as responses to nonmilitary munitions and explosives.  The Services submit reports within 72 hours to the Bureau of Alcohol, Tobacco, Firearms, and Explosives' US Bomb Data Center.

(7)  Approvals from SecDef and Director, FBI; the Federal Aviation Administration; Federal Communications Commission; and United States Strategic Command are required for DoD EOD personnel to employ electromagnetic countermeasures in the United States while conducting EOD support of civil authorities.  Per the *National Strategy for Combating Terrorist Use of Explosives in the United States,* the FBI is the primary federal agency for domestic use of electromagnetic countermeasures.  When the FBI requests DoD EOD support, the use of electromagnetic countermeasures equipment or devices should be addressed.  All use of electromagnetic countermeasures equipment or devices while conducting EOD operations supporting civilian authorities is coordinated with the FBI's Strategic Information Operations Center and reported to the National Joint Operations and Intelligence Center.

*See JP 3-42,* Joint Explosive Ordnance Disposal*, for additional information.*

## 13.  Urban Search and Rescue Program

The USACE Urban Search and Rescue Program deploys specially trained and equipped structural engineers (Structures Specialist Cadre) to augment FEMA urban SAR task forces, incident support teams, military technical rescue organizations, and other forces during structural collapse incidents and other disaster response missions.  This rescue engineering capability provides technical support and advice to task force leaders and commanders to assess damage, mitigate hazards, enable safe entry, and assure mobility throughout a disaster site to enable rescue and life-saving operations.  The USACE Urban Search and Rescue Program develops doctrine, training programs, and national standards for structural collapse response operations and conducts initial training courses, advanced coursework, exercises, and continuing education for all FEMA urban SAR structures specialists.  On order, the program deploys its cadre to conduct structural assessments in support of USACE responsibilities and other military and civil contingency requirements.  USNORTHCOM and United States Transportation Command provide the following support to FEMA urban SAR:  strategic and tactical airlift, logistics, C2, incident support team augmentation, and skilled and unskilled military forces augmentation.  USACE leads the training for structures specialists and maintains a cadre of structures specialists that are deployed as part of an incident support team engineering cell and urban SAR task forces.

## 14.  Defense Support to Cybersecurity Incident Response

a. Defense support to cybersecurity incident response is provided within the framework of DoDD 3025.18, *Defense Support of Civil Authorities (DSCA).*  DoD supports the LFA and other organizations as necessary for asset and threat response to cybersecurity incidents outside the DoD information network.

b. When an LFA requests DoD cyberspace support, the CCMD, in coordination with the Service components, determines the most appropriate response force, which may include NG personnel in a Title 10 or Title 32, USC, status.

c. Establishing the Cyber Defense Support of Civil Authorities Coordination Element (CDCE).

(1)  When CDRUSNORTHCOM or CDRUSINDOPACOM receive an RFA from the DHS CISA concerning a significant cybersecurity incident, they activate the CDCE. The CDCE provides a direct link between DHS/CISA and DoD and comprises personnel from USNORTHCOM or USINDOPACOM (depending upon where the response is required), the NGB, and United States Cyber Command to:

(a)  Represent DoD's concerns for critical infrastructure protection.

(b)  Validate CISA requests and requirements for specific DoD support.

(c)  Integrate into USNORTHCOM, USINDOPACOM, United States Cyber Command, NGB, and DHS battle rhythms.

(d)  Assess ongoing incident to inform DSCA planning.

(e)  Maintain situational awareness of NG tasking related to the incident.

(f)  Inform CISA regarding projected costs of DoD support.

(2)  The United States Cyber Command LNO to CISA serves as the director of the CDCE, and the USNORTHCOM/USINDOPACOM LNO (as appropriate) to CISA serves as the deputy director.  The CDCE level of response is scalable to the severity of the incident, allowing for integration of additional CCMD and NGB response coordinators, intelligence analysts, and planners, as required.

(3)  The CDCE stand-up occurs in three phases:

(a)  Phase 1: pre-coordination support to CISA, triggered by the receipt of the RFA, to validate DoD's ability to support CISA requirements.

(b)  Phase 2: partial stand-up, triggered by the release of a DoD memorandum directing the stand-up of the CDCE, to support CISA with establishing communications channels, information/intelligence sharing, and maintaining situational awareness.

(c)  Phase 3: full stand-up, triggered by CISA operations that affect the DoD information network or a request for DoD cyberspace forces to respond off the DoD information network.  The CDCE validates specific requests for cyberspace forces and supports CISA operations with deployment of forces to support civil authorities.

(4)  The CDCE stands down upon expiration of the RFA or when DoD support is no longer required.

*For more information, see DoDI 8530.03,* Cyber Incident Response.

## 15. Human Space Flight Support

DoD plans, trains for, and executes human space flight support (HSFS) operations. HSFS operations include DoD support for normal (nominal) and emergency (contingency) National Aeronautics and Space Administration-sponsored crewed launches and landings. The level of support is defined in National Aeronautics and Space Administration RFAs, National Aeronautics and Space Administration program requirements documents, DoD CONOPS, and DoD orders. Depending on the program, HSFS may include the pre-positioning of DoD rescue or recovery forces; the contingency rescue of astronauts; the nominal recovery of astronauts and space vehicles; landing site support at DoD installations and other locations; payload security and support; medical support; news media support; weather support; unique communications activities; and coordination of airlift, sealift, and salvage support. First Air Force coordinates with the Services, federal agencies or departments, and other CCMDs to develop and recommend HSFS-specific equipment, training, plans, procedures, and force requirements in support of United States Space Command's role as the DoD HSFS Manager.

## 16. Other Defense Support of Civil Authorities Missions

Other DSCA missions include hurricane response, wildland firefighting, oil and hazardous material response, nuclear and radiological incident support, animal and plant disease response, medical countermeasures distribution, pandemic influenza and infectious disease response, mass migration response, and civil disturbance operations.

*For additional details, authorities, and references, see DoDM 3025.01, Volumes 1-3,* Defense Support of Civil Authorities.

# CHAPTER V
## SUPPORTING AND SUSTAINING ACTIVITIES

## 1. General

In planning for DSCA, commanders and their staffs face ambiguities about how to prepare for and predict types of contingencies military forces may confront. US military forces are organized with personnel and equipment to perform specific functions, as well as to support their own units, but have inherent flexibility that may be useful in DSCA operations. For example, the C2 system inherent in military units provides a significant advantage when deployed in the austere environment created by a catastrophic event.

## 2. Personnel Services

a. **Personnel Support.** The authorities and responsibilities for personnel support to DSCA operations are the same as those for any other mission set.

b. **Personnel Accountability.** Personnel accountability is a command responsibility. Personnel accountability, strength reporting, and manpower management are the focal points for a joint force manpower and personnel directorate of a joint staff. DSCA operations may pose specific challenges. One example is units that may deploy from their home stations instead of a designated port of debarkation (POD) or mobilization center. Another example is that out-of-state NG units remain under the control of their respective governors and can be recalled on short notice. Service personnel elements supporting home-station deployments should plan to accomplish all processing and reporting requirements prior to unit deployment. In most circumstances, the employing JTF establishes a joint personnel reception center to conduct personnel accountability and to ensure arriving units are ready.

*For additional guidance on personnel support and accountability, see JP 3-35,* Joint Deployment and Redeployment Operations, *and Appendix G, "Department of Defense Installations Supporting Defense Support of Civil Authorities."*

(1) **Personnel Accountability in Conjunction with Disasters.** Attacks or disasters within the United States can affect DoD personnel and their dependents. Service components account for and report the status of all DoD-affiliated military and civilian personnel and all family members immediately following a disaster or attack. Additionally, Service components, in conjunction with Service headquarters, should be prepared to report the number of Service members, DoD civilians, and their dependents requiring evacuation from an affected area. The Services provide the necessary level of personnel accountability support to the CCMD to ensure the CCDR's mission can be accomplished. See DoDI 3001.02, *Personnel Accountability in Conjunction with Natural or Manmade Disasters*, and CJCSM 3150.13, *Joint Reporting Structure—Personnel Manual*, for specific direction.

(2) **Joint Personnel Status and Casualty Report.** Units supporting operations use the Joint Personnel Status and Casualty Report to report the number of personnel.

Using the same report, the CCDR reports to the CJCS the number of personnel, by location, unit, and Service, permanently assigned or attached to the CCMD.

(3) **Manning and Augmentation.** Component commands prepare joint manning documents listing the specific Service expertise required to meet their mission requirements.

*See CJCSI 1301.01,* Joint Individual Augmentation Procedures.

(4) **Family Assistance.** During incidents or civil emergencies, family assistance centers or emergency family assistance centers may be established by the Services to support DoD families affected by man-made or natural disasters. Commanders may direct the establishment of an emergency family assistance center to coordinate family support between the Services and installations in the affected area.

*For detailed guidance on personnel support, see JP 1-0,* Joint Personnel Support.

c. **Religious Affairs.** During DSCA, religious support teams (RSTs)/religious ministry teams (RMTs) deploy for the purpose of providing religious support (RS)/religious ministry (RM) to DoD personnel and religious advisement for the commander on matters of religion, morals, ethics, morale, and well-being in the unit, including religion's impact on military operations. RSTs/RMTs should understand the distinction and relationship between HD and DSCA and anticipate the potential for transition between these mission or simultaneous HD and DSCA operations. RSTs/RMTs should also consider how legal authorities and command responsibilities differ based upon mission area (i.e., Title 32, Title 14, and Title 10, USC, or SAD status).

(1) Joint RS/RM may include coordinating coverage across command and Service component lines to accommodate the religious needs of all DoD personnel. RSTs/RMTs may also be responsible for providing RS/RM to units without assigned chaplains and to personnel from low-density faith groups. An RST/RMT, when directed, may provide RS to NG personnel serving in SAD or Title 32, USC, status during emergency or exigent circumstances. Likewise, IAW state law and when directed, an NG RST in SAD or Title 32, USC, status may provide RS/RM to Active Component personnel during emergency or exigent circumstances. Commands should coordinate joint area RS/RM consistent with the RS/RM plan.

(2) **Legal Considerations.** Legal guidance generally prohibits chaplains from providing RS to the civilian population, other than in specific emergency situations. RSTs/RMTs do not normally provide RS/RM to persons unaffiliated with the Armed Forces of the United States, absent explicit and unambiguous tasking. Examples are traditional open services and authorized support to persons under the care, control, or custody of the Armed Forces of the United States. Chaplains, absent any explicit command prohibition to the contrary, may act in their personal capacity to provide incidental RS/RM to persons not affiliated with the Armed Forces of the United States during the execution of an assigned mission under certain criteria. This specific criteria is known as "the four-pronged test" and is found in JP 3-83, *Religious Affairs in Joint Operations.*

## 3. Intelligence Support

a. **Introduction**

(1) The only authorized mission sets for DoD intelligence components are defense-related foreign intelligence and counterintelligence. DoD intelligence component personnel, capabilities, and assets may only be used for non-intelligence purposes in the United States or territories (e.g., DSCA IAA or SAR) when expressly approved by SecDef or SecDef's delegate.

*For further information, see DoDD 5148.13,* Intelligence Oversight; *DoDD 5200.27,* Acquisition of Information Concerning Persons and Organizations Not Affiliated with the Department of Defense; *DoDD 5240.01,* DoD Intelligence Activities; *DoDM 5240.01,* Procedures Governing the Conduct of DoD Intelligence Activities; *DoD 5240.1-R,* Procedures Governing the Activities of DoD Intelligence Components that Affect United States Persons; *EO 12333,* United States Intelligence Activities (as amended); *and SecDef Memorandum,* Guidance for the Use of Unmanned Aircraft Systems in the US National Airspace.

(2) Intelligence is the product resulting from the collection, processing, integration, evaluation, analysis, and interpretation of available information concerning foreign nations, hostile or potentially hostile forces or elements, or areas of actual or potential operations. In DSCA operations, intelligence organizations take special care to follow the intelligence oversight regulations and privacy laws. In addition, to the extent that intelligence components are authorized to collect, they do so in coordination with the FBI, which has primary responsibility for intelligence collection.

(3) Whether DoD organizations are conducting an intelligence activity or a non-intelligence activity for domestic operations or domestic support operations, certain rules apply to data and imagery collected from overhead and airborne sensors. Geospatial data, commercial imagery, and data or domestic imagery collected and processed by the National Geospatial-Intelligence Agency are subject to specific procedures covering the request for their use. Judge advocate, intelligence, and inspector general personnel should ensure imagery collection and processing is in compliance with National Geospatial-Intelligence Agency policy on requests for geospatial data or imagery and its authorized use. Additionally, DoDI 3115.15, *Geospatial Intelligence (GEOINT),* requires the identification of classified information and providing security classification guides approved by authorized original classification authorities for all DoD airborne and DoD spaceborne geospatial intelligence data, sensors, and systems. Additionally, these intelligence oversight rules also apply to other sources of domestic imagery. Any domestic imagery is captured IAW NGA's National System for Geospatial Intelligence Instruction 1806, *Domestic Imagery.* Strict adherence to this regulatory document is necessary to maintain compliance with current intelligence oversight programs.

(4) When determining what types of DoD capabilities, assets, and products are required for a DSCA mission, planners need to also understand the various intelligence collection platforms, their sensors, and how they operate. Issues to consider include

whether the sensor is fixed or moveable; whether the platform with the sensor can have its course altered during a mission; how the data is collected, transmitted, and processed; and the specific purpose of its mission. For example, an unmanned aircraft system (UAS) can transmit data by live feed only to a line-of-sight receiver or by satellite to a remote location. Additionally, units with weapon system video and tactical intelligence collection capabilities can collect imagery during formal and continuation training missions as long as the collected imagery is not for obtaining information about specific US persons or private property. Collected imagery can incidentally include US persons or private property without consent. For example, imagery could be collected of a private structure so the imagery can be used as a visual navigational aid or to simulate targeting during training. However, imagery is not collected for the purpose of gathering any specific information about a US person or private entity, without consent, nor is stored imagery retrievable by reference to a US person's identifiers. It is important to understand the distinction between visual information activities and other collection activities. Information documented under the auspices of visual information activities (such as still and motion imagery and video documentation in support of intelligence) supports a variety of purposes. When collecting information specifically for one of these purposes, adhere to separate distinct policies, regulations, and rules. For further information on excluded activities, see DoDI 5040.02, *Visual Information (VI)*. It is also important that DoD intelligence personnel assigned to support a DSCA mission understand the roles and responsibilities of interagency partners, as well as the assets, platforms, and analytical capabilities available through state and federal government organizations. Communication and collaboration between DoD intelligence personnel and personnel from other agencies and organizations during a domestic response are essential in developing unity of effort and eliminating duplicative operations. Evidence of a criminal act incidentally collected during an authorized mission using DoD intelligence capabilities is forwarded to the appropriate LEA. However, altering the course of an airborne sensor from an approved collection track to loiter over suspected criminal activities would no longer be incidental collection and could result in a PCA violation unless specifically approved in advance. Certain data contains classified metadata which may need to be stripped at a remote site before it can be disseminated in an unclassified manner. A DSCA operation using DoD capabilities, which includes support to LEAs, requires a separate mission authority approval by SecDef and should consider whether the data is to be exclusively transmitted to the LEA and where the LEA agents are located to control or direct use of the assets to ensure compliance with the PCA and DoD policy, as reflected in DoDI 3025.21, *Defense Support of Civilian Law Enforcement Agencies.* Commanders give careful consideration to whether the collection platform and data transmission are wholly owned, operated, and received by a DoD intelligence organization, a DoD non-intelligence organization, or a combination of both. As a CJCS-controlled activity, the Joint Intelligence, Surveillance, and Reconnaissance Operations Center leads global force management of intelligence, surveillance, and reconnaissance to integrate national and DoD intelligence, surveillance, and reconnaissance capabilities in support of national or CCMDs' IAA requirements. The Joint Intelligence, Surveillance, and Reconnaissance Operations Center develops allocation recommendations for intelligence, surveillance, and reconnaissance and associated processing, exploitation, and dissemination capabilities to satisfy the strategic national and the CCMD strategic theater and operational IAA requirements. No DoD

UASs are used for DSCA operations without the express approval of SecDef, with the exception of DSCA IAA and DSCA SAR missions. Per the 2023 SecDef Memorandum, *Guidance for the Use of Unmanned Aircraft Systems in the US National Airspace,* the CCDR is the approval authority for these missions. All requests for use of a UAS for SAR are coordinated with the Air Force Rescue Coordination Center, Alaska Rescue Coordination Center, or the USCG's Joint Rescue Coordination Center Honolulu. Requesting SecDef approval for use of an unmanned aircraft for DSCA requires a proper use memorandum. Specifically, the following commanders may approve the use of DoD UASs on an Air Force Rescue Coordination Center/Alaska Rescue Coordination Center/Joint Rescue Coordination Center Honolulu-coordinated mission with a SAR mission number after a determination that UASs would be the best platform to assist in the SAR mission and that its use would not interfere with the primary military duties of the unit concerned:

(a) CDRUSNORTHCOM, through the Commander, Air Forces Northern, in the delegated role of SAR Coordinator for the Langley Search and Rescue Region or

(b) CDRUSNORTHCOM, through the Commander, Alaskan Command, as SAR Coordinator for the Elmendorf Search and Rescue Region, landmass of Alaska.

(c) CDRUSINDOPACOM, through Joint Rescue Coordination Center Honolulu (USCG), for Hawaii and the Pacific territories.

*For further information, see JP 3-50*, Personnel Recovery; *SecDef Memorandum,* Guidance for the Use of Unmanned Aircraft Systems in the US National Airspace*; and ATP 3-28.1/MCRP 3-30.6/NTTP 3-57.2/AFTTP 3-2.67/CGTTP 3-57.1,* Multi-Service Tactics, Techniques, and Procedures for Defense Support of Civil Authorities (DSCA).

b. **Information Handling and the Role of DoD Non-Intelligence Components**

(1) DoD non-intelligence components also have restrictions relating to the acquisition of information concerning the activities of persons and organizations not affiliated with DoD. This type of information is often needed when conducting DSCA. Within DoD, military criminal investigative organizations have primary responsibility to gather and disseminate information about the domestic activities of US persons that threaten DoD personnel or property. DoD non-intelligence organizations may acquire information concerning the activities of persons and organizations not affiliated with DoD only in the limited circumstances authorized by DoDD 5200.27, *Acquisition of Information Concerning Persons and Organizations Not Affiliated with the Department of Defense.* Those circumstances include the acquisition of information essential to accomplish the following DoD missions: protection of DoD functions and property, personnel security, and operations related to civil disturbances. The directive is explicit and should be referred to when determining authority for this type of information. Questions on whether DoD non-intelligence capabilities may be utilized in a DSCA operation should be referred to the command judge advocate if the authorities, permissible operational parameters, or limitations are unclear. The command judge advocate provides the commander legal

advice on permissible acquisition and dissemination of information on non-DoD affiliated persons and organizations and legally acceptable courses of action.

(2) DSCA activities may require the disclosing of classified information to civilian personnel or offices.  Disclosure should be made only when it is consistent with policy and national security objectives.  Disclosure of classified military intelligence is made only when the applicable criteria are met.  Criteria and procedures may be found in DoDI 5230.09, *Clearance of DoD Information for Public Release,* and DoDD 5210.50, *Management of Serious Security Incidents Involving Classified Information.*  Collectors should use releasable content, if possible, or in a form best facilitating sanitization to prevent delays in release.  Sanitization is a procedure to provide essential elements of information while concealing sensitive information.

