**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SAM O'HARA,

      Plaintiff,

             v.

DEVON BECK, et al.,

      Defendants.

Civil Action No. 1:25-cv-03753

**PLAINTIFF'S OPPOSITION TO DEFENDANT BECK'S MOTION TO DISMISS**

Opposition to the use of military troops to enforce civilian law is an American tradition as old as the nation itself. *See* Declaration of Independence ¶ 13 (listing this English practice as among the grievances justifying independence). The Framers adopted multiple constitutional provisions, including the Army Clause, U.S. Const. Art. I, § 8, cl. 12, and the Militia Clause, *id.* cls. 15–16, to balance the need for common defense against the dangers of militarized policing. Congress has sought to preserve this equilibrium throughout the country's history, including in its design of the National Guard, the modern-day militia. Congress empowered the Guard to serve the Nation in times of emergency but—in keeping with principles of federalism at the core of our constitutional structure—hedged against abuse by requiring the National Guard to operate under state command in most circumstances and, through the Posse Comitatus Act, proscribing it from exercising law enforcement power while in federal command in all but the most extraordinary situations.

This case implicates the careful division of authority at the heart of this design. In August 2025, President Trump created a task force of National Guard members that would support District law enforcement operations. The task force included District of Columbia Guard members, who

1

serve directly under the President, and the Guard members from Ohio and several other states in 32 U.S.C. § 502(f) status. The out-of-District Guard members remained under state command; the President declined to federalize them and thereby avoided the Posse Comitatus Act's constraints. Perhaps for this reason, in sending his Guard members to the District, Ohio Governor Mike DeWine took pains to emphasize that they could not initiate arrests but rather were required to call MPD if they believed a seizure was warranted.

In this case, Ohio National Guard Sergeant Devon Beck acted on this protocol when he violated Plaintiff Sam O'Hara's First and Fourth Amendment rights. As Sgt. Beck patrolled a D.C. thoroughfare one afternoon last fall, Mr. O'Hara protested the presence of militarized law enforcement in the District by walking behind Sgt. Beck, peacefully and without interfering with his duties, while recording Sgt. Beck and other Guard members and playing the Imperial March Theme from Star Wars—music that cues Darth Vader's arrival and therefore is synonymous with abuse of state (and, indeed, intergalactic) power. Sgt. Beck demanded that Mr. O'Hara stop and, when he continued, Sgt. Beck implemented the arrest protocol Gov. DeWine had put in place: Sgt. Beck contacted MPD to detain Mr. O'Hara and end his protest; they promptly did so.

Sgt. Beck now contends that he cannot face liability for this conduct. That is wrong. Section 1983 provides a remedy for holding state officials liable for the constitutional torts they cause. Here, Sgt. Beck acted under state command. He implemented a protocol his governor specifically authorized and that, per the terms of his deployment, only his governor could punish him for abusing. And abuse it he did: Sgt. Beck induced MPD officers to suppress Mr. O'Hara speech and unlawfully detain him, conduct that violates the Fourth Amendment as well as the First Amendment twice over—in ways that were clearly established at the time. Because Mr. O'Hara plausibly alleges that Sgt. Beck violated his clearly established rights while acting under color of

2

Ohio law, Mr. O'Hara has stated a viable claim. The Court should deny Sgt. Beck's motion to dismiss.

## BACKGROUND

### I.      The Ohio National Guard Deploy to the District in Title 32 Status.

#### A.  The history and structure of the National Guard

The National Guard is the modern-day militia. *Ass'n of Civilian Technicians, Inc. v. United States*, 603 F.3d 989, 992 (D.C. Cir. 2010). Its history, therefore, dates back to the Founding, and the nation's attempt to balance the need for nationwide defense with the "fear that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States." *Perpich v. Dep't of Def.,* 496 U.S. 334, 340 (1990). The Framers kept these principles in equipoise through the Army Clause and, of particular relevance here, the Militia Clause, which vested Congress with power to organize the militia but "expressly contemplated the reservation of powers to the States." *Ass'n of Civilian Technicians, Inc.*, 603 F.3d at 993.

Congress used its power over the Militia to create the National Guard but did so carefully, preserving an appropriate balance between the federal government and the states. Under Congress's scheme, the National Guard of the states and the National Guard of the United States are "two overlapping but distinct organizations," with individuals who enlist in a State Guard simultaneously enlisting in the federal one. *Perpich*, 496 U.S. at 345. Guard members' operational structure depends their status, of which there are three. *District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *2 (D.C. Cir. Dec. 17, 2025). First, in federal active duty status, Guard members operate under Title 10 of the U.S. Code "in the active military service of the United States." *Id.* (quoting 10 U.S.C. § 101(d)(1)). The President can federalize the Guard only in extraordinary circumstances, *id.*, and even then, the Guard members' authority to perform law

enforcement tasks is sharply constrained by the Posse Comitatus Act, *see* 18 U.S.C. § 1385. Second, Guard members can serve in state active duty status, where they remain state officials, not federal military personnel, *Trump*, 2025 WL 3673674, at *2, and therefore are unconstrained by the Posse Comitatus Act, *see* 18 U.S.C. § 1385. Third, National Guard members can act in Title 32 Status, which is governed by the provisions in Title 32 of the U.S. Code and constitutes a "hybrid between state active duty and federal active duty," wherein Guard members "act in service of the federal government and are funded by the federal government," (i.e., federal duty status), but "remain state National Guard members" when they do so. *Id.* For this reason, the Executive Branch understands Title 32 Guard members unbound by the Posse Comitatus Act. *See* Def.'s Ex. C (United States Dep't of the Army, Joint Publication 3-28: Defense Support of Civil Authorities I-13 (2018)).

Congress imposed several checks on Title 32 deployments to prevent the status from undermining the principles of federalism at the heart of the Guard's design. Even as they support federal missions, Title 32 Guard members remain "under state control" and within "their respective [s]tate's chain of command." *Id.* (cleaned up). Further, although the President or Secretary of Defense can "request" Title 32 Guard members to support federal missions under 32 U.S.C. § 502(f), the state governor gets the final say over whether the deployment happens. *Id.* at *7. This follows not only directly from the text of § 502(f), which only authorizes federal "requests" for Guard members to undertake § 502(f)missions, but also, as the D.C. Circuit has noted, 32 U.S.C. § 328(a), which provides that "[t]he Governor of a State    . . .  or the commanding general of the District of Columbia National Guard . . .  may order a member of the National Guard to perform . . . [duties] pursuant to section 502(f) of this title," *see Trump*, 2025 WL 3673674, at *7 (quoting § 328(a); alterations original).

**B. Governor DeWine sends the Ohio National Guard to the District.**

In August 2025, President Trump ordered the Secretary of Defense to request that state National Guards assist with law enforcement support operations in the District. Compl. ¶ 17. Acting pursuant to 32 U.S.C. § 502(f), the Secretary asked several governors for aid, including Ohio Governor Mike DeWine, who ordered members, including Sgt. Beck, to deploy to the District in § 502(f) status. *Id.* ¶¶ 20–22. When "articulating the scope" of the mission, Governor DeWine emphasized an important restriction: Ohio Guard members would not make arrests. Compl. ¶ 24. He explained that "Ohio National Guard members will carry out presence patrols and serve as added security. . . . If in doing a patrol or if in standing guard of a federal building, an arrest has to be made, our guard will be in direct contact with the D.C. police department who will make arrests." ¶ 24.

Governor DeWine retained authority to enforce this restriction after the deployment. D.C. National Guard Colonel Lawrence M. Doane articulated this point in a declaration filed in another case. Col. Doane oversaw the Joint Task Force District of Columbia (JTF-DC), which implemented the operation the President envisioned in his executive order. *See* Compl. ¶ 26 & n.9. He explained that state National Guard members were "participating in this mission with the consent of their state Governors and remain under the administrative command and control of their sending state [sic] Adjutants General and ultimately their State Governors". *Id.* ¶ 26 (quoting Doane Decl., ECF 34-1, *District of Columbia v. Trump*, No. 25-cv-03005 (D.D.C. Sept. 16, 2025)). "All tasks assigned to out-of-district forces are within parameters set by their State Governors," who retained authority to withdraw their forces or limit their operations "at any time" and could require their forces "refuse any task assigned to them" by objecting. *Id.* Col. Doane sole example of this point involved Ohio, as he noted that he could not "assign Ohio National Guard Forces

5

crowd control tasks." *Id.*  Further, as Sgt. Beck concedes, the Ohio National Guard retained disciplinary and administrative authority over its Guard members serving in the District. MTD at 12.

