UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SAM O'HARA,<br><br>              Plaintiff,<br><br>       v.<br><br>DEVON BECK, et al.,<br><br>              Defendants. | Civil Action No. 25-03753 (TJK) |

**DEFENDANT BECK'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS**

## TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ...................................................................................................... iii

Argument ........................................................................................................................ 2

I.    Plaintiff Does Not Plausibly Allege That Beck Acted Under Color of State Law. 2

    A.    The Parties Agree That the Inquiry Turns on the Source of the Authority Exercised in the Challenged Act. ................................................................ 3

    B.    Gubernatorial Consent and Retained Administrative Authority Are Conditions of the Deployment, Not the Source of the Challenged Authority. ............................................................................................... 4

    C.    The National Guard Personnel Decisions Plaintiff Cites Apply the Same Function-Specific Rule and Do Not Support His Theory. .......................... 6

    D.    The Joint Task Force Cases Confirm That Background Home-Agency Authority Is Not Dispositive. ...................................................................... 8

    E.    *Association of Civilian Technicians* and the United States' Filings in *District of Columbia v. Trump* Distinguish State Administrative Authority from Operational Tasking. .......................................................................... 9

    F.    Title 32's Dual Structure and Congress's Treatment of Section 502(f) Duty Confirm the Federal Character of the Challenged Conduct ............. 11

    G.    Section 502(f) Embodies No Remedial Bargain, and Plaintiff's Rule Would Predicate Liability on Home-State Affiliation Alone. .................. 13

II.    Sergeant Beck is Entitled to Qualified Immunity Because the Complaint Does Not Allege That He Personally Violated or Caused a Violation of Plaintiff's First or Fourth Amendment Rights. ................................................................................... 14

    A.    Sergeant Beck's Warning and Call Were Not Themselves a Seizure or Suppression of Speech. ................................................................................ 14

    B.    The Complaint Does Not Plausibly Allege That Sergeant Beck Procured MPD's Detention. ...................................................................................... 15

    C.    The Failure-to-Intervene Allegation Does Not State a Claim. ................. 19

III.    Qualified Immunity Bars Each Claim Against Sergeant Beck Because He Did Not Violate Clearly Established Law. ....................................................................... 20

A.    No Clearly Established Law Made Sergeant Beck's Warning or Call Unconstitutional. ........................................................................................ 20

B.    No Clearly Established Law Required Sergeant Beck to Abstain From Contacting MPD. ......................................................................................... 24

Conclusion ............................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Biden*,
   70 F.4th 817 (5th Cir. 2023) ........................................................................ 11

*Amobi v. D.C. Dep't of Corrections*,
   755 F.3d 980 (D.C. Cir. 2014) ...................................................................... 19

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ...................................................................................... 21

*Aref v. Lynch*,
   833 F.3d 242 (D.C. Cir. 2016) ...................................................................... 15

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ...................................................................................... 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................ 14, 15, 16, 17, 18

*Askew v. Bloemker*,
   548 F.2d 673 (7th Cir. 1976) .......................................................................... 8

*Ass'n of Civilian Technicians, Inc. v. United States*,
   603 F.3d 989 (D.C. Cir. 2010) .................................................................. 9, 10

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ........................................................................................ 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................ 5

*Big Cats of Serenity Springs, Inc. v. Rhodes*,
   843 F.3d 853 (10th Cir. 2016) ...................................................................... 12

*Black Lives Matter D.C. v. Trump*,
   544 F. Supp. 3d 15 (D.D.C. 2021) ................................................................ 22

*California v. Hodari D.*,
   499 U.S. 621 (1991) ........................................................................................ 4

*Cameron v. Thornburgh*,
   983 F.2d 253 (D.C. Cir. 1993) ...................................................................... 15

*Camreta v. Greene*,
   563 U.S. 692 (2011) ...................................................................................... 24

*Carey v. Cont'l Airlines, Inc.*,
   823 F.2d 1402 (10th Cir. 1987) ................................................................ 17–18

*City of Houston v. Hill*,
  482 U.S. 451 (1987) ........................................................................................... 22

*City of Tahlequah v. Bond*,
  595 U.S. 9 (2021) .............................................................................................. 20

*Clark v. Library of Congress*,
  750 F.2d 89 (D.C. Cir. 1984) ............................................................................ 17

*Daniel v. Ferguson*,
  839 F.2d 1124 (5th Cir. 1988) .......................................................................... 17

*District of Columbia v. Trump*,
  No. 25-5418, 2025 U.S. App. LEXIS 32987 (D.C. Cir. Dec. 17, 2025)................... 4–5, 10–11

*District of Columbia v. Wesby*,
  583 U.S. 48 (2018) ............................................................................... 2, 20, 22

*Edwards v. South Carolina*,
  372 U.S. 229 (1963) .......................................................................................... 22

*Fernandors v. District of Columbia*,
  382 F. Supp. 2d 63 (D.D.C. 2005) ................................................................... 19

*Fields v. City of Philadelphia*,
  862 F.3d 353 (3d Cir. 2017) ............................................................................. 22

*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011) .............................................................................. 22

*Gonzalez v. Trevino*,
  602 U.S. 653 (2024) .......................................................................................... 24

*Goodwin v. District of Columbia*,
  579 F. Supp. 3d 159 (D.D.C. 2022) ................................................................. 23

*Green v. City of St. Louis*,
  52 F.4th 734 (8th Cir. 2022) ............................................................................. 22

*Hartley v. Wilfert*,
  918 F. Supp. 2d 45 (D.D.C. 2013) ................................................................... 23

*Hartman v. Moore*,
  547 U.S. 250 (2006) .......................................................................................... 24

*Henry v. Essex Cnty.*,
  113 F.4th 355 (3d Cir. 2024) ............................................................................... 6

*Holley v. United States*,
  No. 24-1536 (LLA), 2025 U.S. Dist. LEXIS 11350 (D.D.C. Jan. 22, 2025) ........................... 4

*In re W.H.L.*,
    743 A.2d 1226 (D.C. 2000) ................................................................................... 23

*Int'l Action Ctr. v. United States*,
    365 F.3d 20 (D.C. Cir. 2004) ............................................................................... 20

*Jakuttis v. Town of Dracut*,
    95 F.4th 22 (1st Cir. 2024) ..................................................................................... 6

*Johnson v. Gov't of the Dist. of Columbia*,
    734 F.3d 1194 (D.C. Cir. 2013) .......................................................................... 4, 5

*Johnson v. Orr*,
    780 F.2d 386 (3d Cir. 1986) ................................................................................... 6

*King v. United States*,
    917 F.3d 409 (6th Cir. 2019) .............................................................................. 6, 8

*Knutson v. Wis. Air Nat'l Guard*,
    995 F.2d 765 (7th Cir. 1993) ................................................................................. 6

*Lewis v. City of New Orleans*,
    415 U.S. 130 (1974) ............................................................................................. 22