## 4. Meteorological Support

a. Military meteorological and oceanographic agencies collaborate with the Department of Commerce National Oceanographic and Atmospheric Administration, National Weather Service, and the Department of Transportation's Federal Aviation Administration to provide the best forecast to the joint force.

b. The CCMD senior meteorological and oceanographic officer can provide assistance in coordinating appropriate Service meteorological and oceanographic force tasking.

*For more information, see JP 3-59,* Meteorological and Oceanographic Operations.

## 5. Logistics

During times of crisis, DoD may provide vital logistics support to civil authorities.

a. **Authorities and Responsibilities**

(1) The authorities and responsibilities for logistics operations in support of DSCA are largely the same as logistics operations for any other DoD mission set.  Some notable exceptions, as indicated in paragraph 5.b. "Logistics Support," apply to DSCA operations within the land, airspace, and territorial waters of the United States.

(2) The JP 4-0 series of publications for logistics support applies in DSCA. However, logistics planners consider both military and civil requirements and capabilities concurrently to avoid duplication and inappropriate uses.  The Defense Logistics Agency and the Services share responsibilities as suppliers to the joint force since both manage supplies in support of readiness requirements.  In this shared role, they support the components of the joint force with equipment and supplies needed for sustained logistics readiness.

(3) When logistics capabilities from many participating agencies, multinational partners, international organizations, NGOs, and private-sector entities are involved, each is ultimately responsible for providing its own logistics support.

b. **Logistics Support.** The primary focus of the combat service support effort is to sustain the joint force. Responsibilities for support as described in existing joint doctrine apply to DSCA missions, except as noted below:

(1) **Supply.** When operating within the United States and its territories, forces accomplishing DSCA missions receive sustainment support from their respective owning Service. The ability for the Services to use home-station stocks and existing contracts makes this the most effective method for sustaining the force. Care should be taken to coordinate any expansion of existing contracts or development of new supply contracts in the operational area, so they do not adversely impact other federal or SLTT contracting efforts. Some classes of supply, such as Class I (Subsistence), Class II (General Support Items), Class III (Petroleum, Oils, Lubricants), Class IV (Construction and Barrier Material), Class VI (Personal Demand Items), and Class VIII (Medical Material/Repair), require close consideration IAW CCMD operational contract support (OCS) guidelines. To facilitate support for US populations impacted by disasters, the Defense Logistics Agency may provide commodity and services support directly to FEMA upon receipt of a funded RFA or through existing interagency agreement.

(2) **Transportation.** With SecDef approval, DoD may provide transportation support.

(a) Airlift priorities for DSCA are outlined in CJCSI 4120.02, *List of Priorities–Department of Defense Transportation Movement Priority System.* The importance of these missions is reflected in the elevated movement priorities.

(b) Joint Strategic Planning System functions are used to control the movement of forces into and out of an operational area. Force deployments are time-phased to meet operational mission requirements per validated requirements and are IAW the Defense Transportation Regulation 4500.9-R, *Defense Transportation Regulations,* and supported CCDR guidance. The CCDR is the validating authority for special assignment airlift missions' movement requirements within the AOR.

(c) The CCDR's joint deployment and distribution operations center is composed of personnel from the CCMD and national partners (i.e., United States Transportation Command, the Defense Logistics Agency, the Services, and other organizations), as required. While the organizational construct is situationally based, it operates under the direction of the supported CCMD. The joint deployment and distribution operations center, in coordination with the LFA, implements command movement priorities; anticipates and resolves transportation shortfalls; synchronizes force flow and distribution; and provides in-transit visibility for Title 10 and Title 32, USC, airlift support during DSCA operations where a DSC has been established. The joint deployment and distribution operations center coordinates with FEMA Headquarters Movement Coordination Center.

(d) The Integrated Data Environment/Global Transportation Network Convergence provides in-transit visibility. Accordingly, Integrated Data Environment/Global Transportation Network Convergence is used to capture, process, and

transmit shipment information of forces deploying and redeploying into and out of an operational area.

*For additional information on transportation, see CJCSI 4120.02,* List of Priorities– Department of Defense Transportation Movement Priority System, *and Defense Transportation Regulation 4500.9-R,* Defense Transportation Regulations.

(3) **Engineering.**  DoD engineer forces are called upon when federal or SLTT contract resources are fully utilized or exhausted or when timely action is necessary to save lives and prevent further human suffering and loss of property.

(a) **Engineer Support.**  Engineers may be tasked on short notice to assist civil authorities as a result of a disaster.  Under immediate response authority or in support of a primary agency, the local commander may direct engineers to conduct DSCA operations.  For example, the local commander may direct route opening to enable road access and emergency response.

1. Commanders consider the requirement to use joint force engineers after examining available commercial services, facilities, support structures, and local governmental resources.

2. A broad force perspective for achieving engineering objectives is necessary.  Engineer support may be garnered from federal and SLTT resources via a multitude of avenues or agreements.  NG engineer forces (Title 32, USC, or SAD status) may be conducting operations within the joint operations area (JOA) along with Title 10, USC, engineer forces.

(b) When required, USACE is designated the lead coordinator for ESF #3 and may coordinate some of these functions in support of other ESF or agencies:

1. Force beddown with FP considerations.

2. Emergency stabilization and repair of damaged critical infrastructure. Repairs/workarounds to other critical public utilities, services, and facilities that help restore the ability of the local authority to manage its own recovery efforts.

3. Emergency opening of streets, roads, bridges, airfields, ports, and waterways in support of recovery and humanitarian needs that help restore the ability of the local authority to manage its own recovery efforts.

4. Immediate humanitarian needs of the dislocated populace, such as the construction of temporary shelters and support facilities.

5. Demolition of damaged structures and facilities that pose a significant risk to the public.

(c) **Construction Policy.**  IAW FEMA doctrine and policy, construction in conjunction with domestic disaster response is normally performed by commercial

contractors, and new construction during DSCA operations should not be expected as DoD is normally prohibited from performing services where viable commercial vendor support is available.  However, when new construction is authorized, adherence to all federal, state, and local codes and standards should be anticipated.  Use of Service construction standards, planning factors, development priorities, and cost estimates are encouraged.  Expedient and rapid construction techniques should be considered, such as prefabricated buildings, inflatable buildings, and clamshell structures.  Expedient construction techniques can be selectively employed with minimum time, cost, and risk and offer deployed forces another source of temporary facilities.  Temporary facilities may be required or requested in certain cases during the initial phase of operations or in support of the LFA.

(d) **Contracted Support.**  Contracted support is the primary means used to accomplish engineer/construction requirements in DSCA.  Ample commercial capacity in heavy equipment and materials should be available in the JOA.  DoD engineer capabilities coupled with commercial sector and contracted support capabilities provide a robust response in support of civil authorities.  Coordination between USACE and potential construction contracting agencies at federal and SLTT levels is required to ensure efficient resource utilization and economies of scale when possible.  Contracted support can be a significant force multiplier, but it is only one of numerous sources of support to the joint force.

(e) **Multinational Forces.**  The use of multinational force civil engineering forces, even if available, should not be considered during mission planning.  DoD component planners should not plan to rely on international assistance as the basis for response and cannot accept military-to-military assistance to meet a DSCA RFA.

(f) **Environmental Considerations.**  DoD forces employed in DSCA operations are responsible for protecting the environment IAW federal, state, and local laws.  Commanders employ environmentally responsible practices that minimize adverse impacts on human health and the environment.  DoD goals are to initiate actions as soon as possible to curtail further environmental damage, resolve environmental impacts, and comply with all applicable laws to the maximum extent possible.

1. Plans are developed to reduce or eliminate negative impacts on the environment.  The joint force supports the primary agency, and environmental responsibilities remain with the primary agency.  However, this does not release the joint force from responsibility to plan and conduct operations in a manner responsive to environmental considerations.  Timely DSCA response in crisis circumstances may make it necessary to take immediate action without preparing the normal environmental planning documents.  Environmental laws often have emergency exceptions.  Commanders should consult with staff judge advocates when establishing environmental guidelines when conducting DSCA under emergency conditions.

2. Documenting conditions and actions as soon as possible before, during, and after operations in the JOA facilitates resolution and closure of environmental issues.  An active environmental review should be conducted to identify possible environmental issues before a negative impact occurs.  Liaison and communication with

the applicable DoD regional environmental coordinator also aid the resolution of environmental issues.  Environmental impacts are addressed as soon as possible once operations have stabilized.  Emergency exemptions may be needed for disposal of contaminated and hazardous material.  The joint force should direct their efforts to identify, contain, document, and transfer environmental issues to civil authorities as soon as possible.

*For additional information on engineer organizations and Service assets, see JP 3-34,* Joint Engineer Operations.

(4) **OCS.**  OCS is the process of planning for and obtaining supplies, services, and construction from commercial sources in support of CCDR-directed joint operations.  OCS enables integration of contracted support in DSCA planning and execution.  OCS provides the framework to harness commercial capability to produce unified action and integrate it into DSCA plans, orders, and execution; make timely, risk-informed decisions on the best sources for procuring contract supplies, services, and construction; and manage and assess the resultant contracted support.

(a) Contract support integration is the planning, coordination, and synchronization of contracted support in operations.  OCS and contracting practitioners establish and coordinate through cross-functional teams to ensure the contracted planning and execution supports the mission.

(b) Contracting support is the planning, coordination, and execution of the contracting authority to legally bind contractors in support of operations.  The contracting community leverages DoD installation and mission-assigned contracting forces to adapt to the planned and executing contracting requirements of DSCA.

(c) Contractor management is the oversight and integration of contractor personnel and associated equipment in support of operations, including DSCA.  OCS, contracting, contractor companies, and assigned commands all have a role in DSCA contractor management.  Contractor management is an expansive and complex process, comprising predeployment preparation, deployment and reception, in-theater management, and redeployment.

*For additional information, see JP 4-10,* Operational Contract Support, *and CJCSM 4301.01,* Planning Operational Contract Support.

## 6. Information Activities and Public Affairs

Military PA, military CAIS element activities, public information actions, and news media access to the operational area are subject to approval by the primary agency.  The joint force should coordinate PA and comply with PA guidance from the LFA.

a. **Media Access.**  News media access to the operational area is determined by local or state authorities.  The public's perception of the response depends to a great extent on traditional and social media.  This perception also influences the level of cooperation and coordination between military and civilian leaders.  Positive public support facilitates

mission accomplishment.  Lack of public support, however, can seriously impede the effectiveness of DSCA operations.  Additionally, the ability of today's media technologies to rapidly transmit information, often inaccurately or without proper context, can shape the way the public views the role, use, value, and success of the military and ultimately affect public support of operations.

    b.  **DoD PA.**  In fulfilling its DSCA role, the CCMD is an active member of the federal response community.  DoD PA officers operate in an interagency environment, with emphasis on cooperation, coordination, and unity of effort that is tailored to support the ESF #15 (External Affairs) requirement to provide accurate, coordinated, timely, and accessible information.  It is critical that PA and visual information activities are planned, coordinated, and integrated across government and private organizations.

*See JP 3-04,* Information in Joint Operations, *and JP 3-61,* Joint Public Affairs*, for additional information.*

    c.  **CAIS.**    Military information support operations forces can be employed domestically for CAIS under direction and authority of a designated LFA or civil authority.  When executing CAIS activities, these forces are restricted by policy and SecDef guidance to only broadcasting and disseminating public information.    When authorized for employment in this manner, they utilize their media development, production, and dissemination capabilities to deliver public or other critical information during domestic emergencies.  Their mission is strictly to inform, and CAIS efforts should be coordinated with ongoing military and LFA PA efforts.  The LFA is the approval authority for all products conveying the lead agency messages.

*See JP 3-53,* Joint Military Information Support Operations, *for additional information.*

## 7.  Health Services

    a.  **Health Services.** Health services include the management of health services resources, such as manpower, monies, and facilities; preventive and curative health measures; evacuation of the wounded, injured, or sick; selection of the medically fit and disposition of the medically unfit; blood management; medical supply, equipment, and maintenance thereof; combat and operational stress control; and medical, dental, veterinary, laboratory, optometry, nutrition therapy, public health, and medical intelligence services.

        (1)  DoD is responsible for health services to DoD forces responding to the event.

        (2) As a supporting agency to HHS, DoD coordinates mission assignments involving health services through the DCO, the Joint Staff Surgeon, and the supporting JRMPO.  DoD may receive RFAs submitted to the DoD Executive Secretary prior to a DCO being notified.  SecDef is the approval authority for RFAs submitted by lead agencies. Approved RFAs are coordinated with the DCO and Joint Staff Surgeon for further action.  Additionally, HHS or the United States Department of Agriculture (USDA) may request assistance from DoD without going through FEMA and the multiagency contract process IAW the Economy Act.  DoD employs and integrates the medical response

through the following joint medical capabilities:  first responder care, forward resuscitative care, en route care, theater hospitalization, and definitive care.  As authorized, DoD can transport medical personnel and provide supplies, equipment and maintenance, laboratory services, and medical intelligence services.  DoD medical support should maintain medical data sharing systems accessible by the interagency to synchronize and distribute medical resources, manage patient care, track infectious disease spread, and health service support. DoD provides medical support in collaboration with SLTT health authorities to save lives and assist in restoration of essential health services until transition to other medical support organizations can be established.  The scope of the medical response varies with the type and scale of emergency.  In most cases, the Military Health System has a scaled response to DSCA emergencies—first, under immediate response authority and mutual aid agreements with SLTT health care systems; second, through the National Disaster Medical System (NDMS); and finally, through SecDef-approved mission assignments.

(3) DoD preparedness and planning consists of public health and medical capabilities from all DoD components, including the Defense Health Agency's role in the Military Health System.  The Defense Health Agency supports planning and preparedness activities for the Military Health System in response to natural disasters or man-made incidents by coordinating on USNORTHCOM CONPLAN 3501, *Defense Support of Civil Authorities (DSCA);* USNORTHCOM Branch Plan 3560, *Pandemics and Infectious Disease Response;* and USNORTHCOM CONPLAN 3502, *Civil Disturbance Operations,* IAW DoDI 3025.24, *DoD Public Health and Medical Services in Support of Civil Authorities.*

*For more details, see JP 4-02,* Joint Health Services.

b. **NDMS.**  DoDI 6010.22, *National Disaster Medical System (NDMS),* establishes policy for DoD participation in the NDMS, a joint federal, state, and local mutual aid response system to provide a coordinated medical response, patient movement, and definitive patient care during a military health emergency, US national emergency, or US domestic disaster.  DoDI 6010.22 also establishes DoD support to NDMS as outlined in Title 42, USC, the Pandemic and All-Hazards Preparedness Reauthorization Act, and the NDMS Federal Partners Memorandum of Agreement.  Acute situations may require response prior to detailed DoD and HHS coordination.  Immediate response authority provisions in DoD policy cover imminently severe conditions resulting from civil emergencies that may require immediate action to save lives, prevent suffering, or mitigate property damage.

*For more details on federal coordinating centers, see the* National Disaster Medical System Federal Coordinating Center Guide.

c. **Responsibilities.**  The joint force surgeon advises the JFC on health services plans, policies, and procedures pertaining to and affecting military and civilian personnel in the AOR/JOA.  The joint force surgeon's cell provides the central location for medical planning and operations.  The staff monitors current and future operations and conducts required planning support.  The joint force medical staff maintains close contact with the CCMD's JRMPOs and with the DCO(s) to carry out ESF #8 (Public Health and Medical

Services) activities, as well as ancillary support to the other ESFs (i.e., #6, #9, #10, #11, and others).  The military public health emergency officer functions as the commander's primary public health advisor during an emergency.  Some of the challenges medical and public health responders may face are:

(1) **Commander's Estimate.**  The medical portion of the commander's estimate identifies the health services and FHP requirements.  It is important to have medical, veterinary, and public health personnel on all survey or advance teams.  Many variables affect health service and FHP needs; therefore, a medical intelligence analysis requires multiple sources of information, most crucial being information gathered by trained medical, veterinary, and public health personnel on scene.  Medical, veterinary, and public health personnel assess the safety of local food and water sources, the risk from disease vectors and environmental factors, and the adequacy of hygiene in lodging and public facilities as early as possible.  Identification of health threats and available medical capabilities allows calculation of health risks and determination of appropriate health service and FHP requirements for inclusion in courses of action for the commander's estimate.

(2) **Triage.**  Triage prioritizes resources, evacuation, and health care delivery for the most seriously injured casualties, using local and regional medical facilities for casualties who must be transferred to higher-level care.  A common occurrence during the chaos of mass casualty events is that the first casualties to receive care are often those who are least injured.  This limits access to life-saving care for those who need it most.

(3) **Distribution of Casualties.**  During mass casualty events, casualties tend to be concentrated locally and transported to the nearest health care facility through both emergency medical services and nonemergency means (such as private vehicles and police transport).  This concentration of casualties may overwhelm some local facilities, while others in the same area may remain under-utilized.  The joint force should identify available facilities and determine a casualty distribution system to optimize resource utilization.  It is crucial to maintain awareness and communication with the local medical facilities to understand their capacities for both normal and surge operations.  Triaged casualties should be distributed accordingly among the local health facilities.

(4) **Damage to the Health Care Infrastructure.**  The level of damage to the health care infrastructure and the level of involvement of the other civil medical organizations are starting points when developing situational awareness for the commander's estimate.  Local or regional public health emergency officers, a federal coordinating center, or a medical treatment facility can provide initial estimates of the situation based on local health system contacts.  Planned health service requirements generally depend on population health issues and the impact on local health service capabilities.

(5) **Health Service Prioritization.**  The medical estimate aids in prioritization of health services to provide the most appropriate and effective interventions to reduce death and disease, given the vulnerability of the affected population.  In situations where injuries are high, the elimination of on-scene health hazards, along with SAR and emergent surgical

services, may be the highest priority.  This type of support is generally short in duration due to patient survivability time limitations and the ability to rapidly build appropriate force levels for these tasks.  In situations where casualties are low and numbers of displaced persons are high, preventive medicine and public health measures will likely be the highest priority health services required (e.g., sanitation, control of infectious communicable diseases).  In general, the same groups who are most vulnerable in normal times are at most risk during emergencies and disasters.  They include people whose health is already compromised (e.g., people with preexisting illness, serious chronic diseases, the very young, the elderly, and pregnant individuals).

(6) **Qualifications of Military Health Care Providers.**  DSCA operations provide an additional challenge to military and health care providers practicing outside of their state of licensure.  Clarity between all participating response agencies (e.g., FEMA, HHS civilian health care administration), health care facilities, and health care providers regarding military licensure/credentialing and their subsequent scope of practice helps deconflict this issue.  Per Title 10, USC, Section 1094, all active duty, DoD civilian employee, and personal service contractor health care professionals under the jurisdiction of DoD, and NG personnel performing training or duty under Section 502(f) of Title 32, USC, in response to an actual or potential disaster, may practice their profession within the scope of their authorized federal duties at any location in any state, the District of Columbia, or a commonwealth, territory, or possession of the United States.  Having a MOA and a clear understanding of DoD policy aids all involved agencies with a shared understanding, thus improving unity of effort and the efficiency of patient care by capitalizing on strengths of every provider from differing organizations.