Statements by the United States indicate that Sgt. Beck served under Ohio's operational control too. In *Association of Civilian Technicians v. United States*, the United Stated asserted that, as a general matter, states control the "day-to-day operations" of Title 32 Guard members, and the D.C. Circuit agreed, holding that "the United States has chosen to defer to the state authorities on matters of daily operations" of Guards in that status. 603 F.3d at 992, 994. The United States made similar representations about the specific mission at issue here in *District of Columbia v. Trump*, a suit filed by the District of Columbia challenging the presence of Guard members in the District. The District argued that the federal government was unconstitutionally exercising direct command of Title 32 state Guard units, rather than ensuring that they reported to their states.  ECF 3-1 at 27, 25-cv-03005 (D.D.C. Sept. 9, 2025). The United States disputed this argument, asserting that state Guard units in the District "receive[] priorities from the local [federal] commander but remain[] under the command and control of their state chains of command"; the D.C. National Guard, it stated, served only in a "liaison and chief coordinating element for the out-of-District National Guard units that have been deployed" here. ECF 34 at 26, 25-cv-03005 (D.D.C. Sept. 16, 2025). These statements strongly suggest that, despite Sgt. Beck's assertions, *see* MTD at 12, Ohio retained operational control over his conduct.

## II.    Mr. O'Hara Protests the National Guard's Presence in the District.

D.C. resident Sam O'Hara was troubled by the presence of military police monitoring District residents. *Id.* ¶ 30. Mr. O'Hara started his protest to express these concerns. *Id.* ¶¶ 31, 32. On three occasions between August 29 and September 10, 2025, Mr. O'Hara walked behind Guard

members "and used his phone (and on one instance a small speaker) to play the Imperial March and record the interaction." *Id.* ¶ 32. Mr. O'Hara did not speak with or touch the Guard members during this protest; he played the music at a volume loud enough for people in the vicinity to hear but not at a blaring level; and he walked behind the Guard members for only a few minutes. *Id.* ¶¶ 33, 34. Guard members generally ignored Mr. O'Hara, and a few laughed; millions of people viewed videos of the protests on TikTok, engaging with the substance of Mr. O'Hara's protest and, in many cases, expressing amusement at his satire. *Id.* ¶¶ 35–37.

Sgt. Beck viewed the situation differently. On September 11, Mr. O'Hara noticed him and several other Guard members at the intersection of 14th and R Streets NW, walking with weapons in hand and an Ohio National Guard insignia embroidered on their uniforms. *Id.* ¶ 39. As he had done on the prior occasions, Mr. O'Hara "began walking behind the Guard members while playing the Imperial March on his phone," loudly but not blaringly, and recording. *Id.* ¶ 40. He did not speak to the Guard members, touch them, or "interfere with their activities—which consisted entirely of walking across public streets and down public sidewalks." *Id.*

Within two minutes, Sgt. Beck turned around and said, "Hey man, if you're going to keep following us, we can contact Metro PD and they can come handle you if that's what you want to do. Is that what you want to do?" *Id.* ¶ 41. Mr. O'Hara continued recording and playing the music without speaking. *Id.* ¶ 42. Sgt. Beck said, "That's what you want to do? Okay." *Id.* ¶ 43. He then stepped aside, called MPD, and within a few minutes, several officers arrived. *Id.* ¶¶ 44, 45.

The officers detained and questioned Mr. O'Hara. Upon arriving on the scene, and without conducting any investigation, one MPD officer suggested that Mr. O'Hara had been "harassing" the Guard members and then accused him of standing in front of the entrance to a store, even though Mr. O'Hara was "standing to the side of the entrance and not blocking anyone's passage."

*Id.* ¶¶ 47–49. The officer ordered Mr. O'Hara to "stand there" when Mr. O'Hara attempted to continue his protest by following the Guard members, who by then had crossed the street, and through this order, prevented Mr. O'Hara from continuing to protest as he had before. *Id.* ¶ 52.

Two other officers arrived and, like the first, asserted that Mr. O'Hara had been harassing the Guard members, without first conducting any investigation. *Id.* ¶¶ 53, 54. They reaffirmed that Mr. O'Hara could not walk after the Guard members and handcuffed him so that he could no longer record them. *Id.* Mr. O'Hara complained about the detention, as well as the tightness of the handcuffs, to no avail. *Id.* ¶ 56. Meanwhile, Sgt. Beck remained "in position to see Mr. O'Hara's detention and hear his complaints" but took no "action to encourage MPD to end the seizure." *Id.* ¶ 61. About twenty minutes later, the MPD officers released Mr. O'Hara without charges. *Id.* ¶ 62.

Mr. O'Hara subsequently filed this lawsuit, challenging Sgt. Beck's conduct as well as that of the District and the MPD officers whom he summoned. The District and its officers quickly entered settlement talks with Mr. O'Hara and the parties subsequently reached an agreement. Meanwhile, Mr. O'Hara located Sgt. Beck's residence in Ohio and served him there.

## LEGAL STANDARD

A complaint need only provide "a short and plain statement … showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss, the Court must accept as true all facts plausibly pleaded in the complaint, drawing all reasonable inferences in plaintiffs' favor. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). "Plausibility does not mean certainty," only that the claim "rises 'above the speculative level.'" *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To the extent inferences must be drawn to show that the defendant is liable, they must merely be reasonable, *Hurd*, 864 F.3d at 678, and need not be the only possible inferences. *Evangelou v.*

8

*District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012). The standard for plausibly pleading a claim is a "low bar." *Holt v. Walsh Grp.*, 316 F. Supp. 3d 274, 282 (D.D.C. 2018).

## ARGUMENT

Sgt. Beck seeks dismissal under Rule 12(b)(5) and 12(b)(6). Neither succeed. Indeed, the 12(b)(5) argument never gets off the ground. Sgt. Beck contends that any *Bivens* claim asserted against him must fail because Mr. O'Hara served him personally but did not serve the United States, as is required for claims against federal officers. MTD at 21. But Mr. O'Hara did not raise a *Bivens* claim; he sued Sgt. Beck solely under 42 U.S.C. § 1983 for conduct arising under color of state law. Sgt. Beck does not argue that proper service of those claims required more than what Mr. O'Hara did by serving him pursuant to Rule 4(e). Sgt. Beck has therefore forfeited the 12(b)(5) argument as to the claims he actually faces. *See, e.g.*, *S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 613 (D.C. Cir. 2000) (declining to consider "asserted but unanalyzed" argument challenging service of process); *Grimaldo v. Reno*, 189 F.R.D. 617, 619 (D. Colo. 1999) (holding that the defendants "waived Rule 12(b)(5)" arguments by failing to develop them); *see also Conservation Force v. Salazar*, 916 F. Supp. 2d 15, 22 (D.D.C. 2013) (arguments made for the first time in reply are forfeited).[1]

The 12(b)(6) motion fares no better. Mr. O'Hara asserts that, due to Sgt. Beck's conduct, his speech was suppressed in violation of the First Amendment; he was detained without reasonable suspicion or probable cause in violation of the Fourth Amendment; and he endured retaliation for his speech in violation of the First Amendment. Sgt. Beck contends that he did not

---

[1] Even if service was improper, which it was not, dismissal with prejudice would be the wrong remedy. "The court must allow a party a reasonable time to cure its failure to serve the United States under Rule 4(i)(3) if the party has served the United States officer or employee," Fed. R. Civ. P. 4(i)(4)(B), and may address other pending defenses in the interim, *see Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 878 (D.C. Cir. 1993).

act under color of Ohio law; however, as explained in Part I, that argument conflicts with the reality of Congress's careful design of the Guard, one that meant Sgt. Beck deployed at his governor's command and remained under Gov. DeWine's control. Sgt. Beck also contends that he is entitled to qualified immunity but, as explained in Part II, his conduct either caused or directly inflicted violations of Mr. O'Hara's clearly established rights.

## I.  Sgt. Beck Acted Under Color of Ohio Law at All Relevant Times.

An act occurs under color of a specific State's law if the act shares a sufficient "nexus" with the state for it to "be fairly treated as that of the [s]tate itself." *Williams v. United States*, 396 F.3d 412, 414–15 (D.C. Cir. 2005). This test originated as a means of determining whether conduct qualifies as state action under the Constitution. *Id.* The D.C. Circuit has also applied it to decide whether an official's action is attributable to the federal government, the District government, or both, *see id.*—the type of issue presented here.

The D.C. Circuit's decisions in *Williams* and in *Johnson v. Government of the District of Columbia*, 734 F.3d 1194 (D.C. Cir. 2013), explain how the nexus test applies in such cases. In each of those decisions, the court held that a defendant acted exclusively under color of federal law because only the federal government "cloaked the defendants" with the authority that gave rise to the alleged misconduct, *Williams*, 396 F.3d at 414 (internal citation marks and quotations omitted); *Johnson*, 734 F.3d at 1200 (assessing the source of "authority" the defendant "exercised" when committing the challenged conduct). As these cases demonstrate, and as Sgt. Beck recognizes, *see* MTD at 12, the dispositive question is what sovereign or sovereigns supplied the "source of [the defendant's] authority when [he or she] allegedly violated [the plaintiff's] rights." *Holley v. United States*, No. CV 24-1536 (LLA), 2025 WL 266532, at *6 (D.D.C. Jan. 22, 2025).