*Lewis v. Clarke*,
    581 U.S. 155 (2017) ............................................................................................. 10

*Lindke v. Freed*,
    601 U.S. 187 (2024) .................................................................................. 3, 4, 7, 13

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) ............................................................................................ 4, 5

*Malley v. Briggs*,
    475 U.S. 335 (1986) ............................................................................................. 19

*Mont. Med. Ass'n v. Knudsen*,
    119 F.4th 618 (9th Cir. 2024) ............................................................................... 12

*NeSmith v. Fulton*,
    615 F.2d 196 (5th Cir. 1980) ................................................................................. 6

*New Orleans-Belize Royal Mail & Cent. Am. S.S. Co. v. United States*,
    239 U.S. 202 (1915) ............................................................................................... 7

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ............................................................................................. 24

*NRA v. Vullo*,
    602 U.S. 175 (2024) ............................................................................................. 23

*O'Connor v. Eubanks,*
  83 F.4th 1018 (6th Cir. 2023) ........................................................................ 22

*Ord v. District of Columbia,*
  587 F.3d 1136 (D.C. Cir. 2009) ...................................................................... 19

*Perpich v. Dep't of Def.,*
  496 U.S. 334 (1990) ........................................................................................ 11

*Price v. Garland,*
  45 F.4th 1059 (D.C. Cir. 2022) ...................................................................... 22

*Reichle v. Howards,*
  566 U.S. 658 (2012) ........................................................................................ 24

*Schultz v. Wellman,*
  717 F.2d 301 (6th Cir. 1983) ............................................................................ 6

*Settles v. U.S. Parole Comm'n,*
  429 F.3d 1098 (D.C. Cir. 2005) ...................................................................... 13

*Sherrod v. McHugh,*
  334 F. Supp. 3d 219 (D.D.C. 2018) ................................................................ 19

*Thai v. County of Los Angeles,*
  127 F.4th 1254 (9th Cir. 2025) .......................................................................... 8

*Torres v. Madrid,*
  592 U.S. 306 (2021) ................................................................................... 14, 24

*United States ex rel. Gillett v. Dern,*
  74 F.2d 485 (D.C. Cir. 1934) .......................................................................... 11

*West v. Atkins,*
  487 U.S. 42 (1988) ....................................................................................... 3, 12

*Williams v. United States,*
  396 F.3d 412 (D.C. Cir. 2005) ................................................................ 4, 5, 13

*Wood v. Moss,*
  572 U.S. 744 (2014) ........................................................................................ 21

*Yassin v. Weyker,*
  39 F.4th 1086 (8th Cir. 2022) ............................................................................ 6

*Youngbey v. March,*
  676 F.3d 1114 (D.C. Cir. 2012) ...................................................................... 23

*Zahrey v. Coffey,*
  221 F.3d 342 (2d Cir. 2000) ............................................................................ 18

**Statutes**

18 U.S.C. § 1385 ...................................................................................................... 13

28 U.S.C. § 2671 ...................................................................................................... 11

32 U.S.C. § 328 .......................................................................................................... 4

32 U.S.C. § 502 ............................................................................................... 4, 11, 13

42 U.S.C. § 1983 ................................................................... 1, 3, 6, 7, 11, 13, 20

Act of June 18, 1878, ch. 263, § 15, 20 Stat. 152

Pub. L. No. 88-621, § 1(1), 78 Stat. 999

Pub. L. No. 109-364, § 525(c), 120 Stat. 2195

**Other**

Restatement (Second) of Torts § 877............................................................................ 17

For several weeks in the summer of 2025, Plaintiff followed armed National Guard patrols through the District at close distance and posted the videos to TikTok. On September 11, 2025, Sergeant Beck responded to the fourth installment in the only way his mission allowed—he warned Plaintiff and when Plaintiff kept following, he called the Metropolitan Police Department ("MPD"). He never touched Plaintiff, never blocked him, never arrested him. Indeed, he could not have arrested him; the mission forbade it. MPD officers arrived, apparently formed their own judgments, detained Plaintiff for roughly twenty minutes, and released him without charges.

Plaintiff now asks this Court to hold that a phone call was a constitutional tort. And not just any constitutional tort. Because Plaintiff concedes he "did not raise a *Bivens* claim" and sued "solely under 42 U.S.C. § 1983 for conduct arising under color of state law," Pl.'s Opp'n to Def. Beck's Mot. to Dismiss ("Opp.") at 9, he must establish that a National Guardsman—standing on a Washington sidewalk, on a mission the President requested, the Secretary of Defense directed, federal funds paid for, and a federal task force ran—wielded the sovereign authority of the State of Ohio when he dialed the District's own police department.

He cannot. Sergeant Beck enforced no Ohio statute, exercised no Ohio police power, and invoked no authority Ohio conferred. Ohio's only operational contribution to this encounter, on Plaintiff's own pleading, was to disclaim the sole power whose exercise might have resembled state law enforcement—the power to arrest. Compl. (ECF No. 1) ¶ 24. What Plaintiff offers instead is status. Ohio consented to the deployment, retained administrative and disciplinary authority, and described mission limits the Secretary of Defense imposed. Yet, those are the terms on which state personnel join nearly every cooperative federal operation; the city cop deputized as an FBI task-force agent has a local human resources office too. On the question the parties agree is

dispositive—the source of the authority exercised in the challenged act—the opposition is silent, because every accurate answer is federal.

Causation fails just as plainly. The Complaint never alleges what Sergeant Beck said on the call, that he reported anything false, that he requested a detention, or that he held any authority over the MPD officers or their actions. Plaintiff claims the innocent account would be an "astonishing coincidence." Opp. at 24. It is no coincidence. It is the protocol, drawn from his own incorporated materials, which instructed Task Force personnel to call 9-1-1 and left every investigation and arrest decision to MPD. Doane Decl. (ECF No. 22-1) ¶¶ 7, 14. The Complaint pleads that Beck was "[a]dhering to" that very directive when he called. Compl. (ECF No. 1) ¶ 44. Police answering a police call and then exercising apparently independent judgment is not a suspicious sequence. It is the system working as Plaintiff himself described it.

Finally—and most obviously—qualified immunity independently ends the matter. Plaintiff litigates at a high level of generality, invoking the rights to record, to protest, and to be free from unreasonable seizure, even though the governing legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). No decision holds that a Guard member violates the Constitution by calling the police. Every case Plaintiff musters involves an official who himself arrested, dispersed, threatened sanctions, or used force. None involves a caller.

The claims against Sergeant Beck should be dismissed.