*For more information, see DoDI 6200.03,* Public Health Emergency Management within the Department of Defense.  *For more details on credentialing, see DoDI 3025.24,* DoD Public Health and Medical Services in Support of Civil Authorities.

d. **Animal and Plant Disease Response.**  Under ESF #8 and ESF #11, DoD may provide assistance to HHS and the USDA to provide available zoonotic and food protection activities.  Specifically, as the LFA for ESF #11, the USDA may request DoD assistance to contain and eradicate an actual or imminent outbreak of plant or animal disease that threatens the public health, US economy, or national security.

(1) The USDA and DoD established a MOA that provides a mechanism for the USDA to request and receive priority support if the presence of animal diseases or pests constitutes an emergency, as declared by the USDA.  This support may be provided under either the Economy Act or the Stafford Act.

(2) Through a federal task force, USDA's Animal and Plant Health Inspection Service coordinates, directs, and conducts the federal response to control and eradicate animal and plant diseases and pests, reimbursing DoD for actual costs incurred.  General Services Administration provides supplies and equipment.  Given SecDef approval where required, the OASD(HD&HA) coordinates requests with the CJCS, CCDRs with DSCA responsibilities in the matter, and Military Department Secretaries and other DoD officials as appropriate.  The OASD(HD&HA) also coordinates or consults, as appropriate, with

DHS and other federal agencies on the development and validation of DSCA requirements. The Services and other supporting commanders may provide installations for bases of support, provide resources, and identify and provide technically qualified personnel to assist the USDA as directed by the Joint Staff.

(3) Defense Health Agency, Veterinary Services Division, appoints a veterinary support LNO to coordinate with the interagency and USDA; an additional liaison may be designated to work directly with the USDA Animal and Plant Health Inspection Service for veterinary support that may be available IAW activation of the MOA. When requested, the Defense Health Agency, Veterinary Services Division, facilitates the designation of military specialists trained in transboundary animal disease diagnosis, epidemiology, microbiology, immunology, pathology, and public health, who can be deployed by supporting commanders.

*For more information, see JP 4-02,* Joint Health Services*. For veterinary services, refer to DoDD 6400.04E,* DoD Veterinary Public and Animal Health Services.

e. **Food and Agriculture Sector Resilience.** When requested by relevant agencies, DoD provides support for the security and resilience of the food and agriculture sector, including:

(1) Routine and emergency response situations, including intentional events involving animal diseases, the food supply, and other threats that could result in harm to humans, animals, plants, the environment, resources, property, institutions, or the nation's economy;

(2) Technical assistance and training, epidemiology, surveillance and contact tracing, modeling, laboratory diagnostics, transportation and logistics, information sharing, PA and communications support, information technology and cybersecurity support, debris removal and disposal, cleaning, disinfection, sanitation, and field operations; and

(3) Coordination, planning and exercise activities, risk assessments, including emergency infrastructure assessments, sampling, provision of equipment and supplies, critical infrastructure and public facility restoration, and demolition and structural stabilization.

*For more information, see National Security Memorandum-16,* National Security Memorandum on Strengthening the Security and Resilience of United States Food and Agriculture.

## 8. Mortuary Affairs

While the CCDRs coordinate mortuary affairs operations within their AOR, the local medical examiner or coroner often maintains jurisdiction over both military and civilian fatalities, including mass casualty events. The individual with jurisdiction has authority to order and perform an investigation, including an autopsy or an appropriate medicolegal death examination. Jurisdiction varies depending on geographical area and is dependent upon federal, state, county, or local laws. When there is a death of a Service member,

jurisdiction is generally concurrent. Concurrent jurisdiction means that a local medical examiner or coroner has the authority to conduct the medicolegal death investigation, including autopsy, but may waive jurisdiction to the military or request Armed Forces medical examiner (AFME) assistance. Investigation of deaths in areas of exclusive federal jurisdiction belong to the office of the AFME. Military bases are not necessarily under exclusive federal jurisdiction. The local staff judge advocate should identify the base's jurisdiction before an event or be consulted during early stages of the response phase. Federal law (Title 10, USC, Section 1471) allows the AFME to conduct its own forensic pathology investigation to determine the cause or manner of death of a deceased active duty person if such an investigation is determined to be justified. However, this activity may or may not occur in conjunction with local medicolegal authorities' investigation. If the AFME believes the local authorities' medicolegal investigation was not sufficient, the remains may be transferred to the AFME before being released to the legal next of kin. Federal law also gives exclusive jurisdiction to the AFME for the President, the President's direct staff, and other key elected officials in the USG. The Services may deploy mortuary affairs units to search for, recover, transport, and temporarily store remains in support of civil authorities. Since there are only a few of these units, they are best used to augment existing capabilities. DoD may also provide remains recovery, preliminary identification, DNA [deoxyribonucleic acid] identification of remains, autopsy services (if applicable), mortuary processing, family assistance center support, and remains transport. If applicable, USACE may provide temporary remains interment.

*For more information, see JP 4-0,* Joint Logistics.

## 9. Cyberspace Support

DSCA operations can include employment of DoD cyberspace forces, including NG or reserve forces, to assist the LFA in support of SLTT civil authorities during a significant cybersecurity incident. DoD cyberspace forces may also be requested to support a larger DSCA effort that requires responses throughout the operational area through the creation of critical emergency telecommunication networks or other critical infrastructure, including the security and defense of these infrastructures. Per PPD-41, *United States Cyber Incident Coordination Policy,* DHS has the primary responsibility for protecting all non-DoD USG information systems and coordinating the whole of government response to significant cybersecurity incidents affecting non-USG information systems. This response is part of the NRF and is set forth in the *National Cyber Incident Response Plan.*

*For more information on military support in cyberspace, see USNORTHCOM Branch Plan 3574,* DSCA in Cyberspace; *JP 3-12,* Joint Cyberspace Operations; *and DoDI 8530.03,* Cyber Incident Response.

## 10. Space Operations Support

Space-related products supporting DSCA are concentrated on remote sensing; satellite communications; environmental monitoring; and positioning, navigation, and timing. Space-based systems and capabilities, in some cases, provide inherent advantages over terrestrial systems, such as global coverage with the ability to focus capacity in areas of

special interest, independence from terrestrial architectures, and persistent and enduring access to remote areas.

*For more information, see JP 3-14,* Joint Space Operations.

## 11. Electromagnetic Spectrum Operations

a. Information and data exchange between DoD and civil authorities relies on the electromagnetic spectrum for dissemination. The electromagnetic operational environment is heavily congested by friendly and neutral emitters and contested by enemy operations. The electromagnetic operational environment consists of the background electromagnetic environment and the friendly, neutral, and adversarial emitters within the electromagnetic area of influence of a given area.

b. Statutory requirements and the variety of USG departments and agencies present within the homeland make domestic electromagnetic spectrum operations very different than electromagnetic spectrum operations conducted in support of operations overseas. DSCA mandates coordination with local and state-level authorities.

c. Federal government and civilian agencies maintain separate frequency allocations for day-to-day operations. Under Title 47, USC, nonfederal agencies may use federally allocated frequencies only if "the communications involved relate directly to the imminent safety-of-life or property" or "with US Government stations...in connection with mutual activities." However, Title 47, USC, requires that "for transmissions concerning the imminent safety-of-life or property, the transmissions shall be suspended as soon as the emergency is terminated." Also, the safety of life provision makes it clear that the exception applies only when the communications involved "relate directly" to the "imminent" safety of life or property. For federal agencies to use frequencies licensed to nonfederal agencies on a day-to-day mutual aid basis requires the nonfederal agency to own the Federal Communications Commission license and a signed memorandum stating that federal use of the frequency is necessary.

*For more information, see JP 3-85,* Joint Electromagnetic Spectrum Operations; *JP 6-0,* Joint Communications; *47 Code of Federal Regulations Part 300,* "Revision to the Manual of Regulations and Procedures for Federal Radio Frequency Management;" *and the* DHS Office of Emergency Communications National Interoperability Field Operations Guide.

## 12. Other Support and Sustainment Considerations

### a. International Support

(1) Guidance on carrying out responsibilities for international coordination in support of the USG's response to a domestic incident with an international component is provided by the International Coordination Support Annex of the NRF. Policies and procedures outlined in this annex are elaborated in the International Assistance System (IAS) CONOPS, a document jointly prepared by DHS, DOS, and the United States Agency for International Development in the aftermath of Hurricane Katrina. The IAS CONOPS establishes the policies and standard operating procedures to manage the flow of

international resources in the United States, under the NRF, for a presidentially declared major disaster as described under the Stafford Act.

(2) Since the USG is usually in a position to fill its domestic disaster response needs, the USG typically does not find it necessary to activate the IAS.  Exceptions may include particularly large or simultaneous disasters, for which very specific commodities or technical assistance might be requested and for which a foreign partner can provide needed goods in a timely manner.

(3) When the IAS is implemented, USG departments and agencies may be requested to provide assistance in expediting the flow of international resources during a domestic disaster declared under the Stafford Act.  The IAS also applies to FEMA mission-assigned agencies that may request assistance through the IAS to obtain international resources for disaster response activities.  The IAS support is only available for international assistance that has been specifically approved by FEMA and accepted under FEMA's gift acceptance authority under the Stafford Act.

(4) Outside the IAS, DoD does not require FEMA approval to accept foreign military assistance in support of its own operations; however, for a domestic response, there should be no support falling within the military-to-military category without coordination with DOS.  Even if there are standing military-to-military agreements in place, any foreign military wishing to provide direct support should offer assistance through DOS, with DoD knowledge, for the response to be properly adjudicated and a timely response provided.

*For detailed guidance on international support, see the International Coordination Support Annex of the NRF and the IAS CONOPS.*

(5) ***Canada-United States Civil Assistance Plan.***  The *Canada-United States Civil Assistance Plan* provides a framework for the military forces of one nation to support those of the other when providing military support to civil authorities.  Global Affairs Canada and the US DOS are the LFAs that coordinate requests for and offers of assistance with their respective country's federal departments.  Any execution of the *Canada-United States Civil Assistance Plan* requires mission-specific legal authority, typically in the form of a Canada-United States exchange of diplomatic notes between Global Affairs Canada and US DOS.

b. **Financial Management (FM).**  FM units provide the same capabilities during DSCA operations as they do for other operations.  FM capabilities provide the following support:  procurement, pay, disbursing, accounting, and banking.  Costs incurred during DSCA operations are incremental and are reimbursable IAW the Economy Act and Stafford Act, unless otherwise directed by the President.  FM units should have processes in place to capture these incremental costs to facilitate reimbursement.  See Appendix F, "Reimbursement for Defense Support of Civil Authorities," for details on reimbursement procedures for DSCA.

c. **Safety.** Safety planning, coordinated with other agencies, and operational risk management are key factors in the prevention of accidental loss of life and resources. The Services conduct their own safety reporting, and required elements for reports, record keeping, and accident investigations are contained in DoDI 6055.07, *Mishap Notification, Investigation, Reporting, and Record Keeping.*

d. **Legal.** DSCA involves numerous statutory, regulatory, and policy considerations. The commander and the staff judge advocate should be knowledgeable regarding the authority and responsibility of DoD, as well as that of the various other federal agencies. Inherent in these operations are the relationships between federal and SLTT authorities, as well as jurisdictional principles, security requirements, environmental requirements, and claims administration. The occurrence of an incident or civil emergency presents complex legal problems. Legal issues range from questions regarding jurisdiction and authority to exclude the general public from specific areas to payment of simple personal property claims. The response force organization should include a legal element to advise and assist in resolving these and other local legal issues. Whenever possible, NG legal support that is familiar with SLTT laws should be included. Specific tasks are to:

(1) Advise the commander and staff on any matters related to the DSCA operation.

(2) Coordinate technical legal matters with a higher authority, when required.

(3) Coordinate legal issues with the principal legal advisors or other participating departments and agencies, as required.

(4) Provide legal advice and assistance to other federal officials upon request, as permitted by the appropriate interagency service agreements.

(5) Review proposed public statements for legal sufficiency and implications.

(6) Advise on the legal issues relating to rules of engagement, RUF, and use of riot control agents.

Chapter V

Intentionally Blank

# CHAPTER VI
## DEFENSE SUPPORT OF CIVIL AUTHORITIES IN THE FUTURE OPERATIONAL ENVIRONMENT

### 1. Fundamental Changes

Technological advancements in space, cyberspace, the electromagnetic spectrum, and the increasing digitization of information characterize the fundamental changes in the character of warfare.  Due to these fundamental changes, adversary actions across the competition continuum may cause domestic disruptions that overwhelm SLTT organizations and increase the demand for DSCA operations.  These actions could occur in a coordinated fashion across a wide geographic area or across all domains and the electromagnetic spectrum. Individually, JFCs may erroneously deem these adversary actions as unrelated to existing adversary or proxy activity due to geographical disparity. However, adversaries may intentionally create widespread confusion within the United States with the intent to generate their own operational advantages at any global location to achieve their objectives. If SLTT organizations and JFCs executing DSCA are not adequately prepared to mitigate these malicious attempts, adversaries may seize an opportunity to leverage these advantages, below the threshold of armed conflict, as the USG focuses attention and resources on multiple, simultaneous domestic crises.

### 2. Natural and Man-Made Disasters

SLTT organizations may increase their demand for DSCA if natural and man-made disasters that are unrelated to adversary activities occur more often in the future operational environment.  If domestic disasters increase in frequency, it is possible that an adversary could leverage a window of opportunity to weaken the United States via activities in all domains and across the competition continuum.

### 3. Domestic Crises

In the future operational environment, civil authorities may unknowingly request DSCA to respond to a crisis generated by clandestine adversary action. After initially marshaling resources, JFCs and SLTT organizations may assess that hostile action is a contributing factor to the crisis. This scenario may require JFCs to transition rapidly from DSCA to HD. Figure I-1 provides a visual depiction of the relationship between these mission sets and the potential for overlap between HD and DSCA. Multiple simultaneous domestic crises in geographically separated areas could generate concurrent DSCA requests. This situation may cause significant resource allocation dilemmas for FEMA and DoD, especially if DoD transitions from DSCA to HD.

### 4. Joint Force Commander Responses

a. JFCs who prioritize adaptability while preparing for and conducting DSCA activities may be able to respond more effectively to changes in the operational environment, thwarting adversary attempts to seize an advantage during domestic disasters.

b.  JFCs should recognize that an overlap situation with an ambiguous DoD role may impact response timelines. Force organization and command relationships differ significantly when DoD is a supporting organization capable of providing essential assistance in times of crisis (as with DSCA) versus when it is the supported organization (as with HD).  JFCs who implement continuous training programs designed to expose their organizations to these situations may respond faster and optimize resource allocation during real-world operations.

c.  JFCs should also consider prioritizing continuous training programs that promote the sharing of intelligence with civil authorities, within the scope of all applicable laws and regulations. Such programs may include sharing of predictive or responsive climate-related data from interagency and DoD sources (e.g., using DoD spacecraft for early identification and geolocation of wildfires at the request of civil authorities during wildfire season).  JFCs should contemplate risks and benefits associated with proactively disclosing sensitive or classified information to SLTT organizations when it pertains to adversary involvement with domestic crises. JFCs that regularly train for DSCA missions should enable and practice proactive dissemination of such intelligence. DoD and civil authority collaboration may enable SLTT organizations to mitigate a potential crisis preemptively and respond more effectively to events resulting from adversary action, which may preclude the need for a DSCA request.

# APPENDIX A
## NATIONAL INCIDENT MANAGEMENT SYSTEM OVERVIEW

### 1. General

Communities across the United States experience a diverse set of threats, hazards, and events. The size, frequency, complexity, and scope of these incidents vary, but all involve a range of personnel and organizations to coordinate efforts to save lives, stabilize the incident, and protect property and the environment. Every day, jurisdictions and organizations work together to share resources, integrate tactics, and act collaboratively. Whether these organizations are nearby or are supporting each other from across the country, their success depends on a common, interoperable approach to sharing resources, coordinating and managing incidents, and communicating information. NIMS describes this comprehensive approach. NIMS guides all levels of government, NGOs, and the private sector to work together to prevent, protect against, mitigate, respond to, and recover from incidents. NIMS provides stakeholders across the whole community with the shared vocabulary, systems, and processes to successfully deliver the capabilities described in the National Preparedness System. NIMS defines operational systems, including the ICS, EOC structures, and multiagency coordination groups that guide how personnel work together during incidents. NIMS applies to all incidents, from traffic accidents to major disasters. The jurisdictions and organizations involved in managing incidents vary in their authorities, management structures, communication capabilities and protocols, and many other factors. NIMS provides a common framework to integrate these diverse capabilities and achieve common goals. The guidance contained in this document incorporates solutions developed over decades of experience by incident personnel across the United States.

### 2. Overview of National Incident Management System Components

The components of the NIMS were not designed to stand alone but to work together in a flexible, systematic manner to provide the national framework for incident management. NIMS is organized into three major components, and they represent a building-block approach to incident management. Applying the guidance for all three components is vital to successful NIMS implementation.

a. **Resource Management.** NIMS resource management guidance enables many organizational elements to collaborate and coordinate to systematically manage resources (e.g., personnel, teams, facilities, equipment, and supplies). Most jurisdictions or organizations do not own and maintain all the resources necessary to address all potential threats and hazards. Effective resource management includes leveraging each jurisdiction's resources and private-sector resources, involving volunteer organizations, and encouraging further development of mutual aid agreements. These are standard mechanisms to systematically manage resources, both before and during incidents, to allow organizations to more effectively share resources when needed.

b. **Command and Coordination.** Local authorities handle most incidents using the communications systems, dispatch centers, and incident personnel within a single

jurisdiction.  Larger and more complex incidents may begin in a single jurisdiction but rapidly expand to multi-jurisdictional or multidisciplinary efforts necessitating outside resources and support.  Standard incident command and coordination systems allow the efficient integration of these outside resources and enable assisting personnel from anywhere in the United States to participate in the incident management structure.  The command and coordination component of NIMS describes the systems, principles, and structures that provide a standard national framework for incident management.

c. **Communications and Information Management.**  Incident personnel rely on flexible communications and information systems to obtain and provide accurate, timely, and relevant information; establish and maintain situational awareness; and maintain accessibility and interoperability for voice and data communications.  Properly planned, established, and applied communications facilitate information dissemination among command and support elements and cooperating jurisdictions and organizations.  To maintain situational awareness, incident personnel continually update incident information by gathering, collating, synthesizing, and disseminating incident information to and from all appropriate parties to create a common operational picture.  This information flow is facilitated through developing and using common plans and interoperable equipment, processes, standards, and architectures.  During an incident, this integrated, familiar approach links all incident personnel, whether on scene, in an EOC, or in another support location, to maintain communications connectivity and situational awareness.  Communications and information management planning addresses the incident-related policies, equipment, data architecture, systems, standards, and training necessary to achieve interoperable communications.

### 3.  National Incident Management System and Its Relationship to the National Response Framework

The response protocols and structures described in the NRF align with NIMS.  NIMS provides the incident management basis for the NRF and defines standard command and management structures.  Standardizing national response doctrine on NIMS provides a consistent, nationwide template to enable the whole community to work together to prevent, protect against, mitigate, respond to, and recover from the effects of incidents regardless of cause, size, location, or complexity.  The NIMS concepts of multiagency coordination and unified command are described in the command and management component of NIMS.  These two concepts are essential to effective response operations because they address the importance of developing a single set of objectives; using a collective, strategic approach; improving information flow and coordination; creating a common understanding of joint priorities and limitations; ensuring no agency's legal authorities are compromised or neglected; and optimizing the combined efforts of all participants under a single plan.

a. **Intended Audience**

(1)  The NRF is intended to be used by the whole community.  This all-inclusive concept focuses efforts and enables a full range of stakeholders—individuals, families, communities, private and nonprofit sectors, faith-based organizations, state and local civil

authorities, and federal governments—to participate in national preparedness activities and to be full partners in incident response.  Government resources alone cannot meet all the needs of those affected by major disasters.  All elements of the community are activated and integrated to respond to a major or catastrophic incident.