10

Here, Sgt. Beck's conduct is attributable to Ohio. Sgt. Beck devotes much of his brief to asserting that he did not act under color of District law, but that is irrelevant: action under color of Ohio law falls within § 1983's ambit. As explained below, Ohio's authorization of Sgt. Beck's mission, and ongoing control over him, established a nexus between the state and the challenged conduct (Part A) that was not severed by the mission's federal tinctures (Part B).

### A. Sgt. Beck's Conduct Is Fairly Attributable to Ohio.

*Johnson* and *Williams* determined the source of an officer's authority by considering which government or governments "gave [the defendant] the power" that caused the plaintiff's injuries, as well as by considering with government(s) exercised "authority . . . over" the defendant. *See Williams*, 396 F.3d at 414–15; *Johnson*, 734 F.3d at 1200. Here, both these inquiries turn on the federalism considerations that shaped the Guard's design. *See* Subpart 1, *infra*. Moreover, each of the two considerations the D.C. Circuit has endorsed establishes a sufficient nexus between Sgt. Beck and Ohio to make his conduct "fairly attributable to the State," *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982), *see* Subparts 2 and 3, *infra*.

1. **The federalism principles underlying § 502(f), and the Design of the Guard itself, demonstrate the state law basis of Sgt. Beck's conduct.**

In enacting 32 U.S.C. § 502(f), Congress respected the traditional balance between efficacy and federalism, *see Perpich*, 496 U.S. at 340-42. On one hand, § 502(f) expands the circumstances when Guard members can support nationwide law enforcement efforts, allowing them to perform "other dut[ies]" that the President requests without the constraints of the Posse Comitatus Act. On the other hand, § 502(f) provides that Guard members can support those missions only if their governors deploy them and, even then, remain under state command. *See Trump*, 2025 WL 3673674, at *3-*4. Had Congress done otherwise, members in § 502(f) status would be federal military personnel in both form and function, and the effect of § 502(f) would have been to create

11

an exception to the Posse Comitatus Act any time the President identified "other dut[ies]" he wanted Guard members to undertake, *see* 32 U.S.C. § 502(f)(1).

Sgt. Beck's brief reads as if Congress had not imposed this bargain. Section 502(f) expands the United States's law enforcement capacities but Congress's plain intent was to create a nexus between Guard members in this status and their home states—and a nexus to the state is all that's required to trigger § 1983. The applicability of § 1983 fits Congress's objectives. It preserves the principles of federalism underlying § 502(f) by ensuring that individuals in receiving states have a meaningful legal check if Guard members, deployed under the command of another state, commit unconstitutional actions. The Department of Justice seeks to avoid that result here, but it must take the bitter with the sweet.

### 2.  Ohio granted Sgt. Beck the power that he misused.

Each of the distinct inquiries courts use to determine whether an official acted under a particular government's law demonstrates that Sgt. Beck's conduct is fairly attributable to Ohio. Consider, first, the question of where the powers he abused originated. Because Congress vested state governors with final say over whether their Guard members can undertake a mission in Title 32 status, *Trump*, 2025 WL 3673674, at *7, it was Governor DeWine, not President Trump, whose command allowed the Ohio Guard members to serve in JTF-DC. Compl. ¶¶ 20, 21. Thus, Sgt. Beck's deployment turned on Governor DeWine's conclusion that the mission was prudent and the powers Ohio Guard members would possess were "authorized under state law." *Trump*, 2025 WL 3673674, at *9. These powers included the duty to patrol District streets and, of central relevance here, the responsibility to refrain from making arrests, and instead engage MPD upon encountering someone potentially breaking the law. Whether or not Governor DeWine authored this arrest protocol himself, *see* MTD at 9, he explicitly endorsed it and emphasized the limits the

12

imposed in "articulating the scope" of his Guard members' mission. Compl. ¶ 24. This, at minimum, demonstrates that Governor DeWine relied on the core protocols in authorizing the mission. By exercising the delegation Congress granted him, Governor DeWine, and therefore Ohio, imbued Sgt. Beck with the power he abused.

These plausibly pleaded facts, on their own, establish that Sgt. Beck acted under color of Ohio law. Courts have consistently held that when Congress vests a state official with the final say over whether certain powers can be exercised, the subsequent use (or misuse) of those powers is attributable to the state. For example, federal law requires that the "final decision" to authorize discharges of Guard members be made by state adjutants general, who are state officers. *See Johnson v. Orr*, 780 F.2d 386, 392–93 (3d Cir. 1986). The Third Circuit has held that when state adjutants general exercise this power, the resulting discharge is done under color of state law— even when: (1) the Guard members who initiated and carried out the discharge were in hybrid-status and classified as federal employees under federal law; (2) federal regulations constrained the state adjutants general's termination authority; and (3) the state adjutants general operated as "federal agent[s]" when approving the discharges. *See id.* The Fifth, Sixth, and Seventh Circuits have held that Guard members acted under color of state law when making termination decisions in circumstances that involved some or all of these factors. *See Knutson v. Wis. Air Nat'l Guard*, 995 F.2d 765, 768 (7th Cir. 1993); *Schultz v. Wellman*, 717 F.2d 301, 304 (6th Cir. 1983); *NeSmith v. Fulton*, 615 F.2d 196, 200 (5th Cir. 1980).

These cases are analogous to Mr. O'Hara's. In those matters, as in this one, a state official's say-so was a prerequisite to the actions that caused the plaintiff's injuries. Attempting to sidestep these rulings, Sgt. Beck asserts that they involve a "quintessentially" state power, MTD at 11, but the cases teach that the statutory framework Congress designed, not "quintessence," determines

13

the allocation of power over the National Guard. Here, as there, Congress made state officials the final decisionmakers.

Nor is it relevant that, in the cases above, state officials approved the challenged termination specifically, whereas here, Ohio authorized the arrest protocol but did not endorse Sgt. Beck's decision to invoke that rule in the manner he did when interacting with Mr. O'Hara. What matters for § 1983 purposes is whether Ohio "gave [Sgt. Beck] the power" he abused, *Williams*, 396 F.3d at 415, not whether the state explicitly ratified his interaction with Mr. O'Hara. This conclusion accords with historic common law principles, under which an employer could face liability for an employee's action even when that worker was "loaned" to another. In that setting, the Supreme Court explained, "[a]uthority to direct the course of a third person's servant does not prevent his remaining the servant of the third person." *New Orleans-Belize Royal Mail & Cent. Am. S.S. Co. v. United States*, 239 U.S. 202, 206 (1915) (Holmes, J.). The same is true here.

In sum, because Ohio made the final decision to grant Sgt. Beck the powers he abused, the source of his authority was Ohio law.

### 3. Ohio exercised substantial control over Sgt. Beck during his mission.

Independently, Sgt. Beck's conduct is attributable to Ohio because it retained substantial "authority over" Sgt. Beck during his deployment. *Williams*, 396 F.3d at 415. Indeed, it is blackletter law that Guard members not in active federal duty are under the control of their states. *See, e.g.*, *Trump*, No. 25-5418, 2025 WL 3673674, at *3; *United States ex rel. Gillett v. Dern*, 74 F.2d 485, 487 (D.C. Cir. 1934) ("[E]xcept when employed in the service of the United States, the whole government of the militia is within the province of the states."); *Abbott v. Biden*, 70 F.4th 817, 829 (5th Cir. 2023) ("The States . . . retain exclusive power to . . . govern the non-federalized

14

militia."); *see also Perpich*, 496 U.S. at 349 (indicating that Guard members operate under either state or federal control, but never both).

The legal particulars of Sgt. Beck's deployment comport with these principles. As a Guard Member in § 502(f) status, Sgt. Beck operated in federal duty status but remained a "state National Guard member[] under state control" and within his "State's chain of command." *Trump*, No. 25-5418, 2025 WL 3673674, at *3. Sgt. Beck argues that testimony of Col. Doane, the JTF-Commander, refutes this point, MTD at 8-9, but that testimony actually supports it. As Col. Doane explained, state Guard members in JTF-DC could receive tasks only if they were "within the parameters set by" state governors, that governors could "withdraw" their forces or "further limit[]" their duties "at any time," and if a governor  objected to a specific task, his Guard members would have to "refuse" it. Compl. ¶ 26 (quoting Doane Decl.). Crucially, Ohio also possessed exclusive disciplinary authority over Sgt. Beck. Col. Doane testified that the DCNG, which oversaw the JTF operations, lacked the power to punish officers, Doane Decl. ¶ 9, and Sgt. Beck concedes that disciplinary authority fell within the "administrative control" that Ohio retained. MTD at 12. Thus, in response to constitutional misconduct, Ohio had the power to terminate or alter Sgt. Beck's mission, and exclusive power to discipline him personally.