## ARGUMENT

### I. <u>Plaintiff Does Not Plausibly Allege That Beck Acted Under Color of State Law.</u>

Plaintiff's opposition narrows this case in a key respect that bears emphasis. Having disclaimed any *federal* cause of action, Plaintiff also abandons any theory that Sergeant Beck acted under color of District law. He devotes not a line to defending it. Instead, he brushes aside Sergeant

Beck's showing that the Complaint fails to identify any District-conferred authority as "irrelevant," insisting that "action under color of Ohio law falls within § 1983's ambit" and that his conduct "is attributable to Ohio." Opp. at 11. Every argument that follows in his brief is built on that premise—Ohio's consent, Ohio's chain of command, Ohio's disciplinary authority, Ohio's power to withdraw its forces. Opp. at 11–20. Plaintiff has thus staked his Section 1983 claim entirely on the proposition that *Ohio law* somehow supplied the authority Sergeant Beck exercised when he telephoned the District's police department.

The nature of the authority Beck exercised is the only question before the Court, and Plaintiff has not answered it. The parties agree on the governing test. The dispute is whether Plaintiff has plausibly alleged that the challenged act—a call to MPD, placed while on a federally requested, federally funded, and federally tasked mission, and in accordance with a protocol that forbade Guard members from enforcing the law themselves—drew its authority from the State of Ohio. Nothing in the Complaint, and nothing in the opposition, identifies an Ohio statute, an Ohio order, or an Ohio-conferred power that Sergeant Beck exercised or purported to exercise. What Plaintiff offers instead are the terms on which Ohio personnel joined a federal operation. Those terms describe how Sergeant Beck came to be on the Task Force. They say nothing about the authority he wielded once he was there.

A.     **The Parties Agree That the Inquiry Turns on the Source of the Authority Exercised in the Challenged Act.**

Section 1983 reaches only a person who, "under color of" state or District law, subjects another to a deprivation of federal rights. 42 U.S.C. § 1983. The requirement is function-specific. An official acts under color of state law only when the challenged conduct involves authority "possessed by virtue of state law" and purportedly exercised in the act at issue. *West v. Atkins*, 487 U.S. 42, 49 (1988); *Lindke v. Freed*, 601 U.S. 187, 198–204 (2024) (requiring both actual state

authority over the particular matter and a purported exercise of that authority). The particular conduct challenged must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). And when an official operates within overlapping federal and state structures, the D.C. Circuit asks one question: what was the source of the authority the officer exercised when he allegedly violated the plaintiff's rights? *Williams v. United States*, 396 F.3d 412, 414–15 (D.C. Cir. 2005); *Johnson v. Gov't of the Dist. of Columbia*, 734 F.3d 1194, 1200 (D.C. Cir. 2013). Title, appearance, or employment may inform that inquiry, but they cannot replace the exercise of state authority. *Lindke*, 601 U.S. at 199–202.

Plaintiff does not quarrel with that framing. He concedes that "the dispositive question is what sovereign or sovereigns supplied the 'source of [the defendant's] authority when [he] allegedly violated [the plaintiff's] rights.'" Opp. at 10 (quoting *Holley v. United States*, No. 24-1536 (LLA), 2025 U.S. Dist. LEXIS 11350, at *12–14 (D.D.C. Jan. 22, 2025)). Nevertheless, Plaintiff answers the source-of-authority question by pointing to everything except the challenged act. He points to Governor DeWine's consent to the deployment, Ohio's retained administrative command, Ohio's exclusive disciplinary authority, and Ohio's power to limit or withdraw its forces. Opp. at 11–18. Each of those facts describes the terms on which Sergeant Beck arrived in the District. None describes the authority he exercised—or even purported to exercise—when he called MPD.

**B.    Gubernatorial Consent and Retained Administrative Authority Are Conditions of the Deployment, Not the Source of the Challenged Authority.**

Plaintiff's lead theory is that because Congress gave Governor DeWine the "final decision" whether Ohio Guard members would deploy, Ohio necessarily "grant[ed] Sgt. Beck the powers he abused." Opp. at 14. The premise is partially correct, but the conclusion does not follow. Congress did make gubernatorial consent the gateway to Section 502(f) duty. 32 U.S.C. §§ 328(a),

502(f)(2)(A); *District of Columbia v. Trump*, No. 25-5418, 2025 U.S. App. LEXIS 32987, at \*28 (D.C. Cir. Dec. 17, 2025) (per curiam) (granting stay pending appeal). But a gatekeeping role is not an operational one, and a prerequisite to deployment is not the source of the authority allegedly misused. *Williams*, 396 F.3d at 414–15 (rejecting Section 1983 liability where the District did not cloak the federal officer with the authority he exercised). On Plaintiff's logic, every act by every officer on every cooperative operation would be attributable to whichever sovereign held the power to say "no" at the outset. The case law squarely forecloses that approach, which would substitute a but-for test of participation for the fair-attribution test the Supreme Court prescribes. *Lugar*, 457 U.S. at 937; *Williams*, 396 F.3d at 414–15.

Ohio's retained disciplinary authority argument fares no better. Plaintiff insists that "only his state bosses could terminate or discipline him," Opp. at 15, and that this "incentive structure ties Sgt. Beck's conduct to Ohio," Opp. at 16. But a sovereign's after-the-fact ability to discipline a service member does not transform every field act into an exercise of that sovereign's law. *Johnson* is fully consistent with this. There, the D.C. Circuit held that a Superior Court marshal acted under color of federal law because the essential elements of his position were federal. 734 F.3d at 1199–1201. The court did not hold that whichever sovereign wields disciplinary or removal power thereby colors every act the official takes; it examined the authority exercised in the challenged conduct. *Id.* at 1200. Here, that authority was federal at every step—the President initiated the mission, the Secretary of Defense issued the employment guidance, Joint Task Force– District of Columbia ("JTF-DC") assigned all tasks to out-of-district forces, and the mission's rules directed Guard members to call law enforcement rather than act themselves. Compl. (ECF No. 1) ¶¶ 17–18; Doane Decl. (ECF No. 22-1) ¶¶ 4, 9, 14; Sec'y Def. Employment Guidance Mem. (ECF No. 22-2) at 1–3.

Plaintiff's theory is also contrary to established precedent and would vastly expand the scope of Section 1983 liability. Courts of appeals have consistently held that deputized local officers assigned to federal task forces act under color of federal law. *See, e.g.*, *Yassin v. Weyker*, 39 F.4th 1086, 1088–91 (8th Cir. 2022) (deputized police officer investigating federal crimes acted under color of federal law); *Jakuttis v. Town of Dracut*, 95 F.4th 22, 29 (1st Cir. 2024) (state trooper deputized by DEA acted under color of federal law); *Henry v. Essex Cnty.*, 113 F.4th 355, 360 (3d Cir. 2024) (state law enforcement officers deputized to serve as Deputy U.S. Marshals not liable under Section 1983 despite "arguably mixed . . . authority"); *King v. United States*, 917 F.3d 409, 433 (6th Cir. 2019) (federally deputized state detective acted under color of federal law where state neither "authoriz[ed]" nor "managed" the operation), *rev'd on other grounds sub nom. Brownback v. King*, 592 U.S. 209 (2021). This is true even though those officers answer to a state home agency for pay, promotion, and discipline, and each serves at the sufferance of a state home agency that could recall him tomorrow. If retained state home-agency discipline sufficed, the color-of-law inquiry would collapse into an employment inquiry—precisely what *West*, *Lindke*, and *Williams* forbid.