(2) Involving the whole community is essential to US success in achieving resilience and national preparedness.  Individual and community preparedness is a key component to this objective.  By providing equal access to acquire and use the necessary knowledge and skills, the whole community contributes to and benefits from national preparedness.  This includes children; individuals with disabilities and others with access and functional needs; those from religious, racial, and ethnically diverse backgrounds; and people with limited English proficiency.  Their contributions should be integrated into preparedness efforts, and their needs incorporated into planning for and delivering the response core capabilities.

(3) Although the NRF is intended to provide guidance for the whole community, it focuses especially on the needs of those who are involved in delivering and applying the response core capabilities defined in the national preparedness goal.  This includes emergency management practitioners, community leaders, and government officials who collectively understand and assess the needs of their respective communities and organizations to determine the best ways to organize and strengthen their resiliency.

b. **Scope**

(1) The NRF describes structures for implementing nationwide response policy and operational coordination for all types of domestic incidents.  This section describes the scope of the response mission area, the guiding principles of response doctrine and their application, and how risk informs response planning.

(2) The response mission area focuses on ensuring the United States is able to respond effectively to all types of incidents that range from those that are adequately handled with local assets to those of catastrophic proportion that require marshaling the capabilities of the entire nation.  The objectives of the response mission area define the capabilities necessary to save lives, protect property and the environment, meet basic human needs, stabilize the incident, restore basic services and community functionality, and establish a safe and secure environment moving toward the transition to recovery.

(3) The NRF describes the principles, roles and responsibilities, and coordinating structures for delivering the core capabilities required to respond to an incident and further describes how response efforts integrate with those of the other mission areas.  The NRF is always in effect, and elements can be implemented at any time.  The structures, roles, and responsibilities described in the NRF can be partially or fully implemented in the context of a threat or hazard, in anticipation of a significant event or in response to an incident.  Selective implementation of NRF structures and procedures allows for a scaled response, delivery of the specific resources and capabilities, and a level of coordination appropriate to each incident.

(4)  In this framework, the term incident includes actual or potential emergencies and disasters, resulting from all types of threats and hazards, ranging from accidents and natural disasters to cyberspace threats and terrorist attacks.  The NRF's structures and procedures address incidents where federal support to state and local governments is coordinated under the Stafford Act, as well as incidents where USG departments and agencies exercise other authorities and responsibilities.

(5)  Nothing in the NRF is intended to alter or impede the ability of any state and local or USG department or agency to carry out its authorities or meet its responsibilities under applicable laws, EOs, and directives.     See  https://www.fema.gov/media-library/assets/documents/148019 for additional information on NIMS, and for additional information on the NRF, see https://www.fema.gov/media-library/assets/documents/32230.

## 4.  The Incident Command System

a.  ICS is a standardized approach to the command, control, and coordination of on-scene incident management that provides a common hierarchy for personnel from multiple organizations to be effective.  ICS specifies an organizational structure for incident management that integrates and coordinates a combination of procedures, personnel, equipment, facilities, and communications.  Using ICS for every incident helps hone and maintain skills needed to coordinate efforts effectively.  ICS is used by all levels of government, as well as by many NGOs and private-sector organizations.  ICS applies across disciplines and enables incident managers from different organizations to work together seamlessly.  This system includes five major functional areas, staffed as needed for a given incident: command, operations, planning, logistics, and finance/administration.

(1)  Incident command is responsible for the overall management of the incident.  A single incident commander or unified command conducts the command function for an incident.  Command and general staff support the incident command to meet the incident's needs.

(2)  The incident command organizational structure develops in a top-down, modular fashion that is based on the size and complexity of the incident, as well as the specifics of the hazard environment created by the incident.  The basic ICS organization comprises:

(a)  Four general staff sections:

1.  Operations,

2.  Planning,

3.  Logistics, and

4.  Finance and administration.

(b)  Three command staff sections:

    1. Public information,

    2. Safety, and

    3. Liaisons.

(3) When needed, separate functional elements can be established, each of which may be further subdivided to enhance internal organizational management and external coordination.

(4) Responsibility for the establishment and expansion of the ICS modular organization ultimately rests with the incident commander based on the requirements of the situation. As incident complexity increases, the organization expands from the top down as functional responsibilities are delegated. Concurrently with structural expansion, the number of management positions expands to adequately address the requirements of the incident.

(5) Incident command may be transferred from one commander to a succeeding one. The transfer of incident command includes a transfer of command briefing (which may be oral, written, or both). A transfer of command occurs when a more qualified person assumes command; the incident situation changes over time, resulting in a legal requirement to change command (e.g., multijurisdictional or multiagency involvement); there is normal turnover of personnel on extended incidents; or the incident response is concluded and responsibility is transferred to the home agency.

b. **Incident Management Teams (IMTs)**

(1) IMTs are rostered groups of ICS-qualified personnel, consisting of an incident commander, other incident leadership, and personnel qualified for other key ICS positions. IMTs exist at regional, state, local, and national levels and have formal notification, deployment, and operational procedures in place. These teams are based on team members' qualifications and may be assigned to manage incidents or to accomplish supporting incident-related tasks or functions. When assigned to manage an incident or to support an incident-related task or function, IMTs are typically delegated the authority to act on behalf of the affected jurisdiction or organization.

(2) **Incident Management Assistance Teams (IMATs)**

(a) Some IMTs are referred to as IMATs to clarify that they support on-scene personnel or the affected jurisdiction(s). IMATs may have C2 over certain aspects of response and recovery efforts (e.g., the use of state/federal assets). Through participation in a unified command or a unified coordination group with representatives from state and local governments, IMATs ensure activities align with local priorities. IMATs exist at various levels of government and within the private sector. Regardless of who owns IMATs or their specific missions, IMATs operate using the principles and practices of ICS.

(b) FEMA IMATs deploy to incidents or incident-threatened venues, help identify and provide federal assistance, and coordinate and integrate inter-jurisdictional

Appendix A

response in support of an affected state or tribe.  FEMA IMATs provide the federal government with an early presence at an incident, integrating FEMA's response capabilities into the existing community of emergency management functions.

(c) National (DHS) IMAT is focused on HS incidents.  This team responds to incidents that fall outside of the authorities of the Stafford Act but require a coordinated federal or DHS response.

c. **Multiagency Coordination System**

(1)  The primary functions of multiagency coordination systems are:

(a)  Support incident management policies and priorities.

(b)  Facilitate logistics support and resource tracking.

(c)  Inform resource allocation decisions using incident management priorities.

(d)  Coordinate incident-related information.

(e) Coordinate interagency and international issues regarding incident management policies, priorities, and plans.

(2)  These functions define the operating characteristics, interactive management components, and organizational structure of supporting incident management entities at the federal, state, local, tribal, and regional levels through mutual aid agreements and other assistance arrangements.

(3)  When incidents cross disciplinary or jurisdictional boundaries, or involve complex incident management scenarios, a multiagency coordination entity, such as an emergency management agency, may be used to facilitate incident management and policy coordination.  The situation at hand and the needs of the jurisdictions involved dictate how these multiagency coordination entities conduct their business, as well as how they are structured.

(4) Multiagency coordination entities typically consist of principals (or their designees) from organizations and agencies with direct incident management responsibility or with significant incident management support or resource responsibilities.  These entities are sometimes referred to as crisis action teams, policy committees, incident management groups, executive teams, or other similar terms.

(5) Direct tactical and operational responsibility for conducting incident management activities rests with the incident commander.  Command authority does not reside with coordinating officers or coordinating entities, although coordinating officers may be designated with command authority.  In some instances, EOCs may serve a dual function as a multiagency coordination entity; in others, the preparedness organizations may fulfill this role.  Regardless of the term or organizational structure used, these entities typically provide strategic coordination during domestic incidents.

(6) If constituted separately, multiagency coordination entities, preparedness organizations, and EOCs coordinate and communicate with one another to provide uniform and consistent guidance to incident management personnel.  The JFO is the multiagency coordination center of primary interest to the CCDR or the JFC.

d.  **Public Information Systems.**  These refer to processes, procedures, and systems for communicating timely and accurate information to the public during crisis or emergency situations.  Under the ICS, the public information officer (PIO) is a key staff member supporting the incident command structure.

(1) The PIO represents and advises the incident commander on all public information matters relating to the management of the incident.  The PIO handles media and public inquiries; emergency public information and warnings; rumor monitoring and response; media monitoring; and other functions required to coordinate, clear with appropriate authorities, and disseminate accurate and timely information related to the incident, particularly regarding information on public health and safety and protection.  The PIO should have a basic understanding of several specific subjects, such as nonlethal weapons and CBRN effects, to answer questions appropriately and minimize reactions.

(2) The PIO also coordinates public information at or near the incident site and serves as the on-scene link to the joint information system.  In a large-scale operation, the on-scene PIO serves as a field PIO with links to the joint information center (JIC), which is typically co-located with the federal, regional, state, local, or tribal EOC tasked with primary incident coordination responsibilities.

(a)  The joint information system provides the mechanism to integrate public information activities among JICs, across jurisdictions, and with the private sector and NGOs.  During emergencies, the public may receive information from a variety of sources.

(b)  The JIC provides a location for incident management organizations to work together to disseminate timely, accurate, easy-to-understand, and consistent information to the public.   JICs include processes to coordinate and clear public communications.  The JIC develops, coordinates, and disseminates unified news releases.

(3) News releases are cleared through the JFO coordination group to maintain consistent messaging, avoid release of conflicting information, and prevent negative impact on operations.  This formal approval process for news releases ensures protection of law enforcement-sensitive information or other sensitive but unclassified information.  DoD supports the national-level JIC and contributes to the overall unified message.  DoD and other agencies may issue their own news releases related to their policies, procedures, programs, and capabilities; however, these should be coordinated with the JIC.

Appendix A

Intentionally Blank

## APPENDIX B
## NATIONAL RESPONSE FRAMEWORK'S
## EMERGENCY SUPPORT FUNCTIONS

### 1. Overview

The ESFs provide the structure for coordinating federal interagency support for a federal response to an incident.  They are mechanisms for grouping functions most frequently used to provide federal support to states and federal-to-federal support, both for declared disasters and emergencies, under the Stafford Act and for non-Stafford Act incidents.  ESFs are not based on the capabilities of a single department or agency, and the functions for which they are responsible cannot be accomplished by any single department or agency.  Instead, federal ESFs are groups of organizations that work together to deliver core capabilities and support an effective response.

### 2. Fifteen Emergency Support Functions

The 15 ESFs are shown in Figure B-1, with further information as follows:

a. **ESF #1 – Transportation (Department of Transportation):**  Provides support by assisting local, state, tribal, territorial, insular area, and federal governmental entities; voluntary organizations; NGOs; and the private sector in the management of transportation systems and infrastructure during domestic threats or in response to actual or potential incidents.

b. **ESF #2 – Communications (DHS/CISA):**  Supports the restoration of communications infrastructure, coordinates communications support to response efforts, facilitates the delivery of information to emergency management decision makers, and assists in the stabilization and reestablishment of systems and applications during incidents.

c. **ESF #3 – Public Works and Engineering (DoD/USACE):**  Coordinates and organizes the resources of the USG to facilitate the delivery of multiple core capabilities.



**Figure B-1.  Emergency Support Functions**

d. **ESF #4 – Firefighting (USDA/Forest Service and DHS/FEMA/US Fire Administration):** Provides federal support for the detection and suppression of wildland, rural, and urban fires resulting from, or occurring coincidentally with, an all-hazard incident requiring a coordinated national response for assistance.

e. **ESF #5 – Information and Planning (DHS/FEMA):** Collects, analyzes, processes, and disseminates information about a potential or actual incident, and conducts planning activities to facilitate the overall activities in providing assistance to the whole community.

f. **ESF #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services (DHS/FEMA):** Coordinates and provides life-sustaining resources, essential services, and statutory programs when the needs of disaster survivors exceed SLTT and insular area government capabilities.

g. **ESF #7 – Logistics (General Services Administration and DHS/FEMA):** Integrates whole community logistics incident planning and support for timely and efficient delivery of supplies, equipment, services, and facilities. It also facilitates comprehensive logistics planning, technical assistance, training, education, exercise, incident response, and sustainment that leverage the capability and resources of federal logistics partners, public and private stakeholders, and NGOs in support of both responders and disaster survivors.

h. **ESF #8 – Public Health and Medical Services (HHS):** Coordinates the mechanism for federal assistance in response to an actual or potential public health and medical disaster or incident. Its functions include public health; medical surge support, including patient movement; behavioral health services; mass fatality management; and veterinary, medical, and public health services.

i. **ESF #9 – Search and Rescue (DHS/FEMA):** Deploys federal SAR resources to provide life-saving assistance to state and local authorities, including local SAR coordinators and mission coordinators, when there is an actual or anticipated request for federal SAR assistance. DoD is one of four primary agencies for ESF #9. CDRUSNORTHCOM and CDRUSINDOPACOM serve as the DoD lead in their respective AORs for matters pertaining to planning and operations for ESF #9.

j. **ESF #10 – Oil and Hazardous Materials Response (Environmental Protection Agency/USCG):** Provides federal support in response to an actual or potential discharge or release of oil or hazardous materials, when activated.

k. **ESF #11 – Agriculture and Natural Resources (USDA):** Organizes and coordinates federal support for the protection of the nation's agricultural and natural and cultural resources during national emergencies. ESF #11 works during actual and potential incidents to provide nutrition assistance; respond to animal and agricultural health issues; provide technical expertise, coordination, and support of animal and agricultural emergency management; ensure the safety and defense of the nation's supply of meat,

poultry, and processed egg products; and ensure the protection of natural and cultural resources and historic properties.

l. **ESF #12 – Energy (Department of Energy):**  Provides support to DHS by assisting SLTT and USG entities, NGOs, and the private sector by coordinating government capabilities, services, technical assistance, and engineering expertise during disasters and incidents that require a coordinated federal response.  The term energy includes producing, storing, refining, transporting, generating, transmitting, conserving, building, distributing, maintaining, and controlling energy systems and system components.

m. **ESF #13 – Public Safety and Security (DOJ/Bureau of Alcohol, Tobacco, Firearms, and Explosives):**  Provides federal public safety and security assistance to SLTT and federal organizations overwhelmed by the results of an actual or anticipated natural/man-made disaster or an act of terrorism.

n. **ESF #14 – Cross-Sector Business and Infrastructure (DHS/CISA):**  Supports the coordination of cross-sector operations, including stabilization of key supply chains and community lifelines, among infrastructure owners and operators, businesses, and their government partners.  ESF #14 is complementary to the sector-specific agencies and other ESFs and is a mechanism for entities that are not aligned to an ESF or have other means of coordination.  Critical infrastructure sectors currently aligned to another ESF continue to use that ESF as their primary interface.  ESF #14 is the primary interface for unaligned sectors and supports coordination among all sectors.

o. **ESF #15 - External Affairs (DHS):**  Provides accurate, coordinated, timely, and accessible information to affected audiences, including governments; media; the private sector; and the local populace, including children, those with disabilities, and others with access and functional needs and individuals with limited English proficiency.

*For more information, see the* Response Federal Interagency Operational Plan.

Intentionally Blank

## APPENDIX C
## STANDING RULES FOR THE USE OF FORCE FOR
## UNITED STATES ARMED FORCES

### 1. Purpose

US military forces may be required to assist US civil authorities, which may require the use of force. The participation of the military in such scenarios is fraught with legal and political pitfalls that require clear and specific guidance on the use of force. Some may seek to exacerbate a situation for their own purposes by provoking an excessive use of force. The purpose of this appendix is to reference fundamental policies and procedures governing the SRUF by DoD forces during DSCA missions. These RUF do not apply to NG forces in SAD and Title 32, USC, status. DoDD 5210.56, *Arming and the Use of Force,* also applies.

### 2. Guidance

a. CJCSI 3121.01, *(U) Standing Rules of Engagement and Standing Rules for the Use of Force for US Forces,* establishes fundamental policies and procedures governing the actions to be taken by US commanders and their forces during all DoD DSCA operations and routine military department functions occurring within the US territory or US territorial seas. SRUF also apply to land HD missions occurring within US territory on federal property only.

b. SecDef approves and the CJCS promulgates standing rules of engagement and SRUF for US forces. The Joint Staff J-3 [Operations Directorate], in coordination with OSD, maintains the standing rules of engagement/SRUF. Commanders at all levels establish rules of engagement/RUF for mission accomplishment that comply with the rules of engagement/RUF of senior commanders, the law of war, applicable domestic law, and the CJCS standing rules of engagement/SRUF. It is critical that commanders consult with their command judge advocates when establishing rules of engagement/RUF.

c. Unless otherwise directed by a unit commander (IAW CJCSI 3121.01, *[U] Standing Rules of Engagement and Standing Rules for the Use of Force for US Forces*), military personnel have the right, under law, to use force that is reasonably necessary under the circumstances to defend themselves against violent, dangerous, or life-threatening personal attack. In addition, military personnel are authorized to use force in the performance of their official duties.

d. Nothing in this appendix alters or limits military commanders' inherent right and obligation to exercise unit self-defense in response to a hostile act or demonstrated hostile intent. Unit self-defense includes the defense of other DoD forces in the vicinity.

e. Commanders train their personnel to understand and properly utilize the SRUF. In this regard, it is critical that legal advisors be available to assist in this training and to advise commanders at all levels of the applicable rules.

Appendix C

f. Mission-specific RUF are used when DoD forces are detailed to other federal agencies. These RUF are approved by SecDef and the federal agency concerned.

g. DoD units under USCG control and conducting law enforcement support operations or maritime HS support operations follow the USCG use of force policy, Commandant Instruction M16247.1, *US Coast Guard Maritime Law Enforcement Manual (MLEM),* for employing warning shots and disabling fire and follow the standing rules of engagement/SRUF or mission-specific use-of-force rules for all other purposes. However, DoD forces under USCG control retain the right of self-defense.

h. When DoD forces under DoD control operate in coordination with other federal departments or agencies, the applicable RUF are coordinated with the on-scene federal agency personnel.

i. CCDRs may augment these SRUF, as necessary, by submitting requests for mission-specific RUF to the CJCS, for approval by SecDef (IAW CJCSI 3121.01, *[U] Standing Rules of Engagement and Standing Rules for the Use of Force for US Forces).*

j. There may be a difference between the Title 10, USC, SRUF and the RUF for each state's NG forces. The state RUF may be more or less restrictive than the SRUF. DoD Title 10, USC, forces comply with the DoD SRUF.

k. The separate states and territories promulgate separate RUF. Commanders in a Title 32, USC, or SAD status ensure that, prior to conducting any domestic operation, all personnel are briefed on the applicable RUF. NG RUF were developed to support domestic operations and are constrained or limited by federal, state, and local laws. There are no preexisting, overall, stand-alone RUF for domestic disaster relief. Staff officers and military leaders should understand the legal, policy, and practical limitations for use.