The D.C. Circuit has viewed these types of facts as critical in answering the question: under color of which law does an officer act. In *Johnson*, 734 F.3d at 1199, the court held that the defendant acted exclusively under federal law because he operated in an entirely federal chain of command: he "was appointed and confirmed through a federal process, served as part of a federal agency under the direction of a federal official, and at all times could have been removed by the President."  Here, Sgt. Beck remained in his state chain of command. And even if he had federal superiors, only his state bosses could terminate or discipline him. Thus, Ohio law determined the

consequences Sgt. Beck would face if he engaged in misconduct, and Ohio officials determined whether he would suffer them. This incentive structure ties Sgt. Beck's conduct to Ohio. Moreover, Ohio's broad power to determine the extent and even ability of its officers to participate in the JTF mission—as noted above, Ohio could reject assignments, narrow permissible operation parameters, and even withdraw its troops entirely—gave it leverage to ensure that federal officials provided Sgt. Beck the resources needed to perform his duties in a constitutional manner.

\*\*\*

When Sgt. Beck engaged Mr. O'Hara, he was exercising official authority that he needed permission from Ohio to wield and which only Ohio could punish him for misusing. These parameters, which arise from Congress's careful statutory design to respect state authority within our federalist system of government, make his conduct fairly attributable to Ohio.

## B. The Federal Aspects of Sgt. Beck's Mission Do Not Diminish Their Connection to Ohio.

Sgt. Beck's core argument—that "he was acting under color of federal, not state, law," MTD at 13—incorrectly assumes that the two are mutually exclusive. The D.C. Circuit did not endorse such a rule in *Johnson*, 734 F.3d at 1200, or *Williams*, 396 F.3d at 415. Nor did it do so in *Settles v. U.S. Parole Commission*, 429 F.3d 1098, 1104 (D.C. Cir. 2005), where it observed that "Section 1983 does not apply to federal officials acting under color of federal law" but did not opine on whether officials (federal or otherwise) could act under color of both federal and state authority. *Id.* Other circuits have held that they can. *See NeSmith*, 615 F.2d at 200 & n.7 (holding that Guard member acted "under color of state law" and "also acted under color of federal law"); *Johnson v. Orr*, 780 F.2d 386, 392 & n.11 (3d Cir. 1986) (endorsing *NeSmith*'s conclusion). Here, the structure of § 502(f) and the underlying historical considerations provide reasons to doubt that Sgt. Beck acted under color of federal law when operating within that status, *see* Part I.A.1, but

16

the Court need not resolve that issue. Rather than deciding if Sgt. Beck acted solely under color of Ohio or U.S. law, the Court must determine whether, notwithstanding the federal components of his mission, Sgt. Beck acted "sufficiently under color of state law for purposes of Section 1983." *NeSmith*, 615 F.2d at 200. For the reasons discussed previously, he did.

Sgt. Beck emphasizes four federal aspects of his mission, but none disturbs this conclusion. First, Sgt. Beck notes that the United States exercised operational control of his deployment, "assigning tasks, designating objectives, and giving authoritative direction." MTD at 12. This statement is in significant tension with statements the United States has made about Title 32 deployments in other cases, including statements concerning the very mission at issue here. *See* p.6, *supra*. Sgt. Beck's extrinsic documents, which come from *District of Columbia v. Trump*, where the United States framed its role as a coordinating one, do not conclusively resolve this point, which must await discovery. But even if it were clear that the United States exercised operational control over Sgt. Beck, Ohio exercised administrative control over him, which includes, among other things, discipline—a point Sgt. Beck concedes, *id.* at 11-12. This division of authority undercuts Sgt. Beck's contention that he acted *solely* under color of federal law (if he acted under color of federal law at all). Indeed, in *Johnson*, 734 F.3d at 1199, the D.C. Circuit emphasized hiring authority and removal power in holding that the defendant there, the U.S. Marshal for D.C. Superior Court, acted under color of federal law. Thus, Sgt. Beck is wrong to contend that, for color-of-law purposes, the United States's operational control somehow negates Ohio's administrative control in the color-of-law analysis.

Second, Sgt. Beck asserts that his mission served a federal purpose, MTD at 15, but this point proves little. The relevant question is not *why* an official acted, but *what law* authorized him to do so. *See Orr*, 780 F.2d at 392-93. Thus, courts have held that officials can act under color of

17

state law even when they act as agents of the United States, *NeSmith*, 615 F.2d at 199-200; *Orr*, 780 F.2d at 392-93, or when they otherwise undertake a mission that primarily or exclusively serves federal interests, such as executing a warrant for violations of federal law, *Brant v. Cnty. of Stanislaus*, No. 91-16916, 1993 WL 285905, at *1, *2 (9th Cir. July 29, 1993), or administering a federal benefits program, *Tongol v. Usery*, 601 F.2d 1091, 1097 (9th Cir. 1979). Here, Governor DeWine's authorization was a Congressionally mandated prerequisite to Sgt. Beck's deployment; that suffices to establish a nexus. *See Orr*, 780 F.2d at 390, 393.

Third, Sgt. Beck's contention that federal officials defined the scope of his arrest powers, MTD at 10, is both factually unsupported and legally irrelevant. On the facts, the Complaint does not specify who insisted on the limit on Guard members' arrest powers. Nor do any of Sgt. Beck's exhibits, which merely state those limitations and leaves open the possibility that the United States adopted them for all Guard members only after Governor DeWine insisted on them for Ohio ones. *See id.* (discussing exhibits). In the face of this ambiguity, assuming that the United States authored the relevant constraints would accord *the defense* favorable inferences, the opposite of what's required on a motion to dismiss.

In any event, it is irrelevant whether the U.S. or Ohio developed the limits on Sgt. Beck's powers or even designed the scope of his mission. Governor DeWine adopted the restrictions on Sgt. Beck's arrest powers, as well as the mission parameters, in authorizing the deployment. Compl. ¶ 24. For this reason, an authorization from a state official does not lose its "state law character" even when federal regulations constrain the official's discretion. *Schultz*, 717 F.2d at 305 (6th Cir. 1983); *NeSmith*, 615 F.2d at 200 & n.7 (adjutant general acted under color of state law even though their federal regulations "significantly governed" his termination decision); *Knutson*, 995 F.2d at 767-68 (adopting similar conclusion); *Orr*, 780 F.2d at 393 (same).

18

Finally, Sgt. Beck fares no better in highlighting his status as a Special Deputy U.S. Marshal for the duration of his mission. MTD at 10. The sole power that designation gave him was the right to carry his service weapon, *see id.*, which is not related to the allegations here. Moreover, even a defendant's *permanent* employment status does not resolve the key inquiry: "whether their actions were made possible by authority derived from the state." *Orr*, 780 F.2d at 390. Accordingly, in *Williams*, the D.C. Circuit noted that the defendant was a "federal official" but did not treat this factor as dispositive, 396 F.3d at 415, and in *Orr*, the court held the several defendants acted under color of state law even though their titles classified them as federal employees, 780 F.2d at 390.

These four considerations prove no more when considered collectively than when analyzed one by one. Several circuits have held that officers acted under color of state law even though all four of these factors or their equivalents were present. *See, e.g.*, *Orr*, 780 F.2d at 390, 393; *NeSmith*, 615 F.2d at 200. This conclusion makes sense, because the aspects of Sgt. Beck's duties on which he relies are simply not the ones that matter most for color-of-law analysis. On the dispositive points—source of power and level of control—the link between Sgt. Beck and Ohio is robust.

For similar reasons, Sgt. Beck's principal authorities are easily distinguished. In *Thai v. County of Los Angeles*, 127 F.4th 1254 (9th Cir 2025), a case involving a state-federal task force, "Plaintiffs provide[d] no evidence that 'the authority of the state was exerted in enforcing the law'"—no evidence of Congress delegating the state final authority over the ability of state officials to participate and no evidence of the state retaining exclusive discipline control over the officers, *see id.* at 1262 (quoting *Tongol*, 601 F.2d at 1097). The same evidence was lacking in *Askew v. Bloemker*, 548 F.2d 673 (7th Cir. 1976), the other joint-federal task force case that Sgt.

Beck cites. *See id.* at 677. These decisions, thus, are inapposite to this case, where Sgt. Beck's authority derived from his home state and his governor.