C.       **The National Guard Personnel Decisions Plaintiff Cites Apply the Same Function-Specific Rule and Do Not Support His Theory.**

Plaintiff leans heavily on decisions holding that state Guard officials acted under color of state law when discharging or disciplining Guard members. Opp. at 13–14 (citing *Johnson v. Orr*, 780 F.2d 386, 392–93 (3d Cir. 1986); *NeSmith v. Fulton*, 615 F.2d 196, 199–200 (5th Cir. 1980); *Schultz v. Wellman*, 717 F.2d 301, 304–05 (6th Cir. 1983); *Knutson v. Wis. Air Nat'l Guard*, 995 F.2d 765, 767–68 (7th Cir. 1993)). Those cases are the paradigm of the function-specific approach Sergeant Beck advances. In each, the challenged act was itself an exercise of authority that federal law commits to state officers—namely, the termination or discipline of a state Guard member. The

courts asked what authority the defendant exercised in the challenged act, found that it was quintessentially state personnel authority, and attributed the act to the State accordingly. What those cases do not hold—and what Plaintiff needs them to hold—is that a Guard member acts under color of state law whenever he performs any field task on a federally requested mission. The challenged act here was not a Guard personnel action, a militia disciplinary decision, or the enforcement of any Ohio statute. It was a call to the District's police during a federally tasked patrol, on a mission in which no Ohio official held tasking authority. To the contrary, operational direction ran through JTF-DC and the Commanding General of the D.C. National Guard, and participating members complied with that command's rules for the use of force and rules of conduct. Mem. of Understanding ("MOU") (ECF No. 22-4) §§ 3.2, 3.5; Doane Decl. (ECF No. 22-1) ¶ 9.

Plaintiff's reliance on the common-law "loaned servant" doctrine, Opp. at 14 (citing *New Orleans-Belize Royal Mail & Cent. Am. S.S. Co. v. United States*, 239 U.S. 202, 206 (1915)), is misplaced and does nothing to resolve the color-of-law inquiry. Even as an analogy, that doctrine addresses a fundamentally different question—who controlled the manner and means of a worker's performance. Section 1983, by contrast, asks what sovereign authority the official possessed and purported to exercise in the challenged conduct. *See Lindke*, 601 U.S. at 198–204. These are not interchangeable inquiries. Factors such as employment control, disciplinary authority, or recall power may provide context, but they do not themselves establish the source of the legal authority allegedly misused. Here, the conduct at issue was not an exercise of Ohio-conferred police power or an Ohio personnel decision. It was a phone call made in the course of a federally requested mission, carried out under operational guidance that expressly reserved law-enforcement decision-making authority to MPD.

**D.     The Joint Task Force Cases Confirm That Background Home-Agency Authority Is Not Dispositive.**

Hybrid federal-state operational arrangements are not unusual. Federal law enforcement routinely operates through cooperative structures—FBI Joint Terrorism Task Forces, U.S. Marshals fugitive task forces, DEA state-and-local task forces, health-care fraud strike forces, and many others—that combine federal authority and federal supervision with state or local personnel. Those programs routinely depend on home agencies approving their personnel's participation and retaining ordinary employment authority over pay, discipline, recall, and promotion. Yet the color-of-law inquiry has never turned on those background incidents of home-agency authority. It turns on the source of the authority exercised in the challenged conduct.

*Thai v. County of Los Angeles*, 127 F.4th 1254 (9th Cir. 2025), makes the point in terms that map directly onto this case. The Ninth Circuit acknowledged that state and local entities helped authorize and administer the task force at issue, that the officers remained local investigators who drew county paychecks (later federally reimbursed), carried local identification, and followed some local procedures—yet held that they acted under color of federal law because the challenged conduct occurred in a federally implemented operation, under federal day-to-day supervision, and pursuant to federal authority. *Id.* at 1258–64. The court expressly distinguished the State's role in "authorizing or administering the task force" from the federal government's role in "manag[ing] the operation with the benefit of state resources." *Id.* at 1260. *Askew v. Bloemker*, 548 F.2d 673 (7th Cir. 1976), is stronger still. In that case, the Seventh Circuit concluded that local badges, accountability to local police supervisors, and local payroll mechanics did not make a federally instigated, federally directed raid state action, because the operative enforcement authority was federal. *Id.* at 677–78; *see also King v. United States*, 917 F.3d 409, 432–33 (6th Cir. 2019), *rev'd on other grounds sub nom. Brownback v. King*, 592 U.S. 209 (2021).

Plaintiff's attempted distinction—that in *Thai* the plaintiffs "provide[d] no evidence that 'the authority of the state was exerted in enforcing the law,'" Opp. at 19—is not a distinction. It is the holding Sergeant Beck invokes. In those cases, as here, the plaintiffs pointed to state home-agency authorization, employment, identification, and discipline; in those cases, as here, none of it showed that state authority was exerted in the challenged conduct. And at the pleading stage the burden is Plaintiff's—he must plausibly allege, not hope to discover, that Ohio's authority was exercised in the act he challenges. His suggestion that the question "must await discovery," Opp. at 17, has the matter backwards. State action is an element of his claim, and the operational structure of this mission is established by the very materials his own Complaint quotes and incorporates—the Doane declaration and the Secretary of Defense's employment guidance. Compl. (ECF No. 1) ¶ 26 & n.9; Def. Beck's Mem. Supp. Mot. Dismiss (ECF No. 22) at 3 n.1.

E.   ***Association of Civilian Technicians* and the United States' Filings in *District of Columbia v. Trump* Distinguish State Administrative Authority from Operational Tasking.**

Plaintiff's reliance on *Ass'n of Civilian Technicians, Inc. v. United States*, 603 F.3d 989 (D.C. Cir. 2010), rests on a category error. The "day-to-day operations" as to which "the United States has chosen to defer to the state authorities," *id.* at 994, were the state Guard's daily administrative duties and "individual membership"—the case concerned whether the Army Board for Correction of Military Records could order, or only recommend, reinstatement of discharged Puerto Rico Guard members. *Id.* A decision about who controls state Guard *personnel administration* says nothing about who supplied the authority for street-level conduct on a federally tasked law-enforcement-support mission. If anything, *Association of Civilian Technicians* reinforces the line that runs through this entire body of law—namely that state authority governs the Guard's internal administration, while the federal mission governs the Guard's federally requested operations.