## 3. Procedures

Normally, force is used only as a last resort to counter the threat and should be the minimum necessary and be reasonable in intensity, duration, and magnitude, based on the totality of the circumstances. If force is required, **nonlethal force** is authorized and may be used to control a situation and accomplish the mission or to provide self-defense of DoD forces, defense of non-DoD persons in the vicinity if directly related to the assigned mission, or in defense of the protected property, when doing so is reasonable under the circumstances. Prior training facilitates the effective employment of nonlethal weapons. Lethal force is authorized only when all lesser means have failed or cannot reasonably be employed and the circumstances otherwise justify the use of lethal force.

a. General direction regarding the appropriate use of force comes from a construct known as the use of force continuum. The use of force continuum is generally seamless and does not require movement from one level to the next in sequential order. The use of force continuum can be divided into five broad categories related to the objectives of the military units providing support and the behavior of subject audience—warn/control, deny/obstruct/impede, disorient/distract, disable/incapacitate, and cause death/serious injury.

(1) **Warn/Control.**  In most cases, the subject audience will comply with the verbal instructions or commands.  When time and circumstances permit, the individual(s) or group should be warned and given the opportunity to withdraw with the objective of preventing the escalation of force.  Verbal commands used with firmness and tact may be sufficient to control the situation.  Additionally, the military unit's resolve can be implied by mere presence, donning protective gear, or forming into riot control formations.  The use of nonlethal weapons (e.g., long-range acoustic devices and optical systems) can provide enhanced warnings, thereby increasing decision time and helping to discern intent.

(2) **Deny/Obstruct/Impede.**  At this level, the subject audience usually exhibits simple resistance or refusal to obey instructions, and there is no immediate danger of a physical confrontation.  The use of tactics, techniques, and procedures to deny the subject audience presence in or access to an area, or to obstruct or impede their movement, is authorized.   Examples of the methods short of physical contact include the use of concertina wire, concrete barriers, spike strips, or other means to barricade or isolate an area.  There are also intermediate force capabilities that can deny, obstruct, or impede the threat.

(3) **Disorient/Distract.**   At this level, actual physical resistance may be encountered.  Resistance is commonly manifested by continued refusal to comply with directions coupled with threatening behavior, shouting, and open defiance.  The use of nonlethal weapons that cause disorientation and distraction may be authorized by the designated approval authority.

(4) **Disable/Incapacitate.**  This is the level at which military personnel are in imminent danger of bodily injury.  It is generally characterized by the subject audience using physical attacks or other combative actions to prevent apprehension or otherwise frustrate military operations.  The use of Service-approved, unit-issued nonlethal weapons that cause physical discomfort, physical incapacitation, or blunt trauma is authorized.  Detailed guidance for use of riot control agents by DoD personnel is governed by CJCSI 3110.07, *(U) Guidance Concerning Employment of Riot Control Agents and Herbicides.*  Units employing riot control agents should be fully trained so as to properly assess reasonableness under the circumstances and to minimize unintended fatalities.

(5) **Cause Death/Serious Injury.**   In the final level of the use-of-force continuum, the subject audience behaves in a manner that is combative and poses an imminent threat of death or serious bodily harm.  In such cases, DoD forces may respond with deadly force.  While deadly force is to be used only when all lesser means have failed or cannot reasonably be employed, deadly force is authorized when:

(a)  DoD unit commanders reasonably believe there is an imminent threat of death or serious bodily harm to their units and other DoD persons in the vicinity.

(b) It is needed to defend non-DoD persons in the vicinity, when directly related to the assigned mission.

(c) It reasonably appears to be necessary to prevent the actual theft or sabotage of assets vital to national security when the President has determined such theft or sabotage would seriously jeopardize the fulfillment of a national defense mission and would create an imminent threat of death or serious bodily harm.

(d) It reasonably appears to be necessary to prevent the actual theft or sabotage of inherently dangerous property.  Property is considered inherently dangerous if, in the hands of an unauthorized individual, it would create an imminent threat of death or serious bodily harm.  On-scene DoD commanders are authorized to classify property as inherently dangerous.

(e) It reasonably appears to be necessary to prevent the sabotage of national critical infrastructure, as designated by the President.  The President determines when such sabotage would create an imminent threat of death or serious bodily harm.

b. Consequently, when directly related to the assigned mission, deadly force is authorized when deadly force reasonably appears to be necessary to:

(1) Prevent the commission of a serious offense that involves imminent threat of death or serious bodily harm, including the defense of other persons, where deadly force is directed against the person threatening to commit the offense.  Examples include murder, rape, and aggravated assault.

(2) Prevent the escape of a prisoner, provided there is probable cause to believe that person has committed or attempted to commit a serious offense (i.e., one that involves imminent threat of death or serious bodily harm) and would pose an imminent threat of death or serious bodily harm to DoD forces or others in the vicinity.

(3) Arrest or apprehend a noncompliant suspect who is presenting the imminent threat of serious bodily harm or death to the arresting official or others, provided there is probable cause to believe that such person has committed a serious offense (as defined in the preceding subparagraph).

c. Units with assigned weapons may deploy with weapons stored; however, weapons are not carried during DSCA operations unless authorized by SecDef or except as authorized by DoDD 5210.56, *Arming and the Use of Force.*

## APPENDIX D
### DEPARTMENT OF DEFENSE DUAL-STATUS COMMANDER

### 1.  General

a.  This appendix establishes procedures, assigns responsibilities, and provides instructions for the designation, employment, and training of DSCs for use in DSCA pursuant to the legal authorities.

b.  A DSC is a commissioned officer of the regular USA or USAF or a federally recognized Army National Guard (ARNG) or Air National Guard (ANG) officer authorized, pursuant to Title 32, USC, Section 315 or 325, by SecDef, with the consent of the applicable governor of a state, to exercise command on behalf of, and receive separate orders from, a federal chain of command and exercise command on behalf of, and receive separate orders from, a state chain of command.

c.  A DSC is an intermediate link in two distinct, separate chains of command flowing from different federal, territorial, and state governments (see Figure D-1).  The DSC is empowered to exercise command on behalf of, and may receive orders from, two separate chains of command that recognize and respect the DSC's duty to exercise all authority in a completely mutually exclusive manner (i.e., either in a federal or state capacity), giving orders on behalf of or relaying orders from the federal chain of command to federal military forces and giving orders on behalf of or relaying orders from the state chain of command to state military forces but never relaying federal orders to state military forces or state orders to federal military forces.

d.  Appointment of a DSC does not apply to federal military commanders providing DSCA under immediate response authority, emergency authority, mutual or automatic aid agreements between communities and military installations or federal military commanders supporting DOJ in emergency situations involving weapons of mass destruction.

### 2.  Operational Area

a.  The President or SecDef defines the federal operational area of a DSC, and the governor defines the state operational area of a DSC.  A DSC's federal operational area can include more than one state or territory.  A DSC's state operational area is limited to a single state, territory, or area within a state or territory.

b.  **USNORTHCOM.**  In USNORTHCOM's AOR, DSCs may be appointed in any of the 48 contiguous states, Alaska, the District of Columbia, and the territories of Puerto Rico and the US Virgin Islands.

c.  **USINDOPACOM.**  In USINDOPACOM's AOR, DSCs may be appointed in the state of Hawaii and the territory of Guam.

Appendix D



**Figure D-1.  Dual-Status Commander Command and Control Relationship**

## 3.  Requirements

a.  Pursuant to the terms of the MOAs between each state and DoD, the enacting governor and SecDef or designee(s) agree that the establishment of a DSC is necessary and proper.

b.  In the event that a single state has multiple, large-scale events simultaneously or geographically separated similar events, employment of multiple DSCs may be required.

## 4.  Legal Considerations

a.  The DSC complies with all applicable state and federal laws appropriate to the assigned mission while executing their duties.  If the DSC perceives that orders provided

by the state or federal chains of command may violate state or federal law or create a potential conflict of interest in policy or process, they refrain from executing such orders until they have consulted with a judge advocate from both the state and federal chains of command.  If after such consultation, the DSC perceives that the problem has not been resolved, they notify both chains of command and request appropriate guidance.

b. DoD forces can only be placed under the command of Title 10, USC, authorities. NG forces can only be placed under the command of state authorities while operating in a Title 32, USC, or SAD status.  DoD collection of information on non-DoD persons is restricted by EO, federal law, and DoD policy.  Military justice issues concerning state NG personnel are determined IAW state code.  Military justice issues concerning federal military personnel are determined IAW the *Uniform Code of Military Justice* as implemented by applicable military department regulatory guidance.

## 5. Key Documents

Several key documents should be in place before a DSC is established to command both state and federal military forces.  The documents listed below are required for the establishment of a DSC.

a. **Certificate of Qualification.**  Upon completion of required training, the NGB Operations Directorate, North American Aerospace Defense Command, and USNORTHCOM Directorate for Training and Exercises coordinate certificates of qualification signed by the CNGB and CDRUSNORTHCOM.

b. **Preplanned MOAs Between the State and DoD for the Use and Establishment of a DSC.**  Preplanned MOAs for the use and establishment of a DSC have been coordinated and signed between DoD and all 50 states, Puerto Rico, Guam, and the US Virgin Islands.  In the case that a state may prefer to establish a MOA for each unique event or incident, every effort is made to pre-coordinate a MOA that can be quickly signed and executed.

c. **State and DoD Appointment Memoranda.**  State and DoD appointment memorandum templates are contained in all MOAs between DoD and all 50 states, Puerto Rico, Guam, and the US Virgin Islands to expedite the establishment of a DSC.  The OASD(HD&HA) seeks SecDef's authorization and signature for the DoD memorandum and ensures that the state, Joint Staff, NGB, USNORTHCOM, and USINDOPACOM receive a copy.  The CNGB coordinates with TAG to ensure the governor's consent and signature for the state memorandum and that OSD, the Joint Staff, and USNORTHCOM receive a copy.

d. **Commissioned Officer of the Regular USA or Regular USAF Orders.**  The supported CCMD processes the orders packet through its applicable Service component (USA or USAF).  The supported CCMD's Service component provides the fund cite for the orders.

e. **ARNG or ANG Officer Orders.**  The NGB General Officer Management Office processes the orders packet through the supported CCMD's applicable Service component

(USA or USAF).  The supported CCMD's Service component provides the fund cite for the orders.

f.  **Commission in the State's NG.**  The enacting state tenders (or reserves) a commission in its state NG for the designated DSC.  Additionally, the DSC holds a commission as an officer of the regular USA or USAF.

## 6.  Responsibilities

a.  **The CJCS:**

(1)  Advises SecDef on the training and certification, designation, and use of DSCs.

(2)  Formulates DSC training and certification policies for the members of the Armed Forces of the United States in coordination with the Under Secretary of Defense for Personnel and Readiness.

(3)  Validates DSC training and certification requirements.

(4)  Addresses DSC training and certification program deficiencies and trends.

b.  **CDRUSNORTHCOM and CDRUSINDOPACOM:**

(1)  Recommend to SecDef, through the CJCS, and in coordination with the CNGB, operational requirements for DSCs for DSCA.

(2)  Direct the DSC to exercise state and federal command in a manner that promotes unity of effort between federal military forces providing DSCA and NG forces supporting civil authorities.

(3)  Establish an appropriate federal military C2 structure, including a supporting federal headquarters structure to support the DSC for assigned and anticipated DSCA missions.

(4)  Transfer assigned or allocated federal military forces performing DSCA missions to the federal C2 of the DSC and assign command relationships, as the supported CCDR decides is necessary and appropriate, to accomplish SecDef-approved DSCA missions.

(5)  Ensure the DSC performs federal duties during the duration of the DSC's service.

(6)  Integrate the DSC C2 arrangement into CCMD plans.

(7)  In coordination with the CNGB, maintain and manage the program for training and certifying officers of the ARNG and ANG and commissioned officers of the regular USA and USAF to be designated to serve as a DSC.

(8)  Select and schedule regular USA and USAF officers for training and certification to be designated to serve as a DSC.

(9)  In coordination with the CNGB, issue a certificate of qualification to qualified officers satisfactorily completing the required training.

(10)  Ensure a sufficient number of training and certified regular military officers to serve as a DSC.

(11)  In coordination with the CNGB, ensure each state has the opportunity to train and certify at least one ARNG or ANG officer to be designated to serve as a DSC.

(12)  Maintain and update, every six months, a list of qualified officers trained and certified to be designated to serve as a DSC.

(13)  To the extent practicable, exercise DSC employment by leveraging existing exercise programs, including federal exercises linked to the National Exercise Program and, in coordination with the CNGB, state exercises.

(14)  When necessary, and in coordination with the CJCS and in consultation with the CNGB, recommend SecDef grant a one-time waiver for the training and certification required for an officer to serve as a DSC.

c.  **The CNGB:**

(1)  Serves as the principal advisor to SecDef, through the CJCS, on matters involving non-federalized NG forces and on other matters as determined by SecDef.  The NGB normally serves as the channel of communications for all matters pertaining to the NG between DoD components and the states IAW DoDD 5105.77, *National Guard Bureau (NGB)*.

(2)  Serves as an advisor to the CCDRs on NG matters pertaining to the CCMD missions, and supports planning and coordination for DSCA activities as requested by the CJCS or the CCDRs.

(3)  In coordination with CDRUSNORTHCOM or CDRUSINDOPACOM, as appropriate, maintains and manages the program for training and certifying qualified officers to be designated to serve as a DSC.

(4)  In coordination with CDRUSNORTHCOM or CDRUSINDOPACOM, as appropriate, verifies the eligibility of ARNG and ANG officers approved by their governors for training and certification to be designated to serve as a DSC by confirming that the nominated officer is federally recognized and eligible for authority to command federal military forces.

(5)  In coordination with CDRUSNORTHCOM or CDRUSINDOPACOM, as appropriate, schedules ARNG and ANG officers approved by their governors and verified as eligible for training and certification to be designated to serve as a DSC.

(6) In coordination with TAG and CDRUSNORTHCOM or CDRUSINDOPACOM, as appropriate, ensures each state has the opportunity to train and certify at least one NG officer to be designated to serve as a DSC.

(7) In coordination with CDRUSNORTHCOM or CDRUSINDOPACOM, as appropriate, issues a certificate of qualification to qualified officers satisfactorily completing the required training.

(8) When requested, and in coordination with the CJCS and CDRUSNORTHCOM or CDRUSINDOPACOM, as appropriate, advises SecDef on the granting of a one-time waiver for the training and certification required for an officer to be designated to serve as a DSC.

(9) Ensures NGB (once SecDef has approved the designation of a DSC) enters the designated NG DSC's information into the appropriate automated system to expedite the issuing of Title 10, USC, orders.

d. **The DSC:**

(1) Serves in federal and state statuses simultaneously and performs the duties of those statuses separately and distinctly. A DSC cannot exercise unity of command over federal military forces and NG forces.

(a) While in federal status, exercises C2 of assigned or allocated federal military forces to execute DSCA missions subject to the federal operational chain of command.

(b) While in state status, exercises C2 of assigned NG forces to execute state missions subject to the orders of the state chain of command.

(2) Establishes procedures for, and issues orders that promote unity of effort to, federal military forces under their federal C2 and NG forces under their state C2 (e.g., requiring federal military forces under their federal C2 and NG forces under their state C2 to exchange liaisons and to share situational awareness information).

(3) Establishes separate and distinct federal and state headquarters, which may be co-located to facilitate communications and cooperation.

(4) Ensures federal military, DoD civilian, or DoD contractor personnel report to, or take direction from, appropriate DoD officers or officials and that NG, state civilian, and state contractor personnel report to, or take direction from, appropriate state officers or officials.

(5) Ensures federal military forces are not comingled with NG forces or into combined federal-state military forces or task forces.

(6) Consults with state and federal operational chains of command to resolve mission tasking or conflicts between state and federal missions.

(7)  Complies with all state and federal laws and policies applicable to their assigned missions.  In situations involving an order that may violate applicable law or create a conflict of interest, consults with federal and state legal advisors prior to executing such an order.

## 7.  Dual-Status Commander

USNORTHCOM and USINDOPACOM, in coordination with the NGB, conduct sufficient planning, preparation, and coordination such that appointment and employment of a DSC is an option capable of immediate implementation should the President or SecDef and governor of the affected state(s) so agree.  This option should improve unity of effort and speed the response to save lives, prevent human suffering, and mitigate great property damage for designated planned events or in response to an emergency or major disaster within the United States.

a.  USNORTHCOM's training program, in coordination with USINDOPACOM and the NGB, should:

(1)  Produce trained DSC officers who are qualified and certified to lead military forces (state and federal) in advance of, or in response to, a federally declared disaster or emergency.

(2)  Establish a cadre of Title 10, USC, officers trained to assume duties as deputy commanders within USNORTHCOM and USINDOPACOM organizations, to support DSCs.

(3)  Utilize the trained, experienced, and deployable staff officers that reside within USNORTHCOM or USINDOPACOM organizations to support the DSC.

(4)  Pre-coordinate required documentation and establish the approval process in advance to facilitate the appointment of a DSC for an incident as quickly as possible.

(5)  Exercise the DSC concept within the existing exercise construct, including participation of the Title 10, USC, deputy commander and staff officers in state planning efforts, training events, and exercises, when feasible.

(6)  Establish effective C2 and coordinating relationships to allow effective coordination with the JFO during single-state and multi-state incidents.

b.  Specialized training to command US federal military forces in support of civil authorities is essential.  The initial individual training program consists of:

(1)  The web-based Joint Domestic Operations Course.

(2)  JTF Commander Training Course.

(3)  DSC orientation visit with senior leaders from key organizations, including USNORTHCOM; United States Army, North; US Air Forces Northern; DHS; FEMA; the NGB; the Joint Staff; and OSD.

Appendix D

c.  **Additional Training Opportunities.**  USNORTHCOM, in close coordination with the NGB provides and facilitates continued training opportunities to both sustain and improve this concept.  USNORTHCOM's current additional training opportunities include:

(1)  The DSCA Executive Course,

(2)  The DoD DSCA Phase II Course (in addition, there is the availability to perform the duties as senior mentor for this course), and

(3)  Opportunities for DSCs to gain experience as a deputy director at USNORTHCOM by serving a three-to-seven-week tour filling in for a USNORTHCOM deputy director on an extended temporary duty.

d.  **Nomination Criteria**

(1)  **Title 32, USC, or SAD Officers.**  A state's TAG may nominate an ARNG officer or ANG officer (federally recognized O-6 or general officer) to their respective governor for approval as a DSC nominee.  Approved nominees are scheduled for training through an NGB-established training sequence roster.  TAGs are encouraged to nominate more than one candidate to increase the availability of trained DSCs in their state.

(2)  **Title 10, USC, Officers.**  CDRUSNORTHCOM or CDRUSINDOPACOM may nominate a regular USA or regular USAF general officer, in coordination with the NGB and Joint Staff, to SecDef for approval as a DSC nominee.  Approved nominees complete the qualification and certification described in this document.  Using a Title 10, USC, DSC is not the preferred method but could be appropriate when an event occurs on federal property or within the established National Capital Region JOA or in the event a state does not have a qualified and certified DSC and the governor consents to and the President/SecDef authorizes the appointment.

e.  **Qualification and Certification.**  Specialized training to command US federal military forces in support of civil authorities is essential for the DSC concept to improve unity of effort and enable a rapid response to save lives, prevent human suffering, and mitigate great property damage in the United States.  The NGB, in coordination with state military departments and North American Aerospace Defense Command and USNORTHCOM Directorate of Joint Training and Exercises, establishes a training sequence roster to develop a coordinated plan that ensures each state has the opportunity to qualify at least two officers as a DSC.  USNORTHCOM offers DSC training courses quarterly in support of the training sequence roster.