In sum, the federal aspects of Sgt. Beck's duties do not weaken their Ohio ties or otherwise undercut the conclusion in Part A that his misconduct occurred under color of Ohio law. Either of the factors on which the D.C. Circuit focuses—source of the officer's power and control over the officer—would be enough to find that Sgt. Beck acted under color of Ohio law, and here that conclusion is supported by both factors.

## II.    Sgt. Beck Is Not Entitled to Qualified Immunity on Mr. O'Hara's Claims.

Officials acting under color of state law face § 1983 liability if they "subject[] or cause[] [an individual] to be subjected . . . to the deprivation of any rights . . . secured by the Constitution" or federal law. 42 U.S.C. § 1983. Qualified immunity offers a defense in such circumstances, but it provides no protection when the plaintiff suffered a deprivation of "a federal statutory or constitutional right" that was "clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012))

A right is clearly established if it is "beyond debate." *Id.* at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Satisfying this standard does not require identifying "a case directly on point," *id.* at 64, but the officer must have had "fair warning" that his conduct was unconstitutional, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). There are several ways an officer can have such a warning. First, a right can be clearly established by controlling authority. *Wesby*, 583 U.S. at 63. The D.C. Circuit has recognized such authority can from the Supreme Court or itself. *Lederman v. United States*, 291 F.3d 36, 48 (D.C. Cir. 2002). Additionally, controlling authority can come from a decision from "the highest court in the state in which the case arose." *Lederman v. United States*, 291 F.3d 36, 48 (D.C. Cir. 2002); *accord Alfano v. Lynch*, 847 F.3d 71, 78 (1st Cir. 2017)*;*

20

*Sloley v. VanBramer*, 945 F.3d 30, 40–43, 42 n.9 (2d Cir. 2019); *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998), *aff'd*, 526 U.S. 603 (1999). Second, even absent binding authority, a right can be clearly established based on a robust consensus of cases of persuasive authority." *Wesby*, 583 U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741-42). Finally, a right also can be clearly established in the "'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 64 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

The statutory text and the qualified immunity defense thus combine to define the relevant inquiry. An officer acting under color of state law is liable under § 1983 if he (i) causes the plaintiff to experience or subjects the plaintiff to (ii) a deprivation of constitutional or federal rights that are clearly established—that is, beyond debate. Based on the facts Mr. O'Hara has plausibly alleged, he satisfies both prongs. The Complaint plausibly pleads that Sgt. Beck caused MPD to detain Mr. O'Hara and terminate his protest by asking MPD to do so (Part A). That outcome was unconstitutional in three distinct ways, violating Mr. O'Hara's clearly established rights by suppressing his speech, subjecting him to an unreasonable seizure, and retaliating against him for his views (Part B). Thus, Mr. O'Hara's claims against Sgt. Beck survive.

### A. Sgt. Beck caused the deprivation of Mr. O'Hara's constitutional rights.

Causation under § 1983 relies on common law tort principles, such that an officer faces liability if "the natural consequences of his actions" is the deprivation of another's clearly established constitutional rights. *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978). The D.C. Circuit applied these principles in *Clark v. Library of Congress*, 750 F.2d 89, 98 (D.C. Cir. 1984). There, Library of Congress officials asked the FBI to conduct an investigation into an employee's personal life and associations, an inquiry that the court subsequently held was unconstitutional. *Id.* at 93, 99. In

21

assessing the Library's liability for the unlawful investigation, the D.C. Circuit held it "responsible for the entire scope of the investigation" because the Library "induced the FBI investigation" when it asked the FBI to conduct it and the Library made that request with the "expectation" that the FBI would conduct the full field investigation that it ultimately completed. *Id.* at 91, 98. *Clark* based its analysis on the Restatement (Second) of Torts § 877(a) (A.L.I. 1979), which states that an individual who "induces" the tortious conduct of another is liable for it if he "knows or should know of circumstances that would make the conduct tortious if it were his own." *See Clark*, 750 F.2d at 98. For purposes of § 1983 then, the causation inquiry turns on whether the defendant (i) induced tortious conduct that he (ii) knew or should have known would violate the plaintiff's constitutional rights.

Here, the relevant tortious conduct is MPD's detention of Mr. O'Hara, which was both a seizure and a termination of his ability to continue protesting and recording. This conduct underlies each of Mr. O'Hara's claims. That is, Mr. O'Hara contends that by preventing him from further recording and protesting, the officers suppressed his speech in violation of the First Amendment; that, by detaining him, they effected an unreasonable seizure in violation of the Fourth Amendment; and that the detention was induced in retaliation for Mr. O'Hara's exercise of First Amendment rights.[2] Under *Clark*, Sgt. Beck is liable for these constitutional torts if, with appropriate knowledge, he induced the MPD actions that gave rise to them. The Complaint plausibly shows that he did.

Regarding inducement, Mr. O'Hara plausibly alleged that Sgt. Beck brought about MPD's seizure in the same way the Library caused the FBI's investigation: He requested it. The Complaint

---

[2] Sgt. Beck's liability for the retaliation claim turns not only on whether he caused the adverse action but also whether he did so for retaliatory reasons. Sgt. Beck's motivations are discussed in Part B.3, which specifically concerns that claim, rather than this section.

alleges that Sgt. Beck told Mr. O'Hara: "Hey man, if you're going to keep following us, we can contact Metro PD and they can come handle you if that's what you want to do." Compl. ¶ 41. The Complaint further alleges that, when Mr. O'Hara continued his protest without comment, Sgt. Beck called MPD, with officers arriving minutes later and "handl[ing]" Mr. O'Hara by detaining and handcuffing him, thereby preventing him from continuing to record or protest the Guard members. Compl. ¶¶ 41, 44-45, 54. Sgt. Beck placed this call in accordance with a policy instructing Guard members to contact MPD when they see a crime and want the officer to make an arrest. Compl. ¶¶ 24, 44. When the officers arrived, they accused Mr. O'Hara of harassing the Guard and blocking passage; because the officers issued these charges without any prior investigation, and directly after Sgt. Beck called, Sgt. Beck must have provided them. Compl. ¶¶ 47, 49. And after the police arrived, Sgt. Beck took no action to prevent the seizure, as he might have had the officers misunderstood his call. Compl. ¶ 61. Based on these allegations, it is reasonably inferable that Sgt. Beck asked MPD to detain Mr. O'Hara and stop him from continuing to walk behind the Guard (which was how he protested and recorded them). Under *Clark*, that constitutes inducement.

Sgt. Beck errs in asserting that the Complaint is "conclusory" and fails to support any inference about Sgt. Beck's communications with MPD. MTD at 30. Mr. O'Hara did not merely rely on "temporal sequence and suspicion," MTD at 23, but rather alleged detailed facts about the threat Sgt. Beck made before calling the police and his acquiescence when the officers effectuated it. To infer from these facts that Sgt. Beck asked the officers to do what they did is highly plausible and consistent with inferences this Court has drawn before. *See Sherrod v. McHugh*, 334 F. Supp. 3d 219, 255-56 (D.D.C. 2018) (jury could infer that an officer caused the plaintiff's prosecution by writing the initial police report and failing to correct it as events progressed). Indeed, it would

be an astonishing coincidence if Sgt. Beck had expressed displeasure with Mr. O'Hara's protest and threatened to call MPD, and then MPD promptly showed up to detain Mr. O'Hara *without* Sgt. Beck having induced them to do just that. Thus, not only is Mr. O'Hara's inference plausible—which is all that he needs to survive a motion to dismiss—but the contrary inference is downright *im*plausible. Mr. O'Hara clears Rule 8's "low bar," *Holt v. Walsh Grp.*, 316 F. Supp. 3d 274, 282 (D.D.C. 2018), by a wide margin.

Turning to Sgt. Beck's mental state, the Complaint's allegations also make clear that he knew or should have known—in fact, that he expected—MPD officers would respond to his request by detaining Mr. O'Hara and shutting down his protest and recording. It is plausible to infer that Sgt. Beck expected MPD officers to detain a suspect when a National Guard member requested it, particularly given that MPD and the Guard worked out a policy where Guard members called MPD to initiate arrests. Compl. ¶ 24. Indeed, Sgt. Beck would have had no reason to call MPD if he did *not* expect MPD officers to suppress the activities he sought to stem through his threat. Because it is plausible that Sgt. Beck expected that MPD to act on his request, and because his request induced MPD to do so, the Complaint has plead causation.