The United States' filings in *District of Columbia v. Trump* draw exactly the same line, and Plaintiff cannot convert them into a concession. Colonel Doane explained that JTF-DC exercised "coordinating and tasking authority" over out-of-district forces, that "[a]ll out-of-district forces are assigned tasks by JTF-DC," and that sending States retained administrative command, disciplinary authority, and the power to limit or withdraw their forces. Doane Decl. (ECF No. 22-1) ¶ 9. The same declaration explained that JTF-DC personnel were instructed to call 9-1-1 upon witnessing a crime, a person in distress, or an emergency requiring a police response, and that MPD—not Guard personnel—would decide whether to investigate and arrest. *Id.* ¶¶ 7, 14. The memorandum of understanding provides that sending units remained under their home Adjutants General while the receiving command retained tactical control and provided operational direction for mission accomplishment, including rules for the use of force and rules of conduct. MOU (ECF No. 22-4) §§ 3.2, 3.5. Administrative command in the sending State; operational tasking in the federal mission. That is Sergeant Beck's position, not a contradiction of it.

Finally, Plaintiff's suggestion that "the Department of Justice seeks to avoid" a particular result here, Opp. at 12, conflates the United States' institutional position with the personal liability at issue in this individual-capacity action. In such an action, the officer—not the sovereign—is the real party in interest. *Lewis v. Clarke*, 581 U.S. 155, 162–63 (2017). The United States' prior filings remain relevant insofar as they describe the mission's command structure, but they reveal no inconsistency. Those filings distinguish the sending State's administrative command and disciplinary authority from JTF-DC's coordinating and tasking authority and the supported agencies' responsibility for investigation and arrest decisions. That is the same distinction Sergeant Beck advances here.

**F.**    **Title 32's Dual Structure and Congress's Treatment of Section 502(f) Duty Confirm the Federal Character of the Challenged Conduct.**

Congress's treatment of Section 502 duty further confirms that Title 32 service cannot be reduced to purely state action. The Federal Tort Claims Act expressly defines as an "employee of the government" any National Guard member engaged in training or duty under 32 U.S.C. § 502. 28 U.S.C. § 2671. While that designation does not itself resolve the distinct Section 1983 color-of-law inquiry, it powerfully illustrates that Congress has recognized Guard members performing Section 502 duty as federal employees for purposes of liability. That statutory judgment undercuts Plaintiff's attempt to characterize Title 32 service as exclusively state in nature.

Plaintiff's appeal to "blackletter" statements that non-federalized Guard members remain under state control, Opp. at 14–15 (citing *Perpich v. Dep't of Def.*, 496 U.S. 334, 349 (1990); *United States ex rel. Gillett v. Dern*, 74 F.2d 485, 487 (D.C. Cir. 1934); *Abbott v. Biden*, 70 F.4th 817, 829 (5th Cir. 2023)), proves only what no one disputes: Ohio never surrendered command of its Guard, and Sergeant Beck was never federalized under Title 10. But command relationships and color of law are distinct inquiries. *Perpich* itself rests on the dual-enlistment structure under which Guard members are simultaneously members of their state militia and of a reserve component of the federal armed forces. 496 U.S. at 345–46. Section 502(f) duty is precisely the setting in which that federal membership is engaged—the member supports "operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense," in federal status and at federal expense. *Trump*, 2025 U.S. App. LEXIS 32987, at *19–20 (quoting 32 U.S.C. § 502(f)(2)(A)). That a State retains its chain of command over members performing a federal mission describes Title 32's architecture; it does not convert federally tasked mission conduct into an exercise of Ohio law. *See* Parts I.B–I.D, *supra*.

- 11 -

The suggestion that Sergeant Beck could have acted under color of *both* state and federal law is also without merit. Finding little support for this outlier proposition, Plaintiff relies on forty-year-old dicta from two out-of-circuit cases. *See* Opp. at 16–17. The D.C. Circuit has never held that a government official can simultaneously act under color of both state and federal law, and there is good reason for this. Because color of law is rooted in authority, and any given law enforcement action will ultimately trace its authority back to a single source of law, it follows that officers can only be acting under color of federal or state law, not both. *Cf. West*, 487 U.S. at 49 ("The traditional definition of acting under color of state law requires that the defendant in a Section 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"). As explained, Sergeant Beck was exercising federal authority as part of a federal mission at the time he called MPD.

Even if an officer could exercise authority from multiple sources in a single act, federal law is superior to state law and thus displaces it in case of conflict. *Cf. Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 623 (9th Cir. 2024) ("If state laws conflict with federal law, they are preempted and of no effect."). The supremacy of federal authority thus creates a strong presumption that federal officers are acting only under color of federal law. *See Big Cats of Serenity Springs, Inc. v. Rhodes,* 843 F.3d 853, 870 n.8 (10th Cir. 2016) (there is a "presumption that where federal and state actors come together, they are acting pursuant to supreme law"). Plaintiff's allegations come nowhere near overcoming that presumption. Indeed, Plaintiff has not plausibly alleged that a particular event—the challenged act—drew on Ohio authority; the dual-status cases finding state action did so only because the challenged act was an exercise of state personnel power. *See* Part I.C, *supra*. Plaintiff identifies no Ohio law, no Ohio order, and no Ohio-conferred power that Sergeant Beck exercised—or even purported to exercise—when he called

the District's police. *Lindke*, 601 U.S. at 198. To the contrary, Plaintiff's own allegations establish that Ohio affirmatively disclaimed the only authority whose exercise might resemble state law enforcement: the authority to arrest. Compl. (ECF No. 1) ¶ 24. Plaintiff cannot transform a limitation on Ohio Guard authority into an Ohio-law source of seizure authority. See *Williams*, 396 F.3d at 414–15.

> ### G.   Section 502(f) Embodies No Remedial Bargain, and Plaintiff's Rule Would Predicate Liability on Home-State Affiliation Alone.

Plaintiff's account of Section 502(f) as a grand "federalism bargain"—Posse Comitatus relief in exchange for Section 1983 exposure—overstates both the statute and its history. The Posse Comitatus Act was enacted in 1878; Section 502(f) was added in 1964; and the broad request language of Section 502(f)(2)(A) did not arrive until 2006. 18 U.S.C. § 1385; Act of June 18, 1878, ch. 263, § 15, 20 Stat. 152; Pub. L. No. 88-621, § 1(1), 78 Stat. 999; Pub. L. No. 109-364, § 525(c), 120 Stat. 2195. Section 502 sits in Title 32's training chapter under the caption "Required drills and field exercises," and Section 502(f) authorizes "training or other duty," including support for operations or missions requested by the President or the Secretary of Defense. 32 U.S.C. § 502(f). Nothing in that spare text enacts a remedial trade under which every Guard member on a federally requested mission becomes individually liable under Section 1983. And Plaintiff's plea that Sergeant Beck "must take the bitter with the sweet," Opp. at 12, is not a canon of statutory construction. Section 1983's coverage is fixed by its text—action under color of state law—not by a litigant's assessment of whether some other remedy ought to exist. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104, 1106–07 (D.C. Cir. 2005).