## 8.  Deputy Commanders

**Title 10, USC, Deputy Commanders.**  A cadre of regular USA, USAF, USN, USMC, United States Space Force, and USCG officers is nominated and selected to support designated DSCs.  This includes ensuring execution of the DSC's orders to federal military forces and acting as an advisor to the DSC on federal military matters.  The Title 10, USC, deputy commander also coordinates with the NG deputy commander, if appointed, to achieve unity of effort and purpose within the JTF's total force operations.  Title 10, USC, deputy

commanders establish relationships within their assigned states through the state NG, to include TAG, DSCs, NG deputy commanders (if appointed), appropriate state emergency management operation managers, and FEMA regional representatives.  Each cadre member also establishes relationships with key Title 10, USC, stakeholders, including USNORTHCOM, USNORTHCOM component commands, and appropriate DCOs.

   a. **Selection Criteria**

      (1)  Nominated by directorate, component, or subordinate;

      (2)  Title 10, USC, officer O-6 or uniquely qualified O-5;

      (3)  Command experience preferred;

      (4)  Two years or more remaining in assignment preferred; and

      (5)  Experience in DSCA operations and working with interagency partners.

   b. **Orientation and Training Requirements**

      (1)  Joint Domestic Operations Course,

      (2)  DSCA Phase II Course,

      (3)  JTF Commander Training Course,

      (4)  DSC Orientation Course,

      (5)  State orientation visits (NG JFHQ-State, state EOC), and

      (6)  Interview with the Response and Training Branch Chief within the Operations Directorate at USNORTHCOM.

   c.  During periods of extraordinary DSCA demand, additional Title 10, USC, officers may be designated as Title 10, USC, deputy commanders.  These Title 10, USC, deputy commanders have been used during complex and enduring missions after USNORTHCOM assigned Title 10, USC, deputies set conditions.

## 9.  Appointment Process

   a.  Under appropriate circumstances (i.e., a qualified officer is available and federal military forces under the C2 of the supported CCDR are providing DSCA at the same time, in the same state, and for the same incident or special event as NG forces under the C2 of the applicable state, supporting civil authorities), SecDef, with the consent of the state's governor, may authorize an officer to be placed on appropriate orders and serve as a DSC. The governor's consent and SecDef's authorization may be provided verbally and later documented in writing.

b. SecDef, with the consent of the state's governor, may also authorize an officer to be placed on appropriate orders to serve as a DSC when the CCDR determines that certain conditions have been met (i.e., federal military forces that would be under the command of the CCDR have been directed to support civil authorities for a special event or incident in a state, NG forces have been directed to support civil authorities for the same special event or incident in the same state, and there is an operational requirement for a DSC and the CCDR will assign forces to that DSC to fulfill a DSCA mission requirement).  SecDef's authorization is documented in writing after the CCDR makes the required determinations.

## 10. District of Columbia

a. The District of Columbia NG is a federal militia and operates under the federal chain of command at all times.  Therefore, a DSC is not necessary when the District of Columbia NG and other federal military forces are simultaneously supporting civil authorities in the District of Columbia.

b. When federal military forces, the District of Columbia NG, and other NG are employed simultaneously in support of civil authorities in the District of Columbia, designation of a DSC may be the appropriate C2 arrangement.

## APPENDIX E
## KEY LEGAL AND POLICY DOCUMENTS

### 1.  National Guidance

a.  **HSPD-5,** *Management of Domestic Incidents.*  HSPD-5 assigns the Secretary of Homeland Security as the principal federal official for domestic incident management to coordinate the USG's resources utilized to prepare for, respond to, or recover from terrorist attacks, major disasters, or other emergencies.  The USG assists state and local authorities when their resources are overwhelmed or when federal interests are involved.  HSPD-5 directs that SecDef provide support to civil authorities for domestic incidents as directed by the President or when consistent with military readiness and appropriate under the circumstances and the law.  SecDef retains command of military forces providing DSCA.  Additionally, HSPD-5 directs the Secretary of Homeland Security to lead and manage the development of NIMS to provide a consistent nationwide approach for federal, state, and local governments to work effectively and efficiently together to prepare for, respond to, and recover from domestic incidents.

b.  **PPD-8,** *National Preparedness.*  PPD-8 is aimed at strengthening the security and resilience of the United States through systematic preparation for the threats that pose the greatest risk to the security of the nation, including acts of terrorism, cyberspace attacks, pandemics, and catastrophic natural disasters.  National preparedness is the shared responsibility of all levels of government, the private and nonprofit sectors, and individual citizens.  Everyone can contribute to safeguarding the nation from harm.  As such, while this directive is intended to galvanize action by the USG, it is also aimed at facilitating an integrated, all-of-nation, capabilities-based approach to preparedness.

c.  **PPD-44,** *Enhancing Domestic Incident Response.*  This directive complements HSPD-5, *Management of Domestic Incidents,* and PPD-8, *National Preparedness,* and existing laws and policies related to domestic incident response.  It enhances incident management capacity and effective response by enabling the designation of an agency to serve as the LFA and senior response official for a disaster and encouraging unity of effort for large-scale incidents.

d.  **National Strategy for Homeland Security, October 2007.**  The strategy identifies critical areas that focus on preventing terrorist attacks, reducing the nation's vulnerabilities, minimizing the damage, and recovering from attacks that do occur.

e.  **The Homeland Security Act of 2002.**  This act established DHS to coordinate all federal HS activities to protect the nation against threats to the homeland.  To better facilitate the overarching HS mission, Congress established DHS by merging numerous agencies into a single department.

f.  **Robert T. Stafford Disaster Relief and Emergency Assistance Act (Title 42, USC, Section 5121).**  This act sets the policy of the USG to provide an orderly and continuing means of supplemental assistance to state and local governments in their responsibilities to alleviate the suffering and damage that result from major disasters or

emergencies.  It is the primary legal authority for federal participation in domestic disaster relief.  Under the Stafford Act, the President may direct federal agencies, including DoD, to support disaster relief.  DoD may be directed to provide assistance in one of three different scenarios—a presidential declaration of a major disaster, a presidential order to perform emergency work for the preservation of life and property, or a presidential declaration of emergency.

g.  **The Economy Act (Title 31, USC, Section 1535).**  The Economy Act permits one federal agency to request the supplies or services of another agency when more specific statutory authority does not exist, provided that the requested services cannot be obtained as conveniently or economically by contracting directly with a private source.  Under this act, a federal agency with lead responsibility may request the support of DoD without a presidential declaration of an emergency as required by the Stafford Act.

h.  **Armed Forces of the United States (Title 10, USC).**  Title 10, USC, provides guidance pertaining to the Armed Forces of the United States.  Guidance is divided into five subtitles—one on general military law and one each for the USA, USN and USMC, USAF and United States Space Force, and the RC.  Chapter 15 (Sections 271-284) of Title 10, USC, governs military support for civilian LEAs.

i.  **PCA (Title 18, USC, Section 1385).**  This federal statute places strict limits on the use of the Armed Forces of the United States for law enforcement.  Enacted in 1878, the PCA prohibits the willful use of the USA to execute the laws, except as authorized by Congress or the US Constitution.  Later updates to the PCA added the USN, USMC, USAF, and United States Space Force.  Additionally, federal courts have recognized exceptions to the PCA.  The most notable are the "military purpose doctrine" and the "indirect assistance" to civilian law enforcement exceptions.  Exceptions or circumstances not falling under PCA include:

(1)  Actions taken for the primary purpose of furthering a military or foreign affairs function of the United States.

(2)  Federal troops acting pursuant to the President's constitutional and statutory authority to respond to civil disorder.

(3)  Actions taken under express statutory authority to assist officials in executing the laws, subject to applicable limitations.

(4)  CD operations authorized by statute.

j.  **Title 32, USC, Section 502 (National Guard).**  Title 32, USC, establishes the basis for federal oversight of the NG and provides the authority for the NG to conduct activities in a federal duty status, subject to state control, while accomplishing federal missions and purposes.  The majority of activities conducted pursuant to Title 32, USC, directly relate to training or other readiness requirements established by the USA and the USAF to prepare the NG for its warfighting mission.  Any operational missions approved by the President or SecDef and otherwise permitted by law may be accomplished in federal duty status under Title 32, USC (i.e., employment of NG weapons of mass destruction-civil

support teams; and other domestic operational use of the NG pursuant to Title 32, USC, Section 502[f]).

k. **EO 12656,** *Assignment of Emergency Preparedness Responsibilities,* states that a national security emergency is any occurrence, including natural disaster, military attack, technological emergency, or other emergency, that seriously degrades or threatens the national security of the United States.

## 2. Representative Department of Defense Guidance

a. **Strategic Guidance**

(1) *Unified Command Plan.* The *Unified Command Plan* establishes the missions, responsibilities, and physical AORs for commanders of CCMDs.

(2) *Homeland Defense Policy Guidance* provides SecDef guidance to address formal integration of HD into institutions, planning, organizational culture, and resourcing decisions and to codify the requisite missions and activities to defend the homeland.

(3) **CJCSI 3110.01,** *(U) Joint Strategic Campaign Plan (JSCP),* is a CJCS document that provides additional planning guidance and addresses DSCA.

b. **CJCSI 3121.01,** *(U) Standing Rules of Engagement/Standing Rules for the Use of Force for US Forces.* The SRUF provide operational guidance and establish fundamental policies and procedures governing the actions taken by DoD forces performing DSCA missions (e.g., military assistance to civil authorities and military support for civilian LEAs) and routine Service functions (including antiterrorism/FP duties) within US territory (including US territorial waters). The SRUF also apply to DoD forces, civilians, and contractors performing law enforcement and security duties at all DoD installations (and off-installation, while conducting official DoD security functions), within or outside US territory, unless otherwise directed by SecDef. Additional examples of these missions, within the United States, include protection of critical US infrastructure both on and off DoD installations; military assistance and support to civil authorities; DoD support during civil disturbance; and DoD cooperation with federal, state, and local law enforcement authorities, including CD support.

c. **CJCSI 3125.01,** *Defense Response to Chemical, Biological, Radiological, and Nuclear (CBRN) Incidents in the Homeland.* This instruction provides CJCS policy guidance and operational instructions for DoD response to CBRN incidents in the homeland. For the purposes of this instruction, response refers to those actions necessary to save lives, protect property and the environment, and meet basic human needs after a CBRN incident has occurred.

d. **CJCSI 3110.05,** *Military Information Support Operations Supplement to the Joint Strategic Campaign Plan.* This instruction authorizes the use of military information support operations capabilities and units to conduct CAIS in response to natural disasters or security crises within the United States and its territories. It specifies that the joint force may employ forces and equipment to conduct CAIS as a subset of DSCA, using all

available media when authorized by SecDef or a designated representative, IAW DoDD 3025.18, *Defense Support of Civil Authorities (DSCA)*. During CAIS, forces do not conduct military information support operations. CAIS activities do not follow any military information support operations program. The approval authority for themes, messages, products, and all incident-related information disseminated by psychological operations forces is the designated federal agency, consistent with DoD regulations, instructions, and policies that prohibit the influencing of US audiences. CJCSI 3110.05 also outlines how the deployment of forces in support of CAIS is requested, approved, and designated for C2.

e. **CJCS DSCA EXORD.** This order delegates limited approval authority to CDRUSNORTHCOM and CDRUSINDOPACOM, who have DSCA responsibilities to provide a rapid and flexible DoD response to RFAs.

f. **CJCS Domestic CBRN Response EXORD.** This order assigns specified response authority to the CNGB, CDRUSNORTHCOM, and CDRUSINDOPACOM to provide timely CBRN response capabilities to save lives and mitigate human suffering.

# APPENDIX F
# REIMBURSEMENT FOR DEFENSE SUPPORT OF CIVIL AUTHORITIES

## 1. General

a. DSCA is provided on a reimbursable basis unless otherwise directed by the President.  Cost reimbursement for DSCA is always IAW the Economy Act or the Stafford Act.

*See JP 3-80,* Resource Management, *for more information.*

b.  DoD components are not funded to train, equip, and exercise specifically for DSCA operations; therefore, they ordinarily provide DSCA on a cost-reimbursable basis.

c.  DoD components comply with legal and accounting requirements for the loan, grant, or consumption of DoD resources for DSCA, as necessary, to ensure reimbursement of costs to the DoD components under the Stafford Act, as amended, or other applicable authority.

(1) **Reimbursable Activities.**  Commanders use automatic reimbursements to augment available funds using a special accounting program code.  The following are incremental costs that directly result from disaster relief that are considered eligible for reimbursement:

(a)  Pay of personnel hired specifically for disaster relief.

(b)  Overtime for disaster relief personnel.

(c)  Travel and per diem for military or government civilian personnel under a mission assignment.

(d)  Cost of consumables requisitioned for issue to support disaster operations.

(e)  Transportation of personnel, supplies, and equipment.

(f)  Cost to pack and crate supplies and equipment.

(g)  Cost of petroleum, oils, and lubricants, including aviation fuel.

(h)  Cost of supplies and equipment lost, destroyed, or damaged as a result of DSCA operations (except aircraft, motor vehicles, and watercraft).

(i)  Cost of aircraft flight hours.

(j)  Cost of port (air, ocean, inland-waterway) loading, off-loading, and handling.

(k)  Cost to repair or recondition nonconsumable items returned (providing allocation of the percentage of repair costs attributable to the support).

(l)  Replacement costs of supplies and equipment furnished and not returned.

(m)  Cost of parts used to repair end-items used in disaster relief (excluding depot or field maintenance on a time-compliance basis).

(n)  All USACE district labor charges, including overhead rates.

(o)  Labor and overhead rate charges for any other DoD contracting agency or office support.

(2)  **Nonreimbursable Activities** (except under the authorities of the Economy Act).  The following items are not considered reimbursable expenses in the context of providing DSCA:

(a)  Regular pay and allowances of military and civilian personnel.

(b)  Charges for use of military vehicles and watercraft.

(c)  Aircraft, vehicles, or watercraft damaged, lost, destroyed, or abandoned.

(d)  Administrative overhead.

(e)  Annual and sick leave, retirement, and other benefits.

(f)  Cost of telephone or other transmissions used to requisition items in a disaster area to replenish depot stocks.

d.  DoD components do not procure or maintain any supplies, materiel, or equipment exclusively for providing DSCA, unless otherwise directed by SecDef.

e.  DoD components do not perform any inherently governmental function of civil government unless directed by the President.  Any commander who is directed to perform such functions facilitates the reestablishment of civil authority at the earliest time possible.

## 2.  Reimbursement Process

DoD support is provided on a reimbursable basis, unless otherwise directed by the President.  Title 10, USC, Section 277, requires reimbursement from LEAs, unless SecDef elects to waive reimbursement.  The reimbursement process requires the DoD components to capture and report total and incremental costs IAW applicable DoD FM regulations.  Supported agencies should also maintain records of support received from DoD.  To distinguish these costs from those related to training or normal operating expenses, which are not reimbursed, requires resource managers to maintain accountability throughout an operation for equipment and material costs associated with operational support.  Organizational record keeping needed to support cost capturing begins at the start of the operation and at the lowest functional level.  Since DSCA funding processes can be complicated, commanders and staff should gain early process familiarization and promptly follow up preliminary voice coordination with properly staffed documentation.

*Additional guidance can be found in DoD 7000.14-R,* Department of Defense Financial Management Regulation.

### 3. Legal Considerations

a. **The Economy Act of 1932.**  Title 31, USC, Section 1535, the Economy Act, permits federal agencies to provide goods and services to other federal agencies on a reimbursable basis for total costs.

b. **The Stafford Act.**  Title 42, USC, Section 5121, The Robert T. Stafford Disaster Relief and Emergency Assistance Act, provides for reimbursement for the incremental costs of providing support (approval authority and reporting requirements vary, depending upon the duration and type of support requested), but the President may direct DoD (or any other USG department or agency) to undertake missions and tasks on either a reimbursable or nonreimbursable basis under the Stafford Act for specified items only and with specified limitations.

c. **DoD Guidelines.**  DoD 7000.14-R, *Department of Defense Financial Management Regulation;* USNORTHCOM CONPLAN 3500, *Defense Support of Civil Authorities (DSCA);* and USNORTHCOM CONPLAN 3502, *Civil Disturbance Operations,* require operating agencies and supported CCDRs to recover all costs for civil disturbance operations.  The operating agency and supported CCDR are responsible for collecting costs for civil disturbance operations of all Service components and DoD agencies, preparing cost reports for the executive agency, consolidating billings, forwarding bills to DOJ, and distributing reimbursements to Service components and DoD agencies.

### 4. Service-Specific Considerations

Service-specific regulations provide FM guidance governing funding, reimbursement procedures, cost reports, travel entitlements, and finance pay support for military personnel participating in domestic support operations.

a. Reimbursement procedures conform to the requirements of the legal authority relied on for provision of support.

b. Installations, agencies, and departments providing support maintain records, receipts, and documents to support claims, purchases, reimbursements, and disbursements.

c. Payment of military and civilian personnel remains a Defense Finance and Accounting Service responsibility.

d. Installations should establish separate accounting process codes to record the cost of the operation.  Installations use project codes, management decision packages, and functional cost accounts furnished by Defense Finance and Accounting Service– Indianapolis to record the costs of the operation.

e. Planning and warning orders do not automatically authorize fund expenditures for DSCA operations.

## 5. Disaster Relief Costs

Disaster relief participation is an unprogrammed requirement for the Services for which funds have not been budgeted. Service component commands may be required to initially fund the cost of DSCA operations. Such operations are undertaken with the understanding that additional operating expenses may be reimbursed by the requesting agencies. Costs should be recorded using unique accounting codes IAW Service regulations and guidance.

## 6. Financial Management-Support

Military FM units provide finance and resource management support for personnel supporting DSCA. FM elements of one Service may provide support to other Services and for the entire DSCA operation, as directed.

a. **Contracts.** Paying for contracts and other local procurement is a critical function. FM personnel should deploy early enough to support logistics contracting elements. This support includes providing funds to paying agents.

b. **Individual Support.** FM elements may provide individual support, including check cashing, casual pay, inquiries, and travel payments.

# APPENDIX G
## DEPARTMENT OF DEFENSE INSTALLATIONS SUPPORTING DEFENSE SUPPORT OF CIVIL AUTHORITIES

### 1. General

DoD installations may be used as staging areas (i.e., FEMA) to support federal personnel and resources, when requested. Installations may also be designated as BSIs to support operations IAW existing Service regulations. Designation as one of these staging areas or a BSI requires a CCDR-validated and approved RFA and the concurrence of the appropriate Military Department Secretary. The pre-identified use of these locations for various catastrophic scenarios should be shared as part of the integrated planning efforts with FEMA and SLTT partners.

### 2. Base Support Installation

A BSI is a military installation of any Service or DoD agency that provides specified, integrated resource support to DSCA response efforts.

a. A BSI is normally a DoD federal installation or leased facility of any Service or agency. The BSI is normally located outside of, but proximate to, the incident area. BSIs have utilities, communications, and access to open-road networks.

(1) BSIs are the primary logistics hubs during a DSCA response. Their capabilities are augmented through contracting, either by expanding existing installation contracts, utilizing General Services Administration schedules, utilizing existing DoD contracts, or using other federal contracts. In general, time does not allow the letting of new, large contracts during a DSCA response by DoD.

(2) BSIs serve in general support, which is to provide for the supported DoD force as a whole and not to any particular Service involved in DSCA operations.