Sgt. Beck advances three principal arguments against causation, none of which succeeds. First, Sgt. Beck is wrong that the MPD officers' independent decisions in their interaction with Mr. O'Hara sever the causal chain between his call and Mr. O'Hara's harms. MTD at 28-29. The Supreme Court rejected an even stronger version of this argument in *Malley v. Briggs*, 475 U.S. 335 (1986), which held that officers can face liability for procuring and executing invalid warrants even if a judge approved the warrant in between. *Id.* at 344 n.7. If a judge's signature cannot break the causal chain, *id.*, then neither can conduct by other officers who are pursuing the same law enforcement objectives. This conclusion rests on the same basic principles of tort law underlying

24

*Clark*, which affirm that individuals can face § 1983 liability for third-party conduct that they induce and expect, which is what occurred here. *See* 750 F.2d at 98; *Edmond v. U.S. Postal Serv. Gen. Couns.*, 949 F.2d 415, 422-23, 423 n.14 (D.C. Cir. 1991) (adopting rule similar to *Clark*).

The cases Sgt. Beck cites do not hold otherwise. Contrary to Sgt. Beck's assertion, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), does not provide the appropriate "starting point," MTD 24, as that case, unlike this one, concerned a claim that a supervisor could be liable for the misconduct of a subordinate by virtue of the supervisory relationship combined with "knowledge of his subordinate's discriminatory purpose." *Iqbal*, 556 U.S. at 677. *Iqbal* thus implicates an entirely distinct legal doctrine from this case. Mr. O'Hara does not contend that Sgt. Beck is liable by virtue of a supervisory relationship, or by virtue of someone else's purpose. Rather, Mr. O'Hara seeks to impose liability on Sgt. Beck for *inducing* misconduct by others, as *Clark* allows. *Iqbal* did not speak to that theory and certainly did not purport to overrule *Monroe v. Pape*'s reliance on common law tort principles to resolve this issue. *See* 556 U.S. at 677-87.

Sgt. Beck also errs in his reading of *Hartman v. Moore*, 547 U.S. 250, 257-61 (2006) and other cases considering whether a prosecution or arrest constituted First Amendment retaliation. *See* MTD at 28. *Hartman* concerned an allegedly retaliatory prosecution that turned on two questions of causation: whether the defendant-officers induced or were otherwise culpable for the prosecutor's decision to bring charges, and if so, whether the plaintiff's protected activity caused or motivated the officers to act. *See* 547 U.S. at 257-62. Sgt. Beck emphasizes the second causation question, where the Court held that probable cause to arrest defeated the inference of retaliatory motive. *See* MTD at 28; *Hartman v. Moore*, 547 U.S. at 261. That rule—reiterated in the other cases Sgt. Beck cites, *see Nieves v. Bartlett*, 587 U.S. 391, 398-404 (2019); *Moore v. Hartman*, 644 F.3d 415, 418 (D.C. Cir. 2011), *judgment vacated*, 567 U.S. 901 (2012) (mem.)—bears on

25

Plaintiff's retaliatory arrest claim and therefore is discussed in that section. But that issue is irrelevant to whether Sgt. Beck induced MPD's torts. That inquiry reflects the first causation question in *Hartman*, one that neither it nor *Nieves* nor *Moore* assessed in any detail. By contrast, the teachings of *Pape* and *Clark* are on point, and those decisions, which support Mr. O'Hara's claims, remain binding.

Sgt. Beck's second argument against causation incorrectly asserts that Mr. O'Hara can establish Sgt. Beck's culpability for the seizure and suppression only by showing that Sgt. Beck acted in bad faith when calling MPD. *Clark* implicitly rejected such a rule, holding the Library liable based on what it induced and expected and without consideration of whether it acted in good faith or not. 750 F.2d at 98. Moreover, even if Sgt. Beck were correct, and causation turned on bad faith, the Complaint's allegations plausibly support bad faith. Upon arriving at the scene, the responding MPD officers asserted that Mr. O'Hara had been assaulting and harassing the Guard patrol—none of which was true. Compl. ¶¶ 47-48. By alleging that the officers made these statements before conducting any investigation, the Complaint supports the inference that Sgt. Beck provided these inaccurate facts, as there were no other means for the responding MPD to have obtained them or come to believe them. It is plausible that Sgt. Beck acted in bad faith if he supplied inaccurate information to MPD, *see McHough*, 334 F. Supp. 3d at 257, though for the reasons stated, it is immaterial if he did.

Third, Sgt. Beck errs in attempting to apply qualified immunity to the causation analysis. Qualified immunity turns on whether "the right [at issue] was 'clearly established.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, a defendant can face liability for inducing the constitutional torts of another if they knew or should have known that the conduct they caused would violate the plaintiff's clearly established rights.

26

*See Amobi v. District of Columbia*, 755 F.3d 980, 989-92 (D.C. Cir. 2014). Sgt. Beck contends that the plaintiffs must also demonstrate the clear illegality of the means by which the officer induced the misconduct. If the law imposed such a requirement, Mr. O'Hara would have satisfied it: *Clark* is binding precedent holding that calling police to initiate law enforcement action makes the caller liable for the police conduct that ensues.

But more fundamentally, there is no requirement that the causal mechanism by which a defendant violates a clearly established right be *itself* clearly established as unlawful. In *Amobi*, a plaintiff accused a correctional officer of causing another officer to effect an unlawful arrest. *Id.* at 989-92. In denying qualified immunity, the D.C. Circuit held that the arrest violated the plaintiff's clearly established rights; it did not consider whether it was also beyond debate that *the means by which  the officer induced the arrest* could give rise to liability. Likewise, in *Taylor v. Ways*, 999 F.3d 478, 491 (7th Cir. 2021), the Seventh Circuit denied qualified immunity where the deprivation was clearly established even though the means by which the defendant caused the violation were not.

Similar reasoning explains Sgt. Beck's related error in asserting that Mr. O'Hara cannot defeat qualified immunity unless he finds cases involving officers with the same duty status and job title as Sgt. Beck. Under "the 'clearly established' prong, we should ask 'what happened,' not 'whom can you sue.'" *O'Connor v. Eubanks*, 83 F.4th 1018, 1025 (6th Cir. 2023) (Thapar, J., concurring). D.C. Circuit precedent illustrates the point and reveals Sgt. Beck's error: In *Johnson v. District of Columbia*, 528 F.3d 969, 976–77, the D.C. Circuit denied qualified immunity to an MPD officer based on cases involving similar conduct by U.S. Marshals, U.S. Park Police, and Memphis Police, without asking whether the right at issue was clearly established *as to MPD defendants*. *See also Foster v. Echols Cnty. Sch. Dist.*, 169 F.4th 1291, 1300 (11th Cir. 2026)

27

(holding qualified immunity did not turn on whether the particular defendants at issue could face personal liability).

*Wood v. Moss*, 572 U.S. 744 (2014), is not to the contrary. There, protestors alleged that Secret Service agents engaged in viewpoint discrimination when they moved protestors opposing the President in response to security concerns. *Id.* at 748-49. In granting qualified immunity to the officers, the Court held that the protestors lacked a clearly established right to enjoy access to "comparable locations" as groups of different views "at all times," *id.* at 758–60; it nowhere suggested that had officers of the local police rather than the Secret Service set the locations, the result would have differed.  The Court thus focused its "clearly established" analysis on the relevant right, not the office holder or causal mechanism. As discussed below, applied here, that analysis establishes Sgt. Beck's liability.

### B. Plaintiff O'Hara Plausibly Alleged that He Suffered a Violation of His Clearly Established Rights.

#### 1.  Mr. O'Hara's speech was suppressed in violation of his First Amendment rights.

The First Amendment protects the right to hold a recording device in public near police officers and peaceably film them performing their duties without interfering in those activities. The First Amendment likewise safeguards the right to peaceably protest police officers in public while remaining near them but not interfering in their work. These rights are clearly established. Mr. O'Hara plausibly alleged that he suffered a deprivation of each one when his ability to protest and record was suppressed.

Start with the right to record. In *Price v. Garland*, 45 F.4th 1059, 1071 (D.C. Cir. 2022), the D.C. Circuit recognized the right to film police as they publicly perform their duties, a

conclusion also reached by every appellate court to consider the issue.[3] It is likewise settled that officers may order individuals to stop recording only when the order constitutes a reasonable time, place, or manner restriction. *Id.* at 1070–73. Officers may demand individuals filming them "to disperse for reasons related to public safety and order and other legitimate law-enforcement needs," *Alvarez*, 679 F.3d at 607, but absent these considerations, "prohibiting the recording of a public official performing a public duty on public property is unreasonable" and therefore unlawful under the First Amendment, *Price*, 45 F.4th at 1071.