Plaintiff's contrary rule would also produce irrational distinctions. A District of Columbia Guard member and an Ohio Guard member standing side by side on the same Task Force, performing the same federally coordinated mission, subject to the same federal employment

guidance, and dialing the same MPD dispatch system would face different constitutional damages regimes based solely on home-state affiliation. That result would follow not from the source of the authority used in the challenged act, but from the identity of the service member's sending jurisdiction. The Court should decline Plaintiff's invitation to adopt an affiliation-based rule that no court has embraced.

**II.    Sergeant Beck is Entitled to Qualified Immunity Because the Complaint Does Not Allege That He Personally Violated or Caused a Violation of Plaintiff's First or <u>Fourth Amendment Rights.</u>**

**A.      Sergeant Beck's Warning and Call Were Not Themselves a Seizure or Suppression of Speech.**

Plaintiff's suppression theory fails because Sergeant Beck suppressed nothing. Plaintiff continued recording and playing music after Beck's statement. Compl. (ECF No. 1) ¶¶ 41–44. The acts that ended the protest—blocking Plaintiff's path, ordering him to remain, handcuffing him, and detaining him—were performed by MPD officers. *Id*. ¶¶ 45–62. Nor do the pleaded facts support Plaintiff's motive theory. Sergeant Beck's alleged statement—"if you're going to keep following us, we can contact Metro PD and they can come handle you if that's what you want to do"—was directed at Plaintiff's persistent following of an armed patrol, not the content of the Star Wars music or Plaintiff's views about the deployment. *Id*. ¶ 41. The allegation that Beck was "not amused" by the satire, *id*. ¶ 3, is a conclusory motive label the Court need not accept where the pleaded facts are more plausibly consistent with a lawful concern about persistent close following. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–82 (2009).

The Fourth Amendment claim fails for the same structural reason. A seizure occurs when an officer, by physical force or a show of authority, restrains a person's liberty. *Torres v. Madrid*, 592 U.S. 306, 317–18 (2021); *California v. Hodari D.*, 499 U.S. 621, 626–29 (1991). Plaintiff does not allege that Sergeant Beck touched him, blocked him, ordered him to stop, or otherwise

restrained him. Compl. (ECF No. 1) ¶¶ 40–62. A call to the police does not itself restrain liberty. And Plaintiff's arguments that the responding officers lacked reasonable suspicion or probable cause, Opp. at 32–35, go to MPD's conduct, not Sergeant Beck's.

The retaliation count adds nothing. Its elements require protected activity, an adverse action sufficient to deter a person of ordinary firmness, and but-for causation. *Aref v. Lynch*, 833 F.3d 242, 258–59 (D.C. Cir. 2016). The alleged adverse action—detention and handcuffing—was performed by MPD, Compl. (ECF No. 1) ¶¶ 45–62; but-for causation fails for the reasons stated below; and the claim fails under qualified immunity, as explained in Part III, in any event.

### B.      The Complaint Does Not Plausibly Allege That Sergeant Beck Procured MPD's Detention.

Even if Plaintiff could establish state action, each federal claim would still fail because the Complaint does not plausibly allege that Sergeant Beck's own conduct caused the alleged First or Fourth Amendment injuries. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677; *see Cameron v. Thornburgh*, 983 F.2d 253, 258 (D.C. Cir. 1993). What the Complaint does not allege is telling. It does not allege what Sergeant Beck said during the call. It does not allege that he asked officers to detain Plaintiff, reported a crime falsely, signed anything, directed anyone, or possessed a shred of authority over the responding officers. Compl. (ECF No. 1) ¶¶ 41–62.

Plaintiff attempts to bridge that gap with a single inferential allegation: that Beck's pre-call statements and MPD's post-call conduct "indicate" that Beck instructed the officers to detain him. Compl. (ECF No. 1) ¶ 46. That is a "naked assertion devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (cleaned up). Facts that are "merely consistent with" liability "stop[] short of the line between possibility and plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). And where the pleading and its incorporated materials supply an "obvious alternative explanation"

for the defendant's conduct, the inference of unlawful conduct is not plausible. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). Here, the alternative explanation is the protocol Plaintiff himself pleaded. Task Force personnel were instructed to call 9-1-1 when a police response appeared warranted, after which MPD would respond and make its own investigation and arrest decisions. Doane Decl. (ECF No. 22-1) ¶¶ 7, 14. Governor DeWine said the same thing publicly, in the very statement Plaintiff quotes: if an arrest had to be made, the Guard "will be in direct contact with the D.C. police department who will make arrests." Compl. (ECF No. 1) ¶ 24.

Plaintiff argues it would be an "astonishing coincidence" if MPD detained him "without Sgt. Beck having induced them to do just that," Opp. at 24, and that there is an "absence of any other plausible rationale," Opp. at 38. But MPD arriving minutes after a call to MPD, and then exercising its own judgment on the scene, is not an astonishing coincidence. It is the ordinary and intended operation of the system Plaintiff describes. His theory requires not one inference but three: that Beck not only called, but instructed; not only instructed, but instructed the officers to detain; and not only requested a detention, but did so knowing it would be unlawful. The Complaint pleads no fact—no overheard words, no report, no radio traffic, no statement by any officer attributing an instruction to Beck—supporting any link in that chain. Nor is there any basis to believe the MPD officers would be beholden to any purported "instruction" from a National Guard member who had no more authority over them than an average civilian calling for police assistance. Rule 8 does not permit liability to rest on speculation, even speculation consistent with the pleaded facts.

Plaintiff pleads that, in calling MPD, Sergeant Beck was "[a]dhering to Gov. DeWine's directive that MPD, and not Guard members, make arrests." Compl. (ECF No. 1) ¶ 44. That allegation is contrary to the inference Plaintiff now urges. By his own pleading, the call appears to

have been an act of compliance with the mission's reporting protocol, not a deviation from it. A plaintiff cannot allege that the defendant followed a lawful protocol and simultaneously ask the Court to infer, from the very same act, an unlawful secret instruction. Where the complaint itself supplies the lawful explanation, the unlawful one is not plausible. *Iqbal*, 556 U.S. at 682.

Plaintiff's reliance on *Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984), underscores the defect. There, Library officials "in writing, requested the FBI to conduct a five-part investigation into Clark's political beliefs and activities" and "develop any other information that might 'reflect adversely on his suitability for continued Federal employment.'" *Id*. at 91. The Court therefore concluded that the Library and the Librarian, in his official capacity as the head of a federal government agency, "induced" a full-field FBI investigation into an employee's political associations, with the "expectation" that the FBI would conduct precisely the intrusive inquiry it conducted; the defendant's own request defined and set in motion the challenged conduct. *Id*. at 91, 98–100. The inducement principle *Clark* drew from the Restatement requires exactly that: procuring the specific tortious conduct with knowledge of the circumstances that make it tortious. *See* Restatement (Second) of Torts § 877(a). The Complaint here alleges no comparable request. It does not allege that Sergeant Beck requested a detention, a handcuffing, the suppression of recording, or any investigation into protected activity. It alleges that he called MPD after Plaintiff continued following the patrol. Compl. (ECF No. 1) ¶¶ 41–45. A request for police to respond and assess a situation is categorically different from a request for a constitutional violation—and treating the two as equivalent would make a person who calls police a constitutional tortfeasor whenever responding officers later make an allegedly unconstitutional stop or arrest, a rule the courts have rejected. *Carey v. Cont'l Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir. 1987); *Daniel v. Ferguson*, 839 F.2d 1124, 1130 (5th Cir. 1988) ("[A] private party does not act under color of

- 17 -

state law when she merely elicits but does not join in an exercise of official state authority," and "[p]olice reliance in making an arrest on information given by a private party does not make the private party a state actor.").