(3) Support provided by the designated BSI includes general supply and maintenance; transportation; contracting; communications; reception of DoD forces; staging equipment; civil engineering; medical and FHP; and other life-support services, to include billeting, food service, and FP.

(4) The BSI may also serve additional sustainment functions such as port of embarkation, POD, intermediate staging base, forward operating base, or JRSOI site. The BSI supports movement of forces from the POD to the reception site on the BSI. Types and quantity of support equipment are based on the time-phased force and deployment data. The BSI also assists in the retrograde of equipment from BSI to ports of embarkation and movement of forces to the ports of embarkation as they redeploy.

(5) A BSI supporting DoD forces may simultaneously support FEMA or other federal agencies (when requested and approved). Priority of support is to the federal agency.

(6) BSI responsibilities rest with the senior commander for the installation relying on the installation staff and tenant units via established host-tenant agreements, MOAs/MOUs, and Service administrative control of tenant units.

(7) As a combat support agency, the Defense Health Agency Medical Logistics Directorate can assist with any medical logistics requirements that require military treatment facility engagement or support.

b. **FEMA Incident Support Base (ISB)**

(1) An ISB is a temporary location where response personnel and commodities are received and pre-positioned for deployment as required. ISBs are set up outside of the incident area and are established and managed by FEMA regional logistics staff.

(2) ISBs are designed to stage resources that may be provided to state and local governments. Once a requirement for commodities arises, the ISB commodities become committed to the disaster-affected state and will be under the operational control of FEMA Operations.

(3) FEMA sends out resources and national disaster assets to pre-determined locations, such as state staging areas. Other federal departments and agencies may stage tactical teams at the FEMA staging bases or send items in support of the disaster operation.

## 3. Concept of Operations

Support concepts are based on the proximity and capabilities of the BSI, which are:

a. **Major Installation.** If a designated BSI is a major installation within a reasonable travel time from the incident area, then that installation may augment task force common-user support to responding forces within the limits of existing capability/capacity for that installation without impacting other ordered requirements. Additional capabilities for that installation are requested through appropriate processes and procedures by the supported CCDR. This enables the responding task force to focus on the DSCA mission.

b. **Austere Installation.** Depending on the location of the catastrophic event, the BSI may be designated in an area that is not close to a major DoD installation. In these instances, the commander, joint task force (CJTF), completes an estimate of the situation and either requests contract support or submits a request for forces to mitigate logistics capability shortfalls due to limited personnel, equipment, facilities, or interrupted or extended lines of communications between the BSI and those DoD elements operating at the incident site.

## 4. Base Support Installation Considerations

The BSI-designated installation provides general support for common-user logistics (food, life-support, medical support, and fuels) to all proximate DoD forces, as well as JRSOI as required. Commanders and their staffs conduct mission analysis to meet logistics

requirements and to coordinate the potential use of a military installation for base support of DoD forces during DSCA. Considerations include:

   a. A concise concept of purpose and description of the functions the BSI is expected to support.

   b. Forces required to support the operation and phasing for induction of logistics elements.

   c. FEMA mobilization location.

   d. Estimated length of time the BSI is required.

   e. Transportation suitability (e.g., reception and staging capabilities, condition, maximum on ground, material handling equipment, medical evacuation capability).

   f. Adequate supply, maintenance, transportation, engineering, medical, and other service support at the BSI.

*For additional information and guidance, refer to the* Standing CJCS DSCA EXORD.

### 5.  Joint Reception, Staging, Onward Movement, and Integration

   a. **General.** JRSOI is characterized by three overarching principles—unity of effort, synchronization, and balance of unit flow into the operational area. While sharing many similarities of conventional JRSOI operations as described in JP 3-35, *Joint Deployment and Redeployment Operations,* the CJTF plans for unique DSCA factors.

      (1)  The JTF headquarters often performs JRSOI functions primarily with internal resources and assistance from the designated BSI.

      (2)  DoD units may not necessarily flow into the operational area through designated PODs when responding to catastrophic events. Units may have to stage and move directly from their home station installations to the operational area or may have to use one or more intermediate staging bases to coordinate flow of support. Intermediate staging bases provide flexibility to a response event by enabling the staging and configuration of assets in an area outside of the immediate event zone. Multiple lines of communications may be used by units responding to DSCA operations. Pre-designated routes and phasing of DoD capabilities during a pre-planned response should be shared with SLTT partners during pre-incident integrated planning.

      (3)  Deploying forces undergo some form of reception, staging, onward movement, and integration. The JTF requires a well-planned and carefully managed process that has a robust command, control, and communications infrastructure that is able to manage the dynamic flow of prepared and ready forces into the operational area. The establishment of a consolidated movement control section within the JTF with responsibility for analyzing forces and support in the area, including non-DoD entities, and making recommendations to the event aids the commander on priority of movement within the event area.

b. **Reception operations** include all those functions required to receive and clear unit personnel, equipment, and materiel through the POD. During reception operations, it is essential the JTF control and coordinate the deployment flow. A dedicated movement control element within the JTF headquarters is vital to unity of effort and synchronization. Component support plans address how personnel report to the CJTF regardless of the POD that units use for reception and staging.

c. **Staging operations** includes the assembling, temporary holding, and organizing of arriving personnel, equipment, and materiel in preparation for onward movement. Staging areas provide the necessary facilities, sustainment, and other required support to enable units to become mission capable prior to onward movement into the JOA. The personnel, equipment, and materiel to be employed for DSCA operations within the United States may stage within the confines of their respective home installation. Reliable communications and well-understood reporting requirements are essential for the JTF to effectively manage the building of capability for the CJTF.

d. **Onward movement operations** include movement of personnel and accompanying material from reception facilities and staging areas to designated unit forward operating bases within the JOA. If units and forces employed in DSCA missions within the United States are geographically close to the JOA, the unit forward operating bases may be located at the unit's home installation. Depending on the location of the BSI in relation to the incident site, forward operating bases could also be located at a designated BSI.

e. **Integration operations** encompass the synchronized hand-off of units to an operational commander prior to mission execution. DSCA operations within the United States often combine Title 10, USC; Title 32, USC; and SAD forces. The CJTF's C2 and communication and coordination possibilities are extensive and special attention to integration should be emphasized.

*For more information, refer to JP 3-35,* Joint Deployment and Redeployment Operations.

## APPENDIX H
### DEFENSE SUPPORT OF CIVIL AUTHORITIES
### PLANNING FORMAT (NOTIONAL)

DSCA OPLANs and CONPLANs are formatted IAW CJCSM 3130.03-1, *Defense Support of Civil Authorities Supplement to CJCSM 3130.03, Planning and Execution Formats and Guidance.* Below is a sample format that a joint force staff can use as a guide when developing a joint OPLAN. The exact format and level of detail may vary somewhat among joint commands, based on theater-specific requirements and other factors. However, joint OPLANs and CONPLANs contain the basic five paragraphs and their primary subparagraphs. The joint planning and execution community typically refers to a joint contingency plan that encompasses more than one major operation as a campaign plan, but JFCs prepare a plan for a campaign in joint contingency plan format.

 a.  Copy Number

 b.  Issuing Headquarters

 c.  Place of Issue

 d.  Effective Date-Time Group

 e.  OPERATION PLAN: (Number or Code Name)

 f.  USXXXXCOM OPERATIONS TO . . .

 g.  References: (List any maps, charts, and other relevant documents deemed essential to comprehension of the plan.)

## 1.  Situation

 a.  **General.** Describe the situation that requires DSCA. Identify the support category or categories of effort: domestic emergencies, law enforcement support, or other domestic activities. (DSCA categories and mission types may overlap or occur simultaneously depending on scenario).

 b.  **Area of Concern**

  (1)  **AOR.** Outline the commander's operational area.

  (2)  **Area of Interest.**

  (3)  **Operational Area.**

 c.  **Deterrent Options.** (If applicable)

d. **Adversarial/Environmental Factors.**  Describe threat actors or other conditions affecting DSCA operations.

e. **Friendly.**  Identify DoD and non-DoD federal entities and the support capabilities of regional, state, and local civil governments in the operational area.  Also include nongovernmental entities.

f. **Assumptions.**  List the assumptions on which DSCA planning is based.  Examples are:

(1)  Federal, regional, or state and local civil policies/plans regarding this type of operation.

(2)  Ability of federal, regional, state, and local civil government(s) to provide this assistance.

(3)  Impact of existing cooperative national, regional, state, and local civil-military agreements (e.g., EMACs).

(4)  Ability to conclude agreements (MOUs/MOAs) with federal, regional, state, and local entities.

(5)  Level of required Active Component or RC support.

(6)  Impact of COAs.

(7)  Availability of local resources.

(8)  Communications gaps that will/will not exist.

(9)  International support.

g. **Legal Considerations.**  Identify the legal basis for DSCA effort (e.g., Titles 10, 14, 18, and 32, USC, and SLTT statutes).

## 2. Mission

## 3. Execution

a. **CONOPS**

(1) **Commander's Intent**

(a) **Purpose and Ends**

(b) **Objectives**

(c) **Effects** (if discussed)

(2) **General.**  Describe the operation by phase.

(a) **Phase I**

1. Commander's Intent

2. Timing

3. Objectives and Desired Effects

4. Risk

5. Execution

6. Employment

7. Transition/Termination Criteria

(b) **Remaining Phases.**  Describe each phase using the same format.

b. **Tasks.**  List the tasks assigned to each element of the supported and supporting agencies or commands.  Each task should be a concise statement of an activity to be performed and include all key elements.

(1) Supported federal, regional, state, and local civil governments/agencies/commands.

(2) Supporting commands/units.

(3) Supporting combat support agencies.

(4) Other USG departments and agencies (e.g., DHS, FEMA).

(5) Non-USG department and agencies (e.g., national, regional, state, and local civil governments; NGOs/international organizations; and private-sector elements).

c. **Coordinating Instructions.**  List the instructions applicable to the whole command, its elements, and agencies or entities external to the command.  (Refer to annex V [Interagency Coordination].)  Areas, events, or items requiring coordination for DSCA operations may include:

(1) Liaison arrangements with federal, regional, state, and local civil governments.

(2) Liaison arrangements with allied forces, if applicable.

(3)  Establishment of operational boundaries.

(4)  EMACs.

(5)  Public announcements to be issued.

(6)  Emergency measures for security of civilian population.

## 4.  Administration and Logistics

a.  **Concept of Sustainment.**  Identify policies, guidance, and procedures to support DSCA/NGCS.

b.  **Logistics.**  Illustrate functions, sustainment categories, priorities and resources, support bases, priority of movement and timing, and contracted support.

c.  **Personnel.**  Describe personnel support functions.  Establish deployability criteria unique to the operation.  List RS.

d.  **Resource Management.**  Illustrate financial requirements, sourcing, acquisition and distribution of funds, fiscal policy and monitoring execution.  Note management controls and procedures.

e.  **Medical Support.**  Identify medical and public health capabilities and functions such as casualty response, emergency life-saving steps and patient evacuation.

f.  **Reports.**  Establish administrative reporting requirements.

## 5.  Command and Control

a.  **Command**

(1)  **Command Relationships.**  Describe the federal, state, or other chain(s) of command supporting DSCA operations.  Identify the civilian and military organizational structure expected to exist.  List any changes to major C2 organizations and time of expected shift (e.g., shifts that may occur during transition from DSCA to HD or vice-versa and among federal, regional, state, or local entities).  (Refer to annex J [Command Relationships].)

(a)  Outline existing command arrangement agreements, MOUs, and MOAs.

(b)  Note command arrangement agreements, MOUs, and MOAs requiring development.

(2)  **Command Posts.**  List the designation and location of headquarters involved in plan execution.

(3) **Succession to Command.**  Designate, in order of succession, the authorities responsible for assuming command.

b.  **Command, Control, Communications, and Computer Systems.**  Note the scope of C2 and communications systems or procedures required to support the mission.

[Signature]

[Name]

[Rank/Service]

Commander

Intentionally Blank

# APPENDIX J
## EXAMPLE PHASING OF DEFENSE SUPPORT OF CIVIL AUTHORITIES

DSCA is generally provided in the following phases: phase 1 pre-incident, (1a) normal operations, (1b/1c) elevated/credible threat (for a notice event); phase 2 response, (2a) immediate response, (2b) deployment of resources and personnel, (2c) sustained response; and phase 3 recovery and transition. These phases align with FEMA's CONOPS and deviate from the notional phasing construct. During planning, the JFC establishes conditions, objectives, or events for transitioning from one phase to another. Phases are designed to be conducted sequentially, but some activities may begin in a previous phase and continue into subsequent phases. In many incidents, no clear transition exists from one phase to the next, and phases may run concurrently. Additionally, during incidents that affect multiple states or FEMA regions, different jurisdictions may transition through the phases at various paces depending on the impact to the respective geographical area. It is helpful for DoD to align DSCA phases to the phasing construct of the LFA. The following example phases align with the FEMA phasing model:

## 1. Phase 1 (Pre-Incident)

Phase 1 is continuous situational awareness and preparedness. Actions in this phase include interagency coordination, planning, identification of gaps, exercises, and PA outreach. This phase sets the conditions for expanded interoperability and cooperation with interagency partners.

a. **Phase 1a (Normal Operations).** During phase 1a, local civil authorities and state and federal entities, including Title 10 and Title 32, USC, military personnel, determine existing logistics and resource capabilities, develop plans and procedures, and conduct training and exercises to validate existing plans. In addition, continuity operations and planning need to be incorporated to facilitate the performance of response core capabilities during all-hazards emergencies or other situations that may disrupt normal operations. Actions taken during phase 1a are focused on awareness and national preparedness goals: prevent, protect against, mitigate, respond to, and recover.

b. **Phase 1b (Elevated Threat).** During a notice incident, there may be an elevated threat that allows for further coordination and planning. Plans should be revised based on the current situation. Situational reports should be analyzed and addressed to plan for the potential activation of federal, state, local, tribal, and territorial coordination structures, including DCO/EPLOs. Additional stakeholders should be identified into planning efforts, as appropriate.

c. **Phase 1c (Credible Threat).** During a notice incident, there may be a credible threat that requires further assessment of the situation. Plans should continue to be updated and revised. Additional stakeholders should be incorporated into planning efforts, as appropriate. Pre-positioning other selected response forces to facilitate quicker response after coordination with the LFA should also be considered.

Note that because phases 1b and 1c may not occur (i.e., a no-notice incident), there should not be any specific tasks assigned within phases 1b or 1c.

## 2. Phase 2 (Response)

Response begins when DoD receives, or expects to receive, an RFA from an LFA for DoD support, or the President or SecDef direct support in a federal response to a disaster or emergency in support of a state or tribal government(s) or to support another USG department or agency for specifically authorized events. Phase 2 ends when the situation is stabilized to the point where DoD support is no longer required to support life-saving and life-sustaining activities. The following sub-phases of response assist with prioritizing and organizing activities: initial response, deployment of resources and personnel, and sustained response operations.

a. **Phase 2a (Initial Response).** Phase 2a begins when DoD receives, or expects to receive, an RFA from an LFA for DoD support or the President or SecDef direct support in a federal response to a disaster or emergency in support of a state or tribal government(s) or to support another federal agency for specifically authorized events. Key activities during this phase are activation of emergency management structures, assessment of the situation, and the movement of pre-planned DoD resources. Local commanders may also exercise immediate response authority during this phase upon request from an appropriate civil authority. DSCA is based on RFAs, which are made at different times and for missions that are completed at different times. Consequently, forces will likely deploy into and out of the affected area throughout the duration of the civil emergency or period of rendered support.

b. **Phase 2b (Deployment of Resources and Personnel).** Phase 2b begins when life-saving operations have started in the affected area and federal resources begin JRSOI at intermediate staging bases. Key activities during this phase are to locate the affected population, evacuate (e.g., DoD airlift as authorized), and provide life-sustaining support services; stabilize the situation to the point at which communications and channels connecting responders and the public are in place and operational; characterize the incident and deploy federal resources; and initiate individual and public assistance programs. Phase 2b success is achieved when forces are deployed with sufficient capability to support civil authorities.

c. **Phase 2c (Sustained Response).** Phase 2c begins when all survivors, having been evacuated, are being sustained through mass-care and recovery efforts. SAR operations have transitioned to the search for and the recovery of human remains. Phase 2c ends when survivors have been sheltered or given the approval to return home; wherever possible, the restoration of critical infrastructure and key resources and essential services has been completed; and senior leaders have made preliminary decisions about the initial recovery plan for the impacted area.

## 3. Phase 3 (Recovery and Transition)

Phase 3 begins when the life-saving and life-sustaining activities for the affected population have been stabilized to the point where local, state, and federal resources are

sufficient to continue without DoD response tasks and ends upon determination by civil authorities that recovery tasks have been completed. DoD does not generally support recovery tasks; however, in certain instances, it is possible that DoD could be tasked to support specific aspects of the recovery. Transition begins when all operational aspects of mission assignments are complete and redeployment of remaining DoD forces commences. Phase 3 ends when all federal response forces have been relieved and redeployed, C2 is transferred to their respective commands, and DoD forces have transitioned all operations back to civil authorities.

Intentionally Blank

K-1

# APPENDIX K
## REFERENCES

### 1. General

a. EO 12333, *United States Intelligence Activities,* as amended.

b. EO 12656, *Assignment of Emergency Preparedness Responsibilities,* as amended.

c. EO 13470, *Further Amendments to Executive Order 12333, United States Intelligence Activities.*

d. HSPD-5, *Management of Domestic Incidents.*

e. National Security Memorandum-16, *Strengthening the Security and Resilience of United States Food and Agriculture.*

f. PPD-8, *National Preparedness.*

g. PPD-14, *US Policy on International Counternarcotics in the Western Hemisphere.*

h. PPD-21, *Critical Infrastructure Security and Resilience.*

i. PPD-41, *United States Cyber Incident Coordination Policy.*

j. PPD-44, *Enhancing Domestic Incident Response.*

k. Homeland Security Act of 2002.

l. *National Security Strategy.*

m. *National Defense Strategy.*

n. *National Military Strategy.*

o. *National Disaster Recovery Framework.*

p. *National Strategy for Homeland Security.*

q. *National Response Framework.*

r. *National Incident Management System.*

s. *DoD Cyber Strategy.*

t. *National Cyber Incident Response Plan.*

u. The North American Aerospace Defense Command Agreement and Terms of Reference and the Canadian/US Basic Security Document.

v.  Title 10, USC.

w.  Title 14, USC.

x.  Title 18, USC.

y.  Title 31, USC.

z.  Title 32, USC.

aa.  Title 42, USC.

bb.  Title 47, USC.

cc.  *Unified Command Plan.*

dd.  *Federal Interagency Operational Plan.*

ee.  *Response Federal Interagency Operational Plan.*

ff.  *National Prevention Framework.*

gg.  *National Response Plan, Terrorism Incident Law Enforcement and Investigation Annex.*

## 2.  Department of Defense Publications

a.  *(U) Homeland Defense Policy Guidance,* December 2023.

b.  DoDD 3000.03E, *DoD Executive Agent for Non-Lethal Weapons (NLW), and NLW Policy.*

c.  DoDD 3020.40, *Mission Assurance (MA).*

d.  DoDD 3025.13, *Employment of DoD Capabilities in Support of the US Secret Service (USSS), Department of Homeland Security (DHS).*

e.  DoDD 3025.14, *Evacuation of US Citizens and Designated Aliens from Threatened Areas Abroad.*

f.  DoDD 3025.18, *Defense Support of Civil Authorities (DSCA).*

g.  DoDD 3150.08, *DoD Response to Nuclear and Radiological Material Incidents.*

h.  DoDD 3160.01, *Homeland Defense Activities Conducted by the National Guard.*

i.  DoDD 5105.77, *National Guard Bureau (NGB).*

j. DoDD 5105.83, *National Guard Joint Force Headquarters-State (NG-JFHQs-State)*.

k. DoDD 5148.13, *Intelligence Oversight*.

l. DoDD 5200.27, *Acquisition of Information Concerning Persons and Organizations Not Affiliated with the Department of Defense*.

m. DoDD S-5210.36, *(U) Provision of DoD Sensitive Support to DoD Components and Other Departments and Agencies of the US Government*.

n. DoDD 5210.56, *Arming and the Use of Force*.

o. DoDD 5240.01, *DoD Intelligence Activities*.

p. DoDD 5410.18, *Public Affairs Community Relations Policy*.

q. DoDD 5500.07, *Standards of Conduct*.

r. DoDD 6400.04E, *Veterinary Public and Animal Health Services*.

s. DoDI 3001.02, *Personnel Accountability in Conjunction with Natural or Manmade Disasters*.

t. DoDI 3020.52, *DoD Installation, Chemical, Biological, Radiological, and Nuclear and High-Yield Explosive (CBRNE) Preparedness Standards*.

u. DoDI 3025.16, *Defense Emergency Preparedness Liaison Officer (EPLO) Programs*.

v. DoDI 3025.19, *Procedures for Sharing Information with and Providing Support to the US Secret Service (USSS), Department of Homeland Security (DHS)*.

w. DoDI 3025.20, *Defense Support of Special Events*.

x. DoDI 3025.21, *Defense Support of Civilian Law Enforcement Agencies*.

y. DoDI 3025.22, *The Use of the National Guard for Defense Support of Civil Authorities*.

z. DoDI 3025.23, *Domestic Defense Liaison with Civil Authorities*.

aa. DoDI 6010.22, *National Disaster Medical System (NDMS)*.

bb. DoDI 6055.17, *DoD Emergency Management (EM) Program*.

cc. DoDM 3025.01, Volumes 1-3, *Defense Support of Civil Authorities*.

dd. DoDM 5240.01, *Procedures Governing the Conduct of DoD Intelligence Activities*.