Applying this consensus rule, appellate courts around the country have found constitutional violations in circumstances just like this one—i.e., where a person was arrested or otherwise ordered to desist—for standing or walking near an officer to record without interfering. *See, e.g.*, *Fields*, 862 F.3d at 358–60 (police violated right to record when they stopped plaintiff from moving to a better vantage point to record an arrest); *Glik*, 655 F.3d at 84 (police violated right to record by arresting plaintiff for using his phone to record an arrest that was occurring a several feet away); *Fordyce*, 55 F.3d at 438–39 (reversing grant of summary judgment to defendant and holding that plaintiff, who "attempt[ed] . . . to videotape a public protest march" and brought a § 1983 claim to vindicate his "First Amendment right to film" after an officer "attempted physically to dissuade Fordyce from his mission," was entitled to proceed to trial on that claim).

---

[3] *See, e.g., Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *Fields v. City of Philadelphia*, 862 F.3d 353, 358–60 (3d Cir. 2017); *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 (4th Cir. 2023); *Turner v. Lieutenant Driver*, 848 F.3d 678, 685–90 (5th Cir. 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 608 (7th Cir. 2012); *Chestnut v. Wallace*, 947 F.3d 1085, 1090–91 (8th Cir. 2020); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *see also Fraternal Ord. of Police Metro. Police Dep't. Lab. Comm. v. District of Columbia*, 290 A.3d 29, 45 (D.C. 2023); *United States v. Rarick*, 636 F. Appx 911, 917 (6th Cir. 2016) (Batchelder, J., concurring in part); *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15–16 (D.D.C. 2018).

Read in the light most favorable to Mr. O'Hara, the Complaint plausibly alleges a deprivation of this clearly established right. At the time of his interaction with Sgt. Beck, Mr. O'Hara was recording the Guard patrol while walking several feet behind them along public streets and sidewalks without interfering with the officers' duties. Compl. ¶¶ 40, 48.  He did not speak to the Guard members, touch them, or record any activities that might require privacy, such as witness interviews, or otherwise interfere with police activities. *Id.* ¶ 40. Given these facts, the First Amendment barred suppression of Mr. O'Hara's ability to continue filming. When Sgt. Beck called MPD to "handle" Mr. O'Hara and they did so, by blocking him from walking behind the Guard and handcuffing him, *id.* ¶¶ 41, 44-46, 54, Mr. O'Hara suffered a violation of his clearly established recording rights.

In addition to filming the Guard, Mr. O'Hara was protesting them by playing the Imperial March Theme; this conduct, too, enjoys clearly established First Amendment protection. In *City of Houston v. Hill*, the Supreme Court recognized a First Amendment right to protest police as they publicly perform their duties, and held that officials may silence such a protest only if it is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." 482 U.S. 451, 461 (1987) (internal citation and quotation marks omitted).

Applying this rule, the Supreme Court has repeatedly held that peacefully protesting public officers does not constitute a clear and present danger even if the protest is loud or hostile. *Hill* itself struck a statute making it unlawful to "abuse or interrupt any policeman in the execution of his duties." *Id.* at 460–61 (cleaned up). Likewise, *Edwards v. South Carolina*, 372 U.S. 229, 233 (1963) held that 187 protestors engaged in protected speech when, while standing on a public sidewalk, they responded to a police dispersal order with fifteen minutes of "boisterous, loud,

flamboyant conduct," including "loudly singing." *See also, e.g.*, *Lewis v. City of New Orleans*, 415 U.S. 130, 132–34 (1974) (holding unconstitutional a law prohibiting using "opprobrious language" toward police); *Cox v. Louisiana*, 379 U.S. 536, 547–51 (1965) (striking breach-of-peace conviction where defendant led loud but "not riotous" demonstration on courthouse grounds).

As plausibly alleged, Mr. O'Hara's conduct falls within the safeguards of these binding decisions. By playing the Imperial March Theme, Mr. O'Hara was engaged in speech, *see Edwards*, 372 U.S. at 233 (music is speech); *United States v. Doe*, 968 F.2d 86, 88–90 (D.C. Cir. 1992) (same), and more specifically protest. Because he remained on public streets and sidewalks at all times, his protest could be terminated only if it presented a clear and present danger, which, under Supreme Court precedent, it did not. Indeed, Mr. O'Hara's protest of the law enforcement officials here was less disruptive than the boisterous, 187-person protest in *Edwards* and less abusive than the conduct proscribed by the statutes in *Hill* and *Lewis*.

Nor did Mr. O'Hara pose a clear and present danger by following the officers as they publicly performed their duties. On top of the binding decisions discussed above, a consensus of persuasive authority holds that protestors need not remain stationary when their targets walk away. The Supreme Court has held that the First Amendment protects the right to follow subjects of protest as they walk away. *McCullen v. Coakley*, 573 U.S. 464, 500 (2014) (Scalia, J., concurring). Likewise, the D.C. Court of Appeals held that the First Amendment protected an individual's right to ride his bicycle behind police officers and swear at them as they questioned and patted down a suspect. *In re W.H.L.*, 743 A.2d 1226, 1228–29 (D.C. 2000). Each of these cases, on its own, clearly establishes Mr. O'Hara's rights here, as does the consensus of persuasive authority holding that the First Amendment protects the right to follow officers. *see* p. 29, *supra* (holding First Amendment protected individuals following officers to record them).

31

Further, Mr. O'Hara's right to protest the Guard is clearly established on a second and independent ground: obviousness. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 462-63. No reasonable officer could have thought otherwise. Nonetheless, Sgt. Beck engaged MPD to prevent Mr. O'Hara from continuing his protest by detaining and handcuffing him. Mr. O'Hara thus suffered a deprivation of his clearly established protest rights.

### 2. O'Hara Plausibly Alleged that Beck Caused a Violation of O'Hara's Clearly Established Fourth Amendment Right to be Free from Unreasonable Seizures.

The Fourth Amendment prohibits the government from conducting unreasonable seizures; since both parties agree that Mr. O'Hara was seized, the only question under the Fourth Amendment is whether that seizure was lawfully initiated. Although different standards apply depending on whether the seizure here was an arrest (for which probable cause is required) or a stop (for which  reasonable suspicion is required), *see Dunaway v. New York*, 442 U.S. 200, 212–16 (1979); *United States v. Cortez*, 449 U.S. 411, 417, n.2 (1981), the Court need not decide here which standard applied, because Sgt. Beck had no "arguable" basis, *Wesby*, 583 U.S. at 65, for even reasonable suspicion, let alone probable cause. Sgt. Beck identifies two statutes that he contends justified the detention, but no reasonable officer could have believed Mr. O'Hara was violating either one, and so Sgt. Beck is not entitled to qualified immunity on the Fourth Amendment claim.

First, Sgt. Beck contends that he reasonably suspected Mr. O'Hara of violating the District's anti-pickpocketing statute but, based on the Complaint's allegations, there was no basis from which Sgt. Beck could even arguably draw such a conclusion. The anti-pickpocketing provision states that "[i]t is unlawful, under circumstances whereby a breach of the peace may be

32

occasioned, to interfere with any person in any public place by jostling against the person, unnecessarily crowding the person, or placing a hand in the proximity of the person's handbag, pocketbook, or wallet." D.C. Code § 22-1321(g). The provision was passed to "prevent pickpocketing by means of physically touching and then stealthily snatching the purse or pocketbook from the victim." *In re A.B.*, 395 A.2d 59, 62 (D.C. 1978). While Sgt. Beck puts great weight on the phrase "unnecessarily crowding," the D.C. Court of Appeals long ago held, due to constitutional concerns about the phrase's subjectivity, that "unnecessarily crowding" was surplusage and means the same thing as "jostling against." *Id.* at 62 n.3. Thus, to violate this provision, someone must have (1) jostled against or pickpocketed another person *and* (2) done so under circumstances where a breach of the peace was likely. Sgt. Beck lacked arguable reasonable suspicion for *either* element, let alone both.

The first element was obviously lacking. Jostling requires making physical contact. *Jones v. United States*, 374 A.2d 854, 856 (D.C. 1977). But the Complaint alleges Mr. O'Hara made no physical contact with officers and provides no basis to infer that he was preparing to do so. Rather, he was playing music, recording, and following the patrol on a public sidewalk, in daylight, for a few minutes—the activities of a satirist or protestor, not a pickpocket or jostler. He was also consistently several feet away from the patrol both before and after being confronted, which was evidence that he did not plan to go near and jostle or pickpocket them.

Sgt. Beck also lacked arguable reasonable suspicion that the second element, a breach of the peace, was forthcoming. Where the breach rests on speech, this element is met only if there is a likelihood that the speech will provoke someone, other than law enforcement, to react violently. *Martinez v. District of Columbia*, 987 A.2d 1199, 1203 (D.C. 2010); *Shepherd v. District of Columbia*, 929 A.2d 417, 418–19 (D.C. 2007). Mr. O'Hara neither acted violently, nor were his

33

words likely to provoke violence. *See W.H.L.*, 743 A.2d at 1228–29, 1229 n.2; *In re M.W.G.*, 427 A.2d 440, 441–43 (D.C. 1981).