Plaintiff's fallback—that because Officer Campbell used the conditional words "if you are harassing" and "if you are assaulting" upon arrival, Sergeant Beck "must have provided" those accusations, Opp. at 23—is inference stacked on inference: from words spoken by other officers, to what a dispatcher may have relayed, to what Beck must have said, to what Beck must have intended. The Complaint itself alleges that the officers arrived on scene, approached Plaintiff, spoke with him, observed where he stood, and interacted with him before and during the detention. Compl. (ECF No. 1) ¶¶ 47–56. Officers forming impressions from dispatch information, the scene, and their own observations is far more consistent with the incorporated protocol than an unpleaded unlawful instruction. *Iqbal*, 556 U.S. at 678–82. And even if Sergeant Beck had reported that he felt harassed—the Complaint nowhere alleges that he did—reporting one's perception of an offense to the police is not the procurement of an unlawful seizure absent allegations of knowing falsity, direction, agreement, or control. *Daniel*, 839 F.2d at 1130; *Carey*, 823 F.2d at 1404. The Complaint contains none.

The Complaint instead alleges that four MPD officers engaged Plaintiff directly, made the detention decision, handcuffed him, invoked their own supervisor procedures, and released him on their own timetable. Compl. (ECF No. 1) ¶¶ 47–64. An "intervening exercise of independent judgment" breaks the causal chain in the absence of well-pleaded allegations "that the [defendant] misled or pressured the official who could be expected to exercise independent judgment." *Zahrey v. Coffey*, 221 F.3d 342, 351–52 (2d Cir. 2000). Neither deception nor pressure is alleged here.

*Malley v. Briggs*, 475 U.S. 335 (1986), does not close the gap. Opp. at 24. In *Malley*, the defendant officer was himself the affiant: he prepared and presented the warrant applications and supporting affidavits. 475 U.S. at 337–39. The Court held that he could not avoid liability merely by relying on the magistrate's approval of his own objectively deficient submission. *Id.* at 344–46 & n.7. *Malley* bears little resemblance to this case, as Sergeant Beck was not a civilian law enforcement officer, possessed no arrest authority, did not purport to exercise police authority, and was not applying for a warrant. Here, by contrast, the Complaint pleads no presentation at all—no affidavit, no report, no statement whose content is even alleged—and the responding officers are alleged to have engaged Plaintiff directly before detaining him. Plaintiff's remaining authorities are of a similar nature. *Ord v. District of Columbia*, 587 F.3d 1136, 1144 (D.C. Cir. 2009), involved an officer who "caused a warrant to issue" on the basis of an allegedly false affidavit. *Amobi v. D.C. Dep't of Corrections*, 755 F.3d 980, 991–92 (D.C. Cir. 2014), recognized liability where the defendant's own actions caused the seizure. And *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 255–56, 265–66 (D.D.C. 2018), involved an officer who drafted the complaint, supplied the arrest warrant affidavit, and testified at the preliminary hearing, as well as an allegedly false accusation that was never retracted. Each case involves a pleaded or proven act of fabrication, false reporting, or direction. Again, the Complaint alleges none.

### C.    The Failure-to-Intervene Allegation Does Not State a Claim.

Plaintiff's allegation that Sergeant Beck "did not take any action to encourage MPD to end the seizure," Compl. (ECF No. 1) ¶ 61, does not rescue the claims. Counts I through III are pleaded as inducement claims, not bystander claims. Even construed otherwise, the theory fails on its own terms: failure-to-intervene liability presupposes knowledge of a constitutional violation, a realistic opportunity to prevent the harm, and the legal capacity to do so. *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 72 (D.D.C. 2005). The doctrine is largely an officer-on-officer

- 19 -

doctrine addressed to police who stand by while fellow officers violate rights they share responsibility for protecting. Sergeant Beck is not alleged to have held any authority whatsoever over MPD officers or their detention decisions. Compl. (ECF No. 1) ¶¶ 45–62. And Plaintiff identifies no case—let alone clearly established law—imposing on a National Guard member a duty to countermand a civilian police department's on-scene detention decision. Section 1983 does not impose personal liability based on generalized inaction. *See Int'l Action Ctr. v. United States*, 365 F.3d 20, 27–28 (D.C. Cir. 2004) (active participation, actual facilitation, knowing acquiescence, or a sufficiently specific preexisting duty is required). That independent defect dooms the theory under Part III, *infra*, as well.

## III. Qualified Immunity Bars Each Claim Against Sergeant Beck Because He Did Not Violate Clearly Established Law.

### A. No Clearly Established Law Made Sergeant Beck's Warning or Call Unconstitutional.

Qualified immunity shields officials unless existing precedent placed the unconstitutionality of the official's own conduct "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has "repeatedly stressed" that the inquiry requires "a high 'degree of specificity'" and that clearly established law may not be defined "at a high level of generality." *Wesby*, 583 U.S. at 63–64; *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). "It is not enough that the rule is suggested by then-existing precedent"; the precedent must be clear enough that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63.

Plaintiff litigates at a high level of generality. He invokes the right to record, the right to protest, the right to be free from unreasonable seizure, and the right to be free from retaliation. Opp. at 28–38. Framed with the specificity *Wesby* demands, however, the question is whether, in September 2025, every reasonable National Guard member—serving on a federally coordinated

- 20 -

law-enforcement-support mission, prohibited from making arrests, and instructed to call civilian police when a police response appeared warranted—would have understood that calling MPD about a person who had persistently followed his armed patrol at close range, after a warning, violated the First or Fourth Amendment. Plaintiff cites no case establishing that proposition, and none exists. That ends the inquiry.

Plaintiff relies principally on cases defining what police officers may do when a person records, follows, criticizes, or distracts them. Opp. at 28–29, 34–35. But Sergeant Beck was not a police officer, did not purport to exercise police authority, and did not himself stop, search, or detain Plaintiff. Those cases do not establish that a non-police government employee violates the Constitution by contacting MPD when another person's conduct causes concern. A postal employee, for example, does not become constitutionally responsible for a later police detention merely because the employee calls MPD about a disruptive or unsettling customer. Nor does Plaintiff identify authority clearly establishing a different rule for a National Guard member who lacked arrest authority and was instructed to refer matters requiring a police response to MPD.