Appendix K

ee. DoD 5240.1-R, *Procedures Governing the Activities of DoD Intelligence Components That Affect United States Persons.*

ff.  USNORTHCOM Branch Plan 3560, *Pandemics and Infectious Disease Response.*

gg.  USNORTHCOM CONPLAN 3407, *Defense Support to Prevent a CBRNE Attack in the Homeland.*

hh.  USNORTHCOM CONPLAN 3500, *Defense Support of Civil Authorities.*

ii.  USNORTHCOM CONPLAN 3502, *Civil Disturbance Operations.*

jj.  USINDOPACOM CONPLAN 5001, *Defense Support of Civil Authorities (DSCA).*

kk.  USINDOPACOM CONPLAN 5002, *Homeland Defense.*

ll.  USINDOPACOM CONPLAN 5003, *Pandemic Influenza and Infectious Diseases.*

**3.  Joint Publications**

a.  JP 1, Volume 1, *Joint Warfighting.*

b.  JP 1, Volume 2, *The Joint Force.*

c.  JP 1-0, *Joint Personnel Support.*

d.  JP 2-0, *Joint Intelligence.*

e.  JP 3-0, *Joint Campaigns and Operations.*

f.  JP 3-07.4, *Counterdrug Operations.*

g.  JP 3-08, *Interorganizational Cooperation.*

h.  JP 3-11, *Operations in Chemical, Biological, Radiological, and Nuclear Environments.*

i.  JP 3-12, *Joint Cyberspace Operations.*

j.  JP 3-14, *Joint Space Operations.*

k.  JP 3-26, *Joint Combating Terrorism.*

l.  JP 3-27, *Joint Homeland Defense.*

m.  JP 3-29, *Foreign Humanitarian Assistance.*

n.  JP 3-33, *Joint Force Headquarters.*

o.  JP 3-34, *Joint Engineer Operations.*

p.  JP 3-35, *Joint Deployment and Redeployment Operations.*

q.  JP 3-40, *Joint Countering Weapons of Mass Destruction.*

r.  JP 3-41, *Chemical, Biological, Radiological, and Nuclear Response.*

s.  JP 3-53, *Joint Military Information Support Operations.*

t.  JP 3-57, *Civil-Military Operations.*

u.  JP 3-59, *Meteorological and Oceanographic Operations.*

v.  JP 3-61, *Joint Public Affairs.*

w.  JP 3-80, *Resource Management.*

x.  JP 3-83, *Religious Affairs in Joint Operations.*

y.  JP 4-0, *Joint Logistics.*

z.  JP 4-02, *Joint Health Services.*

aa.  JP 4-05, *Joint Mobilization Planning.*

bb.  JP 4-10, *Operational Contract Support.*

cc.  JP 5-0, *Joint Planning.*

dd.  JP 6-0, *Joint Communications.*

**4.  Chairman of the Joint Chiefs of Staff Publications**

a.  *Domestic Operational Law (DOPLAW) Handbook for Judge Advocates.*

b.  CJCSI 3110.01K, *(U) 2018 Joint Strategic Campaign Plan (JSCP).*

c.  CJCSI 3110.05G, *Military Information Support Operations Supplement to the Joint Strategic Campaign Plan.*

d.  CJSCI 3110.07D, *(U) Guidance Concerning Employment of Riot Control Agents and Herbicides.*

e.  CJCSI 3121.01B, *(U) Standing Rules of Engagement/Standing Rules for the Use of Force for US Forces.*

f.  CJCSI 3125.01D, *Defense Response to Chemical, Biological, Radiological, and Nuclear (CBRN) Incidents in the Homeland.*

g.  CJCSI 3710.01B, *DoD Counterdrug Support.*

h.  CJCSI 3810.01E, *Meteorological and Oceanographic Operations.*

i.  CJCSI 4120.02F, *List of Priorities-Department of Defense Transportation Movement Priority System.*

j.  CJCSM 3130.03A, *Planning and Execution Formats and Guidance.*

k.  CJCSM 3130.03-1, *Defense Support of Civil Authorities Supplement to CJCSM 3130.03A, Planning and Execution Formats and Guidance.*

l.  CJCSM 4301.01, *Planning Operational Contract Support.*

## 5.  Multi-Service Publications

a.  ATP 3-22.40/Marine Corps Tactical Publication 10-10A/NTTP 3-07.3.2/AFTTP 3-2.45/CGTTP 3-93.2, *Multi-Service Tactics, Techniques, and Procedures for the Employment of Nonlethal Weapons.*

b.  ATP 3-28.1/MCRP 3-36.3/NTTP 3-57.2/AFTTP 3-2.67/CGTTP 3-57.1, *Multi-Service Tactics, Techniques, and Procedures for Defense Support of Civil Authorities (DSCA).*

c.  ATP 5-0.3/MCRP 5-10.1/NTTP 5-01.3/AFTTP 3-2.87, *Multi-Service Tactics, Techniques, and Procedures for Operation Assessment.*

## 6.  United States Air Force

a.  Air Force Instruction 10-801, *Defense Support of Civil Authorities.*

b.  Department of the Air Force Instruction 10-2501, *Air Force Emergency Management Program.*

c.  Air Force Policy Directive 10-8, *Defense Support of Civil Authorities (DSCA).*

## 7.  United States Army

a.  Army Doctrine Publication 3-28, *Defense Support of Civil Authorities.*

b.  Field Manual 3-0, *Operations.*

## 8.  United States Coast Guard

a.  Commandant Instruction M16247.1, *US Coast Guard Maritime Law Enforcement Manual (MLEM).*

b.  Coast Guard Publication 3-28, *Incident Management and Crisis Response.*

## 9.  National Guard Bureau

a.  CNGB Instruction 2000.01D, *The Conduct and Oversight of National Guard Intelligence Activities.*

b.  CNGB Instruction 3204.00, *National Guard Emergency Management Program.*

c.  CNGB Instruction 3510.01A, *National Guard Chemical, Biological, Radiological, and Nuclear Response Management.*

d.  CNGB Instruction 5200.01, *National Guard Bureau All-Hazards Support Plan.*

e.  CNGB Manual 2000.01B, *National Guard Intelligence Activities.*

## 10.  Canada

*Canada-United States Civil Assistance Plan.*

Intentionally Blank

# APPENDIX L
## ADMINISTRATIVE INSTRUCTIONS

### 1. User Comments

Users in the field are highly encouraged to submit comments on this publication using the Joint Doctrine Feedback Form located at https://jdeis.js.mil/jdeis/jel/jp_feedback_form.pdf and e-mail it to js.pentagon.j7.mbx.jedd-support@mail.mil.  These comments should address content (accuracy, usefulness, consistency, and organization), writing, and appearance.

### 2. Authorship

The lead agent for this publication is United States Northern Command.  The Joint Staff doctrine sponsor for this publication is the Director for Operations (J-3).

### 3. Supersession

This publication supersedes JP 3-28, *Defense Support of Civil Authorities,* 29 October 2018.

### 4. Change Recommendations

a. To provide recommendations for urgent and/or routine changes to this publication, please complete the Joint Doctrine Feedback Form located at https://jdeis.js.mil/jdeis/jel/jp_feedback_form.pdf and e-mail it to js.pentagon.j7.mbx.jedd-support@mail.mil.

b. When a Joint Staff directorate submits a proposal to the CJCS that would change source document information reflected in this publication, that directorate will include a proposed change to this publication as an enclosure to its proposal.  The Services and other organizations are requested to notify the Joint Staff J-7 when changes to source documents reflected in this publication are initiated.

### 5. Lessons Learned

The Joint Lessons Learned Program's (JLLP's) primary objective is to enhance joint force readiness and effectiveness by contributing to improvements in doctrine, organization, training, materiel, leadership and education, personnel, facilities, and policy. The Joint Lessons Learned Information System (JLLIS) is the DoD system of record for lessons learned and facilitates the collection, tracking, management, sharing, collaborative resolution, and dissemination of lessons learned to improve the development and readiness of the joint force.  The JLLP integrates with joint doctrine through the joint doctrine development process by providing insights and lessons learned derived from operations, events, and exercises.  As these inputs are incorporated into joint doctrine, they become institutionalized for future use, a major goal of the JLLP.  Insights and lessons learned are routinely sought and incorporated into draft JPs throughout formal staffing of the development process.  The JLLIS Website can be found at https://www.jllis.mil (NIPRNET) or http://www.jllis.smil.mil (SIPRNET).

## 6.  Releasability

This publication is not for public release. It is available on demand to holders of a DoD common access card, and upon request to employees and contractors of the United States Government to include members and staff of the executive, legislative, and judicial branches. In the interest of furthering US national security and assisting allies and partners, foreign governments and international defense organizations desiring a copy of joint publications should make their request through their respective foreign liaison officer assigned to the Joint Staff (if applicable), the United States defense attaché or security assistance office in their country, or the appropriate United States combatant command. Requestors of joint doctrine should route their requisition to the Joint Staff J-7, Joint Education and Doctrine Division (js.pentagon.j7.mbx.jedd-support@mail.mil).

## 7.  Printing and Distribution

a.  This publication may be locally reproduced by holders of a DoD common access card for use within combatant commands, Services, National Guard Bureau, Joint Staff, and combat support agencies.  This publication is not approved for public release and any reproduction, distribution, or use of a locally reproduced publication must align with the releasability statement above.

b.  The Joint Staff does not print hard copies of JPs for distribution.  An electronic version of this JP is available on:

(1) NIPRNET    Joint    Electronic    Library    Plus    (JEL+)    at https://jdeis.js.mil/jdeis/index.jsp (limited to .mil and .gov users with a DoD common access card) and

(2)  SIPRNET JEL+ at https://jdeis.js.smil.mil/jdeis/index.jsp.

# GLOSSARY
## PART I—SHORTENED WORD FORMS
### (ABBREVIATIONS, ACRONYMS, AND INITIALISMS)

| | |
|---|---|
| AFME | Armed Forces medical examiner |
| AFTTP | Air Force tactics, techniques, and procedures |
| ANG | Air National Guard |
| AOR | area of responsibility |
| ARNG | Army National Guard |
| ATP | Army techniques publication |
| | |
| BSI | base support installation |
| | |
| C2 | command and control |
| CAIS | civil authority information support |
| CBRN | chemical, biological, radiological, or nuclear |
| CCDR | combatant commander |
| CCMD | combatant command |
| CD | counterdrug |
| CDCE | Cyber Defense Support of Civilian Authorities Coordination Element |
| CDRUSINDOPACOM | Commander, United States Indo-Pacific Command |
| CDRUSNORTHCOM | Commander, United States Northern Command |
| CGTTP | Coast Guard tactics, techniques, and procedures |
| CISA | Cybersecurity and Infrastructure Security Agency |
| CJCS | Chairman of the Joint Chiefs of Staff |
| CJCSI | Chairman of the Joint Chiefs of Staff instruction |
| CJCSM | Chairman of the Joint Chiefs of Staff manual |
| CJTF | commander, joint task force |
| CNGB | Chief, National Guard Bureau |
| CONOPS | concept of operations |
| CONPLAN | concept plan |
| CRE | chemical, biological, radiological, and nuclear response enterprise |
| | |
| DCO | defense coordinating officer |
| DHS | Department of Homeland Security |
| DIB | defense industrial base |
| DoD | Department of Defense |
| DoDD | Department of Defense directive |
| DoDI | Department of Defense instruction |
| DoDM | Department of Defense manual |
| DOJ | Department of Justice |
| DOS | Department of State |
| DSC | dual-status commander |
| DSCA | defense support of civil authorities |

| | |
|---|---|
| EMAC | Emergency Management Assistance Compact |
| EO | executive order |
| EOC | emergency operations center |
| EOD | explosive ordnance disposal |
| EPLO | emergency preparedness liaison officer |
| ESF | emergency support function |
| EXORD | execute order |
| | |
| FBI | Federal Bureau of Investigation (DOJ) |
| FEMA | Federal Emergency Management Agency (DHS) |
| FHP | force health protection |
| FM | financial management |
| FP | force protection |
| | |
| HD | homeland defense |
| HHS | Department of Health and Human Services |
| HS | homeland security |
| HSFS | human space flight support |
| HSPD | homeland security Presidential directive |
| | |
| IAA | incident awareness and assessment |
| IAS | International Assistance System |
| IAW | in accordance with |
| ICS | incident command system |
| IMAT | incident management assistance team |
| IMT | incident management team |
| ISB | incident support base |
| | |
| JFC | joint force commander |
| JFO | joint field office |
| JIACG | joint interagency coordination group |
| JIC | joint information center |
| JOA | joint operations area |
| JOC | joint operations center |
| JP | joint publication |
| JRMPO | joint regional medical plans and operations officer |
| JRSOI | joint reception, staging, onward movement, and integration |
| JTF | joint task force |
| | |
| LEA | law enforcement agency |
| LFA | lead federal agency |
| LNO | liaison officer |

| | |
|---|---|
| MCRP | Marine Corps reference publication |
| MOA | memorandum of agreement |
| MOU | memorandum of understanding |
| | |
| NDMS | National Disaster Medical System (HHS) |
| NG | National Guard |
| NGB | National Guard Bureau |
| NG JFHQ-State | National Guard joint force headquarters-state |
| NGO | nongovernmental organization |
| NIMS | National Incident Management System |
| NRF | National Response Framework |
| NSSE | national special security event |
| NTTP | Navy tactics, techniques, and procedures |
| | |
| OCS | operational contract support |
| OASD(HD&HA) | Office of the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs |
| OSC | on-scene commander |
| OSD | Office of the Secretary of Defense |
| | |
| PA | public affairs |
| PCA | Posse Comitatus Act |
| PIO | public information officer |
| POD | port of debarkation |
| PPD | Presidential policy directive |
| | |
| RC | Reserve Component |
| RFA | request for assistance |
| RM | religious ministry |
| RMT | religious ministry team |
| RS | religious support |
| RST | religious support team |
| RUF | rules for the use of force |
| | |
| SAD | state active duty |
| SAR | search and rescue |
| SecDef | Secretary of Defense |
| SLTT | state, local, territorial, and tribal |
| SRUF | standing rules for the use of force |
| | |
| TAG | the adjutant general |
| | |
| UAS | unmanned aircraft system |
| US | United States |
| USA | United States Army |
| USACE | United States Army Corps of Engineers |
| USAF | United States Air Force |

| | |
|---|---|
| USC | United States Code |
| USCG | United States Coast Guard |
| USDA | United States Department of Agriculture |
| USG | United States Government |
| USINDOPACOM | United States Indo-Pacific Command |
| USMC | United States Marine Corps |
| USN | United States Navy |
| USNORTHCOM | United States Northern Command |
| USSS | United States Secret Service (DHS) |

## PART II—TERMS AND DEFINITIONS

### 1.  JP 3-28, *Defense Support of Civil Authorities,* 23 September 2024, Active Terms and Definitions

**base support installation.**  A Department of Defense Service or agency installation within the United States and its territories tasked to serve as a base for military forces engaged in either homeland defense or conducting defense support of civil authorities.  Also called **BSI.**  (DoD Dictionary.  Source: JP 3-28)

**defense coordinating element.**  Staff and military liaison officers who assist the defense coordinating officer in facilitating coordination and support to activated emergency support functions.  Also called **DCE.**  (DoD Dictionary.  Source:  JP 3-28)

**defense coordinating officer.**  Department of Defense point of contact for military support of domestic emergencies.  Also called **DCO.**  (Approved for incorporation into the DoD Dictionary.)

**emergency preparedness liaison officer.**  A senior reserve officer who represents their Service during planning and coordination in support of civil authorities.  Also called **EPLO.**  (Approved for incorporation into the DoD Dictionary.)

**homeland.**  The physical region that includes the continental United States, Alaska, Hawaii, United States territories, and surrounding territorial waters and airspace.  (DoD Dictionary.  Source:  JP 3-28)

**hostile act.** The use of force or other attack against the United States, United States forces, or other designated persons or property to preclude or impede the mission and/or duties of United States forces, including the recovery of United States personnel or vital United States Government property.  (Approved for incorporation into the DoD Dictionary.)

**incident awareness and assessment.**  The processing, analysis, and dissemination of information collected or acquired through the authorized use of intelligence, surveillance, and reconnaissance, and other intelligence, intelligence-related, or non-intelligence capabilities, during defense support of civil authorities and National Guard domestic operations.  Also called **IAA.**  (Approved for incorporation into the DoD Dictionary.)

**request for assistance.**  A request based on mission requirements and expressed in terms of desired outcome formally asking the Department of Defense to provide assistance within the United States or United States territories to a state, local, tribal, or federal agency.  Also called **RFA.**  (Approved for incorporation into the DoD Dictionary.)

### 2.  Terms Removed from the DoD Dictionary

- **Supersession of JP 3-28, *Defense Support of Civil Authorities,* 29 October 2018:** catastrophic event; civil authorities; civil emergency; complex catastrophe;

coordinating agency; crisis management; critical infrastructure protection; emergency preparedness; emergency support functions; federal military forces; immediate response; incident; incident command system; incident management; joint field office; law enforcement agency; mission assignment; National Capital Region; national emergency; national operations center; national special security event; primary agency; regional response coordination center; standing rules for the use of force