Sgt. Beck likewise lacked arguable reasonable suspicion to believe that Mr. O'Hara was violating the second statute he identifies: the District's anti-intimidation law. That statute states, in relevant part, that in public places "it is unlawful for a person to . . . [i]ntentionally or recklessly act in such a manner as to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken." D.C. Code § 22-1321(a)(1). To violate this provision, an individual must have intentionally or recklessly "placed another person in fear of harm to his or her person [or property] (and, as the statute states, the fear must be 'reasonable fear')." *Solon v. United States*, 196 A.3d 1283, 1289 (D.C. 2018).

Nothing in the Complaint suggests that Beck subjectively feared for his person or property. He was with an armed patrol, and he did not try to run, shield himself or his property, or change his behavior. Also, whether he subjectively had such a fear is a disputed fact not to be resolved on a motion to dismiss. *See Crawford-El v. Britton*, 523 U.S. 574, 592–94 (1998).

In any event, such a fear would have been objectively unreasonable. In arguing otherwise, Sgt. Beck substitutes ominous language for the actual facts: according to Beck, from his "on-the-ground perspective, [O'Hara's] combination of close trailing, persistence, auditory distraction, and refusal to disengage could reasonably appear threatening or at least recklessly provocative, particularly in the context of an armed patrol engaged in law-enforcement-support duties." MTD 26. Context matters when looking at the totality of the circumstances, and in this context, Mr. O'Hara wasn't objectively threatening anyone or their property. *See* Compl. ¶¶ 38-51. For one, Beck could see the "close trailing" was for the purpose of exercising his First Amendment rights to record and protest the patrol. If on that basis O'Hara could be reasonably suspected of violating

34

the anti-intimidation provision, that standard would allow almost anyone recording or speaking behind police to be seized—an approach irreconcilable with the First Amendment. *See*, *e.g.*, *Schenck v. Pro-Choice Network of West N.Y.*, 519 U.S. 357, 377–80 (1997) (discretionary floating free speech zones in public forums violate the First Amendment); *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474-81 (8th Cir. 2010) (due to First Amendment concerns, police did not have arguable probable cause to arrest plaintiffs for disorderly conduct, when they were protesting near a mall by dressing up as zombies, playing loud music, walking around, and approaching people).

Nor did the so-called "auditory distraction" suggest a threat. A few minutes of music played in protest and parody did not suggest that Mr. O'Hara was a threat to the patrol's members or property. *See W.H.L.*, 743 A.2d at 1229 n.2 (following behind and swearing at police while they questioned and patted down suspects did not create reasonable suspicion). Further, Mr. O'Hara "persist[ed]" and "refus[ed] to disengage," MTD 26, because Sgt. Beck did not have reasonable suspicion that O'Hara was engaged in criminal activity, so Mr. O'Hara had "a right to ignore [Sgt. Beck] and go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). If "persist[ing]" in exercising constitutional rights were enough to create criminal suspicion, these rights would be terminable at the say-so of any passing officer.

Sgt. Beck's lack of reasonable suspicion was even more obvious considering the limited circumstances in which D.C. law criminalizes disrupting police. The District criminalizes disrupting or distracting police only in cases involving harassment intentionally done to "hinder, delay, prevent or dissuade" individuals from filing criminal reports, seeking arrests, or conducting certain proceedings—not simple patrols. *See D.C. Code* § 22-722(a)(3)–(4); *id.* § 22-1931; *Wynn v. United States*, 48 A.3d 181, 188–91 (D.C. 2012).

In sum, Beck needed arguable reasonable suspicion that someone was engaged in *criminal activity*, not merely in activity that was distracting or provocative. Because the totality of the circumstances reflected only the latter and did not come anywhere close to the former, Beck had no more than an "inchoate and unparticularized suspicion or 'hunch'" that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 27, 30 (1968). Such a hunch could not even arguably provide him with the reasonable suspicion needed to seize O'Hara. And so, by inducing the MPD into seizing him anyway, Beck violated O'Hara's right to be free from unreasonable seizures.

### 3. Defendant Beck Violated Plaintiff O'Hara's Clearly Established Rights by Retaliating Against Him Because of His Protected First Amendment Activities.

Plaintiffs establish First Amendment retaliation claims if they (1) engaged in a First Amendment protected activity, *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); (2) suffered an adverse action, *id.*, i.e., a consequence that "would chill or silence a person of ordinary firmness from future First Amendment activities," *Crawford–El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996), *vacated on other grounds by* 520 U.S. 574 (1998) (cleaned up); and (3) the protected activity was the but for cause of the adverse action, *Aref*, 833 F.3d at 258.

Applying these principles, courts have  put beyond debate that threatening an individual or detaining them without probable cause for First Amendment protected activity is unconstitutional. *See*, *e.g.*, *Green v. City of St. Louis*, 52 F.4th 734, 739 (8th Cir. 2022) (plaintiff plausibly alleged First Amendment retaliation claim against police who tear gassed her as she was to her car following her participation in a protest against police abuse); *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 52–54 (D.D.C. 2013) (holding officer engaged in First Amendment retaliation by threatening to put plaintiff on the list "of crazies" if she continued protesting); *BLM-D.C.*, 544 F. Supp. 3d at 45–46 (plaintiffs plausibly alleged First Amendment retaliation when law enforcement violently dispersed a non-violent protest); *Goodwin v. District of Columbia*, 579 F. Supp. 3d 159, 174

36

(D.D.C. 2022) (plaintiffs who were temporarily detained by police shortly after engaging in a nonviolent protest stated a First Amendment retaliation claim); *Rogers v. L.V. Metro. Police Dep't*, 764 F. Supp. 3d 971, 978 (D. Nev. 2025) (plaintiffs seized by police shortly after loudly playing a song critical of the police stated a retaliation claim).

The Complaint's allegations fall within the ambit of these authorities. Mr. O'Hara plausibly alleged that at the time of his encounter with Sgt. Beck, he was exercising clearly established First Amendment rights to record and protest police for the reasons discussed in Part II.B.1, *supra*. Mr. O'Hara suffered adverse actions when Sgt. Beck threatened him. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 63–72 (1963); *NRA v. Vullo*, 602 U.S. 175, 189–94 (2024); *Hartley*, 918 F. Supp. 2d at 52–54, 57–58. Mr. O'Hara again suffered adverse action when he was detained, *Nieves*, 587 U.S. at 398-99, conduct that, as discussed previously, Sgt. Beck caused, *see* Part II.A, *supra*. Finally, on the facts alleged, Sgt. Beck lacked reasonable suspicion, let alone probable cause, to believe Mr. O'Hara was engaged in crime, *see* Part II.B.2, *supra*, and the timing of both the threat and the arrest make it plausible that Sgt. Beck performed these acts in response to Mr. O'Hara's protected activity, *see* Compl. ¶¶ 41-45, and the same is true for Sgt. Beck's decision to engage MPD, which led to Mr. O'Hara's detainment, *see id.*; *see also Goodwin*, 579 F. Supp. 3d at 174-75 ("[A]t this early stage of the proceedings . . . causation may be inferred . . . when the retaliatory act follows close on the heels of the protected activity."). Thus, Mr. O'Hara has alleged that Sgt. Beck engaged in retaliatory conduct in violation of clearly established law.

Sgt. Beck invokes *Iqbal* to avoid this conclusion, but that case differs sharply from this one. There, the complaint made only conclusory allegations about the defendants' motive. 556 U.S. at 678. Here, by contrast, Mr. O'Hara's conduct immediately before Sgt. Beck's command and engagement of MPD and Sgt. Beck's own statements in issuing the command, combined with

37

the absence of any other plausible rationale, demonstrate that Sgt. Beck was motivated solely by Mr. O'Hara's protected activity. Thus, Mr. O'Hara has plausibly alleged that the order Sgt. Beck made and the arrest he caused were retaliatory, in violation of his clearly established rights.

***

In sum, Mr. O'Hara has plausibly alleged that he suffered violations of his clearly established First and Fourth Amendment rights and that Sgt. Beck either inflicted the deprivation (in the case of the retaliatory order) or caused them (in the case of the others). Mr. O'Hara has thus stated viable claims that overcome qualified immunity.

**CONCLUSION**

For the reasons stated, Sgt. Beck's motion should be denied.

Dated: June 18, 2026

Respectfully submitted,

*/s/ Michael Perloff*
Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
Josh Alpert*
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street NW, Ste. 722
Washington, D.C. 20045
Tel: (202) 457-0800
mperloff@acludc.org

*Admitted in CA; practice supervised by D.C. Bar Members

*Counsel for Plaintiff Sam O'Hara*

38