And if there were any doubt, *Wood v. Moss*, 572 U.S. 744 (2014), confirms the point. There, the Supreme Court granted qualified immunity to Secret Service agents accused of viewpoint discrimination because no precedent addressed their on-the-spot judgments in a comparable security context—even though viewpoint neutrality is among the most settled of First Amendment principles in the abstract. *Id.* at 757–60. So too here. The general rights to protest and record do not clearly establish that a Guard member on an armed patrol violates the Constitution by asking the civilian police to assess a person persistently following that patrol. *See id.*; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (the contours of the right must be sufficiently clear that a reasonable official in the defendant's situation would understand that what he is doing violates it).

- 21 -

Nor can Plaintiff escape through the "obvious case" exception. Opp. at 32. Such cases are extremely "rare," and reserved for conduct whose unlawfulness is sufficiently clear even without precedent addressing similar circumstances. *Wesby*, 583 U.S. at 64. The admonition in *City of Houston v. Hill* that individuals may "verbally . . . oppose or challenge police action without thereby risking arrest," 482 U.S. 451, 462–63 (1987), condemned a municipal ordinance that criminalized speech interrupting officers—enforced there, as in *Edwards v. South Carolina*, 372 U.S. 229 (1963), and *Lewis v. City of New Orleans*, 415 U.S. 130 (1974), by arrest and prosecution. Sergeant Beck arrested no one, prosecuted no one, invoked no statute against speech, and criminalized nothing. Whatever the outer bounds of the obvious case, an official who responds to a person's persistent close following of an armed patrol by issuing a warning and then calling the civilian police is not within them.

Plaintiff argues that the clearly established inquiry asks "'what happened,' not 'whom can you sue.'" Opp. at 27 (quoting *O'Connor v. Eubanks*, 83 F.4th 1018, 1025 (6th Cir. 2023) (Thapar, J., concurring)). The problem for Plaintiff *is* what happened. Sergeant Beck did not arrest, search, handcuff, block, disperse, or silence anyone. He issued a warning and placed a call in the same manner any person could and in the way directed by his mission parameters. Plaintiff's authorities involve arrests for recording, *Glik v. Cunniffe*, 655 F.3d 78, 82–85 (1st Cir. 2011); physically preventing a bystander from repositioning to record, *Fields v. City of Philadelphia*, 862 F.3d 353, 358–60 (3d Cir. 2017); restrictions on filming imposed by the regulating officials, *Price v. Garland*, 45 F.4th 1059, 1070–73 (D.C. Cir. 2022); and dispersal of or force against demonstrators, *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 38–46 (D.D.C. 2021); *Green v. City of St. Louis*, 52 F.4th 734, 739 (8th Cir. 2022). The specificity requirement is not about job titles; it is about the circumstances confronting the official. *Wesby*, 583 U.S. at 63–64. No Supreme Court or

- 22 -

D.C. Circuit decision—and no consensus of circuit authority—establishes that a warning plus a call to the police clearly violates the Constitution.

*In re W.H.L.*, 743 A.2d 1226 (D.C. 2000), fails Plaintiff for similar reasons. In the first instance, a decision of the D.C. Court of Appeals does not constitute clearly established law. *See Youngbey v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012) (clearly established law requires "controlling precedent of the Supreme Court or [the D.C.] circuit" or "a consensus of persuasive authority from [other] circuits"). Even assuming it did, *see* Opp. at 20–21 (citing *Lederman v. United States*, 291 F.3d 36, 48 (D.C. Cir. 2002)), *W.H.L.* concerned whether a juvenile's conduct in riding a bicycle behind officers while swearing at them could sustain a disorderly-conduct charge. Opp. at 31, 34. A decision about what conduct may be *punished* announces no rule about what observations may be *reported*. *W.H.L.* does not hold, much less clearly establish, that an official violates the Constitution by asking the police to assess a person persistently surveilling an armed patrol.

Plaintiff's threat-as-adverse-action theory fails for the same reason. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66–68 (1963), and *NRA v. Vullo*, 602 U.S. 175, 189–94 (2024), condemn official threats of government sanction wielded to coerce the suppression of protected speech— regulatory coercion by officials with power over the speaker or intermediaries. Telling a person who is closely following and recording an armed patrol that police "can come handle you if that's what you want to do," Compl. (ECF No. 1) ¶ 41, is not a sanction-backed regulatory threat; it is an accurate, conditional description of the mission protocol, addressed to conduct, not viewpoint. Certainly, simply calling the police does not constitute a government sanction. Plaintiff's remaining authorities on this score—*Hartley v. Wilfert*, 918 F. Supp. 2d 45 (D.D.C. 2013), and *Goodwin v. District of Columbia*, 579 F. Supp. 3d 159 (D.D.C. 2022)—are district-court decisions,

- 23 -

which "do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). Neither decision places the asserted rule beyond debate.

**B.      No Clearly Established Law Required Sergeant Beck to Abstain From Contacting MPD.**

Plaintiff's reliance on *Nieves*, *Reichle*, and *Gonzalez* does not cure the antecedent defect in his theory. Those cases address whether probable cause defeats a retaliatory-arrest claim and what evidence may satisfy the narrow exception to that rule; none holds that a non-arresting official becomes liable for an arrest merely by contacting police. *See Nieves v. Bartlett*, 587 U.S. 391, 398–402 (2019); *Reichle v. Howards*, 566 U.S. 658, 668–69 (2012); *Gonzalez v. Trevino*, 602 U.S. 653, 655, 658–59 (2024). To the contrary, when the allegedly retaliatory official and the official who takes the adverse action are different people, the plaintiff must bridge the causal gap between the first official's conduct and the second official's decision. *Hartman v. Moore*, 547 U.S. 250, 262–63 (2006). The Complaint alleges no facts doing so. It does not allege what Sergeant Beck told MPD, that any statement was knowingly false, that he asked MPD to detain Plaintiff, or that he pressured, directed, or controlled the officers who made the on-scene decision. At most, Plaintiff alleges that Sergeant Beck called MPD after Plaintiff continued following the patrol. That is not enough to make Sergeant Beck personally liable for MPD's later detention.

Finally, and most fundamentally, calling the police is not itself a seizure and requires no quantum of suspicion at all. The Fourth Amendment regulates seizures, *Torres*, 592 U.S. at 317; it does not impose a reasonable-suspicion prerequisite on requests for police assistance. Plaintiff cites no case holding otherwise—let alone one clearly establishing it as of September 2025.

*    *    *

- 24 -

## CONCLUSION

For these reasons, the Court should dismiss the claims against Defendant Beck.

Dated: July 18, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: _____/s/ Brian C. Tracy_____
      BRIAN C. TRACY, NE Bar #25379
      Special Assistant United States Attorney
      601 D Street, NW
      Washington, DC 20530
      (202) 252-7113
      brian.tracy@usdoj.gov

*Attorneys for the United States of America